No. 24-2011

# United States Court of Appeals for the Sixth Circuit

_____

Kenneth Lowe,

*Plaintiff-Appellant,*

v.

Walbro, LLC,

*Defendant-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 1:18-cv-12835
(The Honorable Thomas L. Ludington)

_____

**PLAINTIFF-APPELLANT KENNETH LOWE'S
BRIEF ON APPEAL**

_____

Jonathan R. Marko (P72450)
Christopher Putrycus (P84991)
**MARKO LAW, PLLC**
220 W. Congress, Fourth Floor
Detroit, MI 48226
P:(313)777-7529 / F:(313)771-5785
jon@markolaw.com
Attorney for Plaintiff-Appellant

Thomas R. Warnicke (P47148)
**LAW OFFICES OF THOMAS R. WARNICKE, PLLC**
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
P:(248)410-3031 / F:(248)232-7832
tom@warnickelaw.com
Attorney for Plaintiff-Appellant

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-2011                    Case Name: Lowe v Walbro, LLC

Name of counsel: Jonathan R. Marko

Pursuant to 6th Cir. R. 26.1, Kenneth James Lowe
                                         *Name of Party*
makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No.

CERTIFICATE OF SERVICE

I certify that on _____ March 10, 2025 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Jonathan R. Marko
220 W. Congress, Fourth Floor
Detroit, MI 48226

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**6th Cir. R. 26.1**
**DISCLOSURE OF CORPORATE AFFILIATIONS**
**AND FINANCIAL INTEREST**

(a)  **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b)  **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c)  **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................. iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .................................... 1

JURISDICTIONAL STATEMENT ...................................................... 1

STATEMENT OF ISSUES FOR REVIEW .............................................. 2

STATEMENT OF THE CASE ............................................................. 3

STATEMENT OF FACTS .................................................................. 6

    I.    Ken Lowe Had a 41 Year Exemplary Career at Walbro................. 6

    II.    Davidson Immediately Undermines Plaintiff's 38-Year Record Performance to Push Him Out Due to Age ......................... 7

    III.    Walbro Terminated Plaintiff and Engaged in Pretextual Conduct to Justify Its Decision ........................................ 8

    IV.    Lowe Suffered Severe Emotional and Professional Harm............... 10

PROCEDURAL HISTORY.................................................................. 10

SUMMARY OF ARGUMENT .............................................................. 13

STANDARD OF REVIEW .................................................................. 15

ARGUMENT ................................................................................ 16

    I.    The District Court Reversibly Erred by Vacating the Jury's Verdict in Contravention of this Court's Binding Precedent and its Own Prior Finding of Sufficient Direct Evidence of Age Discrimination at Trial ......................................... 16

        A.    Plaintiff's Testimony on Davidson's Ageist Comments Constitutes Direct Evidence Supporting the Jury's Verdict ....... 19

i

B.    The Jury Reasonably Found That Defendant Failed to Prove It Would Have Terminated Plaintiff Absent Age-Based Animus ........................................................ 32

II.    The District Court Erred in Vacating the Jury's Verdict as Substantial Circumstantial Evidence Supported A Reasonable Finding that Defendant's "Position Elimination" Was Pretext for Discrimination ........................................................ 35

III.    The District Court Reversibly Erred in Conditionally Granting a New Trial, Contradicting the Evidence and the High Legal Standard for Disturbing a Jury's Damages Award ................................................................ 50

CONCLUSION AND RELIEF REQUESTED .................................................... 61

CERTIFICATE OF COMPLIANCE .................................................... 62

CERTIFICATE OF SERVICE ............................................................ 63

ADDENDA ...................................................................... 64

# INDEX OF AUTHORITIES

## Cases

*Allard v. State Farm Ins. Co.*,
271 Mich. App. 394 (2006) ............................................................. 17, 18

*Allen v. DaimlerChrysler Corp.*,
No. 265427, 2006 Mich. App. LEXIS 678
(Ct. App. Mar. 14, 2006) ................................................................. 31, 41

*Allsopp v. Foust*,
No. 23-5203, 2024 U.S. App. LEXIS 13189
(6th Cir. May 31, 2024) ................................................................... 50, 51

*Aspen Tech., Inc. v. M3 Tech., Inc.*,
569 F. App'x 259 (5th Cir. 2014) .......................................................... 40

*Barnes v. Gencorp, Inc.*,
896 F.2d 1457 (6th Cir. 1990) ............................................................... 43

*Barrett v. Kirtland Cmty. College*,
245 Mich. App. 306 (2001) .................................................................... 37

*Bartlett v. Gates*,
421 F. App'x 485 (6th Cir. 2010) .......................................................... 45

*Belin v. Jax Kar Wash No. 5*,
95 Mich. App. 415 (1980) ..................................................................... 52

*Betts v. Costco Wholesale Corp.*,
558 F.3d 461 (6th Cir. 2009) ............................................................ 15, 16

*Bradley v. Progressive Marathon Ins. Co.*,
345 Mich. App. 126 (2022) .................................................................... 16

*Brunson v. E & L Transp. Co.*,
177 Mich. App. 95 (1989) ..................................................................... 55

*Cacevic v. Simplimatic Eng'g Co.*,
248 Mich. App. 670 (2001) ................................................................ 17

*Campbell v. Dep't of Human Servs.*,
286 Mich. App. 230 (2009) ........................................................... 17, 55

*Champion v. Outlook Nashville, Inc.*,
380 F.3d 893 (6th Cir. 2004) ............................................................. 53

*Chavez v. Dakkota Integrated Sys., LLC*,
832 F. Supp. 2d 786 (W.D. Ky. 2011) ...................................... 31, 42, 43

*Chen v. Dow Chem. Co.*,
580 F.3d 394 (6th Cir. 2009) ............................................................. 44

*Cicero v. Borg-Warner Auto., Inc.*,
280 F.3d 579 (6th Cir. 2002) ......................................................... 45, 46

*Dawe v. Dr. Reuven Bar-Levav & Assocs., P.C.*,
289 Mich. App. 380 (2010) ............................................................... 53

*DeBrow v. Century 21 Great Lakes, Inc.*,
463 Mich. 534 (2001) ....................................................................... 20

*Defever v. Spring Meadows Country Club, Inc.*,
No. 192100, 1997 Mich. App. LEXIS 1366
(Ct. App. May 30, 1997) .................................................................... 48

*Diamond v. Witherspoon*,
265 Mich. App. 673 (2005) ............................................................... 59

*Dodson v. Imperial Motors, Inc.*,
295 F.2d 609 (6th Cir. 1961) ............................................................. 25

*Downey v. Charlevoix Cnty. Bd. of Rd. Comm'rs*,
227 Mich. App. 621 (1998) ............................................................... 26

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
971 F.3d 662 (7th Cir. 2020) ............................................................. 39

*Ercegovich v. Goodyear Tire & Rubber Co.*,
154 F.3d 344 (6th Cir. 1998) ............................................................ 28, 29

*Ewers v. Stroh Brewery Co.*,
178 Mich. App. 371 (1989) ............................................................... 37, 43

*Fielden v. CSX Transp., Inc.*,
No. 2:03-cv-995, 2009 U.S. Dist. LEXIS 82140
(S.D. Ohio Aug. 26, 2009) ...................................................................... 53

*Fischer v. UPS*,
390 Fed. Appx. 465 (6th Cir. 2010) ....................................................... 57

*Freed v. Salas*,
286 Mich. App. 300 (2009) ............................................................... 59, 60

*Gaglioti v. Levin Group, Inc.*,
508 F. App'x 476 (6th Cir. 2012) ........................................................... 48

*Gilbert v. DaimlerChrysler Corp.*,
470 Mich. 749 (2004) ....................................................................... 52, 54

*Goodman v. Genesee County*,
No. 266955, 2006 Mich. App. LEXIS 2490
(Ct. App. Aug. 8, 2006) .......................................................................... 34

*Griffey v. Dep't of Corr.*,
No. 354322, 2022 Mich. App. LEXIS 4265
(Ct. App. July 21, 2022) .................................................................... 55, 57

*Hecht v. Nat'l Heritage Acads., Inc.*,
499 Mich. 586 (2016) ............................................................................ 37

*Hord v. Envtl. Research Inst.*,
463 Mich. 399 (2000) ............................................................................ 17

*Jackson v. Genesee Cty. Rd. Comm'n*,
999 F.3d 333 (6th Cir. 2021) ................................................................. 45

*Kirk v. Ford Motor Co.*,
147 Mich. App. 337 (1985) ................................................................. 53

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) ................................................................ 40

*Landin v. Healthsource Saginaw, Inc.*,
305 Mich. App. 519 (2014) ................................................................. 55

*Lopez v. Am. Family Ins. Co.*,
618 Fed. Appx. 794 (6th Cir. 2015) ..................................................... 34

*Lowe v. Walbro LLC*,
972 F.3d 827 (6th Cir. 2020) ....................................................... passim

*Major v. Vill. of Newberry*,
316 Mich. App. 527 (2016) ................................................................. 44

*Matras v. Amoco Oil Co.*,
424 Mich. 675 (1986) ..................................................................... 37, 43

*May v. William Beaumont Hosp.*,
180 Mich. App. 728 (1989) ................................................................. 56

*McAllister v. Twp. of Bridgeport*,
No. 326801, 2016 Mich. App. LEXIS 1326
(Ct. App. July 12, 2016) ..................................................................... 45

*Miller v. Alldata Corp.*,
14 Fed. Appx. 457 (6th Cir. 2001) ................................................. 16, 52

*Morgan v. New York Life Ins. Co.*,
559 F.3d 425 (6th Cir. 2009) .............................................................. 37

*Palenkas v. Beaumont Hosp.*,
432 Mich. 527 (1989) .............................................................. 52, 55, 59

*Paulitch v. Detroit Edison Co.*,
208 Mich. App. 656 (1995) ................................................................. 56

vi

*People v. Lemmon*,
456 Mich. 625 (1998) ....................................................................... 24, 25

*Perry v. Covenant Med. Ctr., Inc.*,
No. 15-cv-11040, 2016 U.S. Dist. LEXIS 28451
(E.D. Mich. Mar. 7, 2016) ..................................................................... 47

*Pohrybienyk v. Kirchner*,
410 F.2d 1114 (6th Cir. 1969) ............................................................. 53

*Precopio v. Detroit, Dep't of Transp.*,
415 Mich. 457 (1982) .............................................................................. 52

*Randall v. Ameritech Servs.*,
No. 198013, 1999 Mich. App. LEXIS 1319
(Ct. App. Mar. 23, 1999) ......................................................................... 40

*Schram v. Schwan's Sales Enters.*,
124 Fed. Appx. 380 (6th Cir. 2005) ....................................................... 43

*Scott v. Goodyear Tire & Rubber Co.*,
160 F.3d 1121 (6th Cir. 1998) ................................................... 31, 42, 43

*SEC v. Conaway*, 698 F. Supp. 2d 771
(E.D. Mich. 2010) ................................................................................... 50

*Singfield v. Akron Metro. Hous. Auth.*,
389 F.3d 555 (6th Cir. 2004) ................................................................. 45

*Skelton v. Sara Lee Corp.*,
249 Fed. Appx. 450 (6th Cir. 2007) ................................................ 27, 43

*Slagle v. Hella Elecs. Corp.*,
No. 360198, 2023 Mich. App. LEXIS 2599
(Ct. App. Apr. 13, 2023) .......................................................................... 48

*Smith v. HHS*,
No. 356328, 2022 Mich. App. LEXIS 1651
(Ct. App. Mar. 24, 2022) ......................................................................... 42

vii

*Sniecinski v. Blue Cross & Blue Shield*,
469 Mich. 124 (2003) ........................................................................ 27

*Sobotka v. Olympia Ent., Inc.*,
No. 366281, 2025 Mich. App. LEXIS 1230
(Ct. App. Feb. 14, 2025) ................................................................ 29, 30

*Spica v. Schrotenboer*,
No. 317510, 2015 Mich. App. LEXIS 496
(Ct. App. Mar. 12, 2015) .................................................................... 56

*Stevens v. Edward C. Levy Co.*,
376 Mich. 1 (1965) ....................................................................... 52, 53

*Town v. Mich. Bell Tel. Co.*,
455 Mich. 688 (1997) ........................................................................ 44

*Tumbarella v. Kroger Co.*,
85 Mich. App. 482 (1978) ................................................................... 17

*Unibar Maint. Servs. v. Saigh*,
283 Mich. App. 609 (2009) ................................................................. 57

*United States v. Hughes*,
505 F.3d 578 (6th Cir. 2007) .............................................................. 51

*United States v. Soto*,
794 F.3d 635 (6th Cir. 2015) .............................................................. 16

*Williams v. State HHS*,
No. 355203, 2021 Mich. App. LEXIS 6158
(Ct. App. Oct. 28, 2021) ..............................................28, 29, 37, 42, 44

**Statutes**

28 U.S.C. § 1291 ................................................................................. 1

42 U.S.C. § 1332 ................................................................................. 1

Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, et seq ............... 10

Mich. Comp. Laws § 37.2202(1)(a) ....................................................................... 18

**Rules**

6 Cir. R. 30(b) ..................................................................................................... 64

6 Cir. R. 30(g)(1) ................................................................................................ 64

Fed. R. App. P. 3 ................................................................................................. 1

Fed. R. App. P. 32(a)(5) ...................................................................................... 62

Fed. R. App. P. 32(a)(6) ...................................................................................... 62

Fed. R. App. P. 32(a)(7)(B) ................................................................................. 62

Fed. R. App. P. 32(a)(7)(B)(iii) ........................................................................... 62

Fed. R. Civ. P. 50(a) ........................................................................................... 11

Fed. R. Civ. P. 50(b) ........................................................................................... 12

Fed. R. Civ. P. 59 ........................................................................................... 12, 50

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Plaintiff-Appellant Kenneth Lowe contends that oral argument is appropriate in this case to enable each party to address any outstanding factual, legal, or procedural issues for this Honorable Court.

**JURISDICTIONAL STATEMENT**

The trial court had diversity jurisdiction over this lawsuit. 42 U.S.C. § 1332. On October 22, 2024, the trial court issued an opinion and final order: (1) granting Defendant's motion for judgment as a matter of law or for new trial, (2) vacating the October 2023 judgment, (3) entering judgment for Defendant, (4) conditionally granting a new trial, (5) denying as moot Defendant's motion to amend judgment and Plaintiff's motion for attorney fees, and (6) denying as moot Defendant's motion for stay of execution of judgment. (RE143, PgID 4107-4123). On November 18, 2024, Plaintiff filed a timely Notice of Appeal, vesting this Court with jurisdiction over the present appeal. (RE145, PgID 4125-4126); 28 U.S.C. § 1291; Fed. R. App. P. 3.

## STATEMENT OF ISSUES FOR REVIEW

I.    Did the district court commit reversible error by vacating the jury's verdict, contradicting its own trial ruling and this Court's binding precedent, which held that Plaintiff's supervisor's multiple ageist statements constituted direct evidence sufficient to create a jury-triable issue on Plaintiff's age discrimination claim?

       Plaintiff-Appellant says:     "Yes."

       Defendant-Appellee says:   "No."

II.    Did the district court misapply the legal standard and disregard substantial circumstantial evidence of age discrimination—including adverse inference instructions, shifting termination justifications, and fabricated post-hoc documentation—when finding Plaintiff failed to establish a jury-triable issue?

       Plaintiff-Appellant says:     "Yes."

       Defendant-Appellee says:   "No."

III.    Did the district court err in conditionally granting a new trial on damages, despite this Court's precedent that pain and suffering awards in discrimination cases are jury questions, and where Plaintiff presented extensive evidence, including expert testimony, of severe and permanent emotional harm from his termination?

       Plaintiff-Appellant says:     "Yes."

       Defendant-Appellee says:   "No."

## STATEMENT OF THE CASE

> I believe we're at a point where I'm satisfied that there is a jury question here. . . .
>
> We have the statement that was made at the 40-year ceremony. We have the reference to having the old guy handle certain things within the plant, and in my view, the age was mentioned twice, perhaps if only because it was included in some of the severance documents but during that meeting by the HR representative.
>
> So there is - - the Court of Appeals agrees that there was a jury issue, and I'm satisfied that the testimony that we've received corroborates that as well.

(RE119, PageID 3130–3131).

What changed?

These are not the words of Plaintiff, his counsel, or expert witnesses. Rather, these are the district court's own findings at trial when denying Defendant's motion for a directed verdict. With the benefit of live testimony, the court explicitly found sufficient direct evidence of age discrimination—including multiple ageist statements by Plaintiff's supervisor and final decision-maker, Tom Davidson—to present the issue to the jury.

Yet, nearly a year later, without any additional evidence or change in law, the same court inexplicably reversed course, vacating the jury's unanimous verdict in Plaintiff's favor and declaring that there was no longer sufficient evidence for a jury to reasonably consider his age discrimination claim. This about-face, devoid of a

meaningful explanation, constitutes a manifest error of law and an impermissible usurpation of the jury's role as the trier of fact.

The district court's ruling also defies this Court's binding, published opinion in *Lowe v. Walbro LLC*, 972 F.3d 827 (6th Cir. 2020). There, this Court held that Davidson's statement at the termination meeting—"you're getting up there in years, you're at retirement age"—constituted sufficient direct evidence of discrimination alone to create a jury question. The Court further ruled that Davidson's repeated ageist remarks, including calling Plaintiff "old man," "old guy," "old dog," and stating that he was "losing a step" and should retire, provided even stronger evidence of discrimination. These statements were not "stray remarks" but a clear pattern of age-based animus that a reasonable jury could find was a substantial factor in Plaintiff's termination.

In reaching its flawed decision, the district court relied on the demonstrably false premise that the termination meeting statement was not introduced at trial. But the record proves otherwise. Defendant's own expert, forensic psychiatrist Dr. Elissa Benedek, explicitly testified about this statement and that it was made by Plaintiff. Plaintiff himself confirmed it on redirect examination. The district court's failure to acknowledge this evidence demonstrates a fundamental misapprehension of the trial record.

4

The court also erred in disregarding substantial circumstantial evidence, including the adverse inference instruction regarding Defendant's failure to produce a key document—Davidson's 2017 stack ranking—which Defendant claimed justified Plaintiff's termination. The jury was entitled to infer that this missing document contained adverse information for Defendant, further supporting the conclusion that age discrimination was a motivating factor. The court also ignored several other offers of circumstantial evidence, including Davidson's statements, that Defendant's pretextual justifications shifted over time, and that the only documented performance concerns against Plaintiff were fabricated just months before his termination.

But the district court's errors did not stop there. As a final attempt to prevent reinstatement of the jury's verdict, it conditionally granted a new trial with only a cursory and legally deficient justification. The court failed to meet the substantial burden required to disturb a jury's award, particularly regarding non-economic damages, which are entitled to significant deference.

This Court has already ruled once that Plaintiff presented sufficient direct evidence of age discrimination to survive summary judgment. The jury, having weighed that evidence, reached a unanimous verdict in Plaintiff's favor. The district court's belated reversal of that verdict, without any legitimate justification, was a grave error that undermines the integrity of the judicial process.

Plaintiff respectfully requests that this Court reverse the district court's order vacating the jury's verdict and conditionally granting a new trial, and instead reinstate the jury's well-supported verdict.

## STATEMENT OF FACTS

### I.    Ken Lowe Had a 41 Year Exemplary Career at Walbro

Kenneth Lowe began working for Walbro in 1976, fresh out of high school, and dedicated over 41 years to the company until his termination on June 28, 2018. (RE117, PageID 2814-2818). Throughout his career, he consistently received promotions, raises, and commendations for his skills and work ethic. (RE116, PageID 2601-03, 2642-2643; RE117, PageID 2816-2826). His 2013 performance review and 2014 promotion to Area Manager praised him as the company's "go-to employee," a leader who embraced change, managed the plant and maintenance "fantastically," and went "above and beyond" to ensure success. (RE116, PageID 2597-2603).

Lowe worked tirelessly, often logging 60 to 100 hours per week, and made it a priority to stay updated on the plant's machinery, including the blow-molding and robotics systems. (RE117, PageID 2819-2824). As Area Manager, he oversaw maintenance for the entire Cass City plant, managed blow-molding machines, assembly-line machines, robotics, and the janitorial staff, and continued performing his role without issue. (RE117, PageID 2821-2827).

## II.    Davidson Immediately Undermines Plaintiff's 38-Year Record Performance to Push Him Out Due to Age.

In 2016, Walbro hired 35-year-old Tom Davidson as General Manager of the Cass City plant. (RE117, PageID 2694, 2755). Within six months, Davidson removed Lowe's direct reports, Rick Osterbeck and Nate Windsor, two younger employees critical to Lowe's ability to keep up with robotics, significantly impacting his workload. (RE117, PageID 2833). Davidson then stripped Lowe of oversight of robotics and blow-molding, despite Lowe successfully managing these areas for nearly a decade with no complaints. (RE117, PageID 2710, 2716-2717, 2824). Davidson never offered training, a performance improvement plan, or any opportunity to improve. (RE117, PageID 1799, 2832). By early 2018, Lowe was left with minimal responsibilities, making his position appear expendable. (RE118, PageID 2980-2981).

As Davidson reduced Lowe's role, he repeatedly made ageist comments. At Lowe's 40-year anniversary celebration, Davidson remarked, "Old man, you've been here longer than I've been alive. Aren't you ready to retire?" (RE117, PageID 2829). He frequently called Lowe "old man," "old guy," and "old dog," telling others to "let the old guy handle it" and claiming Lowe was "losing a step." (RE118, PageID 2863-2866, 2973). These remarks were made often and in front of other employees. (RE118, PageID 2865-2866).

7

### III.  Walbro Terminated Plaintiff and Engaged in Pretextual Conduct to Justify Its Decision.

In early 2018, Walbro hired HR Manager Debra Rard to evaluate Lowe's position. After finding no documented performance issues, Rard reached out to former employees attempting to solicit complaints but found none. (RE117, PageID 2491-2496). Failing to justify Lowe's termination, she created an "Observed Behavior" document, which she later admitted was entirely unsubstantiated and drafted as a fallback excuse in case the "position elimination" rationale failed. (RE117, PageID 2509, 2519-2521).

On June 28, 2018, Lowe was summoned without warning to a meeting with Davidson and Rard. (RE117, PageID 2838-2841). He was given no indication that his job was in jeopardy. (RE116, PageID 2529-2530; RE117, PageID 2721). Davidson informed him that his position was eliminated. When Lowe pressed for an explanation, Rard twice referenced his age, prompting him to ask if that was the reason for his termination. (RE117, PageID 2838-2841). In response, Davidson stated, "Well, you're kind of getting up there in years. You're at retirement age, you go one way, and the company's going the other." (RE118, PageID 2871, 2991; RE119, PageID 3157-3160). When Lowe asked again if age was a factor, Rard remained silent, effectively confirming Davidson's statement. (RE117, PageID 2838-2839, 2841; RE118, PageID 2934; RE119, PageID 3158-3160).

8

Walbro's ever-changing justifications for Lowe's termination collapsed before the jury. Davidson initially claimed Lowe was let go solely due to position elimination, then immediately contradicted himself by stating performance and behavior also played a role. (RE117, PageID 2688-90). Walbro's interrogatory responses added yet another justification, asserting for the first time that Lowe was fired due to inappropriate behavior—a claim unsupported by any documentation. (RE131-2, PageID 3871). Meanwhile, Rard admitted her "Observed Behavior" document was merely a backup excuse created in case Walbro's position elimination defense failed. (RE116, PageID 2509, 2519-2521).

While insisting Lowe's job was eliminated for legitimate business reasons, Walbro was actively hiring, bringing in 15 salaried employees, 50-100 union workers, and 12 technicians around the time of his termination. (RE116, PageID 2538-39). Davidson also claimed Walbro was moving in a new direction, focusing on blow-molding, but this assertion crumbled under scrutiny. John Graves, Davidson's predecessor, testified that Walbro was in "growth mode," that Lowe was highly skilled with blow-molding equipment, and that during a plant walkthrough just two months before trial, the facility was virtually unchanged from when he left in 2014—aside from two machines. (RE116, PageID 2586-87, 2623).

These contradictions played out in real-time before the jury, as Walbro's leadership twisted itself into knots trying to justify a decision that had already been

made. Their inability to keep their story straight made one thing clear: Walbro's shifting rationales weren't legitimate business decisions—they were pretext, designed to obscure the real reason Lowe was let go.

## IV. Lowe Suffered Severe Emotional and Professional Harm

Meanwhile, Lowe, who had spent his entire career at Walbro, was devastated by his sudden termination. (RE118, PageID 2894-2897, 3033-3039). He suffered severe emotional distress, depression, and humiliation (RE119, PageID 3081-3086). Forensic psychiatrist Dr. Gerald Shiener diagnosed Lowe with Major Depression with PTSD features, directly caused by his termination. *Id.* Lowe's fiancée testified that he became withdrawn, angry, and distant, placing a strain on their relationship (RE118, PageID 2894-2897, 3033-3039). Despite applying for numerous jobs, Lowe was unable to secure comparable employment, as employers viewed his age and long tenure at Walbro as liabilities *Id.* at 2934.

## PROCEDURAL HISTORY

On September 10, 2018, Kenneth Lowe filed a lawsuit in the Eastern District of Michigan, alleging age discrimination under the Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq*. (RE1, PageID 1-24). Despite strong evidence, the district court granted summary judgment for Walbro finding no triable issue of fact regarding age discrimination (RE29, PageID 1004-1013). Lowe appealed, and the Sixth Circuit unanimously reversed, ruling that Davidson's ageist

remarks, particularly at Lowe's termination meeting, constituted direct evidence of discrimination and warranted a jury trial. *Lowe*, 972 F.3d at 831. The court cited Davidson's statements about Lowe's age and other derogatory comments. *Id*. at 830-831).

Following remand, Lowe moved to compel the production of Davidson's 2017 stack ranking, which Walbro claimed justified his termination. (RE131-2, PageID 3871). Davidson had testified that the ranking placed Lowe in the bottom 10% and was the only evidence supporting Walbro's position elimination rationale. The district court granted the motion (RE93, PageID 1702-1707), but at trial, Walbro failed to produce the ordered document. Instead, Davidson claimed the version Walbro provided—showing Lowe was not in the bottom 10%—was not his, asserting that his original ranking had gone missing (RE117, PageID 2706-2712). The district court issued an adverse inference instruction, allowing the jury to infer the missing document was unfavorable to Walbro (RE113, PageID 2456-2459; RE120, PageID 3235).

Lowe's case proceeded to jury trial in October 2023. At the close of Plaintiff's case-in-chief, Walbro moved for judgment as a matter of law under Rule 50(a), arguing Lowe had failed to present sufficient evidence of age discrimination. The district court denied the motion, finding Lowe presented ample evidence, including Davidson's ageist remarks, and emphasized that the Sixth Circuit had already ruled

11

Davidson's statements alone created a triable issue (RE119, PageID 3130-3131). The jury returned a unanimous verdict in Lowe's favor, awarding him $2,304,890 in damages, including lost wages, benefits, and non-economic damages (RE111, PageID 2445-2449). The district court entered judgment on November 2, 2023 (RE114, PageID 2460-2461).

Walbro moved for judgment as a matter of law under Rule 50(b) or, alternatively, for a new trial under Rule 59 (RE125, PageID 3613-3641; RE126, PageID 3660-3694). These motions raised no new evidence or arguments already rejected by the Sixth Circuit or the jury. The parties also filed other motions, including Lowe's motion for attorney fees (RE122, PageID 3353-3392) and Walbro's motion to stay execution of judgment (RE138, PageID 4042-4051). The district court delayed ruling for nearly a year and, on October 22, 2024, reversed itself, vacating the jury's verdict and granting Walbro's motion for judgment as a matter of law (RE143, PageID 4107-4123).

In doing so, the district court contradicted its prior rulings and ignored binding Sixth Circuit precedent. Without new evidence, the court found Lowe failed to prove age discrimination, disregarding Davidson's testimony, the adverse inference instruction, and the jury's role in evaluating credibility and factual disputes. Lowe timely appealed, seeking reinstatement of the jury's verdict, arguing the district court

12

erred by disregarding the Sixth Circuit's ruling, misapplying the legal standard, and substituting its judgment for the jury's.

## SUMMARY OF ARGUMENT

The district court reversibly erred by vacating the jury's verdict and conditionally granting a new trial, disregarding both this Court's binding precedent and its own prior findings at trial that Plaintiff presented sufficient direct and circumstantial evidence to create a jury-triable issue of age discrimination. This Court previously held in *Lowe*, 972 F.3d at 837, that Plaintiff presented sufficient direct evidence of age discrimination to create a jury question based on Davidson's comments at the termination meeting, where he told Plaintiff he was "getting up there in years" and "at retirement age." (RE117, PageID 2838-2841; RE118, PageID 2934). At trial, Plaintiff introduced these comments through his own testimony and the testimony of Defendant's own expert, forensic psychiatrist Dr. Elissa Benedek, who confirmed that Plaintiff had reported these statements during his evaluation. (RE119, PageID 3157-3160). The district court's belated assertion that these comments were not introduced at trial is demonstrably false. In addition to these termination meeting comments, Davidson made more than half a dozen other ageist remarks over the years, repeatedly calling Plaintiff "old man," "old guy," and "old dog", stating that Plaintiff was "losing a step" and should retire, referring to him as "the old boy" and directing coworkers to "let the old guy handle it", and at Plaintiff's

40-year work anniversary ceremony, telling him, "Old man, you've been here longer than I've been alive. Are you ready to retire?" (RE117, PageID 2829; RE118, 2863-2866, 2973). The district court, at the close of Plaintiff's case in chief, found these multiple remarks sufficient to create a jury-triable issue of age discrimination (RE119, PageID 3130-3131), only to completely reverse course post-trial without any new evidence or change in law.

The district court also ignored substantial circumstantial evidence supporting the jury's verdict, including the adverse inference instruction regarding Davidson's missing 2017 stack-ranking document, which the court instructed the jury it could infer would have been adverse to Defendant. (RE113, PageID 2456-2459; RE120, PageID 3235). Additional circumstantial evidence included Defendant's shifting justifications for termination (RE117, PageID 2703-2712, 2716-2719), Davidson and HR representative Debra Rard's silence when Plaintiff directly asked at the termination meeting whether he was being fired because of his age (RE117, PageID 2838-2841; RE118, PageID 2934), and the fabrication of negative performance documentation just months before his termination despite a 41-year record with no prior issues. (RE116, PageID 2489-2491, 2510, 2519-2521). Michigan law has long held that shifting explanations for termination, sudden negative performance documentation, and missing key evidence can support an inference of pretext. The

14

district court improperly failed to consider these numerous offers of circumstantial evidence, any of which was sufficient to support the jury's verdict.

Its conditional grant of a new trial based on the jury's damages award was similarly erroneous, as courts have consistently held that emotional distress damages are inherently subjective and within the jury's discretion. Plaintiff's expert, Dr. Shiener, diagnosed him with Major Depression with PTSD features as a direct result of his abrupt termination (RE119, PageID 3081-3086), and both Plaintiff and his fiancée testified to his severe emotional decline, withdrawal, and financial strain. (RE118, PageID 2894-2897, 3033-3039). Defendant's own expert conceded that Plaintiff exhibited clear signs of emotional distress (RE119, PageID 3161-3162), yet the district court improperly disregarded this evidence, relying solely on the absence of formal psychological treatment, an invalid basis under Michigan law.

## STANDARD OF REVIEW

In diversity cases, the Sixth Circuit applies Michigan law and the relevant standard of review for motions challenging the sufficiency of evidence. *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 466 (6th Cir. 2009). Under Michigan law, judgment as a matter of law is termed a "directed verdict" or "judgment notwithstanding the verdict" ("JNOV"), which this Court reviews de novo, requiring courts to view evidence and inferences in the light most favorable to the nonmoving

party. *Id.* at 467. Relief is warranted only if reasonable minds could not differ on material facts. *Id.*

For a new trial motion, federal law governs whether the verdict was against the great weight of the evidence, while Michigan law applies to excessiveness determinations, both reviewed for abuse of discretion. *Miller v. Alldata Corp.*, 14 Fed. Appx. 457, 464, 466 (6th Cir. 2001). A district court abuses its discretion by relying on clearly erroneous factual findings, misapplying legal standards, or misinterpreting the law. *United States v. Soto*, 794 F.3d 635, 645 (6th Cir. 2015). Under Michigan law, an abuse of discretion occurs when a trial court makes a legal error or reaches an outcome outside the range of principled outcomes. *Bradley v. Progressive Marathon Ins. Co.*, 345 Mich. App. 126, 131-32 (2022).

**ARGUMENT**

## I.    THE DISTRICT COURT REVERSIBLY ERRED BY VACATING THE JURY'S VERDICT IN CONTRAVENTION OF THIS COURT'S BINDING PRECEDENT AND ITS OWN PRIOR FINDING OF SUFFICIENT DIRECT EVIDENCE OF AGE DISCRIMINATION AT TRIAL.

Despite, nearly a year after denying Defendant's motion for judgment as a matter of law at the close of Plaintiff's case in chief, this Court's published opinion explicitly finding that there was sufficient direct evidence of age discrimination to create a jury triable issue, and the jury's verdict upon weighing the evidence and assessing the witnesses' credibility, the district court issued its order granting

16

Defendant's renewed motion, completely deviating from these consistent findings of a sufficient question of fact, and vacating the jury's award.

Michigan Courts have consistently emphasized the substantial burden required to grant this rarely warranted JNOV, holding that the Court grants the nonmoving party:

> [E]very reasonable inference, and resolving any conflict in the evidence in that party's favor to decide whether a question of fact existed. A directed verdict is appropriately granted only when no factual questions exist on which reasonable jurors could differ. If reasonable jurors could reach conclusions different than this Court, then this Court's judgment should not be substituted for the judgment of the jury.

*Cacevic v. Simplimatic Eng'g Co*., 248 Mich. App. 670, 679-80 (2001) (internal citations omitted).

Indeed, the Michigan Supreme Court has recognized that "the threshold for obtaining a directed verdict is high." *Hord v. Envtl. Research Inst.*, 463 Mich. 399, 410 (2000). When "reasonable jurors could honestly have reached different conclusions," neither the trial court nor an appellate court may substitute its judgment for that of the jury. *Campbell v. Dep't of Human Servs*., 286 Mich. App. 230, 239 (2009).

Courts further stress the impropriety of JNOV where credibility and intent are at issue. *See Allard v. State Farm Ins. Co.*, 271 Mich. App. 394, 406-07 (2006); *Tumbarella v. Kroger Co.*, 85 Mich. App. 482, 492 (1978) (holding that "in cases involving questions of intent, credibility, or state of mind, [sufficiency of the

17

evidence as a matter of law] is hardly ever appropriate."). Michigan law also requires courts to uphold jury verdicts unless they are irreconcilably inconsistent. Even if arguably inconsistent, verdicts must stand if a logical interpretation of the evidence supports them. *Allard*, 271 Mich. App. at 407.

This Court, in a prior published opinion, found that Plaintiff produced sufficient direct evidence of age discrimination to create a question of fact regarding Plaintiff's ELCRA claim, reversing the district court's grant of summary judgment. *Lowe*, 972 F.3d at 837. ELCRA prohibits an employer from discharging or otherwise discriminating against an employee "because of…age." Mich. Comp. Laws § 37.2202(1)(a). Under ELCRA, discrimination can be established through direct or circumstantial evidence. *Lowe*, 972 F.3d at 832.

Direct evidence, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action. *Id.* In mixed-motive cases, a plaintiff must prove that discrimination was "more likely than not a substantial or motivating factor" in the decision. *Id.* (citation omitted). Once a plaintiff meets this burden, the defendant may only prevail by proving, by a preponderance of the evidence, that it would have made the same decision regardless of the protected status. *Id.*

18

A. **Plaintiff's Testimony on Davidson's Ageist Comments Constitutes Direct Evidence Supporting the Jury's Verdict.**

At trial, Plaintiff testified to numerous ageist remarks by Tom Davidson, the final decision-maker, explicitly referencing Lowe's age. These statements alone constituted sufficient direct evidence of age discrimination, allowing the jury to reasonably conclude that age was a motivating factor in his termination. Plaintiff recounted more than half a dozen such comments, any one of which was enough to create a jury question. For instance, at his 40-year employment recognition ceremony, immediately after receiving his award, Davidson told him, "**Old man, you been here longer than I have been alive. Are you ready to retire**?" (RE117, PageID 2829; RE118, PageID 2863–2865). On multiple other occasions, Davidson referred to Lowe as "**the old boy**" and "**the old guy**," and also remarked that he was "losing a step." (RE118, PageID 2865–2866, 2973). At Lowe's termination meeting, HR Representative Debra Rard specifically referenced his age twice, prompting Lowe to ask if his termination was age-related—an inquiry met with silence from both Rard and Davidson. (RE117, PageID 2838–2841).

As quoted in the introduction, the district court expressly recognized these statements as direct evidence of discrimination when denying Defendant's directed verdict motion at trial. (RE119, PageID 3130–3131).

As the district court acknowledged, this Court had already unanimously ruled that Davidson's statements constituted sufficient direct evidence of age

19

discrimination, reversing summary judgment. Rejecting the district court's initial finding that these remarks were "too attenuated" to prove direct discrimination, this Court reaffirmed the proper standard:

> [W]e must view the record "in the light most favorable to the nonmoving party," and we "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." We are therefore required to assume that Davidson did in fact make the alleged statement for the purposes of deciding this appeal. *Lowe*, 972 F.3d at 833 (internal citations omitted).

This Court found the Michigan Supreme Court's decision in *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534 (2001), "squarely on point," where a superior's remark—"You're getting too old for this"—was deemed direct evidence of discrimination, despite being subject to varying interpretation. The *DeBrow* Court held that this single remark ***alone***, viewed in the plaintiff's favor as a statement that he was "too old" for his position and was a factor in his removal, sufficed to establish a genuine issue of fact as direct evidence of age discrimination. *Lowe*, 972 F.3d at 833.

Critically, this Court concluded that Davidson's comments provided even stronger evidence of discrimination than in *DeBrow* and amounted to "the textbook definition of what the ELCRA prohibits: discharging an employee 'because of' the employee's age." *Id.* (citation omitted).

The district court's belated grant of Defendant's motion for judgment as a matter of law rested entirely on its assertion that the jury was never presented with

Davidson's age-related statements at the termination meeting—specifically, that Lowe was "kind of getting up there in years" and "at retirement age." (RE143, PageID 4112–4115). This was the same statement this Court previously deemed sufficient direct evidence to create a jury question. However, the district court's conclusion is demonstrably false. The jury *was*, in fact, presented with this evidence through the testimony of Defendant's own expert, forensic psychiatrist Dr. Elissa Benedek, as well as through Lowe's own trial testimony.

At trial, Benedek initially claimed that Lowe had not told her about any age-related remarks at his termination. However, when confronted with her own expert report, which directly attributed these statements to Lowe's account during his psychiatric evaluation, she conceded that she had documented Davidson's comments in her report. The following exchange unfolded before the jury:

Q.  And that he was told, you're getting up there in years, you're getting close to retirement age, the company's going and you are going in a different direction?

A.  He did not report that to me anything -- at the time of his termination that anyone said anything about him getting up in age or getting up in age. . . .

Q.  Well, I'm reading your report on page 4. Mr. Lowe asked Mr. Davidson why am I being terminated, and Mr. Davidson's response was, quote, **you're getting up there in years, you're getting close to retirement age**. We, the company, are going to go in a different direction. You wrote that in your report, didn't you, ma'am?

A.  Sure.

21

\* \* \*

Q.     . . .You specifically state, quote, **Ms. Rard, the HR lady, said we are not letting you go because of your age**, end quote. That's what you typed up, ma'am, and put in this report?

A.     That's correct. . . .

Q.     . . . [S]o when you testify to the jury that you -- that there was nothing said about age in this termination meeting, that is not true. That is not a truthful statement to this jury.

A.     If you pick a sentence out of context, you're free to do so.

\* \* \*

Q.     How is that out of context? You put it in quotes. You put it in quotes, didn't you, ma'am? And when you put something in a quote, that means that it directly was information that was provided to you by the patient.

A.     That's correct.

Q.     . . . And is that statement that I just read to the jury in quotes yes or no?

A.     As well as a lot of other statements, that's correct.

Q.     Okay. Is that a true -- is that accurate what you put or not?

A.     When -- after I see somebody, I try to issue a report and use language that they have used, and I do try to put that in quotes.

Q.     Okay. Thank you.

(RE 119, PageID 3157–3160) (emphasis added).

22

Benedek's report, which she was impeached with, solidifies that Davidson's ageist statement at Lowe's termination was indeed presented to the jury during trial:

15 days when the termination occurred. On the day of the termination, which he believes was a Thursday, he received a text from his Manager, Thomas Davidson, who asked him if he "would come to the office." He said that he had no idea why Mr. Davidson wanted him and he queried Mr. Davidson, "What's this all about?" Mr. Davidson reportedly said that he was to be 'eliminated from his job' and 'his job would be shared with 2 or 3 other people.' He asked Mr. Davidson, "Why am I being terminated?" And Mr. Davidson's response was, 'You are getting up there in years, you're getting close to retirement age, we, the Company, are going to go in a different direction.' He said he asked Mr. Davidson no further questions and there was no further information given to him by Mr. Davidson. He commented that after this brief conversation Mr. Davidson gave him a series of papers to sign. "It was like a script." With Mr. Davidson was the HR representative, Deb Rard. He said that two times during the interview with Mr. Davidson and Ms. Rard, "the HR lady said 'we are not letting you go because of your age'." Mr. Lowe indicated that he read the paperwork, but would not sign it. After their brief encounter he left the office. [Reporting on the day of his termination Mr. Lowe said, "I really don't want to talk about this, it bothers me to talk about it."]

He was asked again if he said anything during the course of the interview and he remembered, "I asked them just before I left, I asked them is it because of my age?" He stated that they gave him no response. He said his immediate thoughts were "I've been there 40 years, I've never gotten a

Benedek's own words confirm that Davidson's ageist remarks were presented to the jury as part of the trial record. Yet the district court ignored this evidence entirely when granting JNOV.

Moreover, despite the district court's reliance on Lowe's initial trial testimony, where he did not recall Davidson making age-related remarks after over five years taking place from when they were told to him, it failed to acknowledge that on redirect examination, Lowe explicitly reaffirmed that such comments were made during his termination meeting:

Q.    Okay. **Did you tell Mr. Cessante that there was age-related comments made at your termination before the break?**

A.    **Yes, sir**.

\* \* \*

Q.    . . . **[D]id you testify** previously before any break, where I wasn't there, **that there was age brought up in the termination meeting?**

A.    **Absolutely**.

(RE118, PageID 2871, 2991) (emphasis added).

Thus, the district court's sole justification for disregarding this Court's prior binding opinion and vacating the jury's verdict—that the "getting up there in years" comment was never "*presented to the jury during trial*"—is simply incorrect. (RE143, PageID 4114). Rather, the jury was explicitly presented with this statement as evidence, which formed part of the trial record and provided a reasonable basis for its verdict—just as this Court previously held at summary judgment.

Even if the district court credited Lowe's initial testimony over his later clarification or Benedek's documented report, this would merely create a credibility dispute—an issue reserved for the jury. By substituting its judgment for that of the jury and disregarding evidence this Court already deemed sufficient to create a fact question, the district court committed clear legal error that must be reversed.

The Michigan Supreme Court has long held that credibility determinations belong solely to the jury. In *People v. Lemmon*, 456 Mich. 625, 642-45 (1998), the Court reaffirmed that absent exceptional circumstances, a trial court may not

24

override the jury's credibility assessments. The Court emphasized that when testimony is conflicting but retains probative value, it remains the jury's role to determine credibility. Even if a trial judge disagrees with the verdict, a mere difference of opinion does not justify setting it aside. *Id*. at 647.

Likewise, this Court has held that conflicts between a witness's deposition and trial testimony present factual disputes for the jury. In *Dodson v. Imperial Motors, Inc.*, 295 F.2d 609, 616 (6th Cir. 1961), the Court made clear that credibility and inconsistencies in testimony are matters for the jury to resolve.

Here, any discrepancy between Lowe's and Benedek's testimony regarding Davidson's termination statements was a credibility issue for the jury, which weighed the evidence and ruled in Lowe's favor. This Court has already determined that the record contains sufficient direct evidence to create a fact question on Lowe's age discrimination claim. The district court had no authority to override the jury's verdict based on its own credibility assessments. This Court should reverse and reinstate the jury's verdict.

The district court's ruling was further flawed in its erroneous conclusion that the multiple other ageist remarks Davidson made did not constitute direct evidence of discrimination. This finding directly contradicted the court's own ruling at trial when it denied Defendant's motion at the close of Plaintiff's proofs. While the "you're kind of getting up there in years" comment was a key part of this Court's

previous opinion, the Sixth Circuit explicitly recognized that Davidson's discriminatory statements were not limited to that remark, "[o]ther Michigan caselaw reinforces the point that statements similar to Davidson's—even if not made at the time of firing—may constitute direct evidence of discrimination." *Lowe*, 972 F.3d at 834.

This Court's ruling leaves no room for the district court's rationale that these additional ageist comments were irrelevant simply because they were not made at the termination meeting. Indeed, *Downey* confirms that ageist remarks by a decision-maker, even months before termination, are "certainly direct evidence of age discrimination." *Downey v. Charlevoix Cnty. Bd. of Rd. Comm'rs*, 227 Mich. App. 621, 633-34 (1998). Davidson's repeated references to Lowe as "old man," stating he was "losing a step" and telling others to "let the old guy do it" (RE118, PageID 2865–2866, 2973) fall squarely within the kind of discriminatory statements found sufficient in *Downey* and *DeBrow*.

Yet, rather than meaningfully analyzing these remarks, the district court summarily concluded—without explanation—that they were not direct evidence because they were not made at the termination meeting. (RE143, PageID 4114). Worse, the court relegated its only discussion of these statements to a footnote, vaguely referencing the Michigan standard distinguishing direct evidence from

26

"stray remarks" and concluding, without analysis, that the comments were stray. *Id*. at 4114–4115 n.2.

The district court's failure to justify its complete departure from its own prior ruling—**finding these very statements sufficient to send the case to the jury**—only underscores its error. No additional evidence was introduced post-trial that would support its abrupt reversal. The district court's opinion is especially suspect given this Court's recognition that "[t]he dividing line between 'direct' and 'circumstantial' evidence is murky at best," requiring a thorough review. *Skelton v. Sara Lee Corp.*, 249 Fed. Appx. 450, 454 (6th Cir. 2007). Had the district court undertaken that necessary analysis, it would have reached the only legally supportable conclusion: these statements constituted direct evidence of discrimination.

The Michigan Supreme Court has identified five factors for determining whether statements are "stray remarks":

> (1) whether they were made by a decision-maker, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly discriminatory, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment action.

*Sniecinski v. Blue Cross & Blue Shield*, 469 Mich. 124, 136 n.8 (2003).

Here, the first factor clearly favors a finding of direct evidence. Davidson himself testified that he was the final decision-maker in Lowe's termination. (RE117,

PageID 2719–2720). Rard, who Lowe testified also made ageist comments, played a key role in the termination decision, including participation in the stack ranking process, observed behaviors investigation, and the termination meeting. (See RE116, PageID 2489–2499, 2528–2534; RE117, PageID 2703–2713, 2719–2731). This aligns with *Williams v. State HHS*, No. 355203, 2021 Mich. App. LEXIS 6158, at *17-18 (Ct. App. Oct. 28, 2021), which held that a decision-maker's influence over the termination process is a critical factor in determining whether a remark is direct evidence rather than a stray comment.

The nature, frequency, and context of Davidson's remarks further support their classification as direct evidence. His repeated references to Lowe as "old man," "old guy," "old boy," and claims that Lowe was "losing a step" are strikingly similar to statements found sufficient in *Downey* and *DeBrow*. Lowe testified that these comments were made more than half a dozen times over a multi-year period and in front of other employees (RE118, PageID 2863–2866), further negating any claim that they were isolated, a conclusion similarly reached in *Williams*. *See Williams*, 2021 Mich. App. LEXIS 6158, at *19-20. Courts have repeatedly rejected the notion that ageist statements must be made at the termination meeting to constitute direct evidence. *Id*. (highlighting that the comments made over a decade, particularly those near a year prior to termination); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154

F.3d 344, 357 (6th Cir. 1998) (finding a comment made 14 months before termination sufficient to establish discrimination).

Regarding the final factor—whether the comments were related to the decision-making process—Lowe testified that Rard explicitly referenced "age" twice during the termination meeting, a fact recognized by the district court when it denied Defendant's motion during trial. (RE117, PageID 2838–2841; RE119, PageID 3131). This further undermines the district court's conclusion that the comments were irrelevant. Moreover, *Downey* and this Court have both acknowledged that statements need not be made at the termination meeting to serve as direct evidence of discrimination. *Williams* further confirms that even if this factor or the ambiguity of certain comments weigh against a plaintiff, satisfaction of the other factors can still establish discriminatory statements as direct evidence. *Williams*, 2021 Mich. App. LEXIS 6158, at *16-17.

The district court's conclusion that these statements were stray remarks because they were not made at the termination meeting is legally flawed. Michigan courts have held that even when statements are not directly linked to a termination decision, they can still provide sufficient evidence of discrimination if they reflect discriminatory animus by someone involved in the process. The Michigan Court of Appeals recently reinforced this principle in *Sobotka v. Olympia Ent., Inc.*, No. 366281, 2025 Mich. App. LEXIS 1230 (Ct. App. Feb. 14, 2025). In *Sobotka*, a

plaintiff's superior made ageist remarks but was not the decision-maker. The court

nonetheless found these statements relevant because the superior had input into the

termination decision:

> [S]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.

> From Padgett's age-related comment to plaintiff, a jury could infer that Padgett's opinion that termination should occur was impermissibly based, in part, on plaintiff's age. *Id.* at *13-14 (citations omitted).

Even though the superior in *Sobotka* was not a decision-maker and denied

making the remarks, the court still rejected the argument that they were stray, holding

that the plaintiff had presented a jury question regarding their influence on the

termination. *Id.* at *14 n.22. Here, Davidson—the final decision-maker—made

multiple explicit age-based remarks over an extended period, making the evidence

far stronger than in *Sobotka*. Unlike in *Sobotka*, where the decision-maker denied

discriminatory intent, Davidson admitted to making at least some of these remarks.

Applying the *Sobotka* standard to this case, it is clear that Davidson's

statements were far more direct and significant, both in tone and quantity. His

remarks were made repeatedly by the ultimate decision-maker, placing them well

within the realm of direct evidence under Michigan law. The district court's failure

to meaningfully analyze these factors—and its complete disregard for its own prior

ruling finding these remarks sufficient—only underscores its error.

In sum, under Michigan's established legal framework, Davidson and Rard's repeated age-related comments were not mere stray remarks but direct evidence of age discrimination.

Even if this Court were to conclude that Davidson's comments were not direct evidence, they still provide critical circumstantial evidence supporting the jury's verdict. As argued more thoroughly in argument section II, Courts consistently recognize that even if a statement does not constitute direct evidence, it remains probative circumstantial evidence sufficient to create a jury question. *See, e.g., Allen v. DaimlerChrysler Corp.*, No. 265427, 2006 Mich. App. LEXIS 678, at *7–10 (Ct. App. Mar. 14, 2006); *Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 797 (W.D. Ky. 2011); *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1129 (6th Cir. 1998). The jury was entitled to consider these statements, and by vacating its verdict, the district court improperly disregarded this evidence and engaged in credibility determinations reserved for the jury.

This Court previously found that Davidson's statements "could lead a reasonable jury to find that the company acted on a predisposition to discriminate on the basis of age" and that Lowe raised "a genuine dispute of material fact as to whether Walbro's 'discriminatory animus' was more likely than not a 'substantial' or 'motivating' factor in the decision." *Lowe*, 972 F.3d at 834. The district court's ruling directly contradicts this binding precedent.

31

Defendant's renewed motion merely rehashed arguments this Court already rejected. First, Defendant again tried to distinguish *DeBrow*, arguing that Davidson was just one of several decision-makers, but this Court had already held that his bias was attributable to Walbro. *Id*. at 834. This was further confirmed at trial when Davidson testified he was the final decision-maker at the Cass City plant. (RE117, PageID 2719–2720). Second, Defendant pointed to statistical evidence of hiring older employees, an argument this Court had already dismissed for lacking any authority to negate direct evidence of discrimination. *Id.*

As both this Court and the district court previously recognized, Davidson's ageist remarks alone constituted direct evidence of age discrimination, creating a triable jury issue under Michigan law. The district court's reversal—after all evidence had been presented—was an unjustified departure from prior rulings and must be corrected. Accordingly, this Court should reverse and reinstate the jury's verdict.

**B.    The Jury Reasonably Found That Defendant Failed to Prove It Would Have Terminated Plaintiff Absent Age-Based Animus.**

As this Court previously recognized, while *DeBrow* held that discriminatory statements alone can suffice as direct evidence, Michigan courts typically apply a mixed-motives analysis, asking whether the employer "would have made the same decision even if the impermissible consideration had not played a role." *Lowe*, 972 F.3d at 834. Under this framework, Walbro could only prevail if it proved as a matter

32

of law that Lowe would have been terminated absent any age-based animus. Yet, just as when it improperly granted summary judgment, the district court again failed to address this issue. *Id.*

At trial, Walbro repeated its claim that Lowe's position was unnecessary due to a shift toward blow-molding and robotics, arguing that Lowe lacked relevant expertise and oversaw no direct reports other than janitorial staff. (RE125, PageID 3626–3629). However, as this Court already determined, Plaintiff presented ample evidence challenging that narrative. Lowe testified that Davidson orchestrated a two-step process: first stripping him of key responsibilities, then using his diminished role as a pretext to justify termination. *Lowe*, 972 F.3d at 835; RE116, PageID 2511, 2553-2559; RE117, PageID 2716-2717; RE118, PageID 2830, 2980. The jury also heard counter-evidence undermining Walbro's claim, including Lowe's consistently strong performance reviews, a decade of managing blow-molding without issue, the absence of documented concerns from Davidson, and Davidson's failure to conduct a performance review despite Walbro's policy requiring annual evaluations. *Id.* Based on this record, this Court previously held that "Walbro has not demonstrated as a matter of law that it would have terminated Lowe regardless of any age-related animus." *Id.*

This Court also rejected Walbro's attempt to downplay Davidson's role, affirming that a decision-maker with discriminatory intent need not act alone for

liability to attach. *Id.* (citing *Goodman v. Genesee County*, No. 266955, 2006 Mich. App. LEXIS 2490, at *13-14 (Ct. App. Aug. 8, 2006)).

Critically, this Court emphasized that the burden of proving it would have terminated Lowe absent discrimination rests with ***Walbro***—not Lowe. The plaintiff's burden in a mixed-motives case is minimal, and courts have consistently held that a case should only be kept from the jury if "the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Lopez v. Am. Family Ins. Co.*, 618 Fed. Appx. 794, 800 (6th Cir. 2015). This Court cited *Downey*, where an employer claimed that a workplace altercation justified termination, but the plaintiff presented evidence that he was deliberately provoked. *Lowe*, 972 F.3d at 836. Because the plaintiff's theory was plausible, the court held a jury question existed. *Id.* Similarly, here, while Walbro's justification—that Lowe's position was unnecessary—was "plausible," so was Lowe's evidence showing that Davidson's repeated ageist remarks and deliberate removal of responsibilities reflected discriminatory intent.

Here, the record presented at trial remained unchanged from that which the Sixth Circuit already deemed sufficient to create a jury question. Lowe testified that Davidson deliberately removed his key managerial duties, reassigned his top employees, and only then questioned whether Lowe's position was necessary. (RE118, PageID 2980–2981). He further stated that he never received negative

performance reviews, written or oral, under Davidson or any previous manager. (RE117, PageID 2820–2826, 2829–2830, 2834–2835). Davidson did not dispute that he stripped Lowe's responsibilities, provided no written performance warnings, and failed to conduct a required annual review. *Id.* at 2695–2699, 2716–2719, 2793–2795.

Moreover, pretext is evident in the contradiction between Davidson's claim that Walbro was shifting focus to blow molding, which Plaintiff supposedly could not handle, and the testimony of former operations director John Graves, who stated Walbro was in growth mode, Plaintiff was highly skilled with blow molding, and the Cass City plant remained virtually unchanged since 2014 except for two machines. (RE116, PageID 2586-2587, 2623).

Because the trial evidence aligned with what this Court previously found sufficient to create a jury question, the district court's ruling was a clear error. The jury properly considered Lowe's claim and found for him, as it was entitled to do. Accordingly, this Court should reverse and reinstate the jury's verdict.

## II.    THE DISTRICT COURT ERRED IN VACATING THE JURY'S VERDICT AS SUBSTANTIAL CIRCUMSTANTIAL EVIDENCE SUPPORTED A REASONABLE FINDING THAT DEFENDANT'S "POSITION ELIMINATION" WAS PRETEXT FOR DISCRIMINATION.

The district court erred in concluding that Plaintiff failed to present sufficient circumstantial evidence of age discrimination to support the jury's verdict. This

conclusion contradicts established precedent and applies an improperly rigid analysis of the circumstantial evidence—evidence Defendant did not directly challenge in its post-trial motions. The court's failure to follow the flexible approach long embraced by the Sixth Circuit and Michigan courts further underscores its error.

Applying the *McDonnell Douglas* burden-shifting framework, the district court halted its analysis at the prima facie stage. (RE143, PageID 4116–4120). While acknowledging that Plaintiff met the first three elements, it focused solely on whether he was "discharged under circumstances that give rise to an inference of unlawful discrimination." *Id*. This narrow approach led to the erroneous conclusion that Plaintiff failed to establish his prima facie case.

Defendant largely bypassed this inquiry in its post-trial motions, instead invoking the business judgment rule and arguing Plaintiff failed to prove pretext. However, both Defendant and the district court ignored key trial evidence supporting the jury's verdict. The district court applied an impermissibly rigid analysis in assessing whether Plaintiff presented sufficient circumstantial evidence to support an inference of discrimination. While acknowledging the accepted flexible approach, it failed to apply it, limiting its analysis to whether Plaintiff was treated differently than younger employees or replaced by one. (RE143, PageID 4117–4119). This hardline approach has been repeatedly rejected by courts.

36

For example, the Michigan Supreme Court in *Hecht v. Nat'l Heritage Acads., Inc.*, 499 Mich. 586, 607 (2016), emphasized that plaintiffs may prove discrimination through "multiple ways." The *Williams* Court likewise refused to restrict plaintiffs to the two most common methods considered by the district court. *Williams*, 2021 Mich. App. LEXIS 6158 at *13-14 (citing *Id*. at 609). In cases involving economic-based terminations, Michigan courts have held that *McDonnell Douglas* may be inapplicable, recognizing that "[a]ge discrimination may also be proved under ordinary principles of proof without resort to any special judicially created presumptions." *Ewers v. Stroh Brewery Co.*, 178 Mich. App. 371, 380-81 (1989) (citing *Matras v. Amoco Oil Co.*, 424 Mich. 675, 683-84 (1986)).

Thus, the district court's narrow analysis improperly disregarded well-established precedent allowing alternative methods of proving discrimination.[1] It also either ignored or failed to meaningfully consider several offers of proof that courts have previously held sufficient to create a jury question.

First, the district court's opinion glaringly omits any mention of the adverse inference instruction it issued regarding Defendant's failure to produce Davidson's

---

[1] This Circuit has held that "[a]fter a trial on the merits, this Court no longer considers whether a plaintiff has established a prima facie case," but only whether sufficient evidence supports the jury's verdict. *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 435 (6th Cir. 2009). While not binding, Michigan courts consistently treat federal Title VII interpretations as persuasive in guiding ELCRA analysis. *Barrett v. Kirtland Cmty. College*, 245 Mich. App. 306, 314 (2001).

2017 stack-ranking spreadsheet. This omission is critical because the instruction allowed jurors to infer that the missing document—Davidson's sole alleged basis for terminating Lowe—would have been adverse to Walbro. (RE113, PageID 2456–2459; RE120, PageID 3235). By ignoring this instruction, the district court fundamentally undermined its own analysis.

At trial, Davidson testified that he terminated Lowe based entirely on a ranking spreadsheet purportedly showing him in the bottom 10%. (RE117, PageID 2703). Yet, when confronted with the spreadsheet Walbro produced in response to a court order—identified as Davidson's basis for termination—he disavowed authorship. *Id.* at 2706–2707. Despite this, he continued to claim that Lowe's ranking justified termination. *Id.* at 2707. However, under cross-examination, he admitted the spreadsheet actually showed Lowe as "Meeting Expectations," contained no indication of his position being eliminated, and explicitly listed other employees—not Lowe—for termination. *Id.* at 2708–2712. The spreadsheet, presented to both Davidson and the jury, explicitly identified other employees—rather than Plaintiff—who were going to be replaced ("Talent Upgrade/Replacement"), when they were going to be replaced ("Talent Upgrade/Replacement Timing"), and any additional comments regarding the employees:

| # | Country | Stack Ranking (2018) | 2017 Mid-Year Performance Rating | Employee Name | Talent Upgrade / Replacement (Y/N) | Talent Upgrade / Replacement Timing | Comments |
|---|---------|------|------|------|------|------|------|
| | | | | | | | |
| **PLANTS (Ops)** | | | | | | | |
| 1 | China | | Meeting | HORUS ZHUANG | | | |
| 2 | Mexico | | Not Meeting | ESPINOZA SAENZ, ANGEL | Y | Q1 | |
| 3 | Mexico | | Not Meeting | GONZALEZ PONCE, IVAN | Y | Q1 | already resigned |
| 4 | Mexico | | Not Meeting | SOTO SOTO, ULISES | | | Was not on list |
| 5 | Mexico | | Meeting | ORDUÑO ZAÑUDO, FRANCISCO | | | |
| 6 | Mexico | | ? | GLAVEZ, GUILLERMO | | | Resigning Dec 15 |
| 7 | Mexico | | ? | MARTINEZ LOPEZ, EMMANUEL | | | Already Term'd |
| 8 | Thailand | | Meeting | Sutthiwat Jongpongklang | | | |
| 9 | USA | | Meeting | Lowe, Kenneth J. | | | |
| 10 | USA | | Meeting | Speirs, Rodney R. | | | |
| 11 | USA | | Meeting | Britt, Paul R. | | | |
| 12 | USA | | Meeting | Johnson, Mark | | | |
| 13 | Japan | | Meeting | Tadamitsu Tanaka | | | |
| 14 | Japan | | Exceeding | Daisuke Tamada | | | |

(RE131-1, PageID 3859).

Given Walbro's failure to produce Davidson's actual 2017 stack-ranking spreadsheet despite court orders (RE93, PageID 1702–1707), the district court granted Plaintiff's motion for sanctions and instructed the jury that it "may infer that the stack-ranking document Mr. Davidson prepared would have been adverse to Walbro." (RE113, PageID 2456–2459; RE120, PageID 3235). This instruction gave the jury the right to infer that the missing document either (1) showed Lowe was meeting expectations—consistent with the produced spreadsheet—or (2) revealed that older employees were disproportionately ranked low and terminated, reinforcing an inference of discrimination.

Federal courts consistently hold that an adverse inference instruction, when paired with even minimal circumstantial evidence, can sustain a jury's verdict. *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 971 F.3d 662, 679 (7th Cir. 2020). The Fifth and Second Circuits have affirmed verdicts and/or denied summary judgment

where such an instruction, in combination with other circumstantial evidence, tip a claim over the threshold necessary to establish a legally sufficient basis for a trier of fact. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 266 (5th Cir. 2014); *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998). Michigan courts also acknowledge this principle. In *Randall v. Ameritech Servs.*, No. 198013, 1999 Mich. App. LEXIS 1319, *3-6 (Ct. App. Mar. 23, 1999), the Michigan Court of Appeals upheld a jury verdict for discrimination based in part on an adverse inference instruction. Even the dissenting opinion in *Randall* conceded that while insufficient alone, such an instruction—combined with other circumstantial evidence—could create a jury question. See *Id.* at *46 (Gage, J., dissenting).

Yet, in vacating the jury's verdict, the district court failed to consider this instruction at all. This omission rendered its analysis incomplete and legally flawed. The instruction was an essential part of the evidentiary record, bolstering Plaintiff's circumstantial proof and strengthening the jury's conclusion. By disregarding it, the district court reached an improper conclusion untethered from the full trial record. Under established precedent, once an adverse inference instruction is given, even minimal circumstantial evidence can sustain a verdict. The district court's failure to acknowledge this principle was not merely an oversight but a fundamental legal error.

Beyond the adverse inference instruction, even if Davidson's ageist remarks are not deemed direct evidence, they remain compelling circumstantial evidence of discrimination. Michigan courts recognize that even vague or infrequent discriminatory comments, when paired with additional circumstantial evidence, can establish a prima facie case. *Allen*, 2006 Mich. App. LEXIS 678 at *7-10. In *Allen*, despite finding that age-related remarks were not direct evidence, the court held statements such as "old people," "too many old faces," and "too many grey-haired men" "could, but need not, be interpreted as proof that age was a motivating factor" and thus constituted circumstantial evidence of bias. *Id*. at *10.

Here, the evidence is even stronger. Unlike the sporadic, ambiguous remarks in *Allen*, Davidson made repeated, explicit age-related comments to Lowe. While *Allen* relied on a general pattern of younger employees receiving promotions, Lowe presented direct evidence that his responsibilities were reassigned to younger employees. Davidson himself—then 35 years old—absorbed key managerial duties, including overseeing Osterbeck and Windsor in blow molding and robotics. (RE116, PageID 2508, 2513; RE 117, PageID 2770–2777, 2799). Other responsibilities went to Osterbeck, who took over Lowe's office and managed technicians. (RE116, PageID 2576–2577; RE118, PageID 2875). Under *Allen*, these remarks, coupled with Lowe's work being reassigned to less experienced, younger employees, provided a strong basis for the jury to infer discrimination.

Courts consistently hold that even if discriminatory remarks do not qualify as direct evidence, they still serve as sufficient circumstantial evidence to sustain a jury verdict. *See, e.g., Chavez*, 832 F. Supp. 2d at 797 (finding that a supervisor's racially derogatory remark, while not direct evidence, was significant circumstantial evidence); *Scott*, 160 F.3d at 1129 (holding that ambiguous comments about preferring "college graduates with less money" and avoiding "white-haired old men" were enough to support an age discrimination claim). The district court ignored this well-established precedent, leading to a flawed analysis that warrants reversal.

Further circumstantial evidence arises from Davidson and Rard's silence when Lowe directly asked whether his termination was due to age. (RE117, PageID 2838-2839, 2841; RE118, PageID 2934; RE119, PageID 3158-3160). Michigan courts recognize that failure to respond to allegations of discrimination is itself probative circumstantial evidence. *See Williams*, 2021 Mich. App. LEXIS 6158 at *17 (holding that a decision-maker's failure to respond to discriminatory comments was circumstantial evidence of bias); *Smith v. HHS*, No. 356328, 2022 Mich. App. LEXIS 1651 at *10-11 (Ct. App. Mar. 24, 2022) (adopting federal precedent stating that while silence is not direct evidence, it permits an inference that non-response indicates assent to the discriminatory implication).

Additionally, the district court improperly analyzed Lowe's prima facie case, narrowly restricting the fourth element to whether a younger employee replaced him

42

or was treated more favorably. However, where an employer claims termination was due to a reduction in force, a plaintiff may establish this element by presenting direct, circumstantial, or statistical evidence showing they were singled out for impermissible reasons. *Skelton*, 249 Fed. Appx. at 457; *Scott*, 160 F.3d at 1126; *Chavez*, 832 F. Supp. 2d at 794; see also *Matras*, 424 Mich. at 684 (holding a plaintiff need only present sufficient evidence that age was a determining factor).

A plaintiff can also meet this burden by demonstrating that younger, less experienced employees were retained while the plaintiff was terminated. *Ewers*, 178 Mich. App. at 381 (1989); *Skelton*, 249 Fed. Appx. at 457-58; *Chavez*, 832 F. Supp. 2d at 796-97 (citing *Barnes v. Gencorp, Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990)). Further, this Court has held that a plaintiff can satisfy the fourth element even when only one job was eliminated. *Schram v. Schwan's Sales Enters.*, 124 Fed. Appx. 380, 384 (6th Cir. 2005).

Lowe testified at trial about his 40+ years at Walbro and extensive experience as an area manager, including staying current with machinery advancements. (RE117, PageID 2814-2827). Yet, despite his superior experience, his duties were reassigned to significantly younger, less experienced employees, including Davidson and Osterbeck. Under the case law cited above, this pattern—combined with Lowe's termination—provided further circumstantial evidence supporting the jury's verdict.

43

Taken together, these factors provided ample circumstantial evidence for the jury to find that age discrimination played a role in Lowe's termination.

Finally, though ignored by the district court, Plaintiff presented substantial evidence of pretext, which courts consistently recognize as both satisfying the prima facie burden and supporting a finding of discrimination. *Williams*, 2021 Mich. App. LEXIS 6158 at *22 ("The same evidence supporting a reasonable inference of discrimination also creates a genuine fact issue that the nondiscriminatory reason for plaintiff's firing is pretextual."); *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 697 (1997). The Supreme Court has also confirmed that "it is ***permissible*** for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.*

Pretext may be established by showing: (1) the employer's explanation had no basis in fact, (2) the explanation was not the actual reason for the adverse action, or (3) the stated reason was insufficient to justify the decision. *Major v. Vill. of Newberry*, 316 Mich. App. 527, 542 (2016). The Sixth Circuit has cautioned against rigidly applying these categories, emphasizing that pretext is a "commonsense inquiry" into whether the employer's explanation is credible or merely a cover for discrimination. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009).

Plaintiff need only present evidence that casts reasonable doubt on the employer's explanation, recognizing the difficulty in ascertaining a defendant's true motivation. *Jackson v. Genesee Cty. Rd. Comm'n*, 999 F.3d 333, 351 (6th Cir. 2021); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004).

Discriminatory statements by decision-makers, even if not direct evidence, are strong circumstantial evidence of pretext. *Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010). Here, as discussed at length above, Davidson repeatedly made ageist comments to Lowe, further supporting an inference that age was a motivating factor in his termination.

Further, Courts recognize that inconsistent explanations for termination strongly indicate pretext. *McAllister v. Twp. of Bridgeport*, No. 326801, 2016 Mich. App. LEXIS 1326, at *18 (Ct. App. July 12, 2016) ("False and shifting reasons are acceptable methods of demonstrating" pretext.).

In *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002), the employer initially claimed termination was due to corporate restructuring. In interrogatories, the rationale shifted to poor performance. By the time of depositions, the justification changed again, citing a failed facility sale. The Sixth Circuit held that these shifting explanations created a genuine issue of fact as to whether the employer's stated reasons were merely a pretext for discrimination:

> "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." Shifting justifications over time

45

calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, Cicero shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination. *Id.*

The court further emphasized that while it does not second-guess business decisions, it will scrutinize shifting justifications, as inconsistencies raise doubts about the employer's true motivation, holding "[w]hen the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision." *Id.*

Here, Defendant's justifications for Lowe's termination changed repeatedly. Davidson initially testified that Lowe was terminated solely due to position elimination. Yet, moments later, he claimed performance and behavior also played a role. (RE117, PageID 2688–2689). Additionally, Walbro's interrogatory responses added yet another justification, asserting for the first time that Lowe was fired due to inappropriate behavior—a claim unsupported by any documentation. (RE131-2, PageID 3871). This contradicted his deposition testimony, where he unequivocally stated performance was not a factor. *Id*. at 2689–2690. HR representative Debra Rard further admitted that she created an "Observed Behavior" document to "pivot" away from the position elimination rationale if necessary. (RE116, PageID 2499, 2509–2511).

Further, the 2017 stack ranking spreadsheet produced at trial showed Lowe "meeting expectations," was not marked for elimination, and lacked negative comments. (RE117, PageID 2706–2713). The jury was instructed to infer that the missing spreadsheet would have been adverse to Defendant. This, combined with Davidson's contradictions, allowed the jury to reasonably conclude that Defendant's justification was pretextual.

Courts have found that unsubstantiated post-hoc complaints fabricated to justify termination suggest pretext. *Perry v. Covenant Med. Ctr., Inc.*, No. 15-cv-11040, 2016 U.S. Dist. LEXIS 28451, at *26 (E.D. Mich. Mar. 7, 2016) ("A jury could determine that this unsubstantiated record constitutes an after-the-fact attempt to build a paper trail.").

Here, Rard created the "Observed Behavior" document just three months before Plaintiff's termination, despite admitting that his personnel file was clean and the document was based on hearsay. (RE116, PageID 2489-2491, 2510, 2519-2521). Moreover, Rard admitted that in compiling this document she called employees and tried to dig up dirt on Lowe. (RE116, PageID 2496-2497). Further, Davidson and Rard contradicted each other on whether employees were solicited for complaints or reported them voluntarily. *Id*. at 2496-2497; RE117, PageID 2692-9263. Defendant's discovery responses also claimed Plaintiff was terminated for "inappropriate

behavior," contradicting trial testimony. (RE116, PageID 2525-2526; RE131-2, PageID 3871).

Additionally, the claim that Lowe was terminated for poor performance is unsupported. Courts have found that a lack of documented performance issues suggests post-hoc fabrication. *Gaglioti v. Levin Group, Inc.*, 508 F. App'x 476, 482 (6th Cir. 2012). Here, Rard confirmed Lowe had no documented performance issues in his 41-year tenure. (RE116, PageID 2492, 2575). Davidson admitted he issued no negative reviews, improvement plans, or disciplinary actions. (RE117, PageID 2695-99). Every prior supervisor rated Lowe as a *top* performer. *Id.* at 2793-2795.

Michigan courts recognize that failure to provide an employee notice of termination or the manipulation of job responsibilities can support an inference of pretext. *Slagle v. Hella Elecs. Corp.*, No. 360198, 2023 Mich. App. LEXIS 2599, at *13 (Ct. App. Apr. 13, 2023); *Defever v. Spring Meadows Country Club, Inc.*, No. 192100, 1997 Mich. App. LEXIS 1366, at *8-11 (Ct. App. May 30, 1997) (finding pretext where an employer reduced an employee's responsibilities before laying him off).

Here, Lowe received no warning that his position was under consideration for elimination. (RE116, PageID 2529-2530; RE117, PageID 2721). Davidson also removed two key employees, Osterbeck and Windsor, from Lowe's supervision— directly leading to the claim that Lowe's role was redundant. (RE117, PageID 2710,

2716-2717). Lowe testified that losing these employees significantly hindered his ability to perform his job, supporting the jury's reasonable conclusion that Davidson manipulated circumstances to justify Lowe's termination. (RE 118, PageID 2980-2981).

Defendant's claim that Lowe's termination was part of a workforce reduction was directly contradicted by trial evidence. At the time of Lowe's termination, Walbro was aggressively hiring new employees. (RE116, PageID 2538-2539). Davidson admitted the facility had substantial work and that Lowe's responsibilities had to be absorbed by others. (RE117, PageID 2717-2718). Former Operations Director John Graves testified that Lowe was invaluable and that Defendant's claim of a strategic shift was unfounded. (RE116, PageID 2586-2587, 2623).

The overwhelming trial evidence demonstrated that Defendant's proffered reason for Lowe's termination was pretextual. The jury heard shifting justifications, contradictory testimony, an adverse inference instruction, and strong circumstantial evidence of discrimination. Given these factors, the jury was fully justified in rejecting Defendant's explanation.

Because credibility determinations and weighing of evidence fall within the jury's province, its verdict was supported by a reasonable evidentiary basis and must be upheld. The district court erred in disregarding this substantial evidence. Its order vacating the jury's verdict should be reversed, and the jury's decision reinstated.

## III. THE DISTRICT COURT REVERSIBLY ERRED IN CONDITIONALLY GRANTING A NEW TRIAL, CONTRADICTING THE EVIDENCE AND THE HIGH LEGAL STANDARD FOR DISTURBING A JURY'S DAMAGES AWARD.

The district court did not merely vacate the jury's verdict—it went even further, ruling that despite this Court's prior recognition that sufficient evidence supported a jury question, the verdict still could not stand, warranting a new trial. This ruling defies the well-established high bar for overturning a jury's verdict and must not be allowed to stand.

A new trial under Fed. R. Civ. P. 59 is justified only when the verdict is (1) against the clear weight of the evidence, (2) excessive, or (3) the result of prejudice or improper influence. *Allsopp v. Foust*, No. 23-5203, 2024 U.S. App. LEXIS 13189, at *13 (6th Cir. May 31, 2024). Courts in this Circuit strongly defer to jury verdicts and will not disturb them unless they are unreasonable. As emphasized in *SEC v. Conaway*, 698 F. Supp. 2d 771, 851 (E.D. Mich. 2010), this Circuit follows a "policy of reluctance to overturn a jury's verdict based on the sufficiency of the evidence" and a new trial is improper unless the verdict is clearly unreasonable. *Id.* Courts "are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Id*.

This Court has repeatedly held that a district court may not "evaluate witness credibility or substitute [its] own judgment for that of the jury; instead, if the jury's

decision is reasonable, the verdict stands." *Allsopp*, 2024 U.S. App. LEXIS 13189 at *13 (citation omitted). A new trial is warranted only in "extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

The district court failed to meet this standard. It offered two justifications: (1) that the verdict was against the great weight of the evidence and (2) that the jury's non-economic damages award was excessive. Neither withstands scrutiny.

The court's first justification—an unsupported assertion that the verdict was against the great weight of the evidence (RE143, PageID 4121)—relied entirely on its flawed analysis of Plaintiff's direct and circumstantial evidence of discrimination. As explained above, the jury's verdict was grounded in substantial evidence, rendering this justification insufficient under Rule 59.

However, nowhere is the district court's overreach more apparent than in its finding that the jury's award of non-economic damages was so excessive as to require a new trial. This conclusion ignored controlling case law, which recognizes that such damages are inherently subjective, within the jury's discretion, and reversible only when entirely unsupported by evidence. Instead, the court improperly viewed the evidence in the light least favorable to Plaintiff.

Under Michigan law, a damages award may be overturned only if it was (1) secured by improper methods, (2) unreasonable, or (3) grossly excessive compared

51

to similar cases. *Miller*, 14 Fed. App'x at 466; *Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 764 (2004). The assessment of damages is a question of fact for the jury, which determines the weight of the evidence and the inferences to be drawn from it. A trial judge may not vacate a jury's damages award simply because they would have reached a different conclusion. *Palenkas v. Beaumont Hosp.*, 432 Mich. 527, 538 (1989).

The burden is on the moving party to *affirmatively* show that the verdict was excessive. It is not enough to offer a mere difference of opinion as to the appropriate amount. *Belin v. Jax Kar Wash No. 5*, 95 Mich. App. 415, 423 (1980). "It has been repeatedly recognized in Michigan that the awarding of damages for such items as pain and suffering rests in the sound judgment of the trier of fact, and a trial court cannot substitute its judgment on that question unless a verdict has been secured by improper methods, prejudice or sympathy." *Id*. Similarly, the Michigan Supreme Court has held that "[a] reviewing court must offer something more tangible than a difference of opinion as to amount" before setting aside an award. *Precopio v. Detroit, Dep't of Transp.*, 415 Mich. 457, 470-71 (1982).

This principle is particularly strong for non-economic damages, which courts recognize as inherently imprecise and dependent on the specific evidence presented. There is no mathematical formula for valuing pain, suffering, or emotional distress. As the Michigan Supreme Court explained in *Stevens v. Edward C. Levy Co.*, 376

Mich. 1, 5 (1965), the quantification of non-economic damages is uniquely within the jury's discretion. Likewise, in *Kirk v. Ford Motor Co.*, 147 Mich. App. 337, 346-347 (1985), the court noted that placing a monetary value on emotional loss is "at best a nebulous decision-making process which does not lend itself to an exacting type of review."

This Court has echoed these principles, recognizing that pain and suffering awards are "questions peculiarly for the jury." *Pohrybienyk v. Kirchner*, 410 F.2d 1114, 1115-16 (6th Cir. 1969). Courts do not disturb such awards unless they are entirely without evidentiary support. "Calculating the amount of damages for pain and suffering does not lend itself to the application of a mathematical formula; it requires the application of the jury's best judgment and common sense based on the evidence presented." *Fielden v. CSX Transp., Inc.*, No. 2:03-cv-995, 2009 U.S. Dist. LEXIS 82140, at *9 (S.D. Ohio Aug. 26, 2009) (citing *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004)).

Determining whether a verdict is against the great weight of the evidence requires review of the entire record. If there is conflicting evidence, the question of credibility should be left to the jury. *Dawe v. Dr. Reuven Bar-Levav & Assocs., P.C.*, 289 Mich. App. 380, 401 (2010). "[A] jury's verdict should not be set aside if there is competent evidence to support it." *Id*. The district court ignored this principle,

53

substituting its own judgment for that of the jury without the required showing that the verdict was so unreasonable as to warrant judicial interference.

The district court relied on three factors to justify its excessive verdict finding: (1) improper methods or inflamed jury passions, (2) reasonableness of the verdict, and (3) comparability to similar verdicts. Its analysis failed to meet the high burden required to disturb the jury's decision. (RE143, PageID 4122).

First, the district court failed to identify any improper conduct that could have inflamed the jury. Instead, it offered a single conclusory statement that the lack of supporting evidence suggested an "impermissible partial and punitive design." *Id.* This falls far short of the affirmative showing required under *Precopio* and *Belin*. In contrast, in *Gilbert*, 470 Mich. at 764, the court overturned a $21 million verdict because counsel deliberately provoked the jury, comparing the defendant to Nazis and engaging in *ad hominem* attacks. No such inflammatory tactics occurred here, and there is no evidence that improper arguments influenced the jury. The district court's failure to identify any prejudicial statements or conduct is fatal to its conclusion.

Second, the district court failed to justify its claim that the jury's award was unreasonable. Despite acknowledging that expert neuropsychologist Dr. Shiener testified that Lowe suffered emotional distress, the court unjustifiably substituted its own subjective judgment to conclude the damages were excessive. (RE143, PageID

4121). Michigan courts consistently hold that expert medical testimony is sufficient to support non-economic damages. See *Palenkas*, 432 Mich. at 561-66; *Griffey v. Dep't of Corr.*, No. 354322, 2022 Mich. App. LEXIS 4265, at *143-47 (Ct. App. July 21, 2022). Further, a plaintiff's own testimony regarding their own subjective feelings, humiliation, embarrassment, and mental anguish is sufficient to support an award. *See Campbell*, 286 Mich. App. at 246; *Landin v. Healthsource Saginaw, Inc.*, 305 Mich. App. 519, 548 (2014); *Brunson v. E & L Transp. Co.*, 177 Mich. App. 95, 106-07 (1989).

The jury's award was well-supported by expert and lay testimony. Dr. Shiener diagnosed Lowe with Major Depression with PTSD features, triggered by the abrupt loss of his job after 41 years. He described Lowe as emotionally devastated, experiencing persistent insomnia, intrusive thoughts, loss of appetite, and diminished sex drive. (RE119, PageID 3081-3086). The trauma carried over into his new job, leaving him withdrawn and lacking confidence. *Id*. at 3082-3083. Dr. Shiener testified that such unexpected job loss overwhelmed Lowe's psychological defenses, leading to severe and likely permanent emotional distress. *Id*. at 3094-3095. Lowe's depression strained his relationships with his fiancée, family, and friends, causing him to abandon his lifelong outdoor hobbies. *Id*. at 3082, 3093-3094.

Defendant's expert conceded that Lowe was visibly stunned, cried when he saw his fiancée, suffered insomnia, and was too embarrassed to discuss his erectile dysfunction, as well as acknowledged that his sudden job loss and financial strain could cause severe depression. *Id*. at 3161-3162. Such testimony is similar to that relied upon in *Palenkas* and *Griffey*, where courts upheld non-economic damage awards based on expert medical opinions regarding sustained emotional distress.

Lay witness testimony further substantiated Lowe's non-economic damages, aligning with judicially recognized categories of emotional harm, including shame, humiliation, anxiety, denial of social enjoyment, and mental anguish. *Spica v. Schrotenboer*, No. 317510, 2015 Mich. App. LEXIS 496, at *12 (Ct. App. Mar. 12, 2015) (quoting *May v. William Beaumont Hosp.*, 180 Mich. App. 728, 758 (1989)).

In *Paulitch v. Detroit Edison Co.*, 208 Mich. App. 656, 659 (1995), the court upheld a non-economic damages award where the plaintiff's relationships with his wife and friends deteriorated due to age discrimination. Similarly, Lowe and his fiancée testified to the significant emotional toll of his termination. He suffered anger, sadness, insomnia, and withdrew from family and social events due to embarrassment. (RE117, PageID 2842-2844; RE118, PageID 3033-3038). Once an avid hunter, he nearly abandoned the activity, reducing his outings from 45 days a year to almost none. (RE117, PageID 2855-2857; RE118, PageID 2894-2897).

His fiancée described the increased financial stress, isolation, and frequent arguments that strained their relationship. (RE118, PageID 3039). Lowe confirmed he remained emotionally stuck, unaware of where to seek help, and internalized his distress. *Id*. at 2899, 2979-2980.

Despite this overwhelming evidence, the district court unjustifiably dismissed Lowe's damages, basing its conclusion entirely on his lack of formal psychological treatment. (RE143, PageID 4121-4122). Michigan courts have consistently rejected this reasoning, finding that accessing such evidence is a jury function, not one of the court. *Unibar Maint. Servs. v. Saigh*, 283 Mich. App. 609, 635 (2009); *May*, 180 Mich. App. at 760-61.

In *Fischer*, this Court upheld a jury's emotional distress award despite the plaintiff never seeking treatment, recognizing that testimony about the impact of termination, job search struggles, and family strain was sufficient evidence. *Fischer v. UPS*, 390 Fed. Appx. 465, 472 (6th Cir. 2010). Similarly, in *Griffey*, the Court refused to reduce damages simply because the plaintiff failed to seek treatment, where the plaintiffs presented evidence that their emotional harm was permanent and the existence of practical barriers to obtaining care, ultimately finding that other evidence of emotional harm was sufficient. *Griffey*, 2022 Mich. App. LEXIS 4265 at *140-142.

Here, Dr. Shiener explicitly testified that Lowe's poor prognosis and deeply ingrained personality traits—his compulsive nature, traditional values, and aversion to expressing emotion—made it unlikely he would seek treatment, even for severe depression. (RE119, PageID 3083-3090, 3094-3096). Lowe's remote living situation and difficulties securing stable employment further limited his access to treatment. (RE118, PageID 2899, 2975-2980; RE119, PageID 3122). Courts do not penalize plaintiffs for coping in ways other than formal therapy. Lowe's case is even stronger than the plaintiff's in *Fischer*, as he testified that his termination after over 40 years of employment left him withdrawn, sleepless, and reliving the experience constantly, as well as his struggles finding comparable work, and the significant strains on his family relationships. His inability to find comparable work compounded his distress, straining his relationships with family and friends. His own testimony reinforced that his suffering was real, even if he did not seek treatment. (RE118, PageID 2978-80).

The district court ignored this well-established precedent and improperly substituted its judgment for that of the jury. The record contained ample evidence of Lowe's emotional distress, and as in *Griffey* and *Fischer*, the absence of formal treatment does not negate the jury's well-supported award. The district court's ruling should be reversed.

Third, the district court failed to conduct a meaningful comparison to similar cases. While the court cited *Gilbert*, it ignored cases upholding substantial non-

economic damage awards. For example, in *Diamond v. Witherspoon*, 265 Mich. App. 673 (2005), the court upheld a $7.5 million award in an ELCRA claim despite the plaintiffs returning to normal functioning without ongoing care. Likewise, in *Griffey*, *Rushing*, and *Misane*—cases also involving ELCRA claims—juries awarded similar non-economic damages. (RE133, PageID 3980-3986). Moreover, the following chart of damage awards for civil rights discrimination cases, only further supports the reasonableness of the jury's non-economic damages award in this case:

|  | Economic Award | Non-Economic Award |
|---|---|---|
| *Rushing v Dep't of Corr*, ___NW2d___; 2024 Mich. App. LEXIS 4721 (Ct App, June 20, 2024), lv den 2024 Mich. LEXIS 2365 (Mich., Dec. 26, 2024) | $ 402,202.00 | $ 867,750.00 |
| *Griffey v Dep't of Corrections*, ___NW2d___; 2022 Mich. App. LEXIS 4265 (Ct App, July 21, 2022) | $ 2,782,189.00 | $8,650,000.00 |
| *Hester v Dep't of Corrections*, ___NW2d___; 2014 Mich. App. LEXIS 1038 (Ct App, June 5, 2014) | $2,000.00 | $450,000.00 |
| *Jenkins v Southeastern Mich Chapter, American Red Cross*, 141 Mich App 785, 799; 369 NW2d 223 (1985) | $362,000.00 | $ 488,000.00 |
| *Osorio v Source Enterprises*, ___F Supp 2d___; 2007 U.S. Dist. LEXIS 18725, at *4-6 (SDNY, Mar. 2, 2007) | $ 372,544.15 | $ 4,000,000.00 |
| *Olsen v Toyota Technical Ctr*, ___NW2d___; 2002 Mich. App. LEXIS 2323, at *1 (Ct App, Dec. 27, 2002) | $ 1,060,600 **reduced to** $ 772,512.13 (workers comp, set off, offset for SSDB) | $6,000,000.00 ($5 mil for PWDCRA claim; $1 mil loss of consortium) |

Michigan courts have cautioned against rigid comparisons of jury awards, recognizing that no two cases are identical. *See Palenkas*, 432 Mich. at 538. As *Freed*

59

*v. Salas*, 286 Mich. App. 300, 336 (2009), held, "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar." The district court ignored this principle and failed to provide any compelling reason why this jury's verdict was outside reasonable limits.

The evidence, viewed in the light most favorable to Lowe, fully supports the jury's non-economic damages award. The district court improperly substituted its judgment for that of the jury, disregarded controlling precedent, and failed to meet the high standard for granting a new trial. Its ruling should be reversed, and the jury's verdict reinstated.

## CONCLUSION AND RELIEF REQUESTED

Wherefore, this Honorable Court should reverse the District Court's October 22, 2024 Order Granting Defendant's Motion For Judgment as a Matter of Law, Vacating the October 2023 Judgment, Entering Judgment for the Defendant, Conditionally Granting a New Trial, Denying as Moot Defendant's Motion to Amend Judgment and Plaintiff's Motion for Attorney Fees, and Denying as Moot Defendant's Motion for Stay of Execution of Judgment (RE143) and Judgment for Defendant (RE 144), re-instate the November 2, 2023 Judgment (RE114), and remand for further proceedings.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date: March 10, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that this brief complies with the type/volume limitation. The number of words in this brief is 12,930, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date: March 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, a copy of Plaintiff-Appellant Kenneth Lowe's Brief on Appeal was filed electronically. Notice of this filing will be sent to the filing parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully Submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date:  March 10, 2025

# ADDENDA

## ADDENDUM CONTAINING DESIGNATION OF RELEVANT DOCUMENTS IN THE DISTRICT COURT ELECTRONIC RECORD BY PLAINTIFF-APPELLANT

Plaintiff-Appellant, pursuant to 6 Cir. R. 30(b) and 30(g)(1), hereby designates the following filings in the electronic record of the District Court:

| Record Entry | Description of Entry | Page ID # Range | Date |
|---|---|---|---|
| 1 | Complaint | 1-24 | 9/12/18 |
| 29 | Order Granting Summary Judgment | 1004-1013 | 10/29/19 |
| 93 | Order Granting in Part and Denying in Part Pl.'s Motion to Compel Supp. Discovery | 1702-1707 | 10/5/23 |
| 111 | Jury Verdict Form | 2445-2449 | 10/31/23 |
| 113 | Order Granting Pl.'s Motion for Adverse Presumption or Inference | 2456-2459 | 11/02/23 |
| 114 | Judgment | 2460-2461 | 11/02/23 |
| 116 | Trial Tr. Vol II. held on 10/25/2023 | 2489-2603 | 11/13/23 |
| 117 | Trial Tr. Vol III. held on 10/26/2023 | 1799-9263 | 11/13/23 |
| 118 | Trial Tr. Vol IV. held on 10/27/2023 | 2830-3039 | 11/13/23 |
| 119 | Trial Tr. Vol V. held on 10/30/2023 | 3081-3162 | 11/16/23 |
| 120 | Trial Tr. Vol VI. held on 10/31/2023 | 3235-3235 | 11/17/23 |
| 122 | Motion for Attorney Fees and Costs | 3353-3392 | 11/30/23 |
| 125 | Motion to enter judgment in Favor of Defendant or, New Trial | 3613-3641 | 11/30/23 |
| 126 | Motion to amend judgment, or alternatively order a New Trial | 3660-3694 | 11/30/23 |
| 131-1 | Def.'s Second Supp. Resp. to Pl.'s Interrogatories and RFPD | 3859-3859 | 1/10/24 |
| 131-2 | Def.'s Answers, Resp., and Objections to Pl.'s First Interrogatories and RFPD | 3871-3871 | 1/10/24 |
| 133 | Pl.'s Resp. to Def.'s Motion to amend judgment, or alternatively order a New Trial | 3980-3986 | 1/10/24 |
| 138 | Def.'s Motion to Stay Execution of Judgment | 4042-4051 | 4/15/24 |
| | | | |

| 143 | Order and Opinion Granting Def.'s Motion for Judgment as a Matter of Law, Vacating October 2023 Judgment, Entering Judgment for Defendant, Conditionally Granting New Trial | 4107-4123 | 10/22/25 |
|---|---|---|---|

## ADDENDUM CONTAINING
## UNPUBLISHED AUTHORITY
## CITED IN THIS BRIEF

*Allen v. DaimlerChrysler Corp.*,
   No. 265427, 2006 Mich. App. LEXIS 678
   (Ct. App. Mar. 14, 2006)

*Allsopp v. Foust*,
   No. 23-5203, 2024 U.S. App. LEXIS 13189
   (6th Cir. May 31, 2024)

*Defever v. Spring Meadows Country Club, Inc.*,
   No. 192100, 1997 Mich. App. LEXIS 1366
   (Ct. App. May 30, 1997)

*Fielden v. CSX Transp., Inc.*,
   No. 2:03-cv-995, 2009 U.S. Dist. LEXIS 82140
   (S.D. Ohio Aug. 26, 2009)

*Goodman v. Genesee County*,
   No. 266955, 2006 Mich. App. LEXIS 2490
   (Ct. App. Aug. 8, 2006)

*Griffey v. Dep't of Corr.*,
   No. 354322, 2022 Mich. App. LEXIS 4265
   (Ct. App. July 21, 2022)

*McAllister v. Twp. of Bridgeport*,
   No. 326801, 2016 Mich. App. LEXIS 1326
   (Ct. App. July 12, 2016)

*Perry v. Covenant Med. Ctr., Inc.*,
   No. 15-cv-11040, 2016 U.S. Dist. LEXIS 28451
   (E.D. Mich. Mar. 7, 2016)

*Randall v. Ameritech Servs.*,
   No. 198013, 1999 Mich. App. LEXIS 1319
   (Ct. App. Mar. 23, 1999)

*Slagle v. Hella Elecs. Corp.*,
    No. 360198, 2023 Mich. App. LEXIS 2599
    (Ct. App. Apr. 13, 2023)

*Smith v. HHS*,
    No. 356328, 2022 Mich. App. LEXIS 1651
    (Ct. App. Mar. 24, 2022)

*Sobotka v. Olympia Ent., Inc.*,
    No. 366281, 2025 Mich. App. LEXIS 1230
    (Ct. App. Feb. 14, 2025)

*Spica v. Schrotenboer*,
    No. 317510, 2015 Mich. App. LEXIS 496
    (Ct. App. Mar. 12, 2015)

*Williams v. State HHS*,
    No. 355203, 2021 Mich. App. LEXIS 6158
    (Ct. App. Oct. 28, 2021)

# *Allen v. Daimlerchrysler Corp.*

Court of Appeals of Michigan

March 14, 2006, Decided

No. 265427

**Reporter**

2006 Mich. App. LEXIS 678 *; 2006 WL 626239

EDDIE B. ALLEN, Plaintiff-Appellant, v DAIMLERCHRYSLER CORPORATION, DAIMLERCHRYSLER MOTORS CORPORATION and DAIMLERCHRYSLER SERVICES NORTH AMERICA, L.L.C., Defendants-Appellees.

**Notice: [*1]** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Appeal denied by *Allen v. Daimlerchrysler Corp., 2006 Mich. LEXIS 1486 (Mich., July 31, 2006)*

**Prior History:** Oakland Circuit Court. LC No. 03-049686-NZ.

**Disposition:** Affirmed.

## Core Terms

direct evidence, promoted, bias, adverse employment action, alleged statement, discriminatory, positions, adverse employment decision, circumstantial evidence, summary disposition, staff meeting, candidates, nonmoving, genuine, remarks, faces, stray

**Judges:** Before: Schuette, P.J., and Murray and Donofrio, JJ.

## Opinion

PER CURIAM.

Plaintiff appeals as of right an order granting defendant Daimler Chrysler Services North America, L.L.C.'s (DCS) motion for summary disposition in this age discrimination action. [1] We affirm.

The only issue properly before us is whether the trial court erred in granting summary disposition on plaintiff's age discrimination claim because there were genuine issues of material fact in light of the direct and circumstantial evidence presented to the trial court. This Court applies "a de novo standard when reviewing motions for summary disposition made under **[*2]** *MCR 2.116(C)(10)*, which tests the factual support for a claim." *Dressel v Ameribank, 468 Mich. 557, 561; 664 N.W.2d 151 (2003)*. This Court "consider[s] the facts in the light most favorable to the nonmoving party, in this case, the plaintiff[]." *Id.*

A motion brought pursuant to *MCR 2.116(C)(10)* should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Miller v Purcell, 246 Mich. App. 244, 246; 631 N.W.2d 760 (2001)*. When the burden of proof at trial would rest on the nonmoving party, the nonmovant may not

---

[1] Plaintiff withdrew his appeal of the grant of summary disposition to defendants Daimler Chrysler Corporation and Daimler Chrysler Motors Corporation.

rest upon mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial. *Quinto v Cross & Peters Co, 451 Mich. 358, 362; 547 N.W.2d 314 (1996)*. A genuine issue of material fact exists when the record, drawing all reasonable inferences in favor of the nonmoving party, leaves open an issue upon which reasonable minds could differ. *West v General Motors Corp, 469 Mich. 177, 183; [*3] 665 N.W.2d 468 (2003)*. When deciding a motion for summary disposition under this rule, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party. *MCR 2.116(G)(5)*; *Ritchie-Gamester v City of Berkley, 461 Mich. 73, 76; 597 N.W.2d 517 (1999)*.

The Michigan Civil Rights Act (CRA), and in particular *MCL 37.2202(1)*, provides:
> An employer shall not do any of the following:
> (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age . . . .

A plaintiff asserting an age discrimination claim must prove that he suffered an adverse employment action, *Wilcoxon v Minn Mining & Mfg Co, 235 Mich. App. 347, 362; 597 N.W.2d 250 (1999)*, and that his age was a factor in the adverse employment decision, *DeBrow v Century 21 Great Lakes, Inc (After Remand), 463 Mich. 534, 539; [*4] 620 N.W.2d 836 (2001)*.

A plaintiff may prove unlawful discrimination by direct or circumstantial evidence. *Sniecinski v Blue Cross & Blue Shield of Michigan, 469 Mich. 124, 132; 666 N.W.2d 186 (2003)*. Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's adverse employment actions. *Id. at 133*. "In a direct evidence case involving mixed motives, . . . a plaintiff must prove that the defendant's discriminatory animus was more likely than not a substantial or motivating factor in the decision." *Id.* (internal quotation marks and citations omitted). "In addition, a plaintiff must establish her qualification or other eligibility for the position sought *and present direct proof that the discriminatory animus was causally related to the adverse decision*." *Id.* (citation omitted; emphasis added). "Stated another way, a defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision." *Id.* (citation omitted).

Here, plaintiff **[*5]** contends that there are two pieces of direct evidence. First, plaintiff testified that according to what he was told by Robert Gullion, a fellow DCS employee, Thomas Gilman, [2] a higher management employee, made a comment at a town hall meeting "about the number of older people in the organization and how they needed some fresh, young faces in the organization." Gullion generally confirmed this in his deposition and indicated that Gilman made the statement "[in] '99 maybe."

Second, plaintiff testified that in late 2000 or early 2001, Pauline Kelly, plaintiff's supervisor, "came into the staff meeting and made a comment that there are too many old faces in here. We need to get some young blood in here." Carl Yauk, another DCS employee, testified in his deposition that at a staff meeting in late 1999 or 2000, Kelly said: "We have too many grey-haired men in here. We need more younger men and women." Plaintiff testified that Yauk **[*6]** was at the same meeting as he was, so both men have different versions of what Kelly said at the meeting, and when that meeting took place.

Defendant, on the other hand, contends that both Gilman's [3] and Kelly's alleged statements are simply stray remarks that do not constitute direct evidence of bias.

It is true that allegedly discriminatory statements that are considered to be "stray remarks" do not constitute direct evidence of discrimination. *Sniecinski, supra at 136*; *Krohn v Sedgwick James of Michigan, Inc, 244 Mich. App. 289,*

---

[2] It is undisputed that Gilman's employment with defendant ceased on May 31, 2002.

[3] The trial court excluded from evidence the testimony of Gullion regarding Gilman's alleged remark. For purposes of this issue, we assume, without deciding, that Gullion's testimony was admissible.

*292; 624 N.W.2d 212 (2001)*. Five factors are utilized to determine if allegedly discriminating remarks are considered to be stray, or whether they constitute direct evidence of discrimination:

> Factors to consider in assessing whether **[*7]** statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. [*Sniecinski, supra at 136 n 8* (citations omitted).]

We conclude that the analysis of the factors enumerated above indicates that Kelly's and Gilman's statements are neither direct evidence of bias, nor mere stray remarks, but constitute circumstantial evidence that a trier of fact could interpret as proof of bias.

There is no dispute that Kelly and Gilman made their statements within the scope of their employment. However, the statements were not related to any decision making process regarding plaintiff, or anyone else for that matter. [4] There is no evidence suggesting that the statements were made within a discussion of hiring and recruitment issues. But, if a decision maker makes a statement to staff members that fresh, **[*8]** new faces are needed, this could be interpreted as relating to recruitment needs or goals, even if the meeting was not convened to discuss hiring and recruitment specifically.

Kelly's statement falls closer to those considered to be "vague and ambiguous" statements as opposed to those "clearly reflective of discriminatory bias." *Sniecinski, supra at 136 n 8*. Kelly's statement was not directed to anybody in particular, was made while walking into a meeting, and was not related to any particular topic. See *Krohn, supra at 297-299*, citing and discussing *Cooley v Carmike Cinemas Inc, 25 F.3d 1325 (CA 6, 1994)*, and *Phelps v Yale Security, Inc, 986 F.2d 1020 (CA 6, 1993)*.

The alleged statements were not part of a clear pattern of biased comments. **[*9]** *Id.* Rather, the alleged statements could only be interpreted as isolated, as they were made by two separate individuals at different times and in different contexts.

Finally, the timing of the statement of Kelly, and of the adverse employment decisions, is not well established by the evidence. [5] *Krohn, supra.* Plaintiff testified that the staff meeting at which Kelly made her alleged "old faces" remark occurred in late 2000 or early 2001. Yauk testified, however, that the staff meeting at which Kelly allegedly made an ageist comment occurred in late 1999 or 2000. Thus, the timing of the alleged ageist comment in connection with an adverse employment action is not clear. DCS issued the open position notices (OPNs) for the positions at issue in August 2000, March 2001, September 2001, and December 2001. Because plaintiff testified that Kelly's comment occurred in late 2000 or early 2001, there were OPNs during that period for which plaintiff was included on the list of internal candidates, and that period was within the limitations period, there is evidence from which a trier of fact could conclude that Kelly's alleged comment was made close in time to an adverse **[*10]** employment decision. However, and importantly, the statements were not made in connection with any of these decisions. *Krohn, supra.*

From the analysis of the foregoing five factors, and without any evidence which would even remotely establish a connection to the decision at issue, we conclude that Kelly's alleged statement is not direct evidence of discrimination. However, if believed, the alleged statement by Kelly could, but need not, be interpreted as proof that age was a motivating factor in the decisions in which plaintiff was not chosen for promotion. Accordingly, we conclude that the alleged remark is circumstantial evidence of unlawful bias.

---

[4] Gilman's alleged statement can have no impact on the adverse employment actions at issue because he was no longer employed by defendant when plaintiff was denied the promotions at issue in this case.

[5] Plaintiff cannot sue for failure to be promoted in July 1998 or March 1999, because his complaint was filed on May 9, 2003. See *Garg v Macomb Co Community Mental Health Services, 472 Mich. 263, 281-282; 696 N.W.2d 646 (2005)*.

In cases involving circumstantial evidence, a plaintiff must proceed by using the burden-shifting **[*11]** approach set forth in *McDonnell Douglas Corp v Green, 411 U.S. 792; 93 S. Ct. 1817; 36 L Ed 2d 668 (1973)*. *Sniecinski, supra at 133-134*. To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) his failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination. *Id. at 134*.

"Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Sniecinski, supra at 134* (citations omitted). "If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Id.* (citations omitted). "Under either the direct evidence test or the *McDonnell Douglas* test, a plaintiff must establish a causal **[*12]** link between the discriminatory animus and the adverse employment decision." *Id. at 134-135*.

It is evident that plaintiff belongs to a protected class because of his age, and that plaintiff suffered adverse employment actions since he was not promoted to certain positions. *Pena v Ingham Co Rd Comm, 255 Mich App 299, 311-312; 660 N.W.2d 351 (2003)*. Plaintiff has also produced sufficient evidence that he was qualified for the positions, especially since this prong of the prima facie case is not overly onerous. See *Hazle v Ford Motor Co, 464 Mich. 456, 469-470; 628 N.W.2d 515 (2001)*. During the first two years that plaintiff reported to Kelly, plaintiff received "role model" reviews. Charles Fuller, a human resources manager, testified that he was somewhat surprised to learn that plaintiff had not received an interview for a financial systems position that plaintiff sought. Kelly admitted in her deposition that plaintiff was "a hard worker" with "some very strong traits" and "was a good, solid performer." But Kelly also testified that plaintiff had "some areas he needed to develop." Kelly testified that plaintiff **[*13]** had room for improvement in his communication. In sum, there is evidence on both sides of the question of whether plaintiff was qualified for the positions for which he applied, which is sufficient to satisfy a prima facie case.

Finally, plaintiff's failure to be promoted arguably occurred under circumstances giving rise to an inference of unlawful discrimination. The individuals promoted were all younger than plaintiff. That fact, coupled with Kelly's alleged statement that there were too many "old faces" at her staff meeting, and that "new blood" was needed, which statement was corroborated by Yauk, could allow a jury to reasonably infer that plaintiff's failure to receive certain promotions was in part because of his age.

DCS's non-discriminatory reason for not promoting plaintiff is that other candidates were better qualified. Kelly testified that plaintiff had room for improvement in his communication skills and that other candidates with proven track records were more qualified:

> .. . I was looking for someone who had done this before, who had a proven track record, who had proven communication skills. And . . . we selected those individuals that we felt were better suited **[*14]** at that.
> Mr. Allen happened to not be one of the employees at the top of that list. [It] doesn't mean that he may not have been considered. He just wasn't at the top of the list. There were other candidates that in my senior manager's opinion were much more qualified than [plaintiff].

Kelly also testified in detail as to why she chose the candidates for these positions, all of which were neutral, and non-discriminatory. We conclude that DCS presented legitimate, non-discriminatory reasons for its decision not to promote plaintiff beyond the "band 93" position.

The question then becomes whether plaintiff has presented evidence showing that DCS's reason for not promoting him was a pretext for discrimination. In other words, plaintiff must show that the comments indicating bias were causally related to his failure to be promoted, and he may not rely upon speculation or conjecture. *Sniecinski, supra at 134-136, 140*. We conclude that plaintiff's pretext theory fails to remove the question of causation from the realm of speculation and conjecture.

While plaintiff presents Kelly's alleged comment as evidence that an ageist attitude motivated Kelly's failure **[*15]** to promote plaintiff, plaintiff fails to present evidence that the comment in question was related to any decision not to promote plaintiff. It remains speculative to posit that the allegedly age-biased sentiment expressed by Kelly was a motivating factor in any of her decisions not to promote plaintiff. Although plaintiff attempts to rely on Gilman's alleged comment, that comment was made in "'99 maybe," outside the limitations period, which began on May 5, 2000. *Garg v Macomb Co Community Mental Health Services, 472 Mich. 263, 281-282; 696 N.W.2d 646 (2005)*. Accordingly, plaintiff fails to present a genuine issue of material fact on the question of pretext or causation. The trial court properly dismissed the claim.

Regarding plaintiff's claim of age harassment, plaintiff fails to brief this issue by failing to cite authority. *Wilson v Taylor, 457 Mich. 232, 243; 577 N.W.2d 100 (1998)*. "It is not sufficient for a party simply to announce a position . . . and then leave it up to this Court to discover and rationalize the basis for his claims . . . ." *Id.* (internal quotation marks omitted). Finally, in light of the resolution **[*16]** of the summary disposition issue, plaintiff's remaining evidentiary issues are moot. *Ewing v Bolden, 194 Mich. App. 95, 104; 486 N.W.2d 96 (1992)*.

Affirmed.
/s/ Bill Schuette
/s/ Christopher M. Murray
/s/ Pat M. Donofrio

---

# *Allsopp v. Foust*

United States Court of Appeals for the Sixth Circuit

May 31, 2024, Filed

File Name: 24a0228n.06

Case No. 23-5203

**Reporter**

2024 U.S. App. LEXIS 13189 *; 2024 FED App. 0228N (6th Cir.); 2024 WL 2799282

JEREMIAH ALLSOPP, Plaintiff — Appellant, v. CODY FOUST, Defendant — Appellee.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE.

## Core Terms

jail, inmates, district court, new trial, defense counsel, corrections officer, classification, sheet, closing argument, convictions, prejudicial, assaultive, argues, altercation, objected, touch, matter of law, comments, felonies, damages, intervened, grounds, sexual, felony conviction, in limine, credibility, outnumbered, questions, handcuff, injuries

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgment

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

*HN1*[⬇] **Judgment as Matter of Law, Postverdict Judgment**

When the motion for judgment as a matter of law is renewed after the jury's verdict, the appellate court may allow the verdict to stand, order a new trial, or enter judgment for the moving party. Fed. R. Civ. P. 50(b). To prevail on his unreasonable force claim, an appellant was required to show by a preponderance of the evidence that the use of force was not objectively reasonable. Reasonableness is based on the facts known at the time through the eyes of a responding officer, not a retroactive judgment from the clarity of the present. The factors the appellate court considers when determining reasonableness are, among others: (1) the relationship between the altercation and the amount of force used, (2) the appellant's injuries, (3) the officer's efforts to temper or to limit the force, (4) the security risk at the time, (5) the threat reasonably perceived by the officer, and (6) the appellant's resistance.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Trials > Judgment as Matter of Law > Alternative Motions for New Trials

Civil Procedure > Trials > Judgment as Matter of Law > Postverdict Judgment

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN2*[⬇] **Standards of Review, Abuse of Discretion**

A new trial is justified under Fed. R. Civ. P. 59 when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias. As with review of a Fed. R. Civ. P. 50(b) motion, the appellate court does not evaluate the credibility of witnesses or substitute its own judgment for that of the jury; instead, if the jury's decision is reasonable, the verdict stands. The appellate court reviews denial of a Fed. R. Civ. P. 59 motion for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

*HN3*[⬇] **Standards of Review, Abuse of Discretion**

The appellate court reviews a district court's evidentiary ruling for abuse of discretion. The district court abuses its discretion when the appellate court is left with the definite and firm conviction that the court below committed a clear error of judgment. An erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial. The error must have affected a party's substantial rights. Fed. R. Civ. P. 61.

Civil Procedure > Trials > Closing Arguments

Civil Procedure > Trials > Closing Arguments > Improper Remarks

*HN4*[⬇] **Trials, Closing Arguments**

Attorneys are given wide latitude in how to present their case, particularly in closing arguments. Closing argument serves to sharpen and clarify the issues for resolution by the trier of fact, something that is only possible at the end of proceedings when all evidence has been presented.

Civil Procedure > Trials > Closing Arguments > Improper Remarks

*HN5*[⬇] **Closing Arguments, Improper Remarks**

The appellant must meet a high standard to obtain a new trial on the grounds of improper statements by opposing counsel. The remedy he seeks is sparingly exercised on appeal, and involves significant deference to the trial court. This deference stems from the realities of the judicial system, particularly the trial court's significant discretion in determining whether an objectionable statement is so prejudicial as to require a retrial, and the appellate court's concomitant reluctance to question such a decision based on a cold record. The appellant must then clear a second hurdle: proving that there is a reasonable probability that the verdict of the jury has been influenced by the statements. Thus, it is insufficient to simply show that the statements were improper; he must show that they violated counsel's duty not to introduce extraneous matters before the jury or, by questions or remarks, endeavor to bring before it unrelated subjects and that such a breach was reasonably likely to have influenced the final verdict.

**Counsel:** For JEREMIAH ALLSOPP, Plaintiff - Appellant: Paul Andrew Justice III, Justice Law Office, Murfreesboro, TN.

For CODY FOUST, Defendant - Appellee: Stephen Walter Elliott, Howell & Fisher, Nashville, TN; Jeffrey R. Thompson, Gina Sarli Vogel, Lewis Thomason, Knoxville, TN.

**Judges:** Before: SILER, COLE, and MATHIS, Circuit Judges.

**Opinion by:** SILER

# Opinion

**SILER, Circuit Judge**. Jeremiah Allsopp sued Coffee County corrections officer Cody Foust under *42 U.S.C. § 1983*, alleging that Foust used excessive force against him during an altercation.[1] The jury reached a verdict in favor of Foust. After trial, Allsopp unsuccessfully moved for judgment as a matter of law on the issue of liability, and for a new trial based on liability, admission of his jail classification sheet at trial, and comments made during the defense's closing arguments. Allsopp appeals the denial of that motion, and we affirm.

I.

While awaiting trial, Allsopp, who was held as a high-risk inmate in the maximum security "BB pod" at Coffee County jail, got into a heated verbal argument with another inmate. Officer Young, a corrections officer at the jail, intervened to separate the **[*2]** two men. As Officer Young separated them, Allsopp swatted away Officer Young's hand and said, "don't touch me." Officer Foust, seeing this, responded. How he responded forms the center of the parties' dispute.

According to Allsopp, Foust violently grabbed Allsopp by the neck, lifted him off the ground and slammed him into a wall. Foust allegedly then began choking Allsopp, causing Allsopp to twist Foust's hand so as to break Foust's grip. This caused Foust pain, and Foust then "slammed [Allsopp] to the floor and continued to choke him until he blacked out." Inmates Edward Worthy and Kyle Wallace testified similarly. Wallace's testimony broadly corroborated Allsopp's testimony, with the exception that he did not claim Foust lifted Allsopp off the ground by his neck. Worthy's testimony was also corroborative, except that he claimed Foust choked Allsopp *before* throwing him to the ground.

The defense testimony painted a very different story. Four corrections officers, including Foust, testified. Officer Perez testified that Foust saw Allsopp swat Young's hand away and intervened to admonish Allsopp, saying, "do not swat my officers." He then stated that Allsopp grabbed Foust's hand, whereupon **[*3]** Foust and Young "took him down to the floor." Officer Bennett testified that when Young separated the arguing inmates, Allsopp "smack[ed]" Young's hand away twice, whereupon Foust intervened. Foust told Allsopp not to touch his officers, and Allsopp swore at Foust. Bennett then testified that Allsopp used some kind of martial arts move on Foust, creating danger for the outnumbered officers and requiring that Allsopp be taken to the floor and handcuffed. However, on cross-examination he appeared to concede that Foust touched Allsopp first. Officer Young testified that after Allsopp swatted away Young's hand, Foust walked into the room and grabbed Allsopp and threw him against the wall.

Foust testified that when he directed Allsopp not to touch his officers, Allsopp cursed back and continued yelling. "Foust told Allsopp to back up but he refused" and took a step forward. Foust interpreted this as a threat and placed Allsopp against the wall to handcuff him. Allsopp was able to break Foust's hold and cause him to cry out in pain, whereupon Foust took him to the ground and handcuffed him.

---

[1] Allsopp also sued Coffee County, and the district court granted summary judgment in favor of the County. However, Allsopp dropped his appeal against the County in a motion on November 2, 2023, electing to proceed on appeal solely against Foust.

Prior to trial, Allsopp moved in limine to exclude any evidence of his twenty-four prior felony convictions. **[*4]**  He argued that they were unfairly prejudicial under _Rule of Evidence 403_ because of their sexual nature, and that they were also not admissible as _Rule 609_ impeachment evidence because they were not crimes of deceit. The district court granted his motion in part, excluding any evidence "of the specific nature of [Allsopp's] felonies" but allowing evidence of "the fact that [he] has been convicted of twenty-four felonies."

At trial, defendants admitted Allsopp's jail Classification Sheet, which listed the type of crime for which he was then detained, a summary of his criminal history, and the jail's assessment of his level of dangerousness. The sheet was redacted to show only that he was convicted of an "Assaultive Felony"; there was **_no_** mention of the sexual nature of his prior crimes. Allsopp unsuccessfully objected, and the court noted that it did not admit the document as character evidence to show that "Allsopp had an assaultive character," but rather to show why he had been placed into the highest security area of the jail, and why Defendants reacted the way they did to the altercation.

While cross-examining Officer Bennett, Allsopp's attorney referenced Bennett's PTSD from combat service in the United States **[*5]**  Marine Corps. Bennett's memory and mental capacity were potentially at issue, and there was some question about whether Bennett had been terminated from his job at the jail because of memory issues. Defense counsel objected, and the district court overruled the objection. On re-direct, defense counsel attempted to ask Bennett if he thought it was "fair" for Allsopp's attorney to ask about his military injuries and if he "appreciated being asked [the] question," but the district court sustained Allsopp's objections to both questions.

Defense counsel referenced this exchange during closing arguments, asking the jury to recall that moment when, as "thanks for" his testimony, Bennet was "grilled . . . about his military experience." Counsel asked the jury, to, when "considering the credibility of the people who are in front of you, and especially the person who is asking you for money damages, [consider] why do you go after a war veteran?" Allsopp's attorney objected, but the court overruled the objection, suggesting to defense counsel, "why don't you move along."

Defense counsel also referenced two elements of Allsopp's character in closing: his status as a felony offender, and his alleged **[*6]**  failure to abide by prison rules. First, counsel cautioned the jury that "if you even give the plaintiff in this case so much as a nickel or a dime, you would be giving that to a plaintiff with 24 or 25 felony convictions." Allsopp's attorney objected and was overruled. Defense counsel also cautioned the jury that they "would be entering a judgment in favor of a plaintiff who violated by his own admission the cardinal rule inside a jail of don't touch the corrections officers . . . so don't give him as much as a nickel or a dime." Allsopp's attorney did not object to this second statement.

At the close of the evidence, both parties moved for judgment as a matter of law and were denied. After the jury returned a verdict in favor of Foust, Allsopp moved for judgment as a matter of law and a new trial pursuant to _Federal Rules of Civil Procedure 50(b)_ and _59(a)_. The district court denied both motions and this appeal followed.


**II**.

On appeal, Allsopp raises the same arguments he made before the district court. Specifically, he argues that he should have been granted judgment as a matter of law under _Rule 50(b)_, and, in the alternative, that he should have been granted a new trial under _Rule 59_. He then argues that admission of the classification sheet **[*7]** violated the court's own order and the Rules of Evidence, that defense counsel's closing argument invited the jury to decide the case on impermissible grounds, and that both these errors demand a new trial.


**A**.

_HN1_[⬆] When, as here, the motion for judgment as a matter of law is renewed after the jury's verdict, we may allow the verdict to stand, order a new trial, or enter judgment for the moving party. _Fed. R. Civ. P. 50(b)_. To prevail on his unreasonable force claim, Allsopp was required to show by a preponderance of the evidence that the use of force was not objectively reasonable. _Kingsley v. Hendrickson, 576 U.S. 389, 397, 135 S. Ct. 2466, 192 L. Ed. 2d_

*416 (2015)*. Reasonableness is based on the facts known at the time through the eyes of a responding officer, not a retroactive judgment from the clarity of the present. *Id.* The factors we consider when determining reasonableness are, among others: (1) the relationship between the altercation and the amount of force used, (2) Allsopp's injuries, (3) Foust's efforts to "temper or to limit" the force, (4) the security risk at the time, (5) "the threat reasonably perceived by" Foust, and (6) Allsopp's resistance. *Id.* (outlining a non-exhaustive list of possible factors).

Allsopp argues that judgment in his favor is justified because, "by virtually **[*8]** everyone's account," he "was not assaulting anyone but was just arguing." He claims that "he simply acted verbally upset, and then took a single step toward Foust." Because, in his view, "[c]ussing and yelling" is not a security threat and, somewhat incredibly, "stepping toward someone . . . is a natural, even respectful thing to do" and that it is "doubtful" that such a movement "could *ever* count as resistance," he argues that Foust's use of force was entirely unjustified.

But this is not the only conclusion the jury could have reached. *See Fed. R. Civ. P. 50(a)* (authorizing entry of judgment when **no** "reasonable jury would [] have a legally sufficient evidentiary basis to find for the party on that issue"). On the contrary, viewing the evidence in the light most favorable to Foust, it becomes clear that the jury was justified in concluding that Allsopp presented a credible threat to corrections officers and "was prepared to escalate the conflict."

On the day of the incident, officers intervened in a loud argument during inmates' one hour of daily exercise time. Allsopp had apparently removed his rosary beads and the other inmate removed his glasses in preparation for a fight. Officer Young intervened in **[*9]** this tense scene and was met with Allsopp's swatting or slapping away Young's hand "one or two times in an angry, defiant manner." When Foust intervened to reprimand Allsopp, Allsopp, according to witnesses, said "fuck that," and took a step toward Foust. Taken in the context of a heated altercation between high-risk inmates in a dangerous area of the jail and in front of greatly outnumbered officers, it is hard to imagine this step forward as being the respectful gesture that Allsopp argues it could have been. Instead, it represents continued belligerence. As the district court noted, "Allsopp's response indicated defiance, and created in Officer Foust a concern that Allsopp presented a continued threat to the safety and security of the corrections officers and the other inmates." A reasonable jury could easily conclude that Allsopp presented a threat, and that placing him against a wall to restrain and handcuff him was reasonable given the circumstances, fulfilling the first *Kingsley* factor. *Kingsley, 576 U.S. at 397*.

Moving to the second *Kingsley* factor, the evidence is inconclusive that Allsopp suffered any injuries from the altercation. *Id.* Allsopp insisted that he suffered from neck pain and impaired mobility because **[*10]** of the confrontation. And at least one of his witnesses testified that he complained of pain. However, corrections officers testified that all inmates are observed, particularly after an incident, and that Allsopp manifested **no** impaired movement and did not appear to modify his behavior. Jail medical staff who examined Allsopp noted that there were **no** physical manifestations of injury besides some mild arthritis and unexplained neck spasms. There was sufficient evidence for the jury to conclude that Allsopp was feigning his shoulder injury and that any issues complained of were not caused by the altercation with Foust.

Foust also applied force commensurate with the threat—in other words, there was ample evidence for the jury to believe that he "temper[ed] or . . . limit[ed] the amount of force" he used. *Id.* The weight of the evidence showed that Foust used accepted best practices to restrain Allsopp during the incident, despite Allsopp's resistance. In contrast to Allsopp's and the other prisoners' testimony that Foust swept in from the sidelines, grabbed him by the throat, and lifted him clear of the ground to slam his head into a neighboring wall, most of the testimony reasonably **[*11]** paints a different picture for the jury: Foust pushed Allsopp against a wall to mitigate the threat he presented to other officers and detain him with minimal risk to everyone present. While it was likely not an enjoyable or comfortable experience, the response was not disproportionate to the situation. Instead, it was "an effective way for a corrections officer—vastly outnumbered by the inmates—to maintain control over an unruly inmate without the assistance of other corrections officers."

Foust subsequently pushed Allsopp to the floor to detain him. This too was reasonable considering Allsopp's resistance to Foust's attempts to handcuff him. Numerous witnesses testified that Allsopp executed some kind of "martial arts move" on Foust while against the wall, causing Foust to cry out in pain. A jury could easily conclude

that taking the struggle to the floor was entirely reasonable in light of the situation at the time. Therefore, the third and sixth *Kingsley* factors are satisfied. *Id.*

The jury heard significant evidence about the potential risk involved in the BB pod at Coffee County jail and how outnumbered corrections officers were. As the district court noted, the BB pod housed "the most **[*12]** dangerous inmates," including Allsopp, who, as his Classification Sheet noted, was being held for an "assaultive felony." The unit had an officer-to-inmate ratio of approximately 3 to 200, making it very dangerous if inmates got the "upper hand" in an altercation. Corrections officers work under the real threat that inmates, if they gain an advantage, could obtain nonlethal weapons such as tasers and pepper spray from officers' belts and use them to incapacitate the guards. Even items as innocuous as an ink pen, or as minor as a handcuff key or pair of handcuffs represent a threat in the hands of inmates. This is precisely why inmates are not allowed to touch officers. These facts cut in favor of Foust on the fourth and fifth *Kingsley* factors. *Id.*

In summary, there was ample evidence for the jury to conclude that Foust's actions were justified in light of Allsopp's actions, the circumstances, and the setting. Allsopp therefore falls far short of the *Rule 50(b)* standard for judgment as a matter of law, and the court's decision to allow judgment on the verdict was justified. *See Fed. R. Civ. P. 50(b)(1)*. We find **no** error in the district court's decision to deny both his motion for judgment in his favor and for a new trial on **[*13]** *Rule 50* grounds.

**B.**

Allsopp moved in the alternative for a new trial under *Rule 59* on three grounds, including on the grounds of liability cited in his *Rule 50(b)* motion. He asserts that *Rule 59* requires that he receive a new trial because (1) the jury's verdict was against the weight of the evidence, (2) the court admitted prejudicial evidence against him, and (3) the defense attorney's closing statement prejudiced the jury.

*HN2*[↑] A new trial is justified under *Rule 59* "when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, 78 F.3d 1041, 1045-46 (6th Cir. 1996)* (quotations omitted). As with review of a *Rule 50(b)* motion, we do not evaluate the credibility of witnesses or substitute our own judgment for that of the jury; instead, if the jury's decision is reasonable, the verdict stands. *Woodbridge v. Dahlberg, 954 F.2d 1231, 1234 (6th Cir. 1992)*. We review denial of a *Rule 59* motion for abuse of discretion. *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC, 880 F.3d 791, 798-99 (6th Cir. 2018)*.

**1.**

Allsopp's argument in support of *Rule 59* relief essentially mirrors his argument for judgment as a matter of law under *Rule 50*. And as with that argument, it is wrong. The jury's verdict is supported by substantial **[*14]** evidence.

**2.**

Allsopp complains that his jail classification sheet should not have been admitted into evidence, and that its admission prejudiced him before the jury for two reasons: First, because it violated the district court's order partially granting his motion in limine to exclude evidence of his felony convictions, and second, because its characterization of his prior convictions as "assaultive" violated the Rules of Evidence as too prejudicial. Neither argument has merit.

Allsopp brings his argument under the third scenario for granting a new trial under *Rule 59*: that of unfairness. *Holmes, 78 F.3d at 1045-46*. He argues that because the jury was allowed to see that his prior convictions were "Assaultive Felonies," they were left with two possible conclusions: either he had been convicted of multiple "violent

alterations" or had been convicted of sexually deviant acts against minors. Because the first assumption is false and the second is true but highly prejudicial, he claims that the trial was unfair.

*HN3*[↑] We review a district court's evidentiary ruling for abuse of discretion. *Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997)*. The district court abuses its discretion when we are left with the "definite and firm conviction that the court below committed a clear **[*15]** error of judgment." *Bryant v. McDonough, 72 F.4th 149, 152 (6th Cir. 2023)* (citations omitted). "An erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial." *Cummins v. BIC USA, Inc., 727 F.3d 506, 510 (6th Cir. 2013)* (citing *United States v. Morales, 687 F.3d 697, 701-02 (6th Cir. 2012)*). The error must have affected a party's "substantial rights." *Fed. R. Civ. P. 61*.

*Violation of the court's order.* Allsopp argues that the district court allowed the defense to violate the district court's own order partially granting his motion in limine by admitting the classification sheet. He raised this issue with the district court in his motion for a new trial and was denied.

The district court's order on Allsopp's *Rule 59* motion effectively dispatched this theory. The court noted that the original order on the motion in limine acknowledged the highly prejudicial nature of Allsopp's prior sexual convictions, stating that "sex offenses and, in particular, sex offenses with a minor are regarded by our society in general as especially shocking, heinous crimes." And while any felony conviction "has probative value bearing on a witness' credibility," these crimes "do not involve an element of dishonesty." The fact that they are "heavy with prejudice" caused the court to conclude that "admission **[*16]** of the nature of [Allsopp's] convictions" would "suggest a decision . . . based on improper considerations." Therefore, the court allowed only information about the bare fact that Allsopp had twenty-four felonies. The court's rationale centered on the sexual nature of his prior offenses, and that context meant that only the sexual nature of the crimes was excluded. Therefore, admission of the redacted classification showing Allsopp's crimes as "assaultive" did not violate the court's prior order.

*The prejudicial nature of the word "assaultive."* Allsopp argues that even if admission of the classification sheet did not violate the court's order on his motion in limine, the word "assaultive" invited the jury to speculate on the nature of his prior offenses in ways that prejudiced him. This, he claims, violates the provisions concerning prejudicial evidence in *Rules 403* and *404*, and the character evidence prohibition of *Rule 609*.

As the district court noted in its order, this is not true. The court admitted the classification sheet for two reasons: to explain why Allsopp was housed in the maximum-security pod at the jail, and to show that Foust "had good reason to take immediate action" when Allsopp defied **[*17]** him. And, as the defendant points out, the fact that Allsopp was dangerous and had potentially committed serious crimes would have been evident to the jury anyway by virtue of the fact that he was in the maximum security pod at the Coffee County jail.

Admission of the classification sheet as impeachment evidence does not leave us with the "definite and firm conviction" that the district court "committed a clear error of judgment." *Bryant, 72 F.4th at 152*. Allsopp's motion was therefore properly denied as to his evidentiary claim.

**3.**

Finally, Allsopp argues that three statements made by the defense attorney in his closing argument were improper because they invited the jury to decide the case on impermissible grounds. The defense attorney asked the jury not to award damages because Allsopp (1) questioned Bennett about his service-related PTSD injuries, (2) was a felon, and (3) did not obey jail rules. We do not believe that these statements clear the high bar for reversal based on allegedly improper closing arguments.

*HN4*[↑] Attorneys are given wide latitude in how to present their case, particularly in closing arguments. "[C]losing argument serves to sharpen and clarify the issues for resolution by the trier of fact," **[*18]** something that is only possible at the end of proceedings when all evidence has been presented. *Herring v. New York, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975)*. Then, counsel respectively addresses the jury and "argue[s] the inferences

to be drawn" and "point[s] out the weaknesses of their adversaries' positions." *Id.* In our adversarial system, this is the pinnacle of the trial, and as the Supreme Court noted, "**no** aspect of [] advocacy could be more important." *Id.* Latitude here is essential to the role of an attorney. *See Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003)* (per curiam) (noting that the "broad range of legitimate defense strategy" necessarily requires latitude in closing arguments).

*HN5*[⬆] ] In light of this, Allsopp "must meet a high standard to obtain a new trial on the grounds of improper statements by opposing counsel." *CFE Racing Prods., Inc. v. BMF Wheels, Inc., 793 F.3d 571, 589 (6th Cir. 2015)*. The remedy he seeks is "sparingly exercised on appeal," and involves significant deference to the trial court. *Id.* (quoting *City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir. 1980)*). This deference stems from the realities of the judicial system, particularly the trial court's significant "discretion in determining whether an objectionable [statement] is so prejudicial as to require a retrial," and our concomitant reluctance to question such a decision based on a "cold record." *City of Cleveland, 624 F.2d at 756*; *see also Balsley v. LFP, Inc., 691 F.3d 747, 761-62 (6th Cir. 2012)*.

Allsopp must then clear a second **[*19]** hurdle: proving that "there is a reasonable probability that the verdict of the jury has been influenced" by the statements. *CFE Racing Prods., Inc., 793 F.3d at 590* (quotations omitted). Thus, it is insufficient to simply show that the statements were improper; he must show that they violated counsel's duty not to "introduce extraneous matters before [the] jury or, by questions or remarks, endeavor to bring before it unrelated subjects" and that such a breach was reasonably likely to have influenced the final verdict. *City of Cleveland, 624 F.2d at 756* (quotations omitted). We hold that Allsopp failed to bear his burden.

*Questioning a military veteran.* Allsopp's attorney asked Bennett on cross-examination about his service-related PTSD injuries and his termination from employment at the jail. The attorney did so in an effort to impeach Bennett's memory of events. Defense counsel objected and was overruled. During closing, defense counsel asked the jury to recall that moment when, as "thanks for" his testimony, Bennett was "grilled . . . about his military experience." Counsel asked the jury to, when "considering the credibility of the people who are in front of you, and especially the person who is asking you for money damages, [consider] why do you go after **[*20]** a war veteran?"

In addressing this objection on Allsopp's original motion for a new trial, the district court acknowledged that it would have been wrong for defense counsel to "suggest to the jury that Allsopp's counsel's arguments should be discounted because his questioning could be deemed critical of a war veteran" but concluded that the issue was "not significant enough" to be a problem. We agree. Although extensive comments along these lines would have been problematic, this issue was quickly addressed during cross-examination, and again during closing arguments, when the trial judge urged defense counsel to "move along." This is hardly the kind of pervasive misconduct which warrants a conclusion on our part that the verdict was likely affected.

*Awarding damages to a felon.* Second, Allsopp objects to defense counsel's comments that any money damages awarded to Allsopp would be awarded to a convicted felon. Specifically, counsel stated, "Ladies and gentlemen, if you even give the plaintiff in this case so much as a nickel or a dime, you would be giving that to a plaintiff with 24 or 25 felony convictions." Allsopp's attorney objected and was overruled.

The district court, in denying **[*21]** the *Rule 59* motion, noted that when "observing [counsel's] closing argument in real time" it thought that counsel "was simply reminding the jurors of evidence that had actually been presented to them during the trial." And while it conceded that "[i]n retrospect, [defense counsel] came extremely close to crossing an impermissible line[,]" counsel's comments did not actually cross that line.

We agree. Because there was **no** video footage, this case rested entirely on witness testimony. It is therefore reasonable, justifiable, and entirely predictable that defense counsel would point to Allsopp's criminal convictions as probative of his truthfulness. Few witnesses agreed in all respects, and Allsopp's testimony was the most extreme in its allegations. Defense counsel was therefore entirely within his rights to draw the jury's attention to Allsopp's untrustworthiness as a way of bolstering his own case and witnesses.

*Awarding damages to a rule-breaker*. Finally, Allsopp objects to defense counsel's comments about prison rules. During closing, counsel told the jury that if they awarded damages, then "you would be entering a judgment in favor of a plaintiff who violated . . . the cardinal rule inside **[*22]** a jail of don't touch the corrections officers . . . so don't give him as much as a nickel or a dime." This comment occurred very shortly after the comment about awarding a felon, and Allsopp's counsel did not object. The district court noted that even if he had, the objections would have been overruled.

As the district court noted in its order denying Allsopp's *Rule 59* motion, defense counsel made these comments in the broader context of contesting Allsopp's characterization of his own actions as nonthreatening. In response, defense counsel highlighted for the jury the inherent danger that corrections officers worked under, how outnumbered they were, and the "cardinal jail rule" that inmates do not touch the officers. While counsel's statement, taken alone, certainly could appear to invite the jury to return a verdict against Allsopp simply because he broke jail rules, the broader context and Allsopp's failure to object at the time the comment was made counsel against reversal. The district court's refusal to grant a new trial was not an error.[2]

Finally, taken in the aggregate, these three comments do not amount to prejudicial conduct sufficient to meet the high bar Allsopp faces here. Counsel's **[*23]** first two comments were mitigated by the court's admonitions or justified by Allsopp's argumentation and the nature of the case, and the final statement, made without objection, is similarly benign. *See CFE Racing Prods., Inc., 793 F.3d at 590* ("[F]ailure to object 'raise[s] the degree of prejudice which must be demonstrated' in order for this Court to grant the request for a new trial." (second alteration in original) (quoting *Strickland v. Owens Corning, 142 F.3d 353, 358 (6th Cir. 1998)*).

The judgment is AFFIRMED.

---

**End of Document**

---

[2] Our conclusion is further bolstered by the district court's inclusion of a jury instruction explicitly informing jurors that "[t]he lawyers' statements and arguments are not evidence."

## *DEFEVER v. SPRING MEADOWS COUNTRY CLUB, INC.*

Court of Appeals of Michigan

May 30, 1997, Decided

No. 192100

**Reporter**

1997 Mich. App. LEXIS 1366 *; 1997 WL 33349426

MARCEL A. DEFEVER, Plaintiff-Appellant, v SPRING MEADOWS COUNTRY CLUB, INC., THOMAS L. BOLLINGER, DON ELLIS, LEROY JOHNSON, DOUGLAS C. HIBBS, ROBERT L. COLE, JASON HARNESS, MILTON R. SCHEFFLER, RUSSELL C. WATSON, FRANK WHITE, and JEFFREY BLACKETT, Defendants-Appellees.

**Notice:** [*1] IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Genesee Circuit Court. LC *No*. 93-021774.

**Disposition:** Affirmed in part, reversed in part, and remanded.

## Core Terms

summary disposition, golf, defendants', member of the board, trial court, just-cause, reasons

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[⬇] **Standards of Review, De Novo Review**

On appeal, an order granting or denying summary disposition is reviewed de novo. A motion for summary disposition may be granted pursuant to *Mich. Ct. R. 2.116(C)(10)* when, except as to the amount of damages, there is *no* genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Giving the benefit of reasonable doubt to the nonmovant, the trial court must determine whether a record might be developed that would leave open an issue upon which reasonable minds might differ.

Evidence > Burdens of Proof > Allocation

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Evidence > Burdens of Proof > General Overview

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

*HN2*[⬇] **Burdens of Proof, Allocation**

The burden of proof in an age discrimination case is allocated as follows: (1) the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination; (2) if the plaintiff is successfully proving a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff then has the burden of proving by a preponderance of the evidence that the legitimate reason offered by the defendant was merely a pretext.

Evidence > Admissibility > Circumstantial & Direct Evidence

Labor & Employment Law > ... > Age Discrimination > Evidence > Burdens of Proof

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

*HN3*[⬇] **Admissibility, Circumstantial & Direct Evidence**

In order to establish a prima facie case of age discrimination under the intentional discrimination theory, a plaintiff must show that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position, and (4) he was replaced by a younger person. Intentional discrimination may be established with circumstantial or statistical evidence, as an employer is rarely so blatant as to announce its illegal motives.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > ... > Age Discrimination > Discriminatory Employment Practices > Demotions & Promotions

Labor & Employment Law > ... > Age Discrimination > Evidence > General Overview

*HN4*[⬇] **Burdens of Proof, Burden Shifting**

A plaintiff can establish that an employer's stated legitimate, nondiscriminatory reasons for discharging him are mere pretexts by showing: 1) that the reasons had **_no_** basis in fact; 2) that, if they have basis in fact, they were not the actual factors motivating the employment decision; or 3) that, if they were the factors, they were jointly insufficient to justify the decision.

Labor & Employment Law > ... > Age Discrimination > Remedies > General Overview

*HN5*[⬇] **Age Discrimination, Remedies**

The "substantial equivalent" of the position from which a claimant is discriminatorily discharged must give him virtually identical promotion opportunities, compensation, job responsibilities, working conditions, and status.

Contracts Law > Types of Contracts > Express Contracts
Business & Corporate Compliance > Contracts > Types of Contracts > Express Contracts

Torts > Business Torts > Commercial Interference > General Overview

Contracts Law > Types of Contracts > Oral Agreements
Business & Corporate Compliance > Contracts > Types of Contracts > Oral Agreements

Evidence > Inferences & Presumptions > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

Labor & Employment Law > Wrongful Termination > Breach of Contract > Express Contracts

*HN6*[⬇]  **Types of Contracts, Express Contracts**

Oral contracts of employment for an indefinite term are presumed to be terminable at the will of either party. The presumption may be overcome if there is an express agreement to the contrary.In order for oral statements to overcome the presumption of employment at will, they must be clear and unequivocal statements of job security. In addition, the parties must "mutually assent to be bound" by the alleged contract.

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Procedural Matters > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Torts > Intentional Torts > Defamation > General Overview

Torts > ... > Defamation > Defenses > Statute of Limitations

*HN7*[⬇]  **Statute of Limitations, Time Limitations**

The statute of limitations for a defamation action is one year. *Mich. Comp. Laws § 600.5805(7)*.

**Judges:** Before: White, P.J., and Cavanagh and J.B. Bruff, [*] JJ.

# Opinion

PER CURIAM.

---

[*] Circuit judge, sitting on the Court of Appeals by assignment.

Plaintiff appeals as of right from an order granting summary disposition to defendants pursuant to *MCR 2.116(C)(10)* on his claims for age discrimination, wrongful discharge, tortious interference with a just-cause contract, and defamation. We affirm in part, reverse in part, and remand for further proceedings.

*HN1*[⬆] On appeal, an order granting or denying summary disposition is reviewed de novo. A motion for summary disposition may be granted pursuant to *MCR 2.116(C)(10)* when, except as to the amount of damages, there is **_no_** genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Giving the benefit of reasonable doubt to the nonmovant, the trial court must determine whether a record might be developed that would leave open an issue upon which reasonable **[*2]** minds might differ. *Plieth v St Raymond Church, 210 Mich App 568, 571; 534 NW2d 164 (1995)*.


I

Plaintiff claims that the trial court erred in granting defendants' motion for summary disposition on his age discrimination claim. We agree.

*HN2*[⬆] The burden of proof in an age discrimination case is allocated as follows: (1) the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination; (2) if the plaintiff is successfully proving a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff then has the burden of proving by a preponderance of the evidence that the legitimate reason offered by the defendant was merely a pretext. *Barnell v Taubman Co, Inc, 203 Mich App 110, 120; 512 NW2d 13 (1993)*.

Plaintiff alleges that he was intentionally discriminated against. *HN3*[⬆] In order to establish a prima facie case of age discrimination under the intentional discrimination theory, a plaintiff must show that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position, and **[*3]** (4) he was replaced by a younger person. *Id.* Intentional discrimination may be established with circumstantial or statistical evidence, as "an employer is rarely so blatant as to announce its illegal motives." *Lytle v Malady, 209 Mich App 179, 185; 530 NW2d 135 (1995)*, lv gtd *451 Mich 920 (1996)*.

The facts viewed in a light most favorable to plaintiff are that defendant Spring Meadows hired plaintiff as grounds keeper in 1970, and promoted him the next year to Greens Superintendent. Plaintiff performed very well and was highly regarded. Plaintiff never received any warnings or disciplinary action. As Greens Superintendent, plaintiff was responsible for maintaining the entire golf course and clubhouse, supervising up to twelve employees, mowing, keeping up the sand traps, changing cups, carpentry and, occasionally, repairing golf carts.

Around 1989, according to deposition testimony of board member Jason Harness, the board recognized that if something were to happen to plaintiff, or if he were to leave for any reason, it had **_no_** ready replacement. In April 1990, the Club hired thirty-year-old Jeffrey Blackett as assistant Greens Superintendent. **[*4]** Blackett challenged plaintiff's authority and knowledge and verbally criticized plaintiff's skills to plaintiff, other staff, and board members. On December 3, 1991, in a letter to the membership stating that "the golf gods [had] smiled upon Spring Meadows" and that the club had "had a very successful year," the Board announced that it was placing Blackett in plaintiff's position of Greens Superintendent, and that plaintiff would be classified as Maintenance Superintendent, a newly created year-round position. Blackett's salary was increased $ 4,000 at the time. Effective November 1, 1992, plaintiff was laid off. On March 31, 1993, defendants sent plaintiff a letter telling him to return to work on April 5, 1993. In response, plaintiff's doctor wrote the golf club that plaintiff was unable to return to work.

In their motion for summary disposition, defendants asserted that because there was a personality conflict between Blackett and plaintiff, the board decided to create a new position of Maintenance Superintendent. Defendants argued that the existence of these two positions would both decrease the need for interaction between Blackett and plaintiff and lessen the workload of the **[*5]** Greens Superintendent. Defendants maintained that plaintiff's removal from the Greens Superintendent position and placement in the Maintenance Superintendent position was not a demotion, but a lateral transfer, and that the Board promoted Blackett to the Greens Superintendent position

because of Blackett's formal education and higher skill in golf course maintenance. [1] As to plaintiff's lay-off effective November 1, 1992, defendants contended that it was due to lack of work and because the clubhouse was scheduled to undergo renovation, which reduced the necessity of having a Maintenance Superintendent.

 [*6]  Plaintiff attached excerpts of his deposition testimony to his response to defendants' motion for summary disposition. At deposition, plaintiff testified that when he was removed from his Greens Superintendent position and made Maintenance Superintendent, he **no** longer supervised any employees or had a budget. As Greens Superintendent, he previously had supervised from six to twelve persons and had had a budget of over $ 200,000. When plaintiff was made Maintenance Superintendent, his office was moved from the maintenance building to the basement; his phone was taken away; defendants stopped paying his dues to the Michigan Association of Golf Course Superintendents and a number of other associations, and stopped paying for him to attend seminars, workshops, and meetings he formerly had attended as Greens Superintendent. Plaintiff testified that Board members regularly played golf with Blackett but never invited plaintiff to play golf with them. Plaintiff also stated that, since 1989, his salary had remained at the same level, while others were given increases. Moreover, one year [2] he was the only person not to receive a bonus, although the younger employees received bonuses. Plaintiff [*7] testified that he was largely excluded from the search process for the assistant Greens Superintendent, that he was not allowed to enter names of candidates or participate in screening the candidates, and that he was told that the wording of the ad had to be approved by, and all resumes had to go through, the Board president, White. Plaintiff also testified that after he was made Maintenance Superintendent his supervisor expressed **no** interest in his work and that he was shunned by Board members. Plaintiff testified that defendants gave him "the unquestionable signal" that they wanted to get rid of him, ostensibly by making him so tired of the job that he would quit.

Plaintiff was not required to submit direct evidence of age discrimination to establish that defendant's articulated reasons for his demotion and lay-off [*8]  were pretextual. *HN4*[⬆] A plaintiff can establish that the employer's stated legitimate, nondiscriminatory reasons are mere pretexts by showing: 1) that the reasons had **no** basis in fact; 2) that, if they have basis in fact, by showing that they were not the actual factors motivating the employment decision; or 3) that, if they were the factors, they were jointly insufficient to justify the decision. *Dubey v Stroh Brewery Co, 185 Mich App 561, 565-566; 462 NW2d 758 (1990).*

We conclude that plaintiff presented evidence sufficient to survive defendants' motion that defendants' alleged legitimate reasons for the adverse employment actions, i.e., that plaintiff was not demoted but laterally transferred, and that plaintiff was later laid off due to lack of work, were pretextual. A reasonable fact-finder could conclude that the terms and conditions of plaintiff's employment worsened considerably when he was removed from the Greens Superintendent position, replaced with the younger Blackett, and made Maintenance Superintendent, and that such constituted a demotion and not a lateral transfer. *HN5*[⬆] The "substantial equivalent" of the position from which a claimant is discriminatorily [*9]  discharged must give him virtually identical promotion opportunities, compensation, job responsibilities, working conditions, and status. *Jenkins v Southeastern Michigan Chapter, American Red Cross, 141 Mich App 785, 797; 369 NW2d 223 (1985).* Although plaintiff's pay was not reduced, plaintiff presented ample evidence that his job responsibilities significantly changed and decreased when he was made Maintenance Superintendent, that his working conditions worsened considerably, and that his status was significantly reduced.

Plaintiff also presented sufficient evidence to raise a genuine issue of fact regarding whether Blackett was better qualified than plaintiff to be Greens Superintendent. Although Blackett apparently had an Associate Degree in turf grass management, plaintiff had more than twenty years' experience as Greens Superintendent, had taken

---

[1] In reference to Blackett's skills being superior to plaintiff's, defendants argued below that the board decided to hire an Assistant Greens Superintendent "because it was believed that Plaintiff's supervisory responsibilities were becoming 'too heavy' and, as a result, there were increased complaints by the members as to the quality of the course." In support of this argument, defendants cited only to the deposition of Jason Harness. We have reviewed the excerpts of Harness' deposition defendants attached to their motion and found **no** reference to member complaints about the golf course.

[2] Although plaintiff testified at deposition that he believed that year was 1989, in response to defendants' motion, plaintiff argued that the year was 1991, and attached a document to that effect.

numerous courses at Michigan State University in turf grass, had attended annual seminars in that area from 1970 until 1993, and was a member of the Michigan Turf Association of Superintendents, The Southern and Michigan and Border Cities Superintendents Association, Michigan Farm Bureau, among others. In **[*10]** addition, plaintiff presented evidence below that threw into question Blackett's work experience before coming to Spring Meadows. [3]

Plaintiff also presented sufficient evidence to raise a genuine issue of fact whether his subsequent lay-off was due to lack of work. Plaintiff testified that there was plenty of work to do at that time, including his regular maintenance work of repairing golf carts, painting and cleaning up, and that **[*11]** there was additional work surrounding the construction job. Moreover, plaintiff's lay-off notice came less than a year after defendant Spring Meadows had announced in writing that it had had a "very successful" 1991 and had distributed bonuses in December 1991 along with a memo which stated that 1991 was one of the club's most successful years. A reasonable fact-finder could, under these circumstances, conclude that "lack of work" was not the true reason for plaintiff's lay off.

In sum, plaintiff presented evidence from which a reasonable fact-finder could conclude that defendants' articulated reasons for removing him from his Greens Superintendent and later laying him off were pretexts, that age was one of the determining factors in defendants' adverse employment actions, and that defendants' actions were taken in an effort to get plaintiff to quit or force him out. We therefore reverse the circuit court's grant of summary disposition of plaintiff's age discrimination claim and remand for further proceedings.

II

Plaintiff next complains that the trial court should not have granted summary disposition on his wrongful discharge or "tortious interference with a just-cause contract" **[*12]** claims. We disagree. *HN6*[⬆] Oral contracts of employment for an indefinite term are presumed to be terminable at the will of either party. *Rood v General Dynamics Corp, 444 Mich 107, 116-117; 507 NW2d 591 (1993)*. The presumption may be overcome if there is an express agreement to the contrary. *Snell v UACC Midwest, Inc, 194 Mich App 511, 512; 487 NW2d 772 (1992)*. Here, plaintiff claims that a just-cause contract was created based on the express oral representations of board members that he was doing a good job; that he should stay with the club; that the board wanted him to stay a long time; and that he could have a job until retirement.

In order for oral statements to overcome the presumption of employment at will, they must be clear and unequivocal statements of job security. *Rowe v Montgomery Ward & Co, 437 Mich 627, 645; 473 NW2d 268 (1991)*. In addition, the parties must "mutually assent to be bound" by the alleged contract. *Rood, supra at 118-119*. Here, none of the alleged oral statements were made during discussions about job security but rather, were made when commending plaintiff's **[*13]** performance or explaining why he would not receive a raise in a particular year. In *Rood*, the Court held that similar statements did not create a just-cause contract because they were not made during discussions about job security in relation to forming a contract. *Id. at 123-124*; see also *Barber v SMH (US), Inc, 202 Mich App 366, 371; 509 NW2d 791 (1993)*. Moreover, statements that plaintiff was doing a good job and that his employers hoped he would stay are statements of optimism, not contractual undertakings. See *Rowe, supra at 642-643*; see also *Rood, supra at 135*. Because the statements made to plaintiff over the years did not clearly or unequivocally establish a just-cause contract, and there is **_no_** evidence that the parties mutually assented to such a contract, summary disposition was appropriate.

III

Finally, plaintiff asserts that the trial court erred in granting summary disposition on his defamation claim against defendant Blackett. The trial court held that the statute of limitations on the claim expired prior to plaintiff's filing suit. *HN7*[⬆] The statute of limitations for a defamation action **[*14]** is one year. *MCL 600.5805(7)*; MSA 27A.5805(7).

---

[3] Plaintiff attached Blackett's resume to his response to defendants' motion for summary disposition. Blackett stated in his resume that he had worked at five golf clubs, including Wabeek Country Club in 1985. Plaintiff argued that he had attempted to obtain Blackett's former employment records, but that Blackett refused to sign authorizations. Nonetheless, plaintiff was able to obtain a letter from Wabeek Country Club, which was appended to his response to defendants' motion, and stated that the club had neither personnel records nor any personal recollections of a Jeff Blackett.

Plaintiff testified that Blackett made defamatory statements about him over a three-year period when Blackett was his assistant. Blackett began his job as plaintiff's assistant in April 1990. On January 1, 1992 plaintiff ceased being the Greens Superintendent, and Blackett was **_no_** longer his assistant. Because Blackett was not plaintiff's assistant for three years, but rather only for twenty-one months, the testimony that the statements were made during the three years that Blackett was the assistant must be disregarded.

Plaintiff continually represented that Blackett was his assistant at the time that the defamatory remarks were made. Moreover, the nature of the remarks themselves indicate that they were made when plaintiff was still managing the greens, laying tile, and buying and spraying chemicals. Plaintiff did not have those responsibilities after January 1, 1992. In addition, plaintiff alleged that he overheard some of the defamatory statements when he was in his office in the maintenance building. Plaintiff did not have an office in the maintenance building after January 1, 1992. Therefore, viewing all **[*15]** of the evidence in a light most favorable to plaintiff and drawing inferences therefrom, we cannot conclude that plaintiff established that any defamatory remarks were made after January 1, 1992. That being the latest date, the statute of limitations ran on January 1, 1993. Because suit was not filed until May 10, 1993, summary disposition on the grounds that the statute of limitations had expired prior to the filing of the suit was appropriate.

Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction. **_No_** taxable costs pursuant to *MCR 7.219*, neither party having prevailed in full.

/s/ Helene N. White

/s/ Mark J. Cavanagh

/s/ John B. Bruff

---

**End of Document**

# *Fielden v. CSX Transp., Inc.*

United States District Court for the Southern District of Ohio, Eastern Division

August 26, 2009, Decided; August 26, 2009, Filed

Case No. 2:03-cv-995

**Reporter**
2009 U.S. Dist. LEXIS 82140 *; 2009 WL 2824459

Jesse A. Fielden, Plaintiff, v. CSX Transportation, Inc., Defendant.

**Prior History:** *Fielden v. CSX Transp., 2007 U.S. App. LEXIS 16393 (6th Cir., July 2, 2007)*

## Core Terms

matter of law, defendant argues, machine, weight of the evidence, new trial, experienced, carpal tunnel syndrome, jury's verdict, plate, pain, statute of limitations, suffering, symptoms, damages, motions

**Counsel:** **[*1]** For Jesse A Fielden, Plaintiff: Thomas H Peyton, LEAD ATTORNEY, Harvey D Peyton, Peyton Law Firm, Nitro, WV.

For CSX Transportation Inc, Defendant: Daniel J Hampton, LEAD ATTORNEY, David A Damico, Burns White & Hickton, Pittsburgh, PA.

**Judges:** James L. Graham, United States District Judge.

**Opinion by:** James L. Graham

## Opinion

### *OPINION AND ORDER*

This matter is before the court on defendant's posttrial motion for judgment as a matter of law, and/or for a new trial, and/or remittitur. The motion has been briefed by the parties and is now ripe for disposition.

Plaintiff initiated this action by filing a complaint, pursuant to the Federal Employers' Liability Act (FELA), *45 U.S.C. § 51 et seq.*, alleging that defendant was negligent in failing to provide him with a reasonably safe place within which to work, and that he was injured as a result of defendant's negligence. More particularly, plaintiff alleged that defendant assigned him to duties which defendant knew, or, in the exercise of reasonable care, should have known, were beyond his physical capacity or would otherwise cause injury to him, and that defendant's negligence caused injury to his hands and wrists. Defendant asserted that it was not negligent and plaintiff **[*2]** was not injured as a result of any negligence by the defendant. The matter proceeded to trial in May 2009. After plaintiff presented his case to the jury, defendant moved for judgment as a matter of law pursuant to *Fed. R. Civ. P. 50(a)*. The court denied the motion, and the matter was submitted to the jury. The jury rendered a verdict in favor of the plaintiff.

Pursuant to *Fed. R. Civ. P. 50(b)*, defendant renews its motion for judgment as a matter of law, and also requests a new trial under *Fed. R. Civ. P. 59*. A *Rule 50(b)* motion may be granted only if in viewing the evidence in the light most favorable to the non-moving party, there is **no** genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party. *Gray v. Toshiba America Consumer Products, Inc., 263 F.3d 595, 598 (6th Cir. 2001)*. This standard also applies to the granting of a motion under *Fed.*

*R. Civ. P. 50(a)* for judgment as a matter of law at the close of evidence. *See Keeton v. Flying J, Inc., 429 F.3d 259, 262 (6th Cir. 2005).*

Defendant presents two grounds in support of its renewed motion for judgment as a matter of law. First, defendant argues that plaintiff **[*3]** failed to present sufficient evidence to establish that he complied with FELA's three-year statute of limitations. Second, defendant argues that plaintiff failed to present sufficient evidence to establish the elements of negligence. These arguments were raised when defendant moved for judgment as a matter of law prior to the submission of the case to the jury, and they were addressed and rejected by the court at that time.

The court adheres to its conclusion that defendant is not entitled to judgment as a matter of law. Simply stated, the evidence at trial, when viewed in a light most favorable to plaintiff, supported a finding of negligence and the finding that the lawsuit was not barred by the FELA statute of limitations. The evidence reasonably indicated that, even though plaintiff experienced symptoms with his hands prior to October 29, 2000, or three years before the filing of the lawsuit, the condition plaintiff experienced with his hands on or after July 2001 was not the result of the ordinary progression of his preexisting carpal tunnel syndrome, but was a new and separate injury to his hands. Thus, evidence supported a finding that the lawsuit was filed within the period **[*4]** of time prescribed by the applicable statute of limitations.

Plaintiff testified that he sustained significant injury to his hands and wrists after being assigned to operate a plate jack machine, and that he repeatedly complained, without avail, to his supervisor about his discomfort and his inability to properly operate the machine due to his physical characteristics. Evidence demonstrated that a plate jack machine operator uses the specialized machine to raise a rail enough to enable the operator to push a metal plate under the rail, and that this procedure is repeated a few thousand times per day and requires the use of certain hand movement and gripping by the operator. Furthermore, the testimony of plaintiff's physicians explained the nature and treatment of carpal tunnel syndrome and how sustained grip activity aggravates carpal tunnel syndrome. Based on their treatment of plaintiff, these physicians opined that plaintiff's condition was work-aggravated. Plaintiff's testimony, combined with the testimony of the physicians, satisfied the "relaxed" standard of causation applicable in FELA cases and supported a finding that defendant's negligence caused injury to plaintiff.

For these **[*5]** reasons, and the reasons articulated by the court on the record at trial in regard to defendant's motion for judgment as a matter of law, the court denies defendant's renewed motion for judgment as a matter of law.

Defendant sets forth six grounds for a new trial. First, defendant argues that the jury's finding that plaintiff complied with the FELA statute of limitations was against the weight of the evidence. Second, defendant argues that the jury's finding that plaintiff's injuries were caused, or aggravated by, defendant's negligence was against the weight of the evidence. Third, defendant argues that the court erred in denying its motions to preclude the testimony of Dr. Thomas Fischer and Dr. David Southwick. Fourth, defendant argues that the court erred in rejecting its proposed instructions on proximate cause. Fifth, defendant argues that the court erred in rejecting its proposed instructions on apportionment of damages. Sixth, defendant argues that the amount of the jury verdict was excessive and against the weight of the evidence.

As to defendant's request for a new trial, the court first addresses defendant's challenge to the court's ruling on its motions, filed April 7, 2009, **[*6]** to preclude the testimony of Dr. Fischer and Dr. Southwick. Plaintiff filed a response to the motions on April 15, 2009. At the final pretrial conference held on April 17, 2009, the parties were given the opportunity to present their respective arguments as to defendant's motions in limine. Upon considering the arguments relating to the motions in limine, the court orally denied the motions and articulated its reasons for the denial on the record. Shortly thereafter, the court filed an order denying the motions. Defendant has presented **_no_** new argument that would cause the court to resolve that its earlier decision on this matter was in error.

The court also finds as unpersuasive defendant's argument that the jury's verdict was against the weight of the evidence as it relates to the jury's findings as to the FELA statute of limitations and defendant's negligence. A motion for new trial should be denied "if the verdict is one which could reasonably have been reached." *Woodbridge*

*v. Dahlberg, 954 F.2d 1231, 1234 (6th Cir. 1992)*. "[A] verdict is not unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." *Id.*

In **[*7]** support of its motion, defendant points to the fact that evidence indicated that plaintiff experienced symptoms with his hands prior to October 29, 2000, which was three years before the lawsuit was filed. Defendant also suggests that the complexity of carpal tunnel syndrome and the lack of certainty as to its causes weighed heavily against plaintiff's claim for recovery based on defendant's alleged negligence.

The fact that evidence indicated that plaintiff experienced symptoms before October 29, 2000, did not preclude a finding that plaintiff sustained a new and separate injury to his hands on or about July 2001, after he was assigned to operate the plate jack machine. As noted above, evidence at trial demonstrated that the problems plaintiff experienced with his hands after he started operating the plate jack machine were markedly different than what he experienced before he was reassigned to operate that machine. Although different inferences could have been made from the evidence that plaintiff experienced symptoms with his hands prior to October 29, 2000, it was not unreasonable, or against the weight of the evidence, for the jury to conclude that plaintiff sustained a new and **[*8]** separate injury after he was assigned to operate the plate jack machine. Moreover, plaintiff's physicians explained the nature of carpal tunnel syndrome and its treatment, and, based on their treatment of him, opined that his condition was work-aggravated. Contrary to what is suggested by defendant, plaintiff's claim was not that defendant's negligence caused his underlying carpal tunnel syndrome, but that, as a result of defendant's negligence, his pre-existing condition was aggravated so as to require him to seek medical treatment including surgery for the injury. The court believes that the jury's verdict for the plaintiff on his FELA claim was reasonable and in accord with the weight of the evidence.

Defendant also argues that a new trial is appropriate because the amount of the jury's verdict, $ 353,631.13, reduced for plaintiff's contributory negligence to a net verdict of $ 286,441.22, was excessive and against the weight of the evidence. In the alternative, defendant moves the court for remittitur of the jury's verdict. Defendant asserts that the evidence of plaintiff's lost wages totaled just under $ 100,000. According to defendant, the evidence of plaintiff's pain and suffering **[*9]** did not support the difference between the amount of his lost wages and the jury's ultimate verdict.

A damage award must stand unless it is beyond the range supportable by the proof, is so excessive as to shock the conscience, or is the result of mistake. *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., 948 F.2d 271, 278 (6th Cir. 1991)*. Calculating the amount of damages for pain and suffering does not lend itself to the application of a mathematical formula; it requires the application of the jury's best judgment and common sense based on the evidence presented. *See Champion v. Outlook Nashville, Inc., 380 F.3d 893 (6th Cir. 2004)* (noting that pain and suffering cannot be "mechanistically" measured). Thus, it is not the role of the court to substitute its judgment as to the proper amount of damages for pain and suffering, if such award is supported by proof, does not shock the conscience, and is not the result of a mistake.

As noted by defendant, evidence at trial indicated that plaintiff suffered a loss of earnings of approximately $ 100,000 due to his injury to his hands and wrists. Evidence also indicated that plaintiff, in an attempt to alleviate the symptoms associated with his injury, **[*10]** endured painful injections into his right hand as well as three surgeries, and that his range of motion and grip strength in his right hand continues to be limited. Based on the evidence presented concerning plaintiff's pain and suffering and loss of earnings, the court concludes that the jury's verdict was reasonable and supported by the evidence. Additionally, nothing suggests that the verdict amount was the result of a mistake. Thus, the amount of the jury's verdict will not be disturbed.

Lastly, the court addresses defendant's challenge to the jury charge as it concerned causation and apportionment of damages. Before the start of trial, the parties submitted proposed jury instructions on the issues of causation and apportionment of damages in a FELA action. Before the jury was charged, a conference was held in which the parties again presented their arguments as to these issues. After duly considering the parties' arguments, the court indicated how it would instruct the jury on the issues of causation and damages, and it explained its reasoning for not instructing the jury in the manner requested by defendant. The court recognized the current debate regarding the proper causation **[*11]** standard in FELA cases but noted that it must adhere to the current state of the law in

the Sixth Circuit. Furthermore, the court found insufficient evidence to support an apportionment instruction that would permit the jury to apportion damages between railroad and non-railroad causes not attributable to plaintiff's contributory negligence. The court adheres to the reasoning it articulated at the charge conference regarding these issues and therefore finds that the jury instructions were proper.

Accordingly, the court DENIES defendant's posttrial motion for judgment as a matter of law, and/or for a new trial, and/or remittitur (Doc. **_No_**. 71).

It is so ORDERED.

/s/ James L. Graham

James L. Graham

United States District Judge

Date: August 26, 2009

---

**End of Document**

# *GOODMAN v. GENESEE COUNTY*

Court of Appeals of Michigan

August 8, 2006, Decided

No. 266955

**Reporter**

2006 Mich. App. LEXIS 2490 *; 2006 WL 2270411

DENNIS GOODMAN, Plaintiff-Appellant, v GENESEE COUNTY, Defendant-Appellee

**Notice:** **[*1]** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Genesee Circuit Court. LC *No*. 04-080516-CD.

**Disposition:** Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

## Core Terms

retaliation, Fleet, pool, protected activity, complaints, reorganization, genuine issue of material fact, adverse employment action, direct evidence, trial court, eliminated, remarks, input, summary disposition, mechanic, racial discrimination, plaintiff's claim, discriminatory, motivation, causation, positions, animus, causal, *no* evidence, recommendations, fact-finder, procurement, regulations, message, argues

**Judges:** Before: Smolenski, P.J., and Hoekstra and Murray, JJ.

## Opinion

PER CURIAM.

In this action alleging violations of the Elliot-Larsen Civil Rights Act (ELCRA), *MCL 37.2101 et seq.*, and the Whistleblowers' Protection Act (WPA), *MCL 15.361 et seq.*, plaintiff appeals as of right the trial court's order granting summary disposition in favor of defendant. Plaintiff also challenges a protective order prohibiting certain discovery. We affirm in part, reverse in part, and remand for further proceedings.

I. Basic Facts and Procedural History

Plaintiff served as defendant's Motor Pool Administrator but was discharged from his position after the motor pool division was reorganized in a manner that eliminated his position and rendered him ineligible for continued employment within **[*2]** the division. He thereafter filed the instant suit for damages, claiming that the reorganization plan resulting in his discharge was the unlawful product of a combination of racial discrimination and retaliation for his complaints of discrimination and reports to the Department of Environmental Quality (DEQ). However, after concluding that plaintiff had failed to create any genuine issues of material fact to support these claims, the trial court granted summary disposition in favor of defendant pursuant to *MCR 2.116(C)(10)*. This appeal followed.

II. Analysis

We review a trial court's decision on a motion for summary disposition de novo. *Bergen v Baker, 264 Mich. App. 376, 381; 691 N.W.2d 770 (2004)*. A motion for summary disposition pursuant to *MCR 2.116(C)(10)* should be granted when there is **no** genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the nonmoving party, leaves open an issue upon which reasonable minds could differ." *West v GMC, 469 Mich. 177, 183; [ *3] 665 N.W.2d 468 (2003)*.

A. Racial Discrimination under the ELCRA

In support of his claim of racial discrimination, plaintiff asserts that his African-American supervisor, Eric Hopson, intentionally caused plaintiff's position to be eliminated because plaintiff is Caucasian. The ELCRA prohibits employers from discriminating "against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." *MCL 37.2202(1)(a)*. Plaintiff correctly notes that different standards of proof are applied to determine whether a discriminatory treatment claim may proceed to the fact-finder based on the type of evidence of discrimination that a plaintiff provides. He claims that racial comments made by Hopson constitute "ordinary evidence that, if believed, would require the conclusion that discrimination was at least a factor in the adverse employment action." *Wilcoxon v Minnesota Mining & Mfg Co, 235 Mich. App. 347, 360; 597 N.W.2d 250 (1999)*. Accordingly, he argues that he has provided direct evidence [*4] of intentional, race-based discrimination, rather than merely alleging "circumstances giving rise to an inference of discrimination." *Id. at 359*. Therefore, he argues that his prima facie case should not be evaluated using the burden-shifting analysis enunciated in *McDonnell Douglas Corp v Green, 411 U.S. 792; 93 S. Ct. 1817; 36 L. Ed. 2d 668 (1973)*, which explicitly requires a plaintiff to prove that the defendant's proffered legitimate reasons for its adverse action are merely pretextual. *DeBrow v Century 21 Great Lakes, Inc (After Remand), 463 Mich. 534, 539; 620 N.W.2d 836 (2001)*; *Wilcoxon, supra at 359-360*. We agree.

Claims that present direct evidence of racial animus are commonly referred to as "mixed motive" or "intentional discrimination" claims. *Wilcoxon, supra at 360*. In such cases, the plaintiff must show: (1) that he is a member of a protected class, (2) an adverse employment action, (3) that the employer was predisposed to discriminating against members of the plaintiff's protected class, and (4) that the employer actually acted on that predisposition [*5] in visiting the adverse employment action on the plaintiff. *Id. at 360-361*. When a plaintiff has provided direct evidence of discrimination, it is generally the job of the fact-finder to weigh the parties' evidence concerning the defendant's motivation, the meaning of apparently discriminatory remarks, or the credibility of evidence. *DeBrow, supra at 539-540*. A defendant may, however, avoid a finding of liability by showing that it would have made the same decision even without consideration of the protected characteristic. *Harrison v Olde Financial Corp, 225 Mich. App. 601, 613; 572 N.W.2d 679 (1997)*.

Here, the parties contest whether plaintiff has created a genuine issue of material fact regarding whether defendant may be said to have been predisposed to discriminating, and to have acted on the predisposition, in choosing to reorganize the motor pool and eliminate plaintiff's position in the process. Plaintiff focuses his argument on an e-mail message that he alleges was sent to him by Hopson on the day before the September 28, 2004 meeting at which defendant's board of commissioners voted to adopt a budget that, [*6] among other things, eliminated plaintiff's position. In addition to requesting motor pool fleet information from Goodman, this e-mail states: "[B]eing white and so autonomous in your position for so many years, I bet you think the board will listen to you tomorrow. You'll find out different, they listen to me now. [P] You people seem to think you can get away with anything but things have changed around here now." [1]

_____

[1] Although Hopson denies that the e-mail message as sent by him to plaintiff contained these statements, and in support of that claim has produced a copy of the e-mail message that contains only the request for motor pool fleet information, for purposes of our review we must view the evidence presented in a light most favorable to plaintiff. *West, supra.*

Plaintiff compares this comment to the facts of *DeBrow, supra at 538*, in which the plaintiff was fired during a conversation in which his supervisor said that the plaintiff was "getting too old for [*7] this shit." There, the Court concluded that the trial court improperly dismissed the plaintiff's age discrimination claim because,

> [w]hile a factfinder might be convinced by other evidence regarding the circumstances of the plaintiff's removal that it was not motivated in any part by the plaintiff's age and that the facially incriminating remark was *no* more than an expression of sympathy, such weighing of evidence is for the factfinder, not for this Court in reviewing a grant of a motion for summary disposition. [*Id. at 539*.]


We agree that Hopson's e-mail message, when viewed in a light most favorable to plaintiff, provides direct evidence of animus that is comparable to the statement in *DeBrow*. The e-mail message refers to plaintiff's race and, simultaneously, clearly refers to the board's upcoming vote on whether to eliminate plaintiff's position and Hopson's intent to influence the board. These remarks constitute "ordinary evidence that, if believed, would require the conclusion that discrimination was at least a factor in the adverse employment action." *Wilcoxon, supra at 360*.

The trial court acknowledged this direct [*8] evidence of discrimination, but incorrectly concluded that this evidence was essentially irrelevant given that it was the board, and not Hopson, that ultimately decided to eliminate plaintiff's position. Regardless that a decision may be made by a potentially unbiased final decision-maker, racially-motivated input into the decision-making process may still provide direct evidence of discrimination. For instance, we note *Harrison, supra at 608 n 7*, in which this Court concluded that racially biased comments made to the employee who made a final hiring decision by other employees participating in the interview process "must be imputed" to the decision-maker for purposes of a motion for summary disposition brought under *MCR 2.116(C)(10)*. There, because the decision-maker testified in his deposition that he had consulted with and considered the views of another employee who exhibited racial animus during the decision-making process, the plaintiff was found to have raised a genuine issue of material fact regarding whether the decision "was influenced by a person that plaintiff alleges operated with racial animus." *Id.* The discriminatory comments [*9] were not considered mere "stray remarks" of non-decision-makers. *Id.*

Here, similarly, the board appears to have received substantial input from Hopson. As defendant's Director of Purchasing, Hopson reviewed an initial reorganization assessment that was provided by an independent contractor. Hopson then provided his own plan recommendations to the board through a memorandum, a presentation to the Finance/Budget Committee, and in meetings with board chairperson Richard Hammel. Indeed, Hammel attested that when plaintiff presented him with materials challenging the prudence of the reorganization plan, Hammel did not review the materials because he was satisfied with Hopson's recommendations.

We reject defendant's argument that Hopson's input was essentially irrelevant because the initial assessment provided by the independent contractor also eliminated plaintiff's position. Rather, we find that plaintiff has created a genuine issue of material fact regarding whether he would have remained eligible for employment if the initial assessment had been adopted. As indicated below, the initial assessment recommended the elimination of plaintiff's position as well as the creation of two [*10] new positions:

> We also recommend that the county create a new position of Fleet Manager to centralize the management of the day to day activities of fleet maintenance operations and motor pool activities. This position should have first hand experience with fleet maintenance as well as with vehicle procurement, daily rental motor pool activities, computerized fleet management applications, and customer service. This position should also be capable of assisting with hands on fleet maintenance activities during vacations and times of peak workloads.
> Motor pool activities should [be] handled by a new position with the title of Fleet Operations Assistant. The current Motor Pool Administrator position should be eliminated. This position is at a level that is higher than is required for motor pool operations and the job description is not suitable for the new Fleet Manager position. The Fleet Operations Assistant position, in addition to dispatching pool vehicles, should also function as the parts technician and procurement assistant for maintenance operations so that the mechanics can devote all of their time to repair activities.

Defendant argues that each of these **[*11]** two positions required the ability to perform basic mechanic services--and therefore required mechanics' certification--because the position descriptions require the capability "of assisting with hands on fleet maintenance" and functioning "as the parts technician and procurement assistant for maintenance operations." Accordingly, because plaintiff is not a certified mechanic, defendant argues that he would have become ineligible for employment regardless of whether Hopson provided his alternative plan for reorganization.

However, there is **_no_** evidence that these positions would have required mechanics' certification. To the contrary, these positions are distinguished from those of "the mechanics" in the assessment and, significantly, the Fleet Operations Assistant position appears designed to replace plaintiff's former position. With regard to specific functions, Hopson testified that plaintiff's former position included "maintaining parts, supplying parts, procuring parts or inventorying parts." Plaintiff also provided his own testimony and affidavit explaining his qualifications, along with the Vehicle/Car Pool Administrator job description and a list of activities he performed **[*12]** that were not included in the job description. His former position "[d]irect[ed] the operation" of the motor pool and required knowledge of computerized systems, procurement, fleet operations, maintenance and repair, among other requirements and duties. Plaintiff's list of additional duties also included maintenance activities such as adjusting brakes, assisting with installations, replacing and adjusting headlights, taillights and tires, and "picking up the slack on minor items during mechanic absences." These duties appear substantially similar to the duties listed in both of the new positions proposed by the assessment and, particularly, appear very similar to the duties of the Fleet Operations Assistant. At a minimum, there exists a genuine issue of fact regarding whether plaintiff would have been qualified for the Fleet Operations Assistant position.

Therefore, plaintiff has created a genuine issue of fact regarding whether his total ineligibility for employment was caused by Hopson's plan. Hopson's plan eliminated plaintiff's position but transferred his managerial duties to a supervising mechanic position; all of the positions that existed after Hopson's reorganization **[*13]** explicitly required mechanics' certification. Plaintiff also provided evidence that African-Americans remained eligible for employment with the motor pool and that an African-American was hired for the new mechanic position created by Hopson's plan. Accordingly, Hopson's level of input into the board's eventual decision is relevant to whether plaintiff's loss of employment was substantially caused by Hopson's alleged discriminatory motives.

We reiterate that summary disposition is not proper here, where there is direct evidence of discrimination, merely because the board is not charged with animus and because defendant has provided significant evidence of its legitimate reasons for adopting Hopson's plan. Rather, because plaintiff has provided factual support for his argument that Hopson provided the primary input into the board's decision, this case is not distinguishable, for instance, from more typical cases in which a supervisor makes a racially motivated decision that is automatically sanctioned and carried out by the defendant organization, which may then be liable based on respondeat superior. If a person who is improperly motivated gives significant input into a decision-even **[*14]** if his or her input is phrased innocently-such biased input may meet the plaintiff's burden to show that animus was "a 'substantial' or 'motivating' factor" in the eventual decision. _Harrison, supra at 611_. In cases where a plaintiff has provided direct evidence of discrimination, we must leave it to the fact-finder to consider the meaning of the apparently discriminatory remarks and to weigh the evidence of discrimination against the evidence supporting the defendant's claim that it would have reached the same decision without consideration of the plaintiff's race. _DeBrow, supra at 539-540_; _Harrison, supra at 613_. The trial court erred by dismissing plaintiff's racial discrimination claim merely because the board was the ultimate decision-maker. Remand is warranted for this reason.

B. Retaliation under the ELCRA and WPA

The trial court, however, properly dismissed plaintiff's claims of retaliation under both the ELCRA and the WPA. With regard to his claim for retaliation under the ELCRA, plaintiff has not provided evidence of a causal connection between defendant's awareness of plaintiff's complaints of racial discrimination **[*15]** and defendant's decision to adopt a reorganization plan that rendered plaintiff ineligible for employment. The ELCRA prohibits retaliation or discrimination "against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under [the ELCRA]." _MCL 37.2701(a)_. To establish a prima facie claim of retaliation under the ELCRA, a plaintiff

must show "'(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.'" *Garg v Macomb Co Community Mental Health Services, 472 Mich. 263, 273; 696 N.W.2d 646 (2005)*, quoting *DeFlaviis v Lord & Taylor, Inc, 223 Mich. App. 432, 436; 566 N.W.2d 661 (1997)*.

We initially note that it is somewhat unclear whether plaintiff engaged in a protected activity at any time before the September 28, 2004 board meeting. It appears **[*16]** that prior to the meeting plaintiff informed Robert Gorman, his union representative, that Hopson had made racial remarks on two occasions when Hopson was subjecting plaintiff to what plaintiff concluded was harassing or discriminatory treatment. Plaintiff also vaguely recounts a meeting with Renita Coney, defendant's Affirmative Action Director, during which plaintiff complained that he was treated differently from other employees, but stated that he had "***no*** way of knowing" whether the harassment was racially motivated. Finally, the packet of materials that plaintiff claims to have supplied to the board before its September 28, 2004 meeting includes an outline that appears to refer to Hopson in stating, "Has made unwarranted racial comments and statements in response to [plaintiff's] time requests."

Plaintiff's argument that defendant had relevant knowledge of these reports of discrimination are somewhat difficult to analyze because he fails to make clear whether he asserts that Hopson, the board, or both retaliated against him. With regard to the board, there is ***no*** evidence that the board was made aware of plaintiff's race-related complaints until either the September 28, 2004 meeting **[*17]** or the time it received plaintiff's materials in preparation for the meeting. Regardless, the board's mere knowledge of Hopson's remarks is not sufficient evidence that their awareness caused plaintiff's retaliatory discharge. In order to establish the causation element, "'[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.'" *Garg, supra at 286*, quoting *West, supra at 186*. Plaintiff has not provided any additional evidence that the board adopted Hopson's plan in retaliation for plaintiff's report of Hopson's racial remarks.

Plaintiff's arguments also implicate Hopson's awareness of plaintiff's complaints, and perhaps rightly so. Although plaintiff presents ***no*** authority directly addressing this point in the context of a claim for retaliation, Hopson's awareness of plaintiff's complaints, and potential retaliation therefore, is arguably relevant to defendant's liability given that Hopson had substantial influence in the board's decision-making process. See, e.g., *Harrison, supra.* Regardless, his claim in this regard cannot succeed because there is ***no*** evidence **[*18]** that Hopson was aware that plaintiff engaged in a protected activity. There is ***no*** evidence that Hopson was aware of the reports to Gorman or Coney. Most strikingly, there is ***no*** evidence that complaints of *racial* discrimination were raised at the meeting among plaintiff, Gorman, and Hopson on January 30, 2004, when Hopson allegedly threatened, "I will never be in a position where I have to prove that I'm not harassing you." Rather, Gorman's affidavit indicates that at this meeting plaintiff complained of generally harassing treatment in violation of the collective bargaining agreement in the form of Hopson's arguably unfair treatment and disciplining of plaintiff. Moreover, the evidence does not show that Hopson was made aware of plaintiff's race-related complaints at the September 28, 2004 board meeting. Plaintiff does not claim that Hopson received plaintiff's packet of materials, and the minutes of the meeting do not suggest that plaintiff addressed race-related issues during his remarks. Regardless, even if Hopson did become aware of plaintiff's complaints at the meeting, the evidence does not create an inference of causation, as Hopson made his initial plan recommendations **[*19]** as early as September 13, 2004. Accordingly, plaintiff has not provided evidence that any knowledge that Hopson or the board had of his race-related complaints was causally connected to his discharge. His retaliation claim under the ELCRA was properly dismissed for this reason.

Plaintiff's claim under the WPA fails for similar reasons. The WPA protects an employee who has reported or is about to report a suspected violation of state or federal law, regulation or rule from adverse employment actions. *MCL 15.362*; see also *West, supra at 183*. To establish a prima facie case under the WPA, a plaintiff must show that "(1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West, supra at 183-184*.

Here, the parties contest whether plaintiff's evidence established genuine issues of material fact concerning the first and third elements of a prima facie case. With regard to the first element, plaintiff claims that he engaged in protected [*20] activity in one or both of two ways. Primarily, he recounts a call that he placed to the DEQ after learning that defendant was considering closing the motor pool and using the facility grounds as a parking lot. Plaintiff had become concerned about DEQ regulations that would require particular treatment or cleanup of the facility's fuel storage tanks. He averred that he told the DEQ "what we had and what the board was talking about in closing it and just making the whole area into a parking facility." It is questionable whether this conversation constitutes a report of a violation of a law or regulation, particularly in light of plaintiff's admission that **_no_** agent of defendant ever specifically told him that defendant intended not to follow DEQ regulations concerning the fuel tanks. Nonetheless, when the testimony is viewed in a light most favorable to plaintiff, the DEQ's alleged response, i.e., "**_No_**, this can't happen like that," arguably implies that plaintiff had suggested that cleanup procedures would not be followed.

On appeal, plaintiff adds that "all complaints [he] made to higher authorities within [defendant]" also constituted protected activity because his complaints [*21] were reports "to a larger umbrella entity that is also a public body." Although, as a general matter, such a report constitutes a report to a public body within the meaning of the WPA, _Heckmann v Detroit Chief of Police, 267 Mich. App. 480, 496; 705 N.W.2d 689 (2005)_, we can only surmise that plaintiff is referring first to the October 28, 2003 memorandum given by him to union representative Mark Pratt and to Hammel, and which he claims he also provided to the board. However, while this memorandum explains DEQ requirements for cleanup, it does not mention his call to the DEQ or his suspicion that procedures would not be followed. Second, plaintiff sent an e-mail message to Hammel and "all users" within the county on April 3, 2003, which he also claims he provided to the board. This message, however, explains the drawbacks of closing the facility--including the cleanup that would be required--but does not mention the DEQ or plaintiff's suspicion that regulations would not be followed. Accordingly, we conclude that only plaintiff's call to the DEQ has the potential to be construed as a report of a violation.

With respect to this call, defendant argues [*22] that a reported suspicion that defendant would violate the law _in the future_ is not protected by the act and, therefore, that plaintiff may not be said to have engaged in protected activity, at all. We decline to address defendant's alternative argument because we find that the trial court properly dismissed plaintiff's claim based on its conclusion that there was **_no_** causal connection between plaintiff's call to the DEQ and defendant's decision to eliminate plaintiff's position.

The only evidence that defendant was aware of plaintiff's call to the DEQ is plaintiff's testimony that he told Hammel that he had contacted the DEQ when he met with Hammel on October 30, 2003. Plaintiff claims Hammel responded: "I wish you had waited." He does not provide any evidence that links his alleged protected activity with his eventual discharge beyond Hammel's response and the fact that the elimination of plaintiff's position occurred in September 2004. Plaintiff merely states in his brief that causation is evident "[b]ecause the timing is so suspicious in this case." However, this is insufficient to establish causation and, therefore, to present a prima facie case under the WPA. Regardless [*23] that the elapsed time-period of nearly a year may not prevent a showing of causation according to the cases cited by plaintiff, these cases also clearly require more than merely proof that the adverse action occurred after the protected activity. For instance, plaintiff cites _Harrison v Metropolitan Government of Nashville, 80 F.3d 1107 (CA 6, 1996)_, overruled in part on other grounds _Jackson v Quanex Corp, 191 F.3d 647, 667 n 6 (CA 6, 1999)_. There, the discharge occurred at most one year and three months after a complaint was filed. _Id. at 1119_. However, causation was established not merely by the timetable, but by the timetable combined with other factors including that three employees feared retaliation because the employer had made "repeated comments that suggested he would not hesitate to run employees out of his department." _Id._

We find this case comparable to _Feick v Monroe Co, 229 Mich. App. 335; 582 N.W.2d 207 (1998)_, which was a retaliation case brought under the ELCRA. Hammel's comment is comparable to the evidence in _Feick_ that the plaintiff's superior "was not pleased" that the plaintiff had [*24] filed an Equal Employment Opportunity Commission complaint. _Id. at 344_. The supervisor had also "talked about the complaint to one other person." _Id._ Regardless, that evidence, without more, was held to be insufficient to create a genuine issue of material fact regarding whether the adverse action was caused by retaliation. _Id. at 344-345_. Accordingly, the trial court properly dismissed plaintiff's

WPA claim because of the lack of evidence of a retaliatory causal link between plaintiff's report and his eventual discharge.

C. Protective Order

Finally, we address plaintiff's argument that the trial court abused its discretion when it limited plaintiff's deposition of Hammel and prohibited plaintiff from deposing the remaining members of defendant's board of commissioners. We review a trial court's decision whether to grant a protective order for an abuse of discretion. *Charter Twp of Bloomfield v Oakland Co Clerk, 253 Mich. App. 1, 35; 654 N.W.2d 610 (2002).*

The order at issue here reads, in pertinent part, as follows:

> Plaintiff is precluded from inquiring into the motivation and/or understanding of any individual Commissioner concerning **[*25]** any vote that was taken in association with the September 28, 2004 meeting of the Genesee County Board of Commissioners or any meeting of the Commissioners leading up to that September 28, 2004 meeting vote.

We find **_no_** abuse of discretion in the trial court's entry of this order. Although parties are permitted to obtain all relevant, nonprivileged information through the discovery process, *MCR 2.302(B)(1)*, the judiciary generally may not interfere with a legislative decision-making process by allowing inquiry into the thought processes of legislative officials. See *Sheffield Dev Co v City of Troy, 99 Mich. App. 527, 533; 298 N.W.2d 23 (1980)* ("[t]he collective or individual motives of a legislative body are not discoverable"). Consistent with this rule, and as conceded by defendant on appeal, the order at issue here does not preclude the deposing of individual board members, but merely inquiry by plaintiff into the motivations and understandings of the members regarding adoption of the reorganization plan. To that extent, and insofar as the order does not preclude other relevant inquiry by plaintiff at deposition, the order **[*26]** is wholly appropriate. *Id.*

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael R. Smolenski
/s/ Joel P. Hoekstra
/s/ Christopher M. Murray

# *Griffey v. Dep't of Corr.*

Court of Appeals of Michigan

July 21, 2022, Decided

No. 354322

**Reporter**

2022 Mich. App. LEXIS 4265 *; 2022 WL 2900390

LISA GRIFFEY and CEDRIC GRIFFEY, Plaintiffs-Appellees, v DEPARTMENT OF CORRECTIONS, Defendant-Appellant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Appeal dismissed by *Griffey v. Dep't of Corr., 2022 Mich. LEXIS 1874 (Mich., Oct. 28, 2022)*

**Prior History:** **[*1]** Genesee Circuit Court. LC No. 17-108535-CD.

*Griffey v. Dep't of Corr., 2020 Mich. App. LEXIS 7636 (Mich. Ct. App., Nov. 17, 2020)*

## Core Terms

Investigator, harassment, retaliation, trial court, plaintiffs', mammy, ticket, charges, discipline, remittitur, misconduct, video, other-acts, jurors, assistant deputy, coworker, offensive, damages, parole, new trial, contacted, employees, retaliatory, depression, answers, retire, questionnaire, probation, witnesses, calculation

**Counsel:** For LISA GRIFFEY, CEDRIC GRIFFEY, Plaintiffs-Appellees: MARK R. BENDURE; JONATHAN MARKO.

For CORRECTIONS DEPARTMENT OF, Defendant-Appellant: JOSEPHINE A. DELORENZO.

**Judges:** Before: CAMERON, P.J., and O'BRIEN and SWARTZLE, JJ.

## Opinion

Per Curiam.

After a month-long jury trial, a jury found in favor of plaintiffs, Lisa Griffey and Cedric Griffey, on their employment-discrimination and retaliation claims under the *Civil Rights Act (CRA)*, *MCL 37.2101 et seq.*, against defendant, the Michigan Department of Corrections. The jury awarded plaintiffs $11,670,128.33. Defendant appeals that judgment as of right.

On appeal, defendant argues it is entitled to (1) reversal and dismissal of plaintiffs' claims, or a JNOV of no cause of action, because plaintiffs failed to prove a prima facie case of disparate treatment, hostile work environment, and retaliation under the CRA; (2) a new trial because of the trial court's erroneous decision to admit improper evidence and the behavior of plaintiffs' counsel during trial; or (3) remittitur or a new trial because the amount of damages was not supported by the evidence during trial or was otherwise improper. Finding no errors warranting appellate relief, we affirm.

## I. FACTUAL [*2] BACKGROUND

Lisa and Cedric both worked for defendant. This case was first filed because Lisa, a 55-year-old black woman, claimed in relevant part that she suffered a racially hostile work environment and disparate treatment while working for defendant. After the lawsuit was filed—which Cedric, as Lisa's husband, joined—plaintiffs claimed that defendant retaliated against Cedric, a 57-year-old black man, which led to plaintiffs amending their complaint to include a charge of retaliation against defendant.

### A. LISA'S CLAIMS

Plaintiffs met in January 1989. Plaintiffs were married in 1991. In October 2000, Lisa began working for defendant as a parole and probation agent. As part of her job, Lisa often wrote presentence investigation reports (PSIR), which required her to interview probationers and parolees.

For her first six years, Lisa worked in various offices in Wayne County. Then, in 2006, Lisa transferred to defendant's parole and probation branch in Macomb County. Lisa remained in defendant's Macomb office until 2014, at which time she moved to Davison, Michigan, with her family and requested a transfer to the Lapeer County office so she would work closer to where she now lived. In November [*3] 2014, Lisa's transfer was approved and she began working as an agent in Lapeer.

The Lapeer office was in the basement of the Lapeer County government building and courthouse. Defendant's parole and probation office was the only state-level department in the building, and it housed fewer than 10 employees. Lisa was the only employee who was black in the entire building. The parole and probation supervisor in Lapeer, Michael Slater, was the highest-ranking employee of defendant in the Lapeer County building. Supervisor Slater also supervised the Sanilac County parole and probation department. Supervisor Slater testified that Lisa was chosen to work in the Lapeer office by someone above him, which he thought was unusual. He clarified that Lisa was assigned to his office against his wishes. According to Supervisor Slater, Lisa agreed to cover some work in Sanilac County as a condition of transferring, which required her to drive out to the Sanilac County office. Lisa disagreed, testifying that she was unaware of the requirement to drive to Sanilac County as part of her job duties, which was about one hour from the Lapeer office. Lisa said that she was the only employee in the Lapeer office [*4] who was required to do so.

On Lisa's first day, Supervisor Slater took her around the building, along with another new hire, and introduced them to the staff. The other individual was a white male. During the introductions, Supervisor Slater told people that he did not know what he was getting with respect to Lisa, but he knew the white male would be a good agent. Lisa testified that she believed Supervisor Slater's comments were racially motivated, but she did not report them at the time.

According to Lisa, over the next two years, she was subjected to numerous racially inappropriate and offensive communications. At trial, Lisa provided some examples of racial harassment, but was clear that she was only discussing those she remembered.

Lisa testified that, one day during work, she was going over a map of Lapeer County with fellow Parole and Probation Agent Meegan Shephard. Agent Shephard directed Lisa's attention to Imlay City and said that it was where a majority of the black residents of Lapeer County lived. Lisa was surprised and offended by the comment, and testified that Agent Shephard "pretty much admitted that she didn't even know why she mentioned it." According to Lisa, in another [*5] instance involving Agent Shephard, Agent Shephard approached Lisa after lunch to tell her that someone in the building was asking about the new employees. Agent Shephard said she knew the person was asking about Lisa because the person described her as "the lady with different hairstyles[.]" Agent Shephard then said, "I don't know why [the person] didn't just call you the black one." Lisa testified that Agent Shephard's comment made her feel singled out and harassed because of her race. Lisa told Agent Shephard that referring to her as "the black one" was offensive, and asked Agent Shephard not to do so in the future. Lisa also testified about a third instance involving Agent Shephard in which another agent, Parole and Probation Agent Tom Arend, was speaking with Agent Shephard in her office, which was across the hallway from Lisa's office. Agents Arend and Shephard were discussing one of Agent Shephard's parolees and the upcoming visit to the parolee's

home. Agent Shephard told Agent Arend that the parolee was racist and did not like black people. Agent Shephard then told Agent Arend that they should send Lisa to do a home visit. Agent Shephard looked across the hall at Lisa, saw **[*6]** she overheard, and laughed. Lisa testified that she was offended and felt threatened by Agent Shephard's statements, though she was never actually asked to go on the home visit.[1]

Lisa also testified that, on a separate occasion, she was in the lunch room with Parole and Probation Agent Nicole Zolinski and the office receptionist, Martine Kraft. Agent Zolinski was discussing her family and told them that her stepsister, whose last name was "Kuhns," had adopted a child who was black. A homophonic comparison was referenced regarding the word "coon," which Lisa testified was a racial slur. According to Lisa, Agent Zolinski stated: "[Y]ou know, [Lisa], you should be able to sympathize with [the adopted child] or empathize with him. He's a young black kid and, you know, he's adopted by a family and their last name is Kuhn[s]. Isn't—you know, what do you think about that, [Lisa]?" Lisa said that she was offended and felt harassed by the implications of the story.[2]

Lisa also testified about interactions she had with Parole and Probation Agent James Olson, who was the most senior agent in the Lapeer office. When Supervisor Slater was out of the office, Agent Olson served as supervisor in his stead. **[*7]** One day, while Agent Olson was filling that role, Lisa asked him if she could speak with him in her office. Lisa wanted Agent Olson to review a document for her. Agent Olson stayed in the doorway, refused to enter, and said, "I'm not going to come into your office because you're scary."[3] According to Lisa, Agent Olson was a large man who would have no reason to be afraid of Lisa. She believed that Agent Olson's comment about her being "scary" was racially motivated.

On another occasion, according to Lisa, Agent Olson and Lisa were alone together in the office when he decided to show her a video on his work computer. Lisa described the video as follows:

> It was Chris Rock talking about what black people should do not to get arrested. And immediately started in the video [sic], they are showing like police officers just beating up this black guy and Chris Rock is narrating the video pretty much giving black people advice on what they shouldn't do so that they are not arrested.

Lisa testified that Agent Olson told Lisa that he thought it was funny, and she told him that she did not think the video was funny and walked out of his office. She noted that Agent Olson did not show the video to **[*8]** the agents in the office who were white. As a result, she suspected that Agent Olson's decision to show her the racially insensitive video was because she was black.[4]

Lisa also described a second event involving a different racially inappropriate video she was shown at work. As pretext, Lisa testified that she and Parole and Probation Agent Brigette Avolio would often say "ain't nobody got time for that" when discussing how busy they were at work. After they had used the phrase for a period of time, Agent Avolio asked Lisa if she knew from where it originated. When Lisa said she did not know, Agent Avolio used her personal cell phone to show Lisa the video while they ate lunch together in the office lunchroom. Lisa described the video in the following manner:

> So [Agent Avolio] got her personal cell phone and she pulled up the video of Sweet Brown on YouTube and it was video of a black female with a scarf on her head, with ashy lips and a gold tooth, and she was speaking incorrect English and she, you know, while—she was being interviewed by the news about a fire that happened in her neighborhood and it was the background of a bad neighborhood. And they were interviewing her and

---

[1] Agent Shephard testified at trial and, for the most part, denied the pertinent allegations.

[2] Agent Zolinski testified that she told the story because it was common for the coworkers to discuss their lives outside of work. She said that she did not intend to offend anyone and was shocked that Lisa would think a discussion about Agent Zolinski's family was derogatory. Agent Zolinski denied telling Lisa that she should be able to sympathize with the child.

[3] Agent Olson testified that he could not recall any such interaction with Lisa.

[4] Agent Olson acknowledged showing the video to Lisa and said that he regretted doing so because, in hindsight, he understood how it could be offensive. Though he also testified that he did not remember Lisa saying anything to him about the video being offensive when he showed it to her.

she—you **[*9]** know, during the interview she was saying ain't nobody got time for that and, at one point in the video, they even added music to it and she was saying it over and over.

Lisa said that Supervisor Slater was in the lunchroom when the Sweet Brown video was shown to her and heard it.[5] She testified that she told Agent Avolio that the video was not funny, and that she would never again use the phrase "ain't nobody got time for that" now that she was aware of its origin. According to Lisa, Agent Avolio used the phrase one more time after Lisa expressed her dislike of the video.[6]

While Supervisor Slater only overheard the Sweet Brown video being played, Lisa testified that there were instances of racial harassment directly involving Supervisor Slater. Lisa recalled on one occasion where she, Supervisor Slater, and Kraft were discussing running. Lisa explained that she and Cedric enjoyed running in 5K races, to which Supervisor Slater and Kraft said that Africans were great runners because they had to run for food. They both laughed about the comment. Lisa testified that she thought it was "unprofessional" and in "poor taste."[7] According to Lisa, on another occasion, Lisa's coworkers decided to **[*10]** order pizza together as an office. Supervisor Slater came around to everyone's offices to ask what toppings they liked on their pizzas. When he entered Lisa's office, he asked if she wanted chitterlings on her pizza. Lisa testified that she was offended by the question because chitterlings were not pizza toppings, but were food items stereotypically eaten by black people. Lisa said that she told Supervisor Slater that she was offended by the comment, but he thought it was funny.[8]

Despite all of the above events, which occurred before August 2016, Lisa never made an official complaint of racial harassment to defendant. She did, however, speak with Cedric about it. Lisa testified that her mental health had begun to suffer from the constant comments to which she was being subjected. Cedric agreed that Lisa had been struggling to deal with the harassment at work. He also testified that it had affected their marriage and his mental health. Both plaintiffs, however, were concerned about reporting any racial harassment because they were aware of retaliation from defendant when individuals reported any type of discriminatory harassment.

This all changed, however, on August 3, 2016. When Lisa **[*11]** walked into work that day, she was greeted by Kraft, who said, "morning, mammy." Lisa testified that she had never heard Kraft refer to anyone else by that name, and being called "mammy" made Lisa "feel horrible." She explained that her understanding of the term was "what black women were called back in slavery who cared for the slave master's children." Cedric agreed that the term "mammy" was extremely offensive, and provided the following description of the term: "Mammy is a term that came up through the late 1800's and it talked about black females who nursed Caucasian children or slave master's children. They were usually depicted as a black female with monkey-like features and big lips and a scarf on their head." Cynthia Rogers, who was a field training officer for defendant and responsible for conducting training regarding harassment, testified that the term "mammy" involves "perceiving a black woman as overweight, unattractive, unintelligent, [and] subservient to a white person."

Upon hearing the comment from Kraft, Lisa walked to her office and decided that she had no option other than to file an official complaint. She sent an e-mail to Supervisor Slater, who was out of the **[*12]** office that day, explaining what had occurred. Lisa also sent an e-mail to Cedric describing Kraft's comment. When Supervisor Slater received the e-mail, he immediately contacted Kraft to ask her what happened. Kraft told Supervisor Slater that her use of the word "mammy" had been a slip of the tongue. Kraft told the same story at trial, which involved an accidental combination of the words "ma'am" and "happy Wednesday." According to Kraft, she always greeted

---

[5] Supervisor Slater acknowledged that he was in the room when Agent Avolio played the Sweet Brown video to Lisa, and he agreed that he heard the conversation between the two women leading up to the video being played. At the time of trial, Supervisor Slater could not specifically recall Lisa's reaction to the video.

[6] Agent Avolio acknowledged that she showed the Sweet Brown video to Lisa and said that she could see how the video was offensive, yet she denied that Lisa said she was offended by the video.

[7] Supervisor Slater denied making or hearing any comment about running for food and agreed that such a comment would be offensive.

[8] Supervisor Slater denied asking such a question, and said that the only time chitterlings were mentioned was when Lisa told him that she did not like chitterlings while Cedric did.

everyone by saying "happy Wednesday," or whatever day it happened to be. As to Lisa, though, Kraft explained they both started calling each other "ma'am" for reasons she could not recall. Thus, Kraft contended that when Lisa walked into the office on August 3, 2016, Kraft meant to say, "good morning, and happy Wednesday, ma'am," but garbled her words and said, "good morning, mammy." Kraft testified Lisa did not mishear the comment; to Lisa's ears, Kraft said the word "mammy."

Supervisor Slater instructed Kraft to go apologize to Lisa if it truly was an accident. Kraft did so, but could tell that Lisa was not receptive to the apology. Lisa testified that Kraft said she only was apologizing because Supervisor Slater had instructed **[*13]** her to do so. At trial, Lisa acknowledged that Kraft often called her "ma'am," but testified that she believed Kraft intentionally called her "mammy," which tracked Lisa's history of facing racial harassment in the office. Lisa did not think Kraft's explanation made sense.

After Supervisor Slater instructed Kraft to apologize, he called Lisa. Supervisor Slater expected the issue to have been resolved by Kraft's apology, but when he spoke with Lisa, she asked to speak with him in person when he was back in the office. When Supervisor Slater returned to the office on August 5, 2016, he met personally with Lisa in his office. Lisa was crying and discussed Kraft's "mammy" comment with him. Supervisor Slater believed that this comment was Lisa's only issue, but she informed him that there had been several instances of race-based comments at the office. According to Lisa, upon hearing this, Supervisor Slater appeared to become upset with Lisa, and she felt threatened by his visible anger, especially because he was one of the people who perpetrated the harassment.[9] Even so, Lisa gave an example to him. She was careful to avoid the instances where Supervisor Slater was himself involved in the **[*14]** racial harassment, so told him the example of the "Kuhns" family. Supervisor Slater told Lisa that she could file a complaint with a harassment counselor if she did not feel the situation had been resolved.

After meeting with Lisa, Supervisor Slater called each member of the staff into his office to discuss defendant's discriminatory harassment policies. Supervisor Slater said that Kraft likely understood the reason for the meeting, but all of the other staff members had no reason to believe his discussion of the policies was related to Lisa. Lisa, however, disagreed with that assumption, noting that she was the only employee in the building who was black. Lisa testified that she was upset with Supervisor Slater's decision to handle her complaint in that manner because she felt it alerted all of her coworkers that she had complained. Lisa believed that the tension in the office worsened after Supervisor Slater's actions.

By August 8, 2016, which was after the weekend, Lisa still had not contacted a harassment counselor to report the racial harassment. On that day, Supervisor Slater was instructed by his superiors that he was required, under defendant's policies, to report the racial **[*15]** harassment, so he contacted Harassment Counselor Kelly Miller and asked her to come to the office. On August 9, 2016, Harassment Counselor Miller came to the Lapeer County building and had Lisa fill out several harassment-complaint forms documenting the harassment she had endured, limited to the preceding six months. When Lisa finished filling out all of her forms, she left the meeting room and went back to work. Later that day, Lisa saw Harassment Counselor Miller speaking jovially with Supervisor Slater and Agent Shephard, two people Lisa had just made complaints against. Upon seeing the interaction between those three, Lisa became confident that her complaints would not be handled appropriately.

According to Lisa, her fears of ostracism and worsening harassment were realized in the weeks after her complaint. She noticed that Agent Olson would glare at her when she came in the office. Lisa also noted that her main job in the Lapeer office was to write PSIRs, which sometimes required home visits, and before her complaints, her fellow agents would sometimes help her with home visits, but no one offered to help with home visits after her complaints. Additionally, on one occasion shortly **[*16]** after Lisa filed her complaints, she was left alone in the building while meeting with a probationer. Lisa testified that this was against the office's policies because the probationer might be dangerous. Lisa noted that she had never seen a white agent left alone with a probationer, and said that she believed it was inappropriate and slightly threatening.

---

[9] Supervisor Slater said that he was concerned, not angered, by Lisa's complaints.

At some point, Lisa requested a transfer out of the Lapeer office to work in Flint, Michigan. Defendant's Assistant Deputy Director James Blakely testified that he discussed the events described above with Lisa and Cedric, and found out about Lisa's transfer request. The assistant deputy director found Lisa's request and circumvented the normal procedures for transferring an agent to process Lisa's transfer to Flint as quickly as possible.

Lisa began working in defendant's Flint parole and probation office on September 26, 2016. Although Lisa requested the transfer, she did not believe that defendant was attempting to do her a favor by granting it. Cedric agreed, noting that Lisa did not suddenly feel better about the harassment after defendant chose to move her away from it. Instead, Lisa testified that defendant only acted when the **[*17]** assistant deputy director became involved and forced defendant to respond.

After she transferred, she was required to finish some of the PSIRs she had begun while working in Lapeer. Lisa testified that she did not know of any other occasion when an agent was required to take work with them after a transfer. Supervisor Slater said that this was relatively common because, otherwise, the Lapeer office would have been short-staffed related to the PSIRs that Lisa had already started.

According to Lisa, when she spoke to her coworkers in her new office, she found them immediately acting in a standoffish manner. She testified that she discovered Supervisor Slater had come to the Flint office and warned her coworkers she had filed discriminatory harassment complaints. Lisa said that this made her feel uncomfortable.

By October 15, 2016, Lisa had nearly a full caseload of parolees and probationers through the Flint office. One of her probationers was also on probation in a county other than Genesee, and therefore, had a separate probation agent in that county. The probationer in question told his other probation agent that he was feeling violent urges toward Lisa, though he did not mention her **[*18]** by name, and had considered killing her. The other probation agent contacted Lisa to warn her of the conversation, and Lisa reported it to her new supervisor, Parole and Probation Supervisor Tika Tyson. Lisa expected that the probationer would be determined to have violated the conditions of his probation, and likely sent to jail. However, Supervisor Tyson decided to simply change the probationer's agent to another person in the Flint office and refer him for mental-health treatment. Lisa testified that this result scared her because it would still require the probationer at issue to go to the building in which she worked. Cedric was also worried about Lisa's safety.

Lisa's concerns were exacerbated because the Flint office did not have a dedicated and secured parking lot. As a result, Lisa had to park down the street from the Flint office and walk on public sidewalks to get in the building. Because she feared a possible attack from the probationer while walking into work, she had Cedric or their son drive her to the office, drop her off, and pick her up when her shift ended.

In December 2016, Lisa's stress from the racial harassment and fear of the probationer were peaking. She decided **[*19]** to speak with her primary care physician, Dr. Sudhir Walavalkar, about her issues. Dr. Walavalkar testified that he had been treating plaintiffs for about 25 years when Lisa came to see him in December 2016. Before that appointment, neither plaintiff had ever complained of problems with mental health, nor had they been prescribed medications for such issues. During the visit in December 2016, though, Dr. Walavalkar noted Lisa's emotional state was different. He said that she was suffering from anxiety and depression, which she reported being caused by her work environment. Lisa told Dr. Walavalkar that her work environment was racially hostile. Dr. Walavalkar testified that he had never seen Lisa so upset. As a result, he diagnosed her with anxiety, depression, and chronic stress. He also recommended that she see a psychiatrist to obtain additional treatment because "the amount of depression that she had was significant . . . ." On December 30, 2016, Dr. Walavalkar found Lisa to be totally disabled, unable to continue working for defendant, and ordered her to stop going to work.

In January 2017, Lisa was in the process of following through with Dr. Walavalkar's recommendations to seek **[*20]** mental health treatment. On January 23, 2017, she attended a psychiatric evaluation with Dr. Gerald Shiener, who was qualified as an expert in "psychiatry, neurology, forensic psychiatry, addiction psychiatry, geriatric psychiatry, and psychosomatic psychiatry." Dr. Shiener identified some of Lisa's issues as feeling anxious and stressed all of the time, having nightmares about work, and being depressed. He noted that Lisa's most significant issue, though,

was the depression. Dr. Shiener diagnosed Lisa with major depression with features of post-traumatic stress disorder (PTSD). Dr. Shiener explained the diagnosis of major depression in the following manner:

> Major depression is a mood disorder and major depression is an illness of guilt, self[-]blame, we have a sense of failure, you feel as if you should have been able to do better and didn't or couldn't, and you suffer with feelings of guilt, remorse, self-doubt, and you have an impairment in sleep, impairments in appetite, impairments in energy level, impairments in concentration.

On January 31, 2017, Lisa attended an initial intake appointment with a therapist, Wendell Harris. Harris opined that Lisa had "a combination of anxiety, [*21] you know, the panic attacks, anxiety attacks, and she's also depressed." Harris testified that Lisa's issues arose from work-related stress, and he diagnosed her with an adjustment disorder with mixed anxiety and depression. Lisa's symptoms included difficulty sleeping, lack of energy, social withdrawal, apathy, and difficulty being assertive.

On February 3, 2017, plaintiffs filed the original complaint in this lawsuit. With respect to Lisa, plaintiffs alleged that defendant violated the CRA by treating her differently than her white coworkers, subjecting her to a racially hostile work environment, and retaliating against her after she complained of the racial harassment. As for Cedric, plaintiffs claimed only a loss of consortium.

After filing the complaint, Lisa continued to seek treatment while on leave from work. On February 14, 2017, she began seeing a psychiatrist, Dr. Leon Rubenfaer. After conducting an evaluation, Dr. Rubenfaer diagnosed Lisa with an "adjustment disorder which is a psychiatric condition that is caused by stress and severe distress in—in a situational environment; meaning that it's an emotional disorder brought on by outside sources, not in—not internal sources, [*22] and it usually is composed of a depressed and anxious mood." Dr. Rubenfaer opined that Lisa's adjustment disorder had been caused by the harassing and racially hostile work environment she had suffered. Dr. Rubenfaer explained that the events at work "made her to feel less of a person, lowered her self-esteem, caused her to feel as though she was made to feel made a fool of and—and not treated properly at all." Dr. Rubenfaer reported that Lisa experienced anxiety, depression, sadness, lack of sleep, nightmares, flashbacks, poor self-esteem, and racing thoughts. At the time, Dr. Rubenfaer recommended that Lisa continue to see a therapist and prescribed her Celexa, an antidepressant. Dr. Rubenfaer also extended Lisa's leave from work because he did not believe her return date of March 6, 2017, was appropriate.

Dr. Rubenfaer saw Lisa again on March 14, 2017, and April 11, 2017. Her problems continued and became chronic, Dr. Rubenfaer testified. These continuing issues led to Lisa becoming "distrustful, suspicious, and very disturbed . . . ." Lisa's quality of life had been harmed, she felt that she could not enjoy things she used to enjoy, and she felt distressed all of the time. When [*23] speaking with Dr. Rubenfaer on April 11, 2017, Lisa told him that she wanted to transfer back to defendant's Macomb office when she was required to return to work. Lisa believed that the situation would be better there because she still knew other agents who worked in Macomb.

In May 2017, when Lisa was about to return to work, her transfer to the Macomb office was approved by defendant. Despite desiring the transfer to escape what she believed to be a dangerous situation in Flint, Lisa did not enjoy having to drive over one hour to and from work each day, considering she still lived in Davison. At about this time, Lisa was taking medications for anxiety and depression.

That same month, she saw Dr. Rubenfaer for her fourth and final visit. Dr. Rubenfaer noted that Lisa's mood had slightly stabilized, which supported her return to work. However, this did not mean she was cured. Instead, Dr. Rubenfaer testified that Lisa's prognosis was poor, and he believed that she would require lifelong medication and psychotherapy to ensure her condition did not worsen. While he guardedly hoped she might improve, Dr. Rubenfaer was more concerned about her condition worsening and potentially resulting [*24] in suicide. In his opinion, Lisa had not substantively benefited from treatment, she likely never would, and she was totally and permanently disabled. In other words, Dr. Rubenfaer opined that Lisa could not and should not return to work on a permanent basis. Also during May 2017, Lisa saw Harris, her therapist, for the last time before a long hiatus. Harris agreed with Dr. Rubenfaer that Lisa's issues had become chronic. He noted that her anxiety continued throughout treatment and she was unlikely to improve at all until she no longer had to work, if ever.

According to Lisa, she had difficulty trying to reinitiate herself with the staff of defendant's Macomb parole and probation office because, despite defendant's promise of confidentiality, Lisa believed that her coworkers at the Macomb office had been told about her complaints of racial harassment in Lapeer. For instance, Lisa testified about a problem she had with one of her former coworkers, Parole and Probation Agent Heidi Zarka, who still worked at the Macomb office. On one occasion, Agent Zarka appeared to become upset with Lisa when she refused Agent Zarka's offer of help with a difficult probationer. According to Lisa, a few [*25] weeks later, she and Agent Zarka were alone in the copy room together when Agent Zarka walked up behind Lisa's back and whispered in her ear, "mammy, mammy, mammy," before walking out. Lisa was upset and immediately reported the event to her supervisor, who submitted the case to a harassment counselor for investigation. Lisa believed that Agent Zarka had been told what word to use to trigger a response form Lisa. Agent Zarka denied saying the words, but Lisa's supervisor agreed to move her office so they would not sit so close together.

Eventually, at some point in September or October 2018, Lisa attended a mandatory training at defendant's Macomb office. The training was conducted by Field Training Officer Rogers, who said that the topics and presentations were prepared by defendant at its headquarters. While the training generally was outlined for her, she was responsible for the specifics of each session. Field Training Officer Rogers stated that she planned to run one training per week at the Macomb office, with different employees attending the training each day.

On the day at issue, the topic of the training was harassment in the workplace. Lisa attended the training on Tuesday, [*26] and during the lunch break, was approached by Field Training Officer Rogers and her co-trainer, Anchelle Anderson, about the upcoming session. Lisa was told that the next segment of the class would be about racial harassment, and asked if she was comfortable with it. Lisa said it was fine, as long as there was no focus on her issues or case. Field Training Officer Rogers agreed that would not happen, though she testified that only Anderson knew of Lisa's specific complaints.[10] However, when the training session was underway, Field Training Officer Rogers announced to the class she would be discussing examples of racial harassment, and asked the class what could be considered racially offensive about the Gone with the Wind movie, to which someone in the class said the term "mammy" is used for a black character in the movie. Field Training Officer Rogers agreed that the term was offensive and provided a description of its meaning. She also displayed an image of a black woman with exaggerated and monkey-like features as an example of offensive material.

Lisa reacted poorly to the example, walked out of the training, and broke down crying. She was unable to continue work that day, felt unable [*27] to drive home, and had Cedric pick her up. Field Training Officer Rogers testified that the example was not directed at Lisa because Field Training Officer Rogers did not know any of the specifics of Lisa's case. Lisa did not believe the reference to Gone with the Wind was coincidental, testifying that she had heard the term "mammy" far too many times for her to believe it was accidental.

Toward the end of 2018, Lisa went out on a second medical leave. Although Lisa thought she needed more time on leave, she was forced to return to work after defendant sent her to see a state psychiatrist, who determined she could return to work, so she did.

In April 2019, Dr. Shiener, who had initially performed a psychiatric evaluation of Lisa in January 2017, reevaluated Lisa to see how her mental health had progressed over the preceding two years. He opined that the transfer to Macomb had helped her condition, but it had not been cured. Dr. Shiener noted that the training incident, which had included a discussion of Gone with the Wind and a reprisal of the use of the word "mammy" was an unfortunate recurrence of a trauma. This affirmed Lisa's sense of hopelessness and her feelings that she could [*28] do nothing to escape the harassment at work. He further opined that Lisa's condition had become chronic and would require lifelong therapy and medication, though he noted that she had discontinued taking her antidepressant. He

---

[10] Field Training Officer Rogers testified that she was not aware of Lisa's experiences being called "mammy" in the Lapeer and Macomb offices, so Lisa was not warned about those specific upcoming examples. Field Training Officer Rogers insisted that she would have changed the examples she had planned to use if she had been informed by anyone of Lisa's particular circumstances.

continued to diagnose Lisa with depression with a history of trauma reactions, and opined that Lisa's mental health required her to leave her employment with defendant.

At trial, Lisa testified about how defendant's harassment and retaliation had affected her. She said that she felt betrayed by defendant after many years of service. She described defendant's responses to her harassment as unfair and absurd. Lisa said that she had been changed as a person. As of trial, she still had difficulty sleeping, suffered from depression, and barely left her home. Indeed, Lisa claimed that she rarely did anything other than go to work and church. As the process continued, Lisa's mental suffering increased. She had not been provided the opportunity or a reason to heal, noting defendant's utter failure to take responsibility for her suffering. According to Lisa, one of the worst consequences for her was her reputation among her coworkers, which had changed to that of a liar. **[\*29]** Lisa testified that she regretted filing the complaint because she never wanted to be in this situation.

## B. CEDRIC'S CLAIMS

Cedric began his career with defendant as a corrections officer (CO) in August 1989, shortly after he met Lisa. Over the years, Cedric was promoted to sergeant, then lieutenant, then acting inspector, then captain, and finally, on March 1, 2014, Cedric was named the deputy warden of Thumb Correctional Facility (TCF), in Lapeer, Michigan. Cedric only ever received positive reviews from his supervisors, and, until the events of this case, never received any disciplinary action from defendant. According to Cedric, throughout his career, he had faced some racially harassing language—for instance, Cedric described an occasion where coworkers hung up photographs of Cedric describing him as a "Bubba"—but he never made any official racial harassment complaints with defendant because he believed the proper method for solving issues was to speak to people one-on-one.

Lisa told Cedric about the harassment she was facing after her transfer to Lapeer County, but like Lisa, Cedric was hesitant to make any reports. Cedric testified that he was upset because he saw how the harassment **[\*30]** was affecting Lisa, but he knew that defendant retaliated against employees who complained. Thus, he believed it was best to stay silent and hope the harassment would stop once Lisa's coworkers got to know her better.

As detailed above, however, things only got worse for Lisa, even after she made her formal complaint in August 2016, and the continually-mounting stress led her to see Dr. Walavalkar in December 2016. Lisa's situation was weighing heavily on Cedric, so he decided to also be evaluated by Dr. Walavalkar at that time. Dr. Walavalkar testified that, during the evaluation, Cedric became "extremely anxious, upset, and also [had] a very high heart rate and gets tachycardic." Dr. Walavalkar continued, stating that Cedric "was emotionally extremely upset, he was also very anxious and distraught because of the situation at work." Dr. Walavalkar diagnosed Cedric with anxiety, for which he prescribed Xanax, and a work-related major depressive disorder. Dr. Walavalkar also encouraged Cedric to see a psychiatrist for his mental-health issues. As related to Cedric's physical health, Dr. Walavalkar noted that the depression and anxiety could lead to high blood pressure and an exacerbation **[\*31]** of Cedric's previous issues with cholesterol.

On December 21, 2016, after Lisa had just taken her first medical leave, Prisoner Demorest,[11] who was housed at TCF and had a history of self-injurious behavior, was acting oddly while Cedric was not at work. Denise Lavender Jones, the prison's psychologist, assessed Prisoner Demorest and created a management plan. Although defendant's policies required a self-injurious prisoner to be stripped of their clothing and confined in a protective jacket, a sergeant on duty urged Jones to write a plan allowing Prisoner Demorest to remain clothed. Upon this urging, Jones relented, wrote the plan as requested, and the sergeant provided it to Lieutenant Richard Miller, who signed it. Lieutenant Miller reviewed the plan with Lieutenant Brent Whitman, who did not object to it.

The next day, December 22, 2016, Prisoner Demorest had to be stopped from injuring himself by other officers. Deputy Warden Scott Schooley, a colleague of Cedric, was made aware of the issue. Deputy Warden Schooley contacted Cedric, who technically supervised Lieutenants Miller and Whitman, and asked if Cedric would allow Deputy Warden Schooley to address the issue. Cedric agreed, **[\*32]** and later that day, Cedric, Lieutenant Whitman, Lieutenant Miller, and Deputy Warden Schooley met in Deputy Warden Schooley's office. According to

---

[11] Prisoner Demorest's first name was not provided in the lower court record.

Lieutenant Whitman, Deputy Warden Schooley yelled and cursed at the two lieutenants for failing to follow policies. After being verbally disciplined by Deputy Warden Schooley, Lieutenant Whitman believed the issue had been resolved. Cedric encouraged Lieutenants Whitman and Miller to take the conversation to heart, to reread the policies, and to ensure they were followed.

Deputy Warden Schooley, however, decided to submit the case for an investigation of possible work-rule and policy violations. In response to Deputy Warden Schooley's filing, Internal Affairs (IA) Manager Stephen Marschke assigned the investigation to Kevin Smith, who was the inspector on staff at TCF, with supervision by IA. Inspector Smith began his investigation shortly thereafter, sending notices of investigation to Lieutenants Miller and Whitman, as well as the sergeant involved. Inspector Smith also sent a questionnaire to Cedric, considering he was present in the room when Deputy Warden Schooley yelled and cursed at Lieutenants Miller and Whitman. Cedric agreed that **[*33]** the event occurred, but did not believe it was a problem. Inspector Smith, however, believed that Deputy Warden Schooley's decision to yell and curse at two subordinates was a violation of certain work rules. Inspector Smith also was concerned about Deputy Warden Schooley's denial of swearing at his subordinates. Inspector Smith suspected Acting-Warden George Stephenson had been aware of Deputy Warden Schooley's improper behavior and had failed to report it.

Because the investigation had shifted to focus on Deputy Warden Schooley and Acting-Warden Stephenson, Inspector Smith contacted IA to report his progress. At the time, which was at the end of January 2017, IA Manager Marschke was out of the office. As a result, Inspector Smith spoke with Kathy Warner, the administrator of defendant's Office of Executive Affairs, who handled some of IA Manager Marschke's responsibilities when he was not in the office. According to IA Manager Marschke and Administrator Warner, defendant's policies required the investigation to be turned over to IA because it involved Inspector Smith's superiors.

While this investigation was progressing, Lisa—as explained above—attended a psychiatric evaluation with **[*34]** Dr. Shiener in January 2017. Because Cedric was feeling stressed and anxious about Lisa's treatment at work, he also underwent a psychiatric evaluation by Dr. Shiener. Dr. Shiener testified that Cedric was having trouble sleeping, experiencing ruminative thoughts, losing weight, and dealing with a reduction in sex drive, and concluded that he, like Lisa, had "become psychiatrically ill." Dr. Shiener noted that Cedric's issues at the time primarily were related to Lisa, explaining that he felt helpless while observing Lisa struggle at work, which hurt him. Dr. Shiener reported that Cedric already was exhibiting manifestations of an inability to properly love and work. Specifically, Dr. Shiener testified that Cedric "had significant behavioral representations of anxiety consistent with his complaints, and I diagnosed an adjustment disorder with mixed emotional features that had become chronic."

Then, on January 31, 2017, Cedric went with Lisa for the initial intake appointment with therapist Harris. Harris noted that Cedric primarily was having stress and anxiety related to the harassment Lisa was facing at work. He felt angry his wife was being treated poorly, especially because his **[*35]** hands were tied with respect to helping her.

One day later, on February 1, 2017, Administrator Warner informed Inspector Smith that he was being removed from the investigation into the events involving Prisoner Demorest and Deputy Warden Schooley's yelling at Lieutenants Miller and Whitman. In his place, Administrator Warner assigned the investigation to IA Investigator Nicholas Cusack.

When Deputy Warden Schooley became aware that IA Investigator Cusack had been assigned to the ongoing investigation at TCF, he contacted IA Investigator Cusack to ask if he should be recused from the investigation considering they were friends. IA Investigator Cusack spoke with Administrator Warner about the issue, and she approved his continued work on the investigation. According to IA Investigator Cusack, he told Administrator Warner that he was not friends with Deputy Warden Schooley, and that the two had only worked together previously. Administrator Warner agreed with IA Investigator Cusack's testimony, noting that people investigating one another often know each other because of intradepartmental job changes. IA Investigator Cusack sent a text message to Deputy Warden Schooley informing him that **[*36]** he would not be recusing himself from the investigation.

With IA Investigator Cusack now running the investigation into the Prisoner Demorest and Deputy Warden Schooley issues, he reviewed the questionnaires that had been completed by Lieutenant Whitman, Cedric, and Lieutenant Miller. IA Investigator Cusack testified that he did not receive any notes from Inspector Smith about the progress of the investigation to that point, nor did he call Inspector Smith to ask him about it. IA Investigator Cusack did, however, notice that the answers to question number eight for Lieutenants Miller and Whitman, which was about what occurred in Deputy Warden Schooley's office, were nearly identical, including the same punctuation errors. IA Investigator Cusack became suspicious Lieutenants Miller and Whitman shared their answers to the questionnaire, which was a violation of policy. Upon further review of Cedric's responses, IA Investigator Cusack believed that Cedric's answer to question number eight was substantially similar to those of Lieutenants Miller and Whitman, although not identical.

As a result of his suspicions, IA Investigator Cusack contacted Administrator Warner and asked for approval **[*37]** to search the e-mail accounts of Lieutenant Miller, Cedric, and Lieutenant Whitman. Despite some initial hesitance, Administrator Warner approved IA Investigator Cusack's request. When he did so, IA Investigator Cusack discovered that Lieutenant Miller had sent an e-mail with a copy of his answers to Lieutenant Whitman after they received their questionnaires from Inspector Smith. A few days later, after Cedric received his notice of investigation from Inspector Smith, Lieutenant Miller sent an e-mail to Cedric with Lieutenant Miller's completed questionnaire attached. The body of the message directed Cedric's attention to number eight of the attached questionnaire. While IA Investigator Cusack's review of the records showed that the e-mail had been opened and deleted by Cedric, there was no data on whether the attached questionnaire had been opened and reviewed. Even so, IA Investigator Cusack believed that the body of the message, which directed Cedric's attention to question eight, proved Cedric requested the e-mail be sent to him.

With the foregoing evidence in hand, IA Investigator Cusack began shifting the focus of the investigation. He suspected Lieutenant Miller, Cedric, and **[*38]** Lieutenant Whitman of colluding in their responses to frame Deputy Warden Schooley, and prepared new questionnaires, this time including questions about whether answers to previous questionnaires were shared. Lieutenant Miller, Cedric, and Lieutenant Whitman all denied sharing answers to questionnaires during Inspector Smith's investigation. Similarly, Deputy Warden Schooley denied cursing at Lieutenants Miller and Whitman. IA Investigator Cusack also asked Deputy Warden Schooley's secretary if she heard yelling coming from the office, which she denied.

On April 19, 2017, IA Investigator Cusack came to TCF to conduct in-person interviews with those involved in the investigation. When he arrived at the facility, Deputy Warden Schooley came outside of the building, greeted IA Investigator Cusack in the parking lot, and the two walked in together. IA Investigator Cusack could not recall what topics they discussed during the walk inside, but insisted it was not the investigation. During the in-person interviews, Lieutenant Miller, Cedric, and Lieutenant Whitman repeated their denials of sharing answers to their questionnaires. Likewise, Deputy Warden Schooley and his secretary denied that **[*39]** Deputy Warden Schooley yelled and cursed at Lieutenants Miller and Whitman. When IA Investigator Cusack left TCF for the day, he was escorted to his vehicle by Deputy Warden Schooley.

On June 1, 2017, Acting-Warden Stephenson was replaced with Warden Willis Chapman. When Warden Chapman started, he was directed to plaintiffs' original complaint, which was still in the desk previously used by Acting-Warden Stephenson. About two months later, on August 26, 2017, events leading to a second investigation of Cedric commenced. On that day, Prisoner Harding-Bey, whose first name was not provided on the record, had a visit with his girlfriend, Saundra Cheeks. Cheeks was a former employee of defendant who, before being fired, had worked with Cedric at a different prison many years previously. Cedric was not at work when Cheeks visited Harding-Bey, and her visit was being monitored by CO Thomas Goodfellow. While supervising the visit, CO Goodfellow saw what he believed was Prisoner Harding-Bey pulling Cheeks' blouse to look at her breasts, which was a violation of the rules against sexual contact in the meeting room. CO Goodfellow showed the video to his shift commander, Lieutenant Patrick Moore, **[*40]** Jr., who agreed that Prisoner Harding-Bey and Cheeks had violated the rules. Consequently, Lieutenant Moore ended the visit, CO Goodfellow wrote a misconduct ticket for Prisoner Harding-Bey, and issued a visitor restriction for Cheeks.

Relevantly, the process for misconduct tickets is relatively confusing and requires some explanation to fully understand the events in this case. A ticket must be reviewed with a prisoner within 24 hours of being written, or it will be thrown out. When a CO writes a ticket, they submit it in a box specifically designated to collect such tickets. At some point later, a shift commander will look at the tickets to see if they are well-written and supported by video evidence. According to all of the witnesses who worked at TCF, this step was relatively important because TCF had a history of a poor conviction rate with respect to misconduct tickets. Therefore, TCF management, especially Cedric, stressed to shift commanders that they should not review with prisoners poorly written or uncorroborated tickets. In short, if the TCF staff stopped bad tickets from going forward by refusing to review them, the conviction rate would increase, which was an important **[*41]** statistic used by defendant to track prison performance. If a shift commander decided not to review the ticket with a prisoner, TCF policy required the shift commander to discuss the decision with the CO who wrote the ticket. If, on the other hand, the shift commander believed the ticket was good, they would review it with the prisoner. After the ticket is reviewed, only a warden was permitted to stop the misconduct ticket from going forward. Assuming no intervention from the warden, the ticket would then go to a hearing officer, who would determine whether the prisoner was guilty of the alleged misconduct.

As relevant to the present case, CO Goodfellow submitted the misconduct ticket regarding Prisoner Harding-Bey shortly after the event occurred. At 7:24 a.m. on the next morning—August 27, 2017—Cheeks sent a text message to Cedric on his work phone, informing him of the visitor restriction and asking for his help. Cedric testified that when he arrived at TCF shortly after 8:00 a.m., he had yet to see the text message from Cheeks. As he was walking toward his office, he was stopped by Inspector Adam Douglas, who was in the office of Hearing Investigator Rodney Buhl. Hearing Investigator **[*42]** Buhl's job was to gather and review evidence related to misconduct tickets to prepare for the hearing with the hearing officer. On this day, before Cedric arrived, Hearing Investigator Buhl had been alerted of the visitor restriction for Cheeks and the misconduct ticket for Prisoner Harding-Bey. Hearing Investigator Buhl and Inspector Douglas decided to review the surveillance video of the visit to determine whether the misconduct ticket and visitor restriction were appropriate. After watching the footage, they both opined that the contact between Prisoner Harding-Bey and Cheeks did not amount to a violation of the policy related to sexual contact.

When they saw Cedric walking into the office, Inspector Douglas decided to get a third opinion from the deputy warden. Cedric, who was the highest-ranking official in the room, watched the video and agreed with Inspector Douglas and Hearing Investigator Buhl. Thus, they determined that the visitor restriction would be revoked and the ticket should not be reviewed with Prisoner Harding-Bey.

Because the ticket had not been removed from the specified box yet, Cedric sent an e-mail to CO Goodfellow's supervisor, Captain McDonald, whose first name **[*43]** was not provided on the record. Cedric informed Captain McDonald that the ticket would not be reviewed and instructed him to tell CO Goodfellow to come speak with Cedric if he had questions about why. CO Goodfellow testified that he received the message from Captain McDonald, but did not immediately go speak with Cedric because CO Goodfellow was "iffy" about the ticket after he wrote it.

At 9:07 a.m. on August 27, 2017, Cedric responded to Cheeks' text message with a call from his office telephone. The conversation was brief, and Cedric testified that he told Cheeks that the issues would be handled internally. He instructed her to call the appropriate prison staff to see if she was permitted to visit in the future.

At some point in August or September 2017, Deputy Warden Schooley contacted IA Investigator Cusack to ask about the progress of the investigation into the burgeoning issues related to the Prisoner Demorest incident. IA Investigator Cusack testified that he was instructed by a superior officer that he could respond to Deputy Warden Schooley's contact and provide an update considering the unusual delay in the investigation. IA Investigator Cusack testified that he spoke with **[*44]** Deputy Warden Schooley and told him that the report still was being prepared, but the portion related to Deputy Warden Schooley was complete.

In the same time period, Deputy Warden Schooley became interested in Cedric's involvement in the decision not to review the misconduct ticket for Prisoner Harding-Bey. Deputy Warden Schooley asked one of the employees he directly supervised to review Prisoner Harding-Bey's jailhouse telephone calls, and upon doing so, the employee found a call in which Prisoner Harding-Bey called Cheeks shortly after the incident in the visiting room. In the call,

Prisoner Harding-Bey said that he believed a particular CO was acting in a biased manner toward him, and would speak with Warden Chapman, Inspector Douglas, and Deputy Warden Schooley to attempt to remedy the situation. Prisoner Harding-Bey also asked Cheeks to contact Cedric for help with the visitor restriction. Believing this to support some form of improper activity by Cedric, Deputy Warden Schooley provided the telephone call recording to Warden Chapman. In response, Warden Chapman sent an investigation request to IA Manager Marschke. In the message to IA Manager Marschke, Warden Chapman only told **[\*45]** IA Manager Marschke about Prisoner Harding-Bey's references to Inspector Douglas and Cedric, omitting that Prisoner Harding-Bey also mentioned Deputy Warden Schooley and Warden Chapman.

On September 26, 2017, IA Investigator Cusack submitted his report regarding his investigation into the Prisoner Demorest incident. IA Investigator Cusack recommended Deputy Warden Schooley and Acting-Warden Stephenson not be charged with any violations. IA Investigator Cusack believed that Deputy Warden Schooley's secretary would have heard Deputy Warden Schooley yelling at Lieutenants Miller and Whitman if such actually occurred. IA Investigator Cusack also recommended that Lieutenants Miller and Whitman be charged with a number of work-rule and policy violations related to their sharing of questionnaire answers, as shown by their e-mails, and later decisions to lie about sharing answers when questioned by IA Investigator Cusack. As for Cedric, IA Investigator Cusack recommended the same charges, which included not maintaining confidentiality of records, failing to report violations of work rules, lying during an investigation when he denied sharing answers with Lieutenant Miller, and conduct unbecoming **[\*46]** of an employee of defendant. These charges included "asterisk rules," which were punishable by termination of employment.

As required, IA Investigator Cusack's report was forwarded to IA Manager Marschke for review. IA Manager Marschke approved the investigation and recommended charges for the reasons identified by IA Investigator Cusack, which Administrator Warner also approved. Sometime after submitting his report, IA Investigator Cusack was once again contacted by Deputy Warden Schooley for an update. IA Investigator Cusack told Deputy Warden Schooley that there was insufficient evidence regarding the allegations against him, so he was in the clear. He also noted, though, that the charges against Cedric would go forward.

For his part, Cedric insisted that he did not collude with Lieutenants Miller and Whitman during the investigation. Cedric noted that it was not surprising that their answers sounded the same because they witnessed the same events. Cedric found it telling that IA Investigator Cusack would rely on statements from Deputy Warden Schooley's secretary, who undoubtedly had reason to lie on his behalf, when two lieutenants and a deputy warden said the opposite. Cedric further **[\*47]** denied receiving information from Lieutenant Miller about his answers to the questionnaire because he did not request the e-mail and he likely deleted it as soon as he received it, did not open the attachment, and promptly forgot about it.

At this point, the issue regarding Cedric ordering Prisoner Harding-Bey's misconduct ticket not to be reviewed was still outstanding, and IA Manager Marschke, with approval from Administrator Warner, had decided to conduct the investigation himself. IA Manager Marschke came to TCF to interview all of the witnesses involved in the case. When he asked Cedric if he had been in contact with Cheeks before deciding not to review the misconduct ticket related to Prisoner Harding-Bey, Cedric said he had not. Cedric did inform IA Manager Marschke he received a call from Cheeks after making the decision, though, saying that the call came in at about 10:00 a.m. IA Manager Marschke collected Cedric's cell phone and office telephone records to review his claims. In the records, he found that Cheeks's text message came in at 7:24 a.m., which was before Cedric arrived at work. Thus, despite not having data regarding when the text message was opened, IA Manager Marschke **[\*48]** determined that Cedric had lied during the investigation. Further, because Cedric's office telephone records showed that he had called Cheeks, instead of the other way around, at 9:07 a.m., instead of 10:00 a.m., IA Manager Marschke determined that Cedric was lying about those claims as well. IA Manager Marschke also concluded that CO Goodfellow's ticket was worthy of review and Cedric's decision to the contrary violated policy. Further, according to IA Manager Marschke, Cedric violated an additional policy because he did not speak with CO Goodfellow before removing the ticket from the review process. IA Manager Marschke also determined that Cedric should have reported the contact from Cheeks to his supervisor, Warden Chapman, but failed to do so. Lastly, IA Manager Marschke found Cedric to have overfamiliarity with Cheeks, a prisoner's girlfriend, considering his apparent response of helping Cheeks with her

issues after being contacted outside of work hours. For the overfamiliarity charge, IA Manager Marschke also relied on the jailhouse telephone call between Prisoner Harding-Bey and Cheeks, during which Cedric's name was mentioned.

For his part, Cedric admitted that he may have been **[\*49]** incorrect about times and the sequence of events, but denied that he purposefully lied. Instead, he gave IA Manager Marschke his best estimate, which happened to be wrong. Cedric also explained that he did not mention the text message to IA Manager Marschke at first because he thought the questions specifically related to *speaking* with Cheeks. Cedric opined that if he had been asked to clarify his answers with the benefit of reviewing his telephone and cell phone records, he would have acknowledged his previous, innocent errors. Further, Cedric explained that he received about 30 calls per day from the family and friends of prisoners, and so he believed it was ridiculous to expect him to remember the exact timing and sequence of his contacts with Cheeks. Cedric stood by his decision that the misconduct ticket should not have been reviewed and the visitor restriction revoked, and contended that he was not required to speak with CO Goodfellow under the circumstances. As for IA Manager Marschke's determination that Cedric should have reported the contacts from Cheeks to Warden Chapman, Cedric thought the determination was ridiculous because, again, Cedric received about 30 calls per day **[\*50]** from prisoners' family and friends and, thus, Warden Chapman would be overrun with official reports of contacts if such were required. As to the evidence of the jailhouse call between Cheeks and Prisoner Harding-Bey, Cedric pondered why IA Manager Marschke did not take greater interest in Prisoner Harding-Bey's claim that he would speak with Deputy Warden Schooley and Warden Chapman to sort out his visitor restriction. Cedric surmised that this investigation and the resulting determinations were a sham done in retaliation for his support of Lisa's harassment claims and lawsuit.

The charges stemming from IA Manager Marschke's investigation also included violations for "asterisk" rules, which, again, permitted termination of employment as a punishment. Because IA Manager Marschke conducted the investigation himself, he submitted his report to Administrator Warner, who approved the charges. At about the same time, IA Manager Marschke approved the charges recommended by IA Investigator Cusack. With all of the charges being approved at around the same time, the hearings regarding the various charges against Cedric were scheduled to occur on the same day, November 21, 2017.

Just one week before **[\*51]** the hearings, though, another investigation-spawning event occurred. On November 15, 2017, CO Voight, whose first name was not provided on the record, arrived to work at TCF while Cedric was not in the building. While proceeding through security during a shakedown, CO Voight removed an unopened 5-Hour Energy drink from his pocket. CO Voight did not try to hide it; he believed he was permitted to bring it into work. Recently, though, the TCF manifest had changed to disallow 5-Hour Energy drinks from being brought in. Thus, CO Voight was found to have brought in contraband. Consequently, Captain Andrew Dyer wrote up CO Voight for the misconduct.

Later, though, on his way home, Captain Dyer wondered whether he should have prepared a critical incident report regarding CO Voight's rule violation. Testimony at trial established that critical incident reports typically were prepared for incredibly serious events, such as a prisoner assaulting or killing another prisoner. As the result of another policy change, though, critical incident reports were now required when there was an attempt to bring in contraband. Before the policy change, COs were permitted to take items back to their cars when **[\*52]** they accidentally kept contraband items on their person when walking into the prison.

In any event, Captain Dyer, concerned he had forgotten to write a critical incident report, called Assistant Deputy Warden (ADW) Ora Carter, who was the shift commander on duty at the time. Captain Dyer asked ADW Carter to call Cedric at home to ask if a critical incident report should be written for CO Voight. ADW Carter followed the instructions, despite being in the same room as the policy manual, which established when such reports were required. According to ADW Carter, Cedric answered the call and told ADW Carter a critical incident report was not required. Cedric testified that he told Captain Dyer and ADW Carter to look at the policy, but he did not believe it sounded like a critical incident. Shortly thereafter, Captain Dyer submitted a request for an investigation related to Cedric's failure to require a critical incident report. Cedric expressed confusion regarding why Captain Dyer chose to submit for an investigation instead of just writing the critical incident report when he discovered it was required. IA Manager Marschke assigned that investigation to IA Investigator Vicki Dahlke.

On [*53]  November 21, 2017, the disciplinary conferences for the already-approved charges against Cedric were held. The conferences were presided over by Assistant Deputy Director Robert Napel, who reviewed the packets of information prepared by IA Manager Marschke and IA Investigator Cusack. At the first conference, which related to the charges arising out of the Prisoner Demorest issue, Cedric did his best to defend himself, but Assistant Deputy Director Napel was not convinced. Thus, after considering the evidence, Assistant Deputy Director Napel found Cedric to be guilty of all of the charges brought against him by IA Investigator Cusack.

The disciplinary conference regarding Cedric's decision not to review the misconduct ticket related to Prisoner Harding-Bey was held immediately afterward. Assistant Deputy Director Napel believed Cedric should have spoken with CO Goodfellow before deciding not to review the ticket, should have reported his inappropriate contacts with Cheeks to Warden Chapman, and was deceptive during the investigation. Assistant Deputy Director Napel also noted that Warden Chapman had stated that he thought the ticket written by CO Goodfellow should have been reviewed [*54]  with Prisoner Harding-Bey. Moreover, regardless of who agreed with Cedric's decision to stop the ticket from being reviewed, Assistant Deputy Director Napel noted that it must be attributed to Cedric as the highest-ranking official involved. Consequently, Assistant Deputy Director Napel again found Cedric guilty of all of the charges against him.

Cedric described the disciplinary conferences as a "kangaroo court," noting that he believed Assistant Deputy Director Napel had already decided against Cedric before the proceedings even began.

Because Cedric had been found to have violated some asterisk rules, Assistant Deputy Director Napel had to consider whether Cedric should be put on "stop order" pending a decision on discipline from Jennifer Nanasy, defendant's discipline coordinator. A "stop order" barred an individual from coming into the prison and required a photograph of the offender to be placed at all prison entrances. Cedric described a "stop order" as one of the most embarrassing things that could happen to an employee. To obtain guidance on whether he should issue a "stop order" for Cedric, Assistant Deputy Director Napel contacted someone at defendant's headquarters in Lansing, [*55]  though he could not recall whom. He testified that it was either Discipline Coordinator Nanasy or Administrator Warner. After speaking with the person, Assistant Deputy Director Napel decided to place Cedric on "stop order." Therefore, as of that moment, Cedric was no longer permitted to come to work.

On December 14, 2017, Cedric decided to follow Lisa's lead and saw Dr. Rubenfaer for psychiatric care. Dr. Rubenfaer conducted a psychiatric evaluation of Cedric and diagnosed him with "severe adjustment disorder with depressed and anxious mood caused by events in the workplace and events that occurred to his wife in the workplace." Dr. Rubenfaer noted that Cedric complained of anxiety, depression, anger, mood swings, panic attacks, feelings of distrust and paranoia, lack of drive, devastation, and an overall inability to function. Dr. Rubenfaer opined that Cedric's issues had been caused by the harassment Lisa suffered at work, his inability to help her with those problems, and the resultant retaliation against Cedric for supporting Lisa. Dr. Rubenfaer stated that medication and therapy were the proper treatments for Cedric's psychiatric issues. The next day, December 15, 2017, Cedric [*56]  saw Harris again for therapy, although it would be his last visit before a lengthy hiatus. Harris generally agreed with Dr. Rubenfaer's summary of Cedric's mental and emotional state at the time.

Shortly thereafter, Cedric looked at all the charges of which he had been found guilty and the "stop order" issued against him, and decided that the writing was on the wall—his employment would be terminated. He reached this conclusion despite not yet being aware of the impending charges regarding the 5-Hour Energy drink incident. Concerned about losing his pension and having difficulty finding a different job if he was fired, Cedric decided he had no other option than to retire early, before defendant could issue its discipline. Cedric testified that about 90% of people lost their jobs after a "stop order" had been issued, but agreed that termination was not required in response to such. Cedric's official retirement date was December 31, 2017. Afterward, Administrator Warner obtained the reports regarding Cedric, which had been in the possession of Discipline Coordinator Nanasy, and added a note that Cedric would have been disciplined but for his retirement. Neither Administrator Warner nor [*57]  Discipline Coordinator Nanasy would say what discipline would have been issued for Cedric.

While IA Investigator Dahlke's investigation into the 5-Hour Energy drink incident continued, Cedric did not participate in it. When the investigation was completed, Cedric was found to have violated work rules regarding

critical incident reports. Captain Dyer, who had actually been in the building during the events at issue, was cleared of all charges because he said he was instructed by Cedric not to create a critical incident report. IA Manager Marschke signed off on the investigation and recommended charges.

On March 8, 2018, after obtaining leave from the trial court, plaintiffs amended their complaint. Most relevantly, plaintiffs added a claim of retaliation under the CRA on behalf of Cedric. Plaintiffs alleged that defendant had learned of Cedric's involvement in Lisa's lawsuit and harassment complaints, came up with questionable charges to punish Cedric for his support of Lisa, and piled one on top of the other to ensure that he would be terminated for his participation in the embarrassment of defendant. Both plaintiffs sought significant economic and noneconomic damages in the amended **[*58]** complaint.

On January 7, 2019, Cedric had his last visit with Dr. Rubenfaer, who, at trial, testified that Cedric's condition had worsened. Instead of an adjustment disorder, Dr. Rubenfaer opined that Cedric was now suffering from PTSD. Dr. Rubenfaer testified that there was no cure for PTSD, and the only treatment course was to stop it from getting worse. Absent medication and therapy, Cedric would be at the risk of becoming self-injurious and even suicidal. Dr. Rubenfaer believed that Cedric's issues were caused by the events at work and had become chronic, which he explained meant that "the likelihood of improvement is unlikely, that it's—that it's no longer treatable in a standard way but it's [going to] need ongoing, long-term psychiatric care, both . . . psychotherapy by a therapist who does talking therapy on a weekly basis and by a psychiatrist who would prescribe medications." Dr. Rubenfaer testified that he did not believe Cedric was embellishing or malingering.

In April 2019, Dr. Shiener, who had initially performed a psychiatric evaluation of Cedric in January 2017, reevaluated Cedric to see how his mental health had progressed over the preceding two years. Dr. Shiener found **[*59]** that Cedric's condition had worsened and, agreeing with Dr. Rubenfaer and Harris,[12] become chronic. Despite taking medications, Cedric still struggled with sleep, ruminative thoughts, and a lack of sex drive, while he was feeling more distressed and disturbed. Dr. Shiener opined that Cedric's condition had progressed to become PTSD, noting that Cedric was dealing with hallmark symptoms of PTSD including flashbacks and phobic avoidance of issues related to work. While Dr. Shiener testified that he was not a lie detector, he believed Cedric was suffering from PTSD as a result of defendant's retaliation "within a reasonable degree of medical certainty." Dr. Shiener stated that Cedric's mental ailments likely would lead to lifelong physical problems, including "muscle aches and pains, temporomandibular joint [issues], clenching your teeth, headaches because of the tension that you carry in your neck and shoulders, sore throats because of clenching your teeth," and an ulcer. Dr. Shiener noted that PTSD often caused permanent chemical changes to the brain, which led to extreme reactions to otherwise minimal stimuli. According to Dr. Shiener, there was little chance of improvement for Cedric, **[*60]** and he would need lifelong medication and therapy to avoid getting worse. Dr. Shiener opined that, should his condition go untreated, Cedric would be at significant risk of suicide.

Cedric agreed that his life had been changed by the retaliation he faced in response to his support of Lisa's claims against defendant. According to Cedric, their lives had become dominated by the harassment and retaliation, their marriage had worsened as a result, he did not feel like the same person, and he struggled to sleep. Without medications, he was only able to sleep about two hours per night. Cedric also reported that plaintiffs' friends who worked for defendant stopped speaking with them. He felt devastated after being forced out of his job and feeling like he could not help Lisa, stating, "I just feel like I let my wife down and there's been times that I ain't even want to live."

Cedric acknowledged that he had considered retirement in the past, including in an e-mail when he expressed plans to retire in 2018, which predated the events of this case. However, at trial, he insisted that those plans were flexible, and he had always believed that he would be a warden one day. Cedric testified that, **[*61]** absent Lisa's harassment complaint and their lawsuit, he still would be employed by defendant, and likely would be a warden. This was the case even though warden positions were extremely competitive and he had been passed over for

---

[12] Harris testified that his final visit with Cedric was in May 2019, at which time Cedric still was suffering from the same chronic issues related to PTSD, depression, and anxiety.

previous openings. Cedric said that since being forced out of his employment, Cedric had taken work as a security guard for a hospital, and later, as a detective with a private firm. Cedric testified that he made about the same amount of money when his new jobs were added to income from his pension, but doing the new work was terrible for him. Cedric's medical providers opined that Cedric having to work several jobs to earn similar pay was detrimental to his ability to access treatment for his PTSD and depression. Harris opined that Cedric being forced out of his dream job and then required to work jobs he did not love caused "depression, anxiety, low self-worth, angry, irritable, social withdrawal, and I'm sure it's affecting him in other areas."

C. VERDICT

A month after trial began, and after multiple days of deliberations, the jury reached a verdict. For Lisa's disparate treatment claim under the CRA, the jury determined that she suffered an adverse employment [*62] action on the basis of race for which defendant was legally responsible. The jury also determined that Lisa was subjected to unwelcome communication or conduct on the basis of race, such conduct or contact interfered with her employment and created a hostile work environment, defendant was legally responsible for the consequences, and Lisa suffered damages as a result.[13] The jury awarded Lisa $25,000 for past economic damages, $857,189 for future economic damages, $2.75 million for past emotional distress, and $1.5 million for future emotional distress. In total, the jury found Lisa suffered $5,132,189 in economic and noneconomic damages.

With respect to Cedric, the jury determined that he was subject to an adverse employment action, which was causally connected to Cedric's protected activities under the CRA. The jury did not award Cedric any past economic damages, but did award him $1.9 million in future economic damages, $1.85 million for past emotional distress, and $2.5 million for future emotional distress. The total award for Cedric, then, was $6.25 million in economic and noneconomic damages. The combined award for both plaintiffs was $11,382,189. On September 23, 2019, the trial [*63] court entered a judgment on the jury's verdict, along with interest, which brought the total award to $11,670,128.33.

Defendant now appeals.

II. JNOV ON LISA'S CLAIMS

After trial, defendant moved for JNOV on both of Lisa's claims. For her disparate treatment claim, defendant argued that Lisa failed to submit evidence that she established an adverse employment action. For both Lisa's disparate treatment and hostile work environment claims, defendant alleged that Lisa failed to submit evidence establishing that defendant was liable under a theory of respondeat superior. The trial court disagreed with defendant on both arguments and denied defendant's motion for JNOV. On appeal, defendant raises the same arguments it did before the trial court. We need not reach the first argument because we conclude that Lisa submitted sufficient evidence to establish respondeat superior, and thus, at the very least, she was entitled to recovery on her hostile work environment claim, and the damages awarded by the jury did not differentiate between Lisa's differing claims.

A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decisions regarding motions for JNOV." *Hecht v Nat'l Heritage Academies, Inc, 499 Mich 586, 604; 886 NW2d 135 (2016)*. When considering a motion for [*64] JNOV, "[t]he appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Id.* (quotation marks and citation omitted). "Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id.* (quotation marks and citation omitted).

B. RELEVANT LAW

This Court, in *Major v Village of Newberry, 316 Mich App 527, 550; 892 NW2d 402 (2016)*, summarized the five elements required to be proven to make a prima facie case of hostile work environment:

---

[13] The jury also decided defendant had not retaliated against Lisa.

(1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

Defendant only contends that plaintiffs failed to prove the final element of Lisa's hostile work environment claim—respondeat superior.

As explained by our Supreme Court, "in cases involving a hostile work environment claim, a plaintiff must show some [*65] *fault* on the part of the employer" in order for that employer to be liable. *Chambers v Trettco, Inc, 463 Mich 297, 312; 614 NW2d 910 (2000)*. When, as here, a hostile work environment is alleged to have "been created because unwelcome . . . communication or conduct substantially interferes with an individual's employment, the violation can only be attributed to the employer if the employer failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment." *Id. at 313*. In other words, an employer "must have notice of alleged harassment before being held liable for not implementing action." *Radtke v Everett, 442 Mich 368, 396; 501 NW2d 155 (1993)*. Such notice can be actual or constructive. *Sheridan v Forest Hills Pub Sch, 247 Mich App 611, 621; 637 NW2d 536 (2001)*. An employer will be deemed to have constructive notice "if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that . . . harassment was occurring." *Chambers, 463 Mich at 319*. "However, if an employer is accused of [the] harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair." *Radtke, 442 Mich at 397*.

C. ANALYSIS

Defendant has consistently argued that Lisa is unable to establish the respondeat superior element of her hostile work environment claim because [*66] defendant first received notice that Lisa was being harassed when she filed her complaint on August 3, 2016, and defendant immediately took remedial actions. Defendant made this argument before trial in a motion for summary disposition, made the argument again when it moved for a directed verdict following plaintiffs' case-in-chief, raised the argument in its motion for JNOV following trial, and continues to raise the argument on appeal.

In response, plaintiffs consistently argued below that a respondeat superior inquiry was unnecessary because, functionally, Lisa's employer was accused of harassment since Supervisor Slater was involved in at least three of the reported instances of harassment. Plaintiffs argued alternatively that, assuming the respondeat superior inquiry was necessary, defendant had constructive notice of the harassment because the harassment was so pervasive that a reasonable employer would have been aware that it was occurring, especially considering that Supervisor Slater was involved in or witnessed several of the instances of harassment. In general, we agree with both arguments.

In *Sheridan, 247 Mich App at 621-622*, this Court explained that an "employee can demonstrate that the employer knew [*67] of the harassment by showing that she complained to higher management of the harassment," and defined "higher management" as "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." Viewing the evidence in the light most favorable to plaintiffs, as we must, we conclude that Supervisor Slater meets this definition of higher management.

It was undisputed that Supervisor Slater was the highest-ranking official of defendant working in the building in which defendant's Lapeer parole and probation office was located. In addition to supervising defendant's Lapeer office, Supervisor Slater also supervised the Sanilac County parole and probation office. Although Supervisor Slater testified that he did not personally choose Lisa for the position, it was implied that his lack of say in hiring Lisa was unusual. Even so, Lisa testified that she had a telephone interview with Supervisor Slater before being transferred to the Lapeer office from Macomb County.

2022 Mich. App. LEXIS 4265, *67

When Lisa started in Lapeer, Supervisor Slater instructed Lisa that her primary job would be to prepare **[*68]** PSIRs for the Lapeer office. Supervisor Slater testified that he was trying a new system where only one agent worked on PSIRs, which he believed would allow for a steady income of PSIRs instead of all of them being submitted in heaps. Lisa additionally was told by Supervisor Slater that she was required to write some PSIRs for the Sanilac office, which happened to be understaffed at that time. Therefore, at the sole direction of Supervisor Slater, Lisa was required to have the exclusive job of writing PSIRs and to drive to the Sanilac office, which was about one hour away.

When Lisa made her official report of racial harassment to Supervisor Slater on August 3, 2016, after she was called "mammy" by Kraft, Supervisor Slater immediately called Kraft to have her explain what happened. When Kraft said that it had been a slip of her tongue, Supervisor Slater believed her and directed her to apologize to Lisa. According to Lisa, Kraft's apology and explanation were not believable. Even so, when Supervisor Slater called Lisa, he believed he had remedied her issues of racial harassment. Lisa, who was worried about speaking with Supervisor Slater because of his involvement in some of her racial **[*69]** harassment concerns, told him Kraft's apparently insincere apology had not been a cure-all. They agreed to speak in person when Supervisor Slater would be back in Lapeer. At the ensuing in-person meeting, Lisa detailed additional instances of harassment that she had endured while at the Lapeer office. After meeting with Lisa, Supervisor Slater called each member of the staff into his office to discuss defendant's discriminatory harassment policies.

Eventually, Lisa decided to transfer to the Flint office of defendant's parole and probation department to escape the racially hostile work environment in Lapeer. When she transferred, she was instructed by Supervisor Slater that she was required to complete PSIRs for the Lapeer office that she had already started. Thus, even when working in a different county, some of Lisa's work duties were being determined by Supervisor Slater.

The foregoing supports that Supervisor Slater fit the definition of higher management, and thus, qualified as Lisa's employer for purposes of respondeat superior analysis. First, Supervisor Slater's own testimony showed that he had at least some sway in regard to who was hired in the Lapeer office of defendant's **[*70]** parole and probation department. It was remarked that Lisa being hired to work in the office, without his express approval, was unusual. This, then, allowed for an inference that, generally, Supervisor Slater was involved in the decision regarding whom to hire.

Second, Supervisor Slater was undisputedly involved in Lisa's job assignments. He ordered her to complete PSIRs as her sole duties while working in the Lapeer office, he demanded she drive to the Sanilac office when it was short-staffed, and he instructed her to complete PSIRs for the Lapeer office even after she had transferred to Flint. There was no testimony about any other individual deciding Lisa's work duties when she worked in the Lapeer office.

Third, Supervisor Slater was involved in the discipline of employees at the Lapeer office. When he was informed of Kraft's use of the term "mammy," he determined her sole discipline would be to make an apology to Lisa. When he was told by Lisa that this was insufficient, he called each member of the staff into his office to discuss defendant's discriminatory harassment policies with them.

As for Supervisor Slater's involvement in the decision-making process related to what employees **[*71]** were paid and whether they were fired, there simply was little evidence on those topics one way or the other. It is hard to imagine, though, that defendant's highest-ranking official in its Lapeer parole and probation office, who actually was able to observe the employees he supervised, was not (1) significantly involved in whether employees were fired and (2) had significant influence in the process for determining who was considered for raises or other pay considerations. We therefore conclude that, when viewing the record in the light most favorable to plaintiff, Supervisor Slater was "higher management" for purposes of the respondeat superior analysis for a claim of hostile work environment under the CRA.

"Because these 'higher management' employees are vested by the employer with actual authority to effectuate change in the workplace, principles of agency law support the conclusion that the knowledge they possess regarding conditions in the workplace would properly be imputed to the employer." *Sheridan, 247 Mich App at 623*.

It follows that, if these "higher management" employees are involved in the harassment, then the respondeat superior inquiry is unnecessary because the employer would necessarily be imputed [*72] with actual knowledge of the harassment. See *Radtke, 442 Mich at 397*.

Viewing the evidence in the light most favorable to plaintiff, Supervisor Slater was present for, or involved in, multiple instances of racial harassment of Lisa prior to her August 3, 2016 complaint. Briefly, Supervisor Slater was present when Agent Avolio played the Sweet Brown video in the lunchroom. Supervisor Slater also was part of the conversation when either he or Kraft said that Africans were good runners because they had to run for food. Supervisor Slater himself was the individual who asked Lisa if she wanted chitterlings on her pizza, and told Lisa's coworkers that he did not know what he was getting with Lisa, which Lisa believed was racially motivated because he said that he was confident her white male counterpart, who Supervisor Slater was also introducing at the time, would be a good agent. Because Supervisor Slater was either aware of or involved in these instances of racial harassment, and because of his status as "higher management," defendant either (1) had actual knowledge of the racial harassment before Lisa filed her August 3, 2016 complaint because Supervisor Slater had actual knowledge of the racial harassment, [*73] see *Sheridan, 247 Mich App at 623*, or (2) the respondeat superior inquiry is unnecessary in the first instance "because holding an employer liable for personal actions is not unfair," *Radtke, 442 Mich at 397*.

Alternatively, viewing the evidence in the light most favorable to plaintiffs, a jury could reasonably conclude that defendant had constructive notice of the harassment before Lisa filed her August 3, 2016 complaint. On top of the incidents described above, which dated back to Lisa's first day at the Lapeer Office, Lisa outlined numerous other instances of racial harassment, including being singled out by Agent Shephard for being black and Agent Shephard referring to Lisa as "the black one"; Agent Zolinski asking Lisa what she thought of Agent Zolinski's relatives adopting a black child when their last name was "Kuhns"; and Agent Olson describing Lisa as "scary" and showing Lisa a racially offensive video. Further, it was generally agreed upon by witnesses that defendant's Lapeer parole and probation office was small, allowing conversations to be overheard from other parts of the office. From the foregoing, an objective view of the totality of the circumstances, viewed in a light most favorable to plaintiffs, supported that Supervisor [*74] Slater, as higher management, "would have been aware of a substantial probability that . . . harassment was occurring." *Chambers, 463 Mich at 319*. Thus, the jury's decision that defendant had notice—specifically constructive notice—was not subject to JNOV.

Next, defendant argues that its response, when it received notice, was prompt and adequate, which relieved it of liability related to Lisa's complaint of a hostile work environment. Defendant's argument, however, relies on notice being provided in August 2016, instead of well before that, as just determined. We therefore need not address this argument at length. As just explained, Lisa testified that the harassment leading to a hostile work environment began nearly as soon as she started in Lapeer, which was in November 2014. Viewing the evidence in the light most favorable to plaintiff, defendant's notice occurred well before August 2016, and all of the remedial actions that defendant points to on appeal happened after Lisa filed her formal complaint on August 3, 2016. Because the response of defendant was not prompt, defendant was not entitled to protection under the CRA for Lisa's claim of a hostile work environment. See *Radtke, 442 Mich at 396* (holding an employer may avoid [*75] liability where its response to notice of harassment is both prompt and appropriate).

III. JNOV ON CEDRIC'S CLAIM

Like with Lisa's claims, after the jury found in favor of plaintiffs on Cedric's retaliation claim, defendant moved for JNOV on that claim. In relevant part, defendant argued that it was entitled to JNOV on Cedric's retaliation claim because Cedric failed to prove a causal connection between his protected activity and the adverse employment action taken against him. We disagree.

A. STANDARD OF REVIEW

"This Court reviews de novo a trial court's decisions regarding motions for JNOV." *Hecht, 499 Mich at 604*. When considering a motion for JNOV, "[t]he appellate court is to review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Id.* (quotation marks and citation omitted). "Only if the evidence so

viewed fails to establish a claim as a matter of law, should the motion be granted." *Id.* (quotation marks and citation omitted).

B. ANALYSIS

Michigan's CRA "prohibits employers from discriminating on the basis of race." *White v DOT, 334 Mich App 98, 107; 964 NW2d 88 (2020)*. That statute, in pertinent part, states:

> (1) An employer shall not do any of the following:
>
> (a) Fail or refuse to hire or recruit, discharge, or otherwise **[*76]** discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [*MCL 37.2202(1)(a)*.]

As relevant to Cedric's claim, the CRA also prohibits a person or entity from "[r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." *MCL 37.2701(a)*.

> "[T]o establish a prima facie case of unlawful retaliation under the [CRA], a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." [*El-Khalil v Oakwood Healthcare, Inc, 504 Mich 152, 161; 934 NW2d 665 (2019)*, quoting *Rymal v Baergen, 262 Mich. App. 274, 300; 686 N.W.2d 241 (2004)*.]

On appeal, defendant only challenges the fourth element of Cedric's retaliation claim—causation.

"To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a 'significant factor' in the employer's **[*77]** adverse employment action, not just that there was a causal link between the two." *Rymal, 262 Mich App at 303*. Our Supreme Court has explained that, "in order to show causation in a retaliatory discrimination case, '[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.'" *Garg v Macomb Co Comm Mental Health Servs, 472 Mich 263, 286; 696 NW2d 646 (2005)*, quoting *West v GMC, 469 Mich. 177, 186; 665 N.W.2d 468 (2003)*. However, close temporal proximity between the protected activity and adverse actions can still be evidence of a causal connection so long as that and other circumstantial evidence, taken as a whole, "would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal, 262 Mich App at 303*.

Defendant contends that plaintiffs have relied solely on evidence of temporal proximity—evidence establishing that the investigations into Cedric started right after Lisa complained, and ramped up after plaintiffs filed their lawsuit—to establish causation, which is not permitted under *Garg, 472 Mich at 286*. Defendant is correct in that plaintiffs presented ample evidence establishing the temporal proximity between the protected activity and the adverse actions. Before Lisa's complaint and the ensuing lawsuit, Cedric was a valued employee who had been promoted numerous times **[*78]** over his 27-year career, had received numerous awards and letters of commendation from various supervisors, and had never been the subject of disciplinary action by defendant. Lisa made her official complaint of racial harassment on August 3, 2016, and plaintiffs filed their original complaint on February 3, 2017. In the months following these events, Cedric was the subject of three investigations, charged with more than 10 work-rule violations, found guilty in disciplinary conferences regarding two of the investigations, placed on "stop order," and decided to retire before defendant could issue its discipline, which Cedric was certain would have been termination of his employment. In light of that evidence, certainly, there was significant proof of temporal proximity between Cedric's engagement in the protected activity of participating in Lisa's racial harassment complaints under the CRA and the adverse employment action of a constructive discharge.

Plaintiffs, however, did not rely solely on evidence of temporal proximity to establish the causation element of Cedric's retaliation claim. The record, viewed in a light most favorable to plaintiffs, shows a plethora of questionable circumstances **[*79]** supporting plaintiffs' contention that defendant's true purpose in investigating and disciplining Cedric was retaliation.

Initially, though, we note that our Supreme Court in _Garg, 472 Mich at 286_, in deciding that temporal proximity, on its own, was not enough to establish a causal connection, relied on _West, 469 Mich at 186_, which was a case alleging a retaliatory discharge in violation of the _Whistleblowers' Protection Act (WPA), MCL 15.361 et seq._, not the CRA. The Court in _Garg, 472 Mich at 277 n 5_, reasoned that its reliance on a case involving the WPA was permissible because "whistleblower statute[s] [are] analogous to antiretaliation provisions of other employment discrimination statutes . . . ." (Quotation marks and citation omitted, alterations in original.) We find this meaningful because the Court in _West, 469 Mich at 186-187_, referred to an opinion of this Court, _Henry v Detroit, 234 Mich App 405, 414; 594 NW2d 107 (1999)_, as an example of circumstances that, in addition to temporal proximity, could create a jury question regarding causal connection. The Court in _West_ explained that the plaintiff in _Henry_ had been successful because, in addition to temporal proximity, the plaintiff "presented evidence that his superior expressed clear displeasure with the protected activity engaged in by the plaintiff," the "plaintiff's record was impeccable or **[*80]** unblemished [before the protected activity] . . . [and] the discipline imposed was seemingly undeserved . . . ." _West, 469 Mich at 186-187_, citing _Henry, 234 Mich App at 414_. As will be discussed, the record supports that Cedric's situation is far more analogous to _Henry_ than it is to _West_.

First, and potentially most damaging for defendant, was Lisa's testimony about her conversation with Assistant Deputy Director Blakely after she made her official complaints of harassment. Testimony established that Cedric had spoken with Assistant Deputy Director Blakely about Lisa's complaint and Cedric's support for Lisa. Then, according to Lisa, during a telephone call with Assistant Deputy Director Blakely, the assistant deputy director told Lisa that he would be processing her transfer to Flint as soon as possible because Assistant Deputy Director Blakely had spoken with someone at defendant's headquarters and he believed that defendant was "circling the wagons."[14] When asked what she thought Assistant Deputy Director Blakely meant by his use of the phrase, Lisa testified, "I believe that he meant they, as in [defendant's representatives in] Lansing, they are circling the wagons, this is going to get worse for you guys." Lisa said that her understanding **[*81]** was cemented when Cedric began facing a number of charges and investigations.

The evidence of Assistant Deputy Director Blakely stating that defendant was circling the wagons in response to Lisa's complaints of racial harassment was circumstantial evidence of defendant being upset about the situation. In other words, it permitted an inference that defendant was not interested in helping plaintiffs, but instead was displeased by the harassment complaints. As discussed in _West, 469 Mich at 186-187_, an expression of displeasure from a superior officer regarding engagement in a protected activity is an additional factor supporting the existence of causal connection. Therefore, in addition to temporal proximity, there was circumstantial evidence supporting that defendant was upset with Lisa's complaints of racial harassment and Cedric's support of them, which weighed in favor of denying JNOV.

Second, plaintiffs presented evidence, as briefly summarized above, of Cedric's work history with defendant. Quite simply, Cedric's 27-year career with defendant was littered with promotions, letters of commendation, and awards. Before plaintiffs began pursuing complaints of racial harassment and filed their lawsuit, Cedric **[*82]** had never been subjected to disciplinary action by defendant. Almost all of the witnesses at trial, including those who disagreed with some of Cedric's decisions, testified that Cedric was a model employee and a great supervisor. They knew him to follow the rules and to be honest. Stated differently, the evidence at trial showed Cedric's "record was impeccable or unblemished before" he began engaging in protected activity under the CRA. _West, 469 Mich at 187_ (quotation marks and citation omitted). Consequently, this was additional circumstantial evidence supporting that the reason for Cedric's investigations and imminent disciplines were not actually motivated by his alleged work-rule violations, but instead, were retaliatory.

Third, plaintiffs introduced testimony supporting that the investigations and potential disciplinary actions involving Cedric were more severe than required. The first investigation involved Cedric purportedly sharing answers and information with Lieutenants Miller and Whitman regarding their meeting with Deputy Warden Schooley. For that investigation, defendant insisted that Cedric's charges, which included violations of asterisk rules allowing for discipline in the form of termination **[*83]** of employment, were warranted because sharing information and

---

[14] Assistant Deputy Director Blakely denied saying this and testified that he never used the term "circling the wagons" in his life.

questionnaire answers was expressly forbidden. There can be little dispute of defendant's clear policy against sharing information and questionnaire answers related to ongoing investigations, but there was a significant factual dispute about defendant's responses to allegations that such sharing occurred.

As just noted, Cedric was charged with work-rule violations permitting him to be fired as discipline. Meanwhile, plaintiffs presented evidence that Kraft and Agent Avolio shared information about the investigation related to Lisa's complaints of racial harassment—indeed, Kraft admitted she asked Agent Avolio how she should answer the questions on the investigatory questionnaire, and later showed Agent Avolio her actual answers—but neither Kraft nor Agent Avolio were investigated or charged with any work-rule violations for their sharing of answers to questionnaires. Further, after Cedric made a harassment complaint, an investigator for defendant discovered that IA Investigator Cusack had provided confidential information about his investigation to Deputy Warden Schooley, yet, after this charge was investigated, IA Investigator **[*84]** Cusack was only cited with a single work-rule violation and disciplined with a written reprimand. Plainly, such is not comparable to Cedric's multitude of work-rule violations, a stop order, and possible termination if he had not preemptively retired. While defendant attempted to explain away the differences in punishment between these situations and Cedric's, plaintiffs presented ample evidence showing how defendant approached Cedric's investigation differently than the others, which led to the different resulting punishments. Moreover, the jury was free to disbelieve—or find immaterial—defendant's reasons for why Cedric's violation of the same rule warranted a significantly harsher punishment than the others. Consequently, a reasonable juror could infer that the extent of the discipline imposed on Cedric as a result of this first investigation was comparatively undeserved, which supports a causal connection under *West, 469 Mich at 186-187*.

The second investigation, which related to Cedric's communications with Cheeks and decision to remove CO Goodfellow's ticket from the review process, could also support an inference that Cedric's punishment was undeserved, and thus that there was a causal connection between **[*85]** Cedric's protected activity and the adverse action. The investigation arose out of a visit between Cheeks and Prisoner Harding-Bey, during which CO Goodfellow suspected inappropriate sexual contact, and thus wrote a misconduct ticket for Prisoner Harding-Bey and a visitor restriction for Cheeks. During a jailhouse telephone conversation later in the day, Prisoner Harding-Bey said he would speak with Inspector Douglas, Warden Chapman, and Deputy Warden Schooley about the misconduct ticket, and asked Cheeks to contact Cedric. The next morning, Cheeks contacted Cedric about the situation, but Cedric did not see the message until later, after he and multiple persons had reviewed a video of the incident and all agreed to throw out the misconduct ticket. Afterwards, Cedric contacted Cheeks and let her know. After an eventual investigation performed by IA Manager Marschke, Cedric was charged with numerous work-rule violations, including lying in an investigation, failing to review the misconduct ticket with CO Goodfellow, failing to report his contacts from Cheeks to Warden Chapman, and overfamiliarity with a prisoner's visitor. As with the first investigation, these charges included violations **[*86]** of asterisk rules, which meant Cedric could be terminated as discipline.

At trial, plaintiffs submitted ample evidence from which a reasonable juror could infer that all of these charges were unnecessarily trumped up as either questionable application of the rules (multiple witnesses testified that they did not believe that Cedric's conduct actually amounted to a violation of some of the rules cited by IA Manager Marschke) or not actually warranted because they were innocent errors (Cedric denied lying during the investigation, explaining that his answers to some of the questions were wrong because, by the time he was asked the questions, so much time had passed since the events at issue that he could only give his best guess). Thus, with this investigation too, a reasonable juror could conclude that the discipline imposed was seemingly undeserved, which supports an inference of a causal connection to a retaliatory motive. See *West, 469 Mich at 187*.

Based on the foregoing, Cedric's circumstances clearly track much closer to the plaintiff in *Henry, 234 Mich App at 414*, than they do the plaintiff in *West, 469 Mich at 186-187*. Consequently, on the basis of this evidence alone, the trial court properly denied defendant's motion for JNOV of Cedric's claim of **[*87]** retaliation.[15]

---

[15] We note that there was even more evidence about the questionable nature of the investigations surrounding Cedric from which a juror could arguably infer retaliatory motive. As will be discussed later in this opinion, plaintiffs presented other-acts evidence that defendant had a historical scheme or plan of retaliation in response to complaints of harassment.

To summarize, defendant's contention that Cedric's claim of retaliation improperly relied on temporal proximity alone to prove a causal connection is inaccurate. The causal connection, instead, was established by a mountain of circumstantial evidence, in addition to the temporal proximity of the protected activity and the adverse action. *Rymal, 262 Mich App at 303*. Consequently, defendant's argument lacks merit, the claim was properly submitted to the jury, and the trial court did not err by denying JNOV. *Hecht, 499 Mich at 604*.

## IV. RACIST IMAGERY

During trial, plaintiffs used a demonstrative displaying representations of the word "mammy" for the jury. The demonstrative included several pictures, including racist caricatures, photos of "Aunt Jemima," a picture of the character "Mammy" from Gone with the Wind, and a breastfeeding slave. Defendant objected to the demonstrative before and during trial, arguing that it was irrelevant and unfairly prejudicial. The trial court overruled defendant's objections. After the jury rendered its verdict in favor of plaintiffs, defendant requested a new trial, again arguing that the racist imagery was improperly admitted because it was irrelevant and unfairly prejudicial. The trial court **[*88]** denied defendant's request. On appeal, defendant argues that the trial court's decisions to admit the evidence and to deny its request for a new trial were abuses of discretion. Given that the abuse-of-discretion standard is highly deferential, we disagree.[16]

### A. STANDARD OF REVIEW

Typically, "[t]his Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Props Owners Ass'n of Kent Co v Kent Co Treasurer, 308 Mich App 498, 531; 866 NW2d 817 (2014)*. Similarly, "[t]his Court reviews for an abuse of discretion a trial court's decisions regarding the admission of evidence . . . ." *Spectrum Health Hosps v Farm Bureau Mut Ins Co of Mich, 333 Mich App 457, 477; 960 NW2d 186 (2020)*. "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock v Crocker, 499 Mich 247, 260; 884 NW2d 227 (2016)*.

### B. ANALYSIS

Generally, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." *MRE 402*. A demonstrative exhibit, like all evidence, must be relevant to be admissible at trial. *Lopez v GMC, 224 Mich. App. 618, 629 n 16; 569 N.W.2d 861 (1997)*. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *MRE 401*. "The relevance contemplated in *MRE 401* and *MRE 402* is logical relevance." *Rock, 499 Mich at 256*.

Even when evidence is relevant under *MRE 401*, it **[*89]** can be excluded under *MRE 403* "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under" *MRE 403*. *People v Mills, 450 Mich 61, 75; 537 NW2d 909 (1995)*, mod *450 Mich. 1212, 539 N.W.2d 504 (1995)* (quotation marks and citation omitted). Consequently,

> photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*People v Head, 323 Mich App 526, 541; 917 NW2d 752 (2018)* (quotation marks and citation omitted).]

---

[16] We note that defendant does not single out any one image and argue that it was irrelevant or unfairly prejudicial, but argues only that the entire demonstrative was so. We therefore limit our review to the demonstrative as a whole, not whether every single image depicted in the demonstrative was relevant and not unfairly prejudicial. We further note that, while the demonstrative was apparently displayed for the entirety of trial, defendant conceded at oral argument that it never objected to the length of time that it was displayed.

Defendant contends that the images portraying the term "mammy" were irrelevant because defendant did not dispute that the term was racially offensive. Although not clearly expressed by defendant, this argument is related to the materiality of the term "mammy" in this case. As relevantly and succinctly summarized by this Court:

> Relevance divides into two components: materiality and probative value. Material evidence relates to a fact of consequence to the action. A material fact need not **[*90]** be an element of a crime or cause of action or defense but it must, at least, be in issue in the sense that it is within the range of litigated matters in controversy. Materiality looks to the relation between the propositions that the evidence is offered to prove and the issues in the case. If the evidence is offered to help prove a proposition that is not a matter in issue, the evidence is immaterial. [_Hardrick v Auto Club Ins Ass'n, 294 Mich App 651, 667; 819 NW2d 28 (2011)_ (quotation marks, citations, and alterations omitted), lv den _493 Mich. 867, 821 N.W.2d 542 (2012)._]

Briefly, defendant essentially argues that the "mammy" imagery was not material to the case because, by not challenging the racially offensive nature of the term, it was no longer "in issue in the sense that it [was not] within the range of litigated matters in controversy." _Id._ (quotation marks and citation omitted). The record, for many reasons, reveals otherwise.

During trial, Lisa's case focused heavily on the term "mammy." She was first called the term by Kraft while working at defendant's Lapeer office, which led her to file her formal complaint. Lisa then had a conversation with Agent Avolio about a Hispanic parolee who supposedly used the word "mammy" to describe the parolee's girlfriend, then was allegedly called **[*91]** the term by Agent Zarka when she transferred back to Macomb, and was exposed to the term a final time during a training on harassment conducted by Field Training Officer Rogers. Lisa claimed that all of the instances of racial harassment, but especially use of the term "mammy," had caused her to suffer significant issues related to her mental health. Dr. Walavalkar, Dr. Shiener, Dr. Rubenfaer, and Harris, who was Lisa's treating therapist, all agreed that Lisa had become psychiatrically ill as a result of the racial harassment. They believed that Lisa's depression and anxiety was chronic, would never be cured, and needed to be treated in order to stop the conditions from worsening. Lisa's request for noneconomic damages was premised on her emotional suffering caused as a result of the racial harassment, which largely revolved around the use of the term "mammy."

Defendant's contention that the racist imagery was irrelevant because they did not contest that the term "mammy" was racist—even if true—does not render the evidence irrelevant because plaintiff did not submit the demonstrative to show that the term was racist, but to show how Lisa perceived the term, which goes to the noneconomic **[*92]** damages suffered by Lisa as a result of repeatedly hearing and being called "mammy." As summarized above, plaintiffs introduced significant evidence about Lisa's emotional suffering after being subjected to racial harassment, which often focused on the term "mammy." Because of the psychological harm, Lisa requested a significant amount of noneconomic damages in the form of mental anguish, which she was permitted to do. "Victims of discrimination may recover for the humiliation, embarrassment, disappointment and other forms of mental anguish . . . ." _Campbell v Dep't of Human Servs, 286 Mich App 230, 246; 780 NW2d 586 (2009)_ (quotation marks and citation omitted). While defendant may not have challenged the offensive nature of the term "mammy," it vigorously argued about the psychological damages Lisa suffered because of hearing and being called the term. During cross-examination of Lisa's medical providers and experts, defendant repeatedly drew attention to the fact that their opinions about Lisa's emotional suffering relied heavily on Lisa's subjective complaints of suffering. Even though the two psychiatrists, Drs. Rubenfaer and Shiener, insisted they were not merely conduits of information from Lisa, defendant sought to have the jury infer the two doctors **[*93]** had only diagnosed Lisa with significant mental-health issues because she exaggerated her symptoms. Plaintiffs sought to rebut this defense in at least two ways: (1) through the testimonies of Drs. Rubenfaer and Shiener, who noted that Lisa's objective expression of the symptoms of mental illness was present during their evaluations or treatment and (2) displaying to the jury what the term "mammy" meant to Lisa through the use of the demonstrative. Through this second route, jurors were able to see the images that Lisa said were conjured in her mind upon hearing the term "mammy," allowing the jury to understand how the term affected Lisa. This method seems particularly appropriate because jurors may not understand why the word "mammy" was so offensive to Lisa and caused her so much psychological suffering. Defendant's concession that the word "mammy" is offensive did not assist jurors in understanding the effect that it had on Lisa; the demonstrative, on the other hand, assisted jurors in understanding this.

In sum, the imagery related to the term "mammy" was relevant to the issue of the extent of Lisa's noneconomic damages. Lisa's psychiatric suffering, as clearly exhibited by the **[*94]** record, was placed at issue by defendant's chosen strategies. Consequently, the evidence was relevant to a material fact at issue during the trial.

Defendant alternatively argues that the images, even if minimally relevant, should have been excluded under _MRE 403_ because the images likely inflamed the passions of the jury, which was unfairly prejudicial.

We agree with defendant that plaintiffs' demonstrative was highly offensive and risked inflaming the passion of the jury. The demonstrative shows the offensiveness of the term "mammy" using vivid imagery. But, as previously explained, "if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors" imagery that is offensive. _Head, 323 Mich App at 541_. And, as also previously explained, the offensive imagery here was admissible for a proper purpose—to explain why the term "mammy" was so offensive to Lisa and caused her so much suffering. That is, the demonstrative was relevant to establishing the extent of Lisa's noneconomic damages. All relevant evidence is prejudicial to some extent, and the question is whether the danger of _unfair_ prejudice _substantially outweighed_ the probative value of **[*95]** the evidence. While this evidence risked inflaming the jurors' prejudice and, thus, there was a danger of unfair prejudice by showing it to jurors, the evidence was also probative to explain why Lisa was so affected by use of the term "mammy." The trial court concluded that the danger of unfair prejudice posed by the demonstrative was not substantially outweighed by its probative value. We believe that this decision was within the range of reasonable and principled outcomes. In other words, given that the deferential abuse-of-discretion standard, we conclude the that trial court did not abuse its discretion by allowing plaintiffs to display the demonstrative.[17]

V. OTHER-ACTS EVIDENCE

At trial, plaintiffs sought to admit evidence about defendant's history of harshly responding to complaints and lawsuits related to harassment purportedly to show defendant's scheme, plan, or system of retaliating against individuals who complain about harassment. Defendant objected, arguing that it was improper propensity evidence being admitted in violation of _MRE 404(b)_. The trial court disagreed and denied the motion. After the jury rendered its verdict, defendant argued, this time in more detail, that it was entitled **[*96]** to a new trial because the other-acts evidence was improperly admitted. The trial court again disagreed and denied defendant's motion. On appeal, defendant argues that the trial court abused its discretion by admitting this improper propensity evidence, and that it is entitled to a new trial because "[t]he jury in this case was inundated with improper propensity evidence . . . ." We disagree.

A. PRESERVATION AND STANDARD OF REVIEW

Before trial, defendant moved to limit certain aspects of the other-acts evidence that plaintiffs sought to admit, and plaintiffs stipulated to those limitations. At that time, however, defendant did not object to the evidence as improper propensity evidence barred by _MRE 404(b)_. After trial began but before the first other-acts witness was called to the stand, defendant objected, on the record, to the other-acts witnesses under _MRE 404(b)_. Plaintiffs then responded on the record, and the trial court issued an oral ruling. Because of the way defendant chose to approach this issue, there is no lower court briefing, and the trial court's ruling on the issue is limited to only a couple pages of transcript, despite this being a significant and lengthy issue. Nevertheless, the issue **[*97]** was raised before the trial court and is therefore preserved. See _Glasker-Davis v Auvenshine, 333 Mich App 222, 228; 964 NW2d 809 (2020)_.

---

[17] Defendant also argues that the trial court abused its discretion because the relevance of the demonstrative was significantly reduced by several witnesses' descriptions of what the term "mammy" meant to them. While defendant is correct that several witnesses gave descriptions of the physical appearance of the term "mammy," our Supreme Court has been clear that "[p]hotographs are not excludable simply because a witness can orally testify about the information contained in the photographs." _Mills, 450 Mich at 76_. Moreover, the demonstrative was clearly better suited to convey the images that the term conjured up for Lisa than any testimony about the same could do. We therefore do not believe that the trial court abused its discretion by allowing plaintiffs to show the demonstrative to the jury.

After trial, defendant argued that it was entitled to a new trial because the other-acts evidence was improperly admitted. Therefore, this issue, too, is preserved. See *id.*

"This Court [] reviews for an abuse of discretion the trial court's decision to grant or deny motions for a new trial . . . ." *Rental Props Owners, 308 Mich App at 531*. Similarly, "[t]his Court reviews for an abuse of discretion a trial court's decisions regarding the admission of evidence . . . ." *Spectrum Health Hosps, 333 Mich App at 477*. "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock, 499 Mich at 260*. This Court reviews "de novo preliminary or underlying questions of law," and "[w]hen a trial court makes a determination that is legally incorrect, the court necessarily commits an abuse of discretion." *Spectrum Health Hosps, 333 Mich App at 478*.

B. ANALYSIS

Our Supreme Court, in *Rock, 499 Mich at 256-258*, provided a relevant and thorough explanation of the interplay of court rules when, as here, a party seeks to admit evidence of prior bad acts:

> To be admissible, evidence must be relevant. *MRE 402*. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or **[\*98]** less probable than it would be without the evidence." *MRE 401*. The relevance contemplated in *MRE 401* and *MRE 402* is logical relevance. *People v VanderVliet, 444 Mich 52, 60; 508 NW2d 114 (1993)*. Even if logically relevant under *MRE 401* and *MRE 402*, evidence may still be excluded under *MRE 404* because *MRE 404* "is a rule of legal relevance, defined as a rule limiting the use of evidence that is logically relevant." *Id. at 61-62*. Legal relevance, as a limiting rule, concerns the purpose for which evidence is used. In particular, *MRE 404(b)(1)* states:
>
> > Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.
>
> Therefore, evidence that is logically relevant under *MRE 401* and *MRE 402* may be excluded under *MRE 404(b)(1)* for lacking legal relevance if it does not have a proper purpose.
>
> Other-acts evidence is only admissible under *MRE 404(b)(1)* when a party shows that it is (1) offered for a proper purpose, i.e., to prove something **[\*99]** other than the defendant's propensity to act in a certain way, (2) logically relevant, and (3) not unfairly prejudicial under *MRE 403*. *People v Knox, 469 Mich 502, 509; 674 NW2d 366 (2004)*. "'[I]f the proponent's only theory of relevance is that the other act shows defendant's inclination to wrongdoing in general to prove that the defendant committed the conduct in question, the evidence is not admissible.'" [*People v Jackson, 498 Mich 246, 258; 869 NW2d 253 (2015)]*, quoting *VanderVliet, 444 Mich at 63*. In *People v Mardlin*, this Court further explained:
>
> > Evidence is *inadmissible* under [*MRE 404(b)*] *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. Any undue prejudice that arises because the evidence also unavoidably reflects the defendant's character is then considered under the *MRE 403* balancing test, which permits the court to exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice . . . ." *MRE 403*. Finally, upon request, the trial court may provide a limiting instruction to the jury under *MRE 105* to specify that the jury may consider the **[\*100]** evidence only for proper, noncharacter purposes. [*People v Mardlin, 487 Mich 609, 615-616, 790 NW2d 607 (2010)*] (citations omitted).]
>
> Accordingly, while *MRE 404(b)* is an inclusionary rule, it is still subject to the balancing test under *MRE 403*. [Footnotes omitted.]

Under the caselaw just summarized, then, the first issue to consider is whether the evidence was offered for a proper, nonpropensity purpose. *Rock, 499 Mich at 257*. "The proponent of the evidence has the burden of establishing a proper, noncharacter purpose for its admission under *MRE 404(b)*." *Merchand v Carpenter, 501 Mich 1071, 1072; 911 N.W.2d 198 (2018)*. In the present case, plaintiffs argued that the evidence of defendant's previous instances of discrimination were admissible to prove defendant's "scheme, plan, or system in doing an act," which is specifically identified as a proper purpose in *MRE 404(b)(1)*. It is not enough, however, to merely claim a proper purpose under *MRE 404(b)(1)*; instead, the proponent of the evidence "must also *explain how* the evidence is relevant to that purpose without relying on a propensity inference." *People v Denson, 500 Mich 385, 402; 902 NW2d 306 (2017)*.

Defendant challenges the testimony of four individuals as inadmissible other-acts evidence—the testimony of James Hedrick, Michael Hester, Teliferio Witcher, and certain statements by IA Manager Marschke. We address each in turn.

1. HEDRICK

Hedrick testified that defendant had a system **[*101]** of conducting sham investigations after a person either reports harassment or assists in the reporting the harassment. As an example, Hedrick said that his supervisor tried to frame him for misplacing a dangerous tool and stealing a camera after Hedrick reported the supervisor for racial harassment. Relevantly, Hedrick's testimony referenced questionable investigations arising out of those two accusations from Hedrick's supervisor. With respect to the missing tool, Hedrick noted that the supervisor had prepared a doctored photograph to implicate Hedrick, and it was Hedrick, not the investigator assigned to the case, who identified the doctored photograph and exonerated himself. During the second investigation with respect to the camera, Hedrick noted that the allegedly stolen camera was not listed on the supervisor's manifest, which once again led to Hedrick being cleared of charges. The implication from Hedrick's testimony was that absent his ability to contradict the allegations against him, he likely would have been disciplined for the false allegations, which could have led to termination. Hedrick insisted that these were examples of "gotcha" investigations, which had predetermined **[*102]** results before they even began because the motive was retaliation.

Hedrick also testified about a coworker who complained about their supervisor using the N-word, which led to the coworker being told to do work he was not medically fit to do. When the coworker refused to do the work, which the supervisor was aware would occur, the supervisor reported the coworker. The coworker was then given a "stop order," which stopped him from coming to work and getting paid for at least part of the time. Defendant then conducted a year-long investigation into the coworker, which resulted in the coworker losing his house because of he could not pay the bills. Hedrick explained that the use of a "stop order" and an unusually lengthy investigation was a manner by which defendant could retaliate without issuing any official discipline. Hedrick also explained that defendant would stack charges by using multiple, often duplicative, work rules to make one potentially minor event—such as refusing to perform work that one is not medically fit to perform—look far worse.

As related to *MRE 404(b)(1)*, plaintiffs asserted that Hedrick's testimony was relevant to defendant's scheme or system when it came to retaliating against **[*103]** individuals who participated in harassment complaints. The scheme or system, according to Hedrick, involved sham investigations potentially setup by bad evidence from supervisors, faulty investigations that ignored possibly determinative evidence, putting people on "stop order," and having overly lengthy investigation periods. Accordingly, plaintiffs adequately explained how Hedrick's testimony was related to a proper, nonpropensity purpose under *MRE 404(b)*, i.e., it was legally relevant.

This testimony about the scheme or plan used by defendant was relevant to facts at issue in the litigation. The defense to Cedric's claim of retaliation was, primarily, that he had committed violations of work rules, was investigated for those in a normal manner, and faced warranted discipline before he decided to preemptively retire. Hedrick's evidence, however, allowed the jury to consider whether Cedric's investigations were part of defendant's scheme or system of retaliation. Notably, one of Cedric's issues—the accusations against Cedric regarding his decision to remove CO Goodfellow's ticket from the review process—arose after some questionable evidence was provided to IA from Cedric's supervisor and coworker. **[*104]** That investigation began only after Deputy Warden Schooley obtained a jailhouse telephone call between Prisoner Harding-Bey and Cheeks in which they said they

would speak with then-Warden Chapman, Deputy Warden Schooley, and Cedric, and then-Warden Chapman forwarded information about the call to IA. Yet, when then-Warden Chapman did so, he only mentioned that Prisoner Harding-Bey and Cheeks referred to Cedric, omitting that they also referred to himself and Deputy Warden Schooley. When the case was then investigated by IA Manager Marschke, he did not seem concerned with Warden Chapman's questionable description of the jailhouse telephone call. In sum, then, Warden Chapman's provision of questionable evidence to IA correlated with Hedrick's testimony regarding his supervisor's use of questionable evidence to spur investigations into Hedrick.

The other connections between Hedrick's description of defendant's retaliatory scheme and Cedric's case are more direct. Hedrick testified that retaliatory investigations often resulted in a "stop order," which happened to Cedric. Further, Hedrick noted that retaliatory investigations were sometimes lengthy, and the claims related to Cedric purportedly **[*105]** colluding with Lieutenants Miller and Whitman on answers to questionnaires were investigated for about 11 months before Cedric finally had an opportunity to defend himself at a disciplinary conference. Finally, Cedric was charged with at least 10 work-rule violations at the same time, despite committing violations possibly explainable by a misunderstanding or confusion. This fit with Hedrick's explanation that retaliatory investigations stacked charges to make possibly minor occurrences seem worse.

As is apparent from the preceding discussion, Hedrick's testimony was not only legally relevant but logically relevant—the evidence provided grounds for the jury to understand the possible scheme or system that defendant had crafted to ensure that those who complained of harassment suffered retaliation.

Lastly, addressing _MRE 403_, evidence about defendant's alleged scheme or system of retaliating against employees who complained about harassment was highly probative. There was no direct evidence that defendant retaliated against Cedric, so circumstantial evidence that defendant had a scheme or system for retaliating against employees who complained about harassment and that defendant's treatment **[*106]** of Cedric largely followed that scheme or system was highly probative. See _People v Oliphant, 399 Mich 472, 495; 250 NW2d 443 (1976)_. While there was a danger of unfair prejudice—the jury could infer that, because defendant had a system or scheme of retaliating against employees who complained about harassment, they retaliated against Cedric here—that danger was largely minimized by the trial court's limiting instruction under _MRE 105_. Jurors are presumed to follow their instructions. See _People v Graves, 458 Mich 476, 486; 581 NW2d 229 (1998)_. In light of the fact that the danger of unfair prejudice was largely minimized, as well as the high probative value of the other-acts evidence, the trial court did not abuse its discretion when it found that Hedrick's testimony was not barred by _MRE 403_.

## 2. HESTER

Hester, who retired from defendant in 2014, testified about the same coworker as Hedrick, who had been called the N-word and complained, and was then asked to do work he was not medically fit to do, and when he refused, was reported, investigated, put on stop order, and went unpaid for a year, which led to him losing his house. Hester reiterated the retaliatory nature of the investigation into that coworker. Hester also claimed that he personally suffered retaliation because he assisted with some employees' **[*107]** harassment claims. According to Hester, he was accused of punching a coworker in on a time clock in retaliation for his complaints of harassment. When the investigation began, Hester encouraged the investigator to watch the video footage of the area covering the time clock. But instead of reviewing the exculpatory evidence, defendant decided to dismiss the claims against Hester. On another occasion, Hester was asked to perform the work of an electrician, which he was not qualified to do. When he complained to representatives of defendant at its headquarters in Lansing, they did not remedy the issue. Finally, Hester testified that he was placed on a "stop order" for two years while defendant investigated an accusation against Hester, the substance of which he was not informed about. Eventually, out of the blue, he was told to come back to work. He later discovered that an investigator for defendant told female prisoners that they could make money if they accused Hester of sexual assault, and the police eventually became involved, after which the prisoners recanted, the charges against Hester were dropped, and he was commanded to return to work. Hester also noted that defendant would **[*108]** stack charges against someone who had complained of harassment to ensure that even minor mistakes looked far worse.

As with Hedrick's testimony, plaintiffs asserted that Hester's testimony was relevant to show defendant's scheme or system for retaliating against individuals who participated in harassment complaints, which was a permissible purpose for the evidence under *MRE 404(b)*. Plaintiffs explained that Hester's experiences with retaliatory investigations from defendant showed how the system worked. The examples provided by Hester demonstrated defendant's attempts to ignore pertinent and potentially exculpatory evidence when conducting retaliatory investigations, as well as using overly long investigations. Further, Hester's testimony demonstrated that when someone was exonerated from a retaliatory investigation, it was not due to defendant's investigation, but because the inadequacy of the charges was discovered by someone other than defendant. Thus, plaintiffs adequately explained the legal relevance of this testimony.

The logical relevance of this testimony is obvious—Hester's testimony suggested that defendant uses inflammatory allegations, sham investigations, bad or questionable evidence, **[*109]** stop orders, a lengthy time period of investigation, and stacked charges to ensure someone who complains of harassment will face exorbitant discipline. Cedric faced circumstances matching closely to this described scheme or system. Accordingly, plaintiffs adequately explained how Hester's testimony was both logically and legally relevant under *MRE 404(b)*.

Lastly, Hester's other-acts testimony was not barred by *MRE 403* for the same reasons that Hedrick's was not barred by that rule. To briefly reiterate, evidence about defendant's alleged scheme or system of retaliating against employees who complained about harassment was highly probative, and the danger of unfair prejudice that this evidence posed was largely minimized by the trial court's limiting instruction under *MRE 105*, which jurors are presumed to follow. See *Graves, 458 Mich at 486*. Accordingly, the trial court did not abuse its discretion by ruling that the danger of unfair prejudice posed by admitting this evidence did not substantially outweigh the evidence's probative value, and thus the evidence was not barred by *MRE 403*.

### 3. WITCHER

Defendant next challenges the testimony of Witcher, who retired from defendant in the mid-2010s. Witcher agreed with Hedrick and Hester, generally, **[*110]** that once someone complained of harassment, they became a target for defendant, saying, "[O]nce you become a target with [defendant], what they tend to do is focus on you, cook up charges, single you out, treat you different, put charges on you." Witcher said that he had seen IA manipulate investigations to ensure that a desired result is reached when the investigation was retaliatory in nature. Witcher also explained that defendant would stack charges against someone who complained, turning one alleged error into many work-rule violations. Witcher added that defendant would "bootstrap" investigations, scheduling them so they all were finalized at the same time, which allowed defendant to combine disciplinary conferences to make the subject of the investigation look worse than the relatively minor issues. Lastly, Witcher testified that he was told about a recent incident of retaliation that occurred after Witcher's retirement. According to Witcher, the employee said that she had been approached by her supervisors to frame a volunteer that the supervisors wanted to remove from the position. When the employee refused and complained about the improper behavior, defendant sent IA Manager **[*111]** Marschke to personally investigate. He quickly found the employee's claims to lack sufficient supporting evidence to allow for charges, closed the investigation, and then opened a new one into the employee who complained. The employee was eventually charged, convicted at a conference, and her employment was terminated.

The relevance of Witcher's more general claims were logically and legally relevant to a proper purpose for the same reasons discussed for the other two witnesses—the testimony showed defendant's scheme or system for retaliating against individuals who participated in harassment complaints, and plaintiffs adequately explained how Witcher's testimony related to that proper purpose. See *MRE 404(b)(1)*; *Denson, 500 Mich 385, 402; 902 N.W.2d 306*. Moreover, his more specific claim had even more probative value than the more general allegations. The incident was more recent and involved an alleged retaliatory investigation by IA Manager Marschke, which Cedric alleged happened to him. Further, the investigation started out with one subject, but shifted quickly to focus on the individual that defendant sought to retaliate against, which, again, is what Cedric alleged happened to him when IA Investigator Cusack shifted the investigation **[*112]** of Deputy Warden Schooley to focus on Cedric as retaliation for plaintiffs' then-recently filed complaint. This additional level of specificity shined light on another facet of defendant's system, which was to send its highest-ranking investigator to perform an investigation and to use an

ongoing investigation as a springboard to shift focus to the person who complained. Thus, the trial court did not abuse its discretion in determining the evidence was relevant for a proper purpose under MRE 404(b)(1). See Rock, 499 Mich at 257.

Lastly, for the same reasons that Hedrick's and Hester's testimony was not barred by MRE 403, Witcher's other-acts testimony was not barred by that rule.[18]

### 4. IA MANAGER MARSCHKE

The last witness challenged by defendant on appeal is IA Manager Marschke, who testified that he was only aware of a single "gotcha" investigation in his time with defendant. IA Manager Marschke insisted that he had discovered the investigation was improper, refused to participate, and reported it. This occurred under a prior administration, which then retaliated against IA Manager Marschke for a time. When the administration changed, IA Manager Marschke was appointed to manager of IA. IA Manager Marschke insisted that the new **[*113]** administration, with him heading IA, no longer conducted "gotcha" or retaliatory investigations.

Despite IA Manager Marschke's insistence that he was speaking about only a single investigation under a different administration, his testimony showed defendant, at least at the time, conducted sham or "gotcha" investigations to essentially frame certain employees. His testimony also established that defendant had retaliated against IA Manager Marschke when he complained about improper procedures. Thus, IA Manager Marschke's testimony was logically and legally relevant to defendant's "scheme, plan, or system in" shifting the focus of investigations, as well as using "gotcha" investigations, as means of retaliation. MRE 404(b)(1). This was probative of a material fact at issue because Cedric claimed retaliation, was investigated by IA Manager Marschke, and had an investigation into Deputy Warden Schooley shift focus to Cedric. Rock, 499 Mich at 257.

Lastly, for the same reasons that Hedrick's, Hester's, and Witcher's testimony was not barred by MRE 403, IA Manager Marschke's other-acts testimony was not barred by that rule.

### 5. DEFENDANT'S ARGUMENTS

Defendant first argues that the testimony of the other-acts witnesses was not legally **[*114]** relevant because it was not admitted for a proper purpose. For the reasons explained above, we disagree.

Defendant next argues that, even if legally relevant, the disputed testimony was not logically relevant because it "involved entirely different facilities, other supervisors, and distinct time periods." While defendant is correct about the differences with the other-acts evidence, it was clear that all of the witnesses were talking about a broad, overarching scheme within defendant as an organization. Although the investigations discussed by the other-acts witnesses did not involve the same place or all of the same people within defendant's organization as this case,[19] the testimony of those witnesses established that it was powers broadly wielded by defendant that allowed for the scheme or system of retaliation to work. In other words, the differences highlighted by defendant did not affect the logical relevance of the other-acts evidence in this case. Rather, as plaintiffs and the trial court pointed out, the differences go to the weight that the jury could choose to give the evidence. For instance, if, as defendant contended, it was a different administration that used defendant's **[*115]** centralized power to enable the retaliatory investigations that the other-acts witnesses testified about, and that administration had changed before the

_____

[18] In its brief on appeal, defendant briefly argues that a portion of Witcher's testimony was inadmissible hearsay. We decline to consider the merits of this argument because defendant did not list it in its statement of questions presented in its brief on appeal, and instead, only challenged Witcher's testimony on the basis of MRE 404(b). See Seifeddine v Jaber, 327 Mich App 514, 521; 934 NW2d 64 (2019) (explaining that a party waives an issue on appeal "by failing to include it in [its] statement of questions presented").

[19] We note, however, that at least some of the people involved in this case—such as Administrator Warner—were seemingly involved in past administrations that handled the cases discussed by the other-acts witnesses.

investigations in this case began, then defendant could present that information to the jury, who could then decide if a change in administration actually fixed the retaliatory system that defendant enabled.[20]

Finally, defendant argues that the evidence should have been barred by *MRE 403*. Defendant argues that the danger of unfair prejudice was particularly pronounced here because "there was no direct evidence that the investigations involving [Cedric] were retaliatory." Yet defendant does not cite any caselaw to support that a lack of other evidence to support a material issue increases the risk of *unfair* prejudice. It certainly makes the evidence more prejudicial, but that is because a "dearth of evidence" on a particular material issue makes evidence related to that issue "particularly important" to the case. *Oliphant, 399 Mich at 495*. That is, any probative evidence is prejudicial to some extent, *Mills, 450 Mich at 75*, and the lack of other evidence on the issue increases the probative value of the other-acts evidence, yet this by itself does not correlate to an increase in the danger **[*116]** of *unfair* prejudice.

Defendant also argues that the other-acts evidence was improperly admitted because it was used to "bolster [a] theory of a department-wide conspiracy to punish everyone who ever complained about anything; a conspiracy so vast and powerful that it covered myriad locations and survived a change in administrations." Even if this was the theory that plaintiffs were using the other-acts evidence to support, defendant's argument reads like a reason why a factfinder should disbelieve plaintiffs' evidence, not a reason to conclude that the evidence should have been barred by *MRE 403*.

Defendant lastly argues that allowing the other-acts evidence was "inequitable," and therefore it should have been barred by *MRE 403*, because to dispute the allegations "would have required several trials within the trial to present the facts of each and every investigation so as to explain its progression and justify its outcome." While this could be a proper basis for a court excluding evidence under *MRE 403* (i.e., the trial court could exclude evidence due to "considerations of undue delay" or "confusion of the issues," see *MRE 403*), the trial court impliedly declined to do so in this case.[21] This was not outside the **[*117]** range of reasonable and principled outcomes. This was a 16-day jury trial, and it is not clear that rebutting the other-acts evidence would have added significantly to this already lengthy trial. Moreover, as previously explained, the evidence was highly probative of a material issue in this case. The fact that it would be difficult for defendant to rebut highly probative evidence on a material issue is not a particularly persuasive reason to bar the evidence under *MRE 403*, and, in our opinion, it is certainly not a reason to conclude that the trial court abused its discretion by refusing to do so.[22]

For these reasons, we disagree with defendant that the trial court abused its discretion when it refused to exclude plaintiffs' other-acts evidence.

VI. MISCONDUCT BY PLAINTIFFS' COUNSEL

---

[20] Indeed, this was one of defendant's strategies during trial. But, unfortunately for defendant, this strategy was undercut at least in part by the testimony of its own witness, Administrator Warner, who insisted that, despite the change in administration, the processes of investigations used by defendant had not changed.

[21] As noted previously, defendant did not brief its objection to the other-acts evidence, but only made an oral motion after trial started. During that motion, defendant's counsel stated only a single time that it was "going to have to relitigate all of those issues," and then never mentioned this point again. Instead, defendant insisted that the other-acts evidence was not relevant because of the change in administration. It is unclear that defendant's single sentence was sufficient to preserve the argument for appeal, but assuming it was, the trial court did not explicitly rule on the issue.

[22] We also note that at least some of the retaliatory investigations discussed by the other-acts witnesses apparently resulted in cases that defendant either lost or settled, and plaintiffs stipulated to not present those results to the jury. It is therefore not entirely clear why defendant would want to walk through "the facts of each and every investigation so as to explain its progression and justify its outcome"—avoiding discussion about at least some of the outcomes of the investigations seemed to work to defendant's advantage.

Defendant next argues that it is entitled to a new trial because of the persistent improper comments and arguments made by plaintiffs' counsel. While we agree that plaintiffs' counsel made numerous improper comments and, at times, acted unprofessionally, we do not believe that a new trial is warranted.

A. STANDARD OF REVIEW

"This Court [] reviews for an abuse of discretion the trial court's decision to grant or deny **[*118]** motions for a new trial . . . ." *Rental Props Owners, 308 Mich App at 531*. Similarly, when considering a claim of attorney misconduct, this Court "review[s] for an abuse of discretion a trial court's general conduct of a trial." *Zaremba Equip, Inc v Harco Nat'l Ins Co, 302 Mich App 7, 21; 837 NW2d 686 (2013)*, lv den *495 Mich. 947, 843 N.W.2d 530 (2014)*. "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock, 499 Mich at 260*.

B. ANALYSIS

"A trial court may grant a new trial when the misconduct of the prevailing party materially affected the substantial rights of the nonprevailing party." *Estate of Carlsen v Southwestern Mich Emergency Servs, PC, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 351159, 2021 Mich. App. LEXIS 5281, at *19)*. As explained by our Supreme Court:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered **[*119]** because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Reetz v Kinsman Marine Transit Co, 416 Mich 97, 102-103; 330 NW2d 638 (1982)*.]

"An attorney's comments do not normally constitute grounds for reversal unless they reflect a deliberate attempt to deprive the opposing party of a fair and impartial proceeding." *Zaremba Equip, 302 Mich App at 21*. "Reversal is required only where the prejudicial statements of an attorney reflect a studied purpose to inflame or prejudice a jury or deflect the jury's attention from the issues involved." *Hunt v Freeman, 217 Mich App 92, 95; 550 NW2d 817 (1996)*. "While a lawyer is expected to advocate his client's cause vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Badalamenti v William Beaumont Hosp-Troy, 237 Mich App 278, 292; 602 NW2d 854 (1999)*.

Defendant first argues that plaintiffs' counsel improperly "injected racially inflammatory terms into the proceedings" by using numerous racial slurs during arguments that Lisa was never subjected to while working at defendant, including "tar baby," "coon," and the **[*120]** entire N-word. We agree that these words are incredibly offensive and ran the risk of inflaming the passion of the jury. Yet Lisa's case largely rested on being subjected to a racial slur multiple times and the effect that this had on her. Counsel's use of other slurs was to analogize the offensiveness of the term "mammy" to other common racial slurs to help explain why it had the effect on Lisa that it did, not to inflame jurors' passion. That said, the use of offensive racial slurs still likely stirred emotions in the jurors, but we cannot conclude that this was per se improper in this case because racial slurs and their effects were germane to the one of the central issues. In short, in a case that revolved largely around the use of a racial slur, it is difficult to conclude that use of racial slurs during argument to show the offensive of the term at issue demonstrates an attempt to "deflect the jury's attention from the issues involved," *Hunt, 217 Mich App at 95*, and we will not do so in this case.

Defendant attempts to analogize this case to *Gilbert v DaimlerChrysler Corp, 470 Mich 749, 772; 685 NW2d 391 (2004)*, where our Supreme Court held, in relevant part, that in the plaintiff's action for sexual harassment, her counsel's attempts to liken the German-owned corporate **[*121]** defendant to Nazis was improper. As noted by our

Supreme Court, such an argument was "a naked appeal to passion and prejudice and an attempt to divert the jury from the facts and the law relevant to this case." *Id. at 773*. Here, however, using racial slurs to emphasize the offensiveness of the racial slur to which Lisa was subjected did not divert the jury from the relevant issues in the case, which involved the use of racial slur and its effect on Lisa. Moreover, plaintiffs' counsel's use of racial slurs other than the one directed at Lisa was not so pervasive that it risked diverting the jurors' attention away from the facts of the case, i.e., jurors still understood that the only slur directed at Lisa while employed with defendant was "mammy."[23]

Defendant next argues that plaintiffs' counsel improperly characterized defendant as an unfeeling entity that needed to be held accountable for its actions. In *Reetz, 416 Mich at 111*, our Supreme Court cautioned against an attorney's attempt "to create in the minds of the jurors an image of [the defendant] as an unfeeling, powerful corporation controlled by a ruthless" leader. And in *Gilbert, 470 Mich at 765*, our Supreme Court explained that the CRA does not permit punitive damages, so it is improper for a plaintiff to argue that a defendant should be punished with an excessive verdict.

Here, defendant takes issue with statements made by plaintiffs' counsel during closing that defendant did not care about plaintiffs and that the only thing that will make them care is a verdict. We are not convinced that the arguments pointed to by defendant were so pervasive or improper as to require reversal. **[*123]** At least some of plaintiffs' counsel's arguments about defendant being uncaring were counsel highlighting evidence to that effect—like plaintiffs' counsel's argument that defendant was uncaring when it did little to ensure Lisa's safety while she was struggling with threats from a probationer. In other instances, however, such as when plaintiffs' counsel urged the jury to provide a significant verdict to hold defendant accountable and make them care, the conduct of plaintiffs' counsel was clearly improper.[24] But, in that instance, upon objection by defendant's counsel, the trial court provided a curative instruction, and plaintiffs' counsel clarified that he was only requesting a verdict requiring defendant to pay "for the harm that was done." Thus, the improper statement was quickly and specifically remedied. After a review of the entire record, it is clear that plaintiffs' counsel's reference to defendant as an uncaring entity who should be held accountable with a verdict were scarce and, though improper, were minimally prejudicial. As our Supreme Court in *Reetz, 416 Mich at 111*, explained, minor instances of misconduct do not usually amount to error

---

[23] Defendant also argues that plaintiffs' counsel improperly referenced lynchings during closing arguments, saying (according to defendant), "Coon is a sign that they used to hang on blacks that they lynched and hung from a tree. And that's what they did to Lisa . . . ." This, however, is not reflected in the transcript. According to the transcript, plaintiff's counsel said,

> And you need to understand, and I know we've talked about this, and these are really offensive images, and these are really offensive things, but this is a reality that it's hard for us who are not African-Americans to fully understand. We understand that this stuff is offensive, but these images and the history behind this, you know, Kuhn [sic] is a sign that they used to hang on blacks that they lynched and hung from a tree. And that's offensive to **[*122]** me and I'm sure it's offensive to you. But to have an African-American to have these types of things said is incredibly, incredibly offensive in a way that's hard for us to fully understand. And that's what they did to Lisa, and that's what [sic] they tried to minimize these things and tried to make excuses and deflect from what happened.

In context, it is evident that plaintiffs' counsel did not insinuate that defendant "lynched" Lisa, as defendant contends. Rather, plaintiff's counsel referenced lynching to explain why the word "coon" (as explained in the fact section of this opinion, the homophone of "coons"—"Kuhns"—was said to Lisa at work) was offensive to Lisa, as an African American. Further, plaintiffs' counsel's statement, "And that's what they did to Lisa" is, in context, clearly not a reference to lynching, but to the fact that Lisa was subjected to offensive words while working for defendant.

[24] Defendant points to other instances where plaintiffs' counsel mentions accountability, but the other statements cited by defendant were not improper. When the arguments are read in context, it is clear that plaintiffs' counsel was not urging jurors to hold defendant accountable, but rather was saying that defendant had not held its offending workers accountable. These various arguments, in context, related to whether defendant's response to Lisa's complaints of harassment were adequate and whether defendant had a retaliatory motive when pursuing investigations into Cedric. Such arguments were not improper.

requiring reversal. Accordingly, while plaintiffs' counsel **[*124]** made some improper arguments about defendant being an uncaring entity that should be held accountable, the misconduct was not enough to warrant a new trial.[25]

Defendant next takes issue with plaintiffs' counsel's arguments that defendant refused to take responsibility for its actions. It is difficult, however, to understand what defendant believes was improper about this argument. For a month of trial, defendant argued that it was not responsible for any damages suffered by plaintiffs. The argument by plaintiffs' counsel that defendant did not take responsibility for its actions was, thus, clearly based on the facts of the case, not an inappropriate argument for punitive damages or an argument intended to arouse the passion of the jurors.

Finally, defendant argues that plaintiffs' counsel improperly denigrated defendant's attorney, the Attorney General (AG). Defendant identifies the subsequent passages as evidence of plaintiffs' counsel's misconduct related to accusing defendant's counsel of lying and working with witnesses to accomplish the same:

> And let's just start with [IA Manager] Marschke because we all remember the day that he testified. It was a long day. He was here all day, and **[*125]** he told us how the department has a history and a culture of retaliation and attacking people.
>
> But let's look at what he said before because guys remember, I had previous testimony from [IA Manager] Marschke. So remember, when [IA Manager] Marschke got on the stand, let's look at what he first says. And this is a theme throughout this case too. A theme of lies by the [AG] and by the [defendant]. So, and I love my Elmo, and if it has been annoying, I apologize, but it's an easy way to get evidence across. I said, sir, would you admit under oath that [defendant] has a history of manipulating investigations in order to get the results he wants? This is right out of the gate, and [IA Manager] Marschke denied it.
>
> Well, thank God I had previous testimony from [IA Manager] Marschke that we were able to go through because we all know what he said and he said it wasn't just once. He said it wasn't just an isolated incident. [IA Manager] Marschke testified that it happened many, many times, because then we heard the [AG], which was another theme that we all know. Suddenly, people go to lunch and their testimony changes. What's going on? And before he has to go to lunch with the [AG] or talk to **[*126]** the [AG] over break, this is what he said. He said it happened numerous times. I've been there a long time, 14 years.
>
> * * *
>
> Remember [Supervisor] Slater, the supervisor of Lisa? We had him on the stand and I asked him, sir, did you say on the first day when you introduced Lisa and another white person, I didn't know what I was getting with her? Remember, he walked around and said I didn't know what I was getting with her. And then we broke for the weekend, he talked to the [AG], and we come back on Tuesday and his testimony changed.
>
> And I was so upset about this, I ordered the transcript of [Supervisor] Slater too because when I asked him about it on the stand, he said oh, I never said that. My testimony never changed. And I had written it down. So I ordered [Supervisor] Slater's testimony. And let me show you what [Supervisor] Slater said before he talked to the [AG] over the weekend.
>
> I said [Supervisor] Slater, and when you introduced Lisa, you told everybody that you didn't know what you're getting with her, isn't that correct? Correct. That was [Supervisor] Slater's testimony before we broke for the weekend. And then the weekend came, he talked to the [AG] and suddenly everything changed. **[*127]** Just like so many other witnesses in this case.
>
> * * *
>
> [Defendant is] represented by a law enforcement agency, the [AG]. Who is supposed to by the way investigate under certain circumstances perjury. You have two of the state's highest law enforcement agencies coming in

---

[25] In contrast, our Supreme Court in *Reetz, 416 Mich at 111*, held that a new trial was warranted because the plaintiff's counsel argued that the defendant "cared nothing about [the plaintiff]'s welfare, that [the defendant] can afford the best of everything, and repeated references to George Steinbrenner III, owner of the New York Yankees and chairman of the board of [the defendant's] parent corporation, although he was not personally a party in the case." The improper arguments in this case fall well short of the egregiously improper arguments made in *Reetz*.

here and lying, and changing their testimony, and leaving out facts, and changing investigations, and basically doing whatever they want.

* * *

And then you hear the AG suggest yesterday, I don't know if you remember this, suggest on direct examination that [IA Investigator] Cusack, he is such a good investigator that he self-reported himself. Remember, they said that with [Discipline Coordinator] Nanasy, who came on right after [Administrator] Warner. That he, himself, reported himself. No, he didn't. No, he did not. That is a lie. That is a lie, and the fact that they would ask that question when they know it's not true shows what they will do in this case. And when I sit down and they get up, I want you to keep that in mind. It shows the lengths that they are willing to go to.

And I don't even understand why they would do that. I have read all of the materials in this case, they know that I know. They know that I know, **[\*128]** and they know that I could get up and cross-examine the person. They just don't care. They don't care. [IA Investigator] Cusack is a liar. And I will say that, he is a liar and he lied. And [Discipline Coordinator] Nanasy was a liar and she was not honest with you. The only reason that [IA Investigator] Cusack got caught is because after this went down and we had information that [IA Investigator] Cusack had met with [Deputy Warden] Schooley in a parking lot, we asked and demanded that an investigation go forward and they had to do it. They had to do it, and then when there is a video, they can't lie about it. How are they going to lie their way out of the video?

In support of its argument that these statements by plaintiffs' counsel amount to misconduct, defendant relies solely on our Supreme Court's opinion in *Kern v St Luke's Hosp Ass'n of Saginaw, 404 Mich 339; 273 NW2d 75 (1978)*. In that case, the Court held that a new trial was warranted based on the defendant's counsel attempt to prove a conspiracy between the "plaintiffs' attorney, medical advisor, and expert witnesses to render collusive and untrue testimony . . . ." *Id. at 350*. The Court explained that such an argument was improper because, despite attempting to do so, defendant's counsel had failed to **[\*129]** elicit any testimony supporting such a theory. *Id.* In other words, the Court in *Kern* held that a new trial was required because the defendant's counsel was making allegations about witnesses and opposing counsel—that they were lying and colluding—without any factual basis to support such a claim. *Id. at 353-354*. And because the arguments were on the basis of accusations not supported by a reasonable view of the record, the Court "perceive[d] a studied purpose to prejudice the jury and divert the jurors' attention from the merits of the case." *Id. at 354*.

Unlike in *Kern*, the arguments made by plaintiffs' counsel here had some support in the record. First, the record supports that Supervisor Slater changed his testimony between days of trial—he initially stated that he told people at the Lapeer office that he did not know what he was getting with Lisa, but after breaking for the weekend, Supervisor Slater claimed he never gave such testimony. Then, when prompted by plaintiffs' counsel, Supervisor Slater agreed that he had spoken with the AG over the weekend.

Second, as to IA Manager Marschke, there can be little dispute that he was confronted by plaintiffs' counsel during his testimony about a prior inconsistent statement. **[\*130]** Relevantly, he testified at trial about the limited nature of "gotcha" investigations in defendant's past, but was shown his deposition testimony, which was different. Considering the length of time between the two occasions, it was implied that he had met with the AG between then.

Third, turning to Discipline Coordinator Nanasy and IA Investigator Cusack, plaintiffs' counsel's argument related to a claim that IA Investigator Cusack faced lesser discipline than Cedric because he had self-reported. IA Investigator Cusack's testimony, however, was that he only admitted to having improper contacts with Deputy Warden Schooley after Cedric initiated an investigation by complaining of discriminatory harassment. In the process, a video of Deputy Warden Schooley and IA Investigator Cusack meeting each other outside of TCF when IA Investigator Cusack was arriving to conduct the investigation was discovered. Discipline Coordinator Nanasy's claim of IA Investigator Cusack self-reporting, then, obviously was at least partially false. While he may have admitted to his wrongdoing after the investigation began, there was no indication on the record that he would have done so if there never was an **[\*131]** investigation. Considering these questionable circumstances, it was not improper for plaintiffs'

counsel to question why the AG would elicit testimony from Discipline Coordinator Nanasy about IA Investigator Cusack self-reporting.

Finally, though it is a close call, considering these various instances of potential collusion between witnesses for the defense and the AG, plaintiffs' counsel's decision to accuse the AG of such was not entirely improper. While perhaps unprofessional and certainly a "breach[] of good manners," there was a "reasonable basis for" the characterization. *Kern, 404 Mich at 353-354*. In sum, then, after a review of the entire record, this accusation by plaintiffs' counsel could be appropriately characterized as "zealous advocacy for [his] clients . . . within the bounds of good lawyering within the context of [this] trial." *Estate of Carlsen, ___ Mich App at ___; 2021 Mich. App. LEXIS 5281, at *23*.

Defendant lastly argues that even if this Court concludes that one of the alleged errors standing alone did not create sufficient prejudice to require reversal, the cumulative effect of all of the errors did. For cumulative error to require reversal, "consequential errors must result in substantial prejudice that **[*132]** denies the aggrieved party a fair trial." *Lewis v LeGrow, 258 Mich App 175, 200; 670 NW2d 675 (2003)*. Stated differently, "actual errors must combine to cause substantial prejudice to the aggrieved party so that failing to reverse would deny the party substantial justice." *Id. at 201*. As discussed above, we agree with defendant that plaintiffs' counsel acted unprofessionally at times and some of his arguments amounted to attorney misconduct. The misconduct, however, was neither severe enough nor pervasive enough to warrant a new trial, and we are satisfied that any minimal prejudice flowing from the misconduct was cured by the trial court's instructions, which jurors are presumed to follow.

## VII. EXCESSIVE DAMAGES OR REMITTITUR

For its final argument, defendant contends that the trial court erred by denying defendant's motion for a new trial due to excessive damages or, in the alternative, motion for remittitur, because, according to defendant, the damages awarded were grossly excessive and not supported by the evidence. We disagree.

### A. STANDARD OF REVIEW

"We review for an abuse of discretion a trial court's decision whether to grant a motion for remittitur." *Local Emergency Fin Assistance Loan Bd v Blackwell, 299 Mich App 727, 740; 832 NW2d 401 (2013)*. "A trial court does not abuse its discretion when its decision falls within the range of principled **[*133]** outcomes." *Rock, 499 Mich at 260*.

### B. ANALYSIS

Defendant argues the trial court should have granted remittitur related to the jury's award of both economic and noneconomic damages. "Broadly defined, remittitur is the procedural process by which a verdict of the jury is diminished by subtraction." *Anderson v Progressive Marathon Ins Co, 322 Mich App 76, 84; 910 NW2d 691 (2017)* (quotation marks and citation omitted). The Michigan Supreme Court provided the following relevant discussion of remittitur:

> In our view, the question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. [*Palenkas v Beaumont Hosp, 432 Mich 527, 531; 443 NW2d 354 (1989)*.]

As with motions for JNOV, "[w]hen reviewing a trial[] court's decision regarding remittitur, this Court must view the evidence in the light most favorable to the nonmoving party." *Diamond v Witherspoon, 265 Mich App 673, 693; 696 NW2d 770 (2005)*, app dis *716 N.W.2d 551 (2006)*. "As long as the amount **[*134]** awarded is within the range of the evidence, and within the limits of what reasonable minds might deem just compensation for such imponderable

items as personal injuries sustained and pain and suffering, the verdict rendered should not be set aside." *Andreson, 322 Mich App at 84* (quotation marks and citation omitted). The trial court

> may consider whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether it was within the limits of what reasonable minds would deem to be just compensation for the injury inflicted, and whether the amount actually awarded is comparable to other awards in similar cases. [*Diamond, 265 Mich App at 694*.]

"[A]wards for personal injury should rest within the sound judgment of the trier of fact, particularly awards for pain and suffering . . . ." *Precopio v City of Detroit, Dep't of Transp, 415 Mich 457, 464; 330 NW2d 802 (1982)*. The Michigan Supreme Court has "recognize[d] that there is no absolute standard by which to measure such awards." *Id. at 464-465*. "In a case tried to a jury, such deference may further reflect a reliance on the communal judgment of the members of the jury in awarding monetary compensation for such imponderables as pain and suffering." *Id. at 465*.

Defendant first contends that the jury's award of future economic **[*135]** damages was excessive because plaintiffs were making about the same amount of money at the time of trial. Defendant correctly points out that Lisa still worked in the Macomb parole and probation office and made the same amount of money, but ignores that Lisa's medical providers testified that she was completely and permanently disabled as a result of the harassment she faced in this case. Dr. Shiener was clear that, for the sake of Lisa's mental health, she should no longer be working for defendant. Similarly, defendant is correct that Cedric was also making about the same amount of money even after his constructive discharge—which required Cedric to work several jobs while collecting his pension—but Cedric's doctors stated that his mental-health situation was fraught, that he needed medication and therapy to avoid becoming significantly worse, and that having to work several jobs to maintain his level of income was a bar to such treatment.

Accordingly, the evidence supported the jury's determination that, for the sake of their mental health, plaintiffs should not still be working. Importantly, the problems with their mental health were caused by defendant. Thus, to the extent that **[*136]** the jury's calculation of damages was reliant upon an understanding that plaintiffs should not be working the jobs they currently worked, "the amount awarded [was] within the range of the evidence," and remittitur on that ground was not required. *Andreson, 322 Mich App at 84* (quotation marks and citation omitted).

Next, defendant contends that the trial court should have granted remittitur because the jury could not possibly have believed the testimony of plaintiffs' damages expert, Barry Grant, about future economic damages.

For Lisa, Grant testified that he calculated lost future economic damages in two different ways. The first assumed that she would retire from defendant at the end of trial, and the second was assuming she retired at 62. Defendant insists that there could be no legal support for the conclusion Lisa would have retired any earlier than age 67, because she said so once in the past. Defendant, again, ignores the specific testimony of Lisa's treating and evaluating psychiatrists that she was entirely and permanently disabled at the time of trial. Thus, there was significant testimony establishing why Lisa would retire at the end of trial or only work for several more years. Consequently, this argument **[*137]** by defendant is unconvincing, and the jury's decision to rely on Grant's testimony about Lisa's date of retirement was within the bounds of the evidence and did not require remittitur.

As for Grant's testimony about Cedric's future economic damages, defendant argues that the jury could not have believed Grant because of certain factual questions. Relevantly, Grant testified that his calculations assumed Cedric would get a 10% bonus each year of his remaining employment if he had not been forced out. Defendant claims this was unsupported by the evidence because the evidence established that 10% bonuses were rare. This argument is simply not a reason to conclude that the trial court abused its discretion by refusing to grant defendant's motion for a remittitur. None of the evidence that defendant discusses establishes that the jury could not have accepted Grant's calculation based on Cedric's 10% bonus—that a 10% bonus is rare does not mean that Cedric could not have received a 10% bonus each year. Moreover, the evidence that defendant relies on to establish that 10% bonuses were rare was presented to the jury, and it nevertheless accepted Grant's calculation using the 10% bonus, rejecting **[*138]** the very argument that defendant reiterates on appeal. Because 10%

bonuses were possible, even though rare, Grant's calculation was not unsupported by the evidence, and the jury's calculation of damages was within the bounds of the evidence and did not require remittitur.

Grant also testified that his calculations assumed Cedric would get normal raises, similar to those provided to union employees. Grant acknowledged that he was aware Cedric was not in a union, but noted that he had been informed that nonunion employees were typically provided similar raises. Defendant insists that this requires remittitur because its HR director testified that raises for nonunion employees relied upon the budget, and thus, were sometimes not provided. Yet again, defendant's argument is unpersuasive because the evidence that defendant points to does not establish that Grant's calculation was impossible. Grant and defendant's HR director both testified that sometimes nonunion employees get raises, sometimes they do not. The jury got to decide whether they believed, in the future, Cedric would get the raises that Grant's calculation assumed, and they apparently did so. This decision by the jury was within **[*139]** the bounds of the evidence, even if defendant hoped the jury would believe otherwise. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Lastly, Grant provided two different calculations for Cedric: one assuming he would work for a few more years and retire as a deputy warden, the other assuming that he would work for the same amount of time but would be promoted to a warden. On this point, defendant first argues that this Court must order a remittitur because the calculation is based on a time period that the evidence does not support. In support of this argument, defendant points to a single e-mail in which Cedric said that he would probably retire in 2018, so Grant's estimation that Cedric would work longer was speculative. Defendant, however, ignores Cedric's trial testimony that he vacillated on his retirement date, and often imagined he would work longer. Cedric working longer, then, was within the bounds of the evidence and not grounds for remittitur. Defendant also contests Grant's assumption for his second calculation that Cedric would be promoted to warden, contending that remittitur is required because Cedric had never **[*140]** applied to be a warden in the past and becoming a warden was difficult. Yet again, such an argument does not mean that it was impossible for Cedric to become a warden. Evidence, including Cedric's testimony that he believed he would be a warden at the time of trial if he had not been constructively discharged, support that Cedric could have been promoted to warden. There was thus sufficient evidence for the jury to believe Grant's warden-track calculation, which the jurors apparently did. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Next, defendant contends that the trial court should have granted remittitur of the noneconomic damages awarded to plaintiffs for three reasons. First, defendant claims that the verdict was not supported because evidence showed that plaintiffs were not taking their mental-health issues seriously. Defendant is correct that there was evidence that plaintiffs were not entirely compliant with their mental-health treatment plans, but, once again, defendant ignores other evidence suggesting that plaintiffs suffered from significant and permanent psychiatric illnesses. Moreover, the evidence showed **[*141]** that Cedric had to work several jobs at once to support his family after being constructively discharged by defendant, and Cedric's treating and evaluating medical team testified that working several jobs could be a barrier to treatment. Thus, the jury was well-founded in believing that Cedric was being undertreated because he had to work too much. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

As for Lisa, evidence at trial showed that defendant interfered when Lisa attempted to take time off to care for her mental health. On one occasion, her medical and prescriptions benefits were terminated for a brief period. During her second leave, defendant forced it to end early by requiring Lisa to speak with a psychiatrist who determined Lisa was fit to work, despite contrary decisions by her own doctors. The jury could infer from this evidence that Lisa's failure to be entirely compliant with mental-health treatment was not because she was not suffering, but because there were barriers to her treatment caused by defendant. Consequently, the jury had satisfactory record support to believe that Lisa was suffering emotionally even **[*142]** though she might not have been compliant with her treatment plan. The trial court did not abuse its discretion by denying defendant's request for a remittitur on this ground.

Defendant also argues this Court should reverse the trial court's decision to deny remittitur because, in cases of comparable harassment, the award for noneconomic damages were far less. This argument is based on our

Supreme Court's decision in *Gilbert, 470 Mich at 767*, in which the Court explained that "comparison with damage awards in comparable cases in this jurisdiction and beyond" is a relevant factor in deciding whether to grant remittitur. The Court noted that "[w]hile the resultant analysis is certainly imperfect, other damage awards may provide a range of what constitutes reasonable compensation for the type of injury suffered by a plaintiff." *Id.* Thus, "[w]ith this range in mind, the reviewing court may determine whether the verdict appears to be within the limits of what reasonable minds would deem just compensation for the injury sustained." *Id.* (quotation marks and citation omitted). Importantly, though, our Supreme Court has also cautioned courts from revisiting a jury's calculation of "for such imponderables as pain and [*143] suffering." *Precopio, 416 Mich at 465*.

Before considering the purportedly comparable cases cited by defendant, it is important to note Lisa was awarded $4.25 million in noneconomic damages and Cedric was awarded $4.35 million in noneconomic damages. Dr. Rubenfaer testified that both plaintiffs had chronic mental conditions from which they were unlikely to ever recover. Indeed, Dr. Rubenfaer testified that, absent medication and therapy, plaintiffs could become much worse. He even noted that he feared potential suicide if plaintiffs did not seek and participate in treatment. Lisa was diagnosed with major depression with features of PTSD. Cedric was diagnosed with PTSD, which required him to be medicated for anxiety. Plaintiffs both testified that their lives and marriages had been ruined by defendant's actions in this case— they did not sleep, they lost their sex drives, they only talked about the issues at work, they stopped seeing their friends, and Lisa never left the house except for work and church. Lisa testified that she was referred to as a liar by people who used to be her friends. Cedric testified that he had pride in his position as a deputy warden, and felt terrible losing it. Cedric also felt helpless [*144] being unable to help Lisa when she was facing harassment at work, and Lisa became convinced that she could do nothing to make herself feel happy again after her complaints led to no results. Dr. Shiener, Dr. Rubenfaer, and Harris were insistent that plaintiffs were unlikely to ever get better and needed treatment to avoid getting worse.

With this in mind, defendant directs this Court to a number of verdicts in discrimination cases. We question whether any of the cases that defendant directs our attention to are comparable to this one because the information provided by defendant does not reflect that the plaintiffs in those cases were suffering permanent and debilitating psychiatric illnesses like plaintiffs here. But even if the cases were comparable, we do not believe that this would be a basis to grant remittitur in this case. In *Gilbert, 470 Mich at 753*, the case upon which defendant relies, the plaintiff was awarded "the largest recorded compensatory award for a single-plaintiff sexual harassment suit in the history of the United States." As part of its reasoning for why such an excessive verdict should be subject to remittitur, the Court refused to accept plaintiff's contention that her case "was the [*145] *worst* case of sexual harassment in the history of the country," and pointed to cases in which plaintiffs "who endure[d] sexual harassment in its most aggressive form" had received "far less in compensatory damages than the amount awarded to plaintiff." *Id. at 769*. Here, we are not dealing with the largest compensatory award for an employment-discrimination and retaliation suit in the history of the United States. More importantly, the awards in the cases cited to by defendant are not so much less than plaintiffs' awards as to convince us that remittitur is appropriate.

Further, even accepting that plaintiffs' award sufficiently exceeded other comparable awards, this was but one factor that the *Gilbert* Court identified for when courts should consider an award of damages as excessive. Another factor that a defendant must satisfy is "whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained." *Gilbert, 470 Mich at 764* (quotation marks and citation omitted). The jury in this case sat through an incredibly long trial, during which they got to hear testimony from Cedric and Lisa about how their lives had changed as a result of defendant's harassment and retaliation. The [*146] jury had also heard from Dr. Shiener, Dr. Rubenfaer, Dr. Walavalkar, and Harris about just how bad plaintiffs' mental suffering was. The jury considered all of that evidence, accounting for the lifelong nature of the suffering, and came up with a calculation of noneconomic damages. Defendant has not provided any grounds in this appeal that could allow this Court to conclude that the verdict was not supported by the evidence. See *Precopio, 416 Mich at 465* ("In a case tried to a jury, such deference may further reflect a reliance on the communal judgment of the members of the jury in awarding monetary compensation for such imponderables as pain and suffering.").

Defendant's final argument for remittitur reiterates its earlier argument that plaintiffs' counsel improperly inflamed the jurors' passion by using racial slurs and racist imagery. Defendant contends that the jury's awards could only

have been so high because of prejudice or bias encouraged by plaintiffs' counsel's inflammatory behavior. For the reasons previously discussed, however, there was a reasonable basis in the evidence for the jury's awards, and the award is not so excessive that it could only have been the result of passion and prejudice. Thus, **[*147]** the trial court did not abuse its discretion by denying defendant's request for remittitur.

VIII. CONCLUSION

Affirmed.

/s/ Thomas C. Cameron

/s/ Colleen A. O'Brien

/s/ Brock A. Swartzle

---

**End of Document**

# *McAllister v. Twp. of Bridgeport*

Court of Appeals of Michigan

July 12, 2016, Decided

No. 326801

**Reporter**

2016 Mich. App. LEXIS 1326 *

BRANDON MCALLISTER, Plaintiff-Appellant, v TOWNSHIP OF BRIDGEPORT, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Appeal dismissed by *McAllister v. Twp. of Bridgeport, 888 N.W.2d 910; 2017 Mich. LEXIS 112 (Mich., Jan. 20, 2017)*

**Prior History:** **[*1]** Saginaw Circuit Court. LC *No*. 13-20193-CZ.

## Core Terms

termination, adverse employment action, retaliation, protected activity, township, prima facie case, trial court, pretext, reasons, summary disposition, fact-finder, proffered, genuine issue of material fact, reasonable inference, causal connection, misconduct, pretextual, causation, anonymous, fired

**Judges:** Before: SAWYER, P.J., and HOEKSTRA and WILDER, JJ.

## Opinion

Per Curiam.

In this action under the Persons with Disabilities Civil Rights Act (PWDCRA), *MCL 37.1101 et seq.*, plaintiff appeals as of right the trial court's opinion and order granting defendant summary disposition under *MCR 2.116(C)(10)*. We reverse and remand for further proceedings consistent with this opinion.

I. FACTS

This case arises out of the termination of plaintiff's employment as a police officer with the Bridgeport Township Police Department, allegedly in violation of the PWDCRA. Specifically, in the trial court plaintiff alleged that defendant fired him in retaliation for his participation in another PWDCRA civil lawsuit, *Jamie Severs v Bridgeport Township*. Plaintiff alleged that in *Severs* he "authored documents which substantiated Severs' claims of disability discrimination," that he "provided testimony which was helpful to Severs including that [Severs] was a good officer and had performed satisfactorily," and that after his participation in *Severs*, the chief of police, Allen Navidonski, began a "pretextual campaign" to discipline and harass him to create a "paper trail" so that the chief could ultimately fire him. **[*2]**

Defendant responded that plaintiff was not fired because of his participation and testimony in *Severs*, but, among other numerous instances of insubordination and misconduct, was fired primarily as a result of another incident that occurred at the end of plaintiff's shift on March 5, 2013. Plaintiff left a police Chevy Tahoe running at a fire scene with a shotgun and AR-15 rifle in view. Also, plaintiff's personal computer and Kindle were left in a zipped bag on

the front seat. Plaintiff alleged that the chief of police "seized [his] personal laptop computer and Kindle out of the patrol vehicle." The next day, the chief called plaintiff into his office, told him that he was suspended, then ordered him to leave. Plaintiff refused to leave the office until his computer and Kindle were returned. He was again ordered to leave. Plaintiff then stood "nose to nose" with the chief and told him to "make a move." Another officer who witnessed the incident called the Michigan State Police, and plaintiff eventually left the chief's office. Plaintiff was fired shortly after the incident, on March 22, 2013, as the incident, according to the chief, created a "non-repairable employment situation." The **[*3]** township manager, Rose Licht, made the final decision to fire plaintiff based on the chief's recommendation that she do so.

Defendant moved for summary disposition. In support, defendant noted that, during plaintiff's deposition, plaintiff admitted to the events that occurred in the chief's office after the Tahoe incident, and plaintiff also acknowledged that disobeying a direct order from the chief was misconduct for which he could be discharged on a first offense basis. Defendant further noted that plaintiff had admitted that he had lied as a police officer, failed to take care of the Tahoe or the firearms within the Tahoe, was absent from duty without authorization, and neglected his duties, all of which was conduct for which an officer could be discharged on a first offense basis. Defendant asserted that, pursuant to the PWDCRA, only plaintiff's termination could be considered an "adverse employment action," such that all the other "paper trail" or "pretextual campaign" actions that plaintiff complained about were irrelevant. Defendant argued that plaintiff's participation in *Severs* could not be considered a "significant factor in his termination" because there was not sufficient **[*4]** evidence that his discharge was caused by his participation in that lawsuit, as opposed to the significant and numerous instances of misconduct that plaintiff acknowledged and which ultimately led to his discharge. Defendant further argued that even if plaintiff could satisfy the requirements for a prima facie retaliation case under the PWDCRA, **_no_** reasonable fact-finder could conclude that defendant's nondiscriminatory reason for terminating plaintiff's employment (the incident in the chief's office) was a pretext, because plaintiff conceded all the facts surrounding that incident, even his challenge to the chief to "make a move." Defendant asserted that there was **_no_** genuine issue of material fact that the chief rightfully—and necessarily—concluded that the employment relationship could not be repaired.

In response, plaintiff argued that the chief took actions that undermined plaintiff's supervisory and command authority, as well as his demotions and termination, all of which constituted adverse employment actions under the PWDCRA. In regard to defendant's argument concerning the causation element of a prima facie retaliation case under the PWDCRA, plaintiff asserted that a reasonable **[*5]** fact-finder could conclude that the chief imposed adverse employment actions on plaintiff because of his participation in *Severs*. Concerning pretext, plaintiff asserted that a reasonable fact-finder could determine that the reasons given for plaintiff's termination were merely a pretext for a dismissal retaliating against plaintiff for his involvement in *Severs*.

In granting summary disposition to defendant, the court "assumed, without deciding, that all of the actions Plaintiff contends constituted adverse employment actions are properly so labeled." In regard to causation—the only element for a prima facie case that was at issue—the court held that plaintiff did not meet his burden of proof, reasoning as follows:

> The essence of Plaintiff's argument is that an event would happen in the *Severs* Case, and an employment-related action would be taken by the Township at a later point in time. The most important causal connection that Plaintiff makes — and wants a jury to make at a trial — is between his trial testimony given on October 24, 2012 in the Severs Case and his termination from employment on March 22, 2013. . . . [T]he lapse of nearly five months renders his timing argument extremely **[*6]** dubious. At the end of the day, the Court concludes that a reasonable juror, based upon the evidence presented by both parties, could not draw an inference of a "clear nexus" between the protected activity and the termination without engaging in an impermissible degree of speculation and conjecture. Thus, holding a trial would be a futile exercise, and the Township's motion should be granted.

The court further held that even if plaintiff had made out a prima facie case (i.e., satisfied his burden regarding the causation element), defendant would still be entitled to summary disposition because plaintiff failed to present evidence from which a rational juror could conclude that defendant's stated nonretaliatory reason for terminating plaintiff was pretextual:

2016 Mich. App. LEXIS 1326, *6

The Court holds, as a matter of law, that the Township's stated reasons did have a basis in fact, and that **no** reasonable person could find that they were, taken in their entirety, insufficient to justify termination. On this record, the only tenable argument is that the Township's explanation for the firing is untrue, and that the true, actual reason for the termination was Chief Navidonski's ire at the *Severs* settlement, which he **[*7]** attributed to Plaintiff's testimony. For the same reasons the Court found Plaintiff's evidence of causal connection insufficient to justify a trial, the Court finds that a reasonable juror could not, without the exercise of an impermissible degree of conjecture and speculation, find that Plaintiff's termination was motivated by a desire to retaliate for his testimony in the *Severs* Case.

This appeal followed.

## II. STANDARD OF REVIEW

A trial court's decision regarding a motion for summary disposition is reviewed de novo. *Ormsby v Capital Welding, Inc, 471 Mich 45, 52; 684 NW2d 320 (2004)* (citation omitted).

A motion under *MCR 2.116(C)(10)* tests the factual sufficiency of the complaint. The trial court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, in the light most favorable to the party opposing the motion, and if the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Wilson v Alpena Co Rd Comm, 474 Mich 161, 166; 713 NW2d 717 (2006)* (citations omitted).]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp, 469 Mich 177, 183; 665 NW2d 468 (2003)*. "This Court is liberal in finding genuine **[*8]** issues of material fact." *Jimkoski v Shupe, 282 Mich App 1, 5; 763 NW2d 1 (2008)*.

## III. ANALYSIS

Plaintiff argues on appeal that the trial court erred in granting defendant's motion for summary disposition and dismissing plaintiff's PWDCRA claim. Specifically, plaintiff contends that he established a prima facie case under the PWDCRA, thereby establishing a preumption of retaliation, and that he presented sufficient evidence for a rational fact-finder to conclude that the nonretaliatory reason defendant proffered for his termination was pretextual. We agree in both respects.

The PWDCRA provides that an employer shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." *MCL 37.1602(a)*. We construe the retaliation provision of the PWDCRA in accord with the retaliation provision of the Elliot Larsen Civil Rights Act (ELCRA), *MCL 37.2701(a)*, because the ELCRA retaliation provision contains precisely the same language as the PWDCRA retaliation provision. See *Mitan v Neiman Marcus, 240 Mich App 679, 681-682; 613 NW2d 415 (2000)*.[1] To establish a prima facie case of retaliation under *MCL 37.1602(a)*

a plaintiff must show: (1) that he engaged in a protected activity, **[*9]** (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action. [*Aho v Dep't of Corrections, 263 Mich App 281, 288-289; 688 NW2d 104 (2004)*.]

If the plaintiff establishes a prima facie case, a presumption of retaliation arises, which the defendant can rebut by offering a legitimate, nonretaliatory reason for the adverse employment action. *Aho, 263 Mich App at 289*. If the defendant provides such a reason, the burden shifts back to the plaintiff to demonstrate that the evidence is

---

[1] The Whistleblowers' Protection Act, *MCL 15.261 et seq.*, also contains statutory language similar to that found in the PWDCRA. It requires a plaintiff to present evidence that "a causal connection exists between the protected activity and the discharge or adverse employment action." *Shaw v Ecorse, 283 Mich App 1, 8; 770 NW2d 31 (2009)*.

sufficient to permit a reasonable fact-finder to conclude that the defendant's proffered legitimate reason was not the true reason but merely a pretext for the adverse employment action. *Id.* In other words, the familiar "burden-shifting analysis under *McDonnell Douglas* [v *Green, 411 U.S. 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]*, applies to PWDCRA claims." *Bachman v Swan Harbour Ass'n, 252 Mich App 400, 433 n 26, 653 NW2d 415 (2002).*

Here, as for the first element of a prima facie case, plaintiff asserts that he engaged [*10] in a protected activity when, in *Severs,* he testified in a proceeding or hearing under the PWDCRA. Defendant does not dispute that this element has been met. Likewise, as for the second element, the parties agree that plaintiff's engagement in such protected activity was known to defendant. Thus, the first two elements are not in dispute.

With regard to the third element, the parties disagree about what actions allegedly taken by defendant constitute "an employment action adverse to the plaintiff." Plaintiff argues that all the actions he complains of (e.g., intensified scrutiny of his job performance by a supervisor, having to remove his treadmill from the police department workout room, being reassigned from a plain-clothed to a uniformed sergeant, having his shift changed, and having his request to attend a seminar rejected while other officers were allowed to go) constitute adverse employment actions under the PWDCRA. On the other hand, defendant argues that plaintiff's termination is the only adverse employment action recognized under the PWDCRA.

In *Chen v Wayne State Univ, 284 Mich App 172, 201-202; 771 NW2d 820 (2009),* this Court explained:

> There is **_no_** exhaustive list of what constitutes adverse employment actions. And what might constitute an adverse [*11] employment action in one employment context might not be actionable in another employment context. . . . Nevertheless, regardless of the employment context, in order to be actionable, an employment action must be materially adverse to the employee—that is, it must be more than a mere inconvenience or minor alteration of job responsibilities. In addition, there must be an objective basis for demonstrating that the employment action is adverse because a plaintiff's subjective impressions are not controlling. Materially adverse employment actions are akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation. [Quotation marks and citations omitted.]

Further, "[i]n determining the existence of an adverse employment action, courts must keep in mind the fact that work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that to the level of a materially adverse employment action." *Peña v Ingham Co Rd Comm, 255 Mich. App. 299, 312; 660 N.W.2d 351 (2003)* (quotation marks and citations [*12] omitted).

Here, it is undisputed that plaintiff's termination was an adverse employment action under the PWDCRA. Additionally, some of the other things about which plaintiff complains could *arguably* constitute adverse employment actions. For example, although it does not appear that plaintiff received less pay or benefits when he was "demoted" from detective sergeant to patrol sergeant or "reassigned" from a plain-clothes detective position to a uniformed investigator position, it does appear that the new positions had less distinguished titles or significantly diminished plaintiff's material responsibilities on the force. Generally, intensified scrutiny of plaintiff's job performance by his supervisor would not be considered an adverse employment action, nor would actions such as having to remove his treadmill from the police department workout room, having his shift changed, having his "dailies" returned for allegedly petty and trivial reasons, being removed from special assignments, having other officers allowed to act as his supervisor, or having his request to attend a seminar rejected while other officers were allowed to attend be considered adverse employment actions. Typically, [*13] such work environment changes are determined to be "mere inconvenience[s] or minor alteration[s] of job responsibilities," which do not rise to a level "akin to termination of employment." See *Chen, 284 Mich App at 201-202.*

The trial court, however, did not rule on this issue, instead "assum[ing], without deciding, that all of the actions" about which plaintiff had complained were properly "labeled" as adverse employment actions. "Ordinarily, we do not address issues . . . that were not decided by the trial court." *Tingley v Kortz, 262 Mich App 583, 588; 688 NW2d 291*

_(2004)_. Accordingly, for the purposes of our review here, we will assume—without deciding—that all of the actions with which plaintiff takes issue were adverse employment actions.

Regarding the fourth element, "[t]o establish a causal connection, a plaintiff must demonstrate that his participation in the protected activity was a 'significant factor' in the employer's adverse employment action, not merely that there was a causal link between the two events." _Aho, 263 Mich App at 289_. "Thus, mere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a _clear nexus_ between such action and the protected activity." _Id._ (emphasis added). "To prevail, [the] plaintiff ha[s] to show that his employer took adverse employment action **[*14]** _because of_ [the] plaintiff's protected activity, [rather than] merely show[ing] that his employer disciplined him _after_ the protected activity occurred." _West, 469 Mich at 185_ (emphasis in original). In _Shaw, 283 Mich App at 14-15_, a Whistleblower Protection Act case, this Court explained,

> A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions. To establish causation using circumstantial evidence, the circumstantial proof must facilitate reasonable inferences of causation, not mere speculation. Speculation or mere conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. In other words, the evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. [Citations and quotation marks omitted.]

Following plenary review of the record, we conclude, contrary to the trial court's ruling, that plaintiff presented sufficient evidence **[*15]** to establish a genuine issue of material fact whether his protected activity (i.e., testifying in _Severs_) was a significant factor in defendant's decision to terminate him. Plaintiff adduced evidence that (1) the township manager and the chief were unhappy with the settlement and believed that it was plaintiff's fault, (2) at least a portion of the _Severs_ settlement came out of township funds, (3) the chief believed that the _Severs_ plaintiff's claim was meritless and thus the chief "wasn't happy" about the decision to settle, (4), the chief's "demeanor" towards plaintiff changed markedly—in the opinion of another officer—"three of four months" after the resolution of _Severs_, (5) other officers believed that the chief was capable of retaliating against his subordinates, (6) the chief recommended plaintiff's termination and conducted the investigation that led to it, and (7) in deciding to terminate plaintiff, the township manager "[a]bsolutely" relied on the investigatory report compiled by the chief.

Most compelling, however, is evidence concerning inaccuracies—perhaps outright deceptions—in the chief's report. The report explains the chief's rationale for opening the investigation as follows:

> **[*16]** On Friday December 7, 2012 I found a sealed envelope on my desk when I came into the office. Upon opening the envelope I found a letter that stated Chief, I am writing in regards to officer safety issues that I have been worrying about for a couple of months involving [plaintiff]. I would like to remain anonymous due to the fear of retaliation from [plaintiff].

According to the report, this anonymous letter alleged that plaintiff slept while on duty, arrived late for work, used a personal laptop and tablet device while on duty, and failed to respond to calls for service or backing up other officers. The chief stated in the report that he was able to determine that Officer Brett Green wrote the anonymous letter from "information on several addresses that I obtained from the dailies over several days from several different officers." At his deposition, the chief likewise testified that the anonymous letter prompted his investigation of plaintiff.

Contrastingly, Green admitted at his deposition that he wrote the "anonymous" letter because he was "pressured" to do so by the chief and the township manager, that the chief verbally instructed Green "to place the envelope under [the chief's] **[*17]** desk," and that he felt would have faced "trouble at work" had he refused to pen the letter. Further, the chief's report catalogs negative statements about plaintiff from other officers that those officers, when deposed in this matter, denied having made. Finally, the report indicates that other officers approached the chief during the investigation and proposed a union vote of "**_no_** confidence" against plaintiff, and the chief testified that it was not his idea to have a vote of **_no_** confidence against plaintiff. But plaintiff has adduced testimony from several officers indicating that it was, in fact, the chief who induced the union vote against plaintiff.

Given such evidence, a rational fact-finder could reasonably infer that plaintiff's protected activity was a significant factor in defendant's decision to terminate him. Accordingly, viewing the evidence in the light most favorable to plaintiff as the nonmoving party, we conclude that he presented sufficient evidence to establish a prima facie case of retaliation under the PWDCRA. By holding otherwise, the trial court erred.

That conclusion, however, does not end our analysis. After plaintiff established a prima facie case, the burden **[*18]** shifted to defendant to present a legitimate, nonretaliatory reason for terminating plaintiff. Defendant did so, contending that it terminated plaintiff for insubordination and misconduct. Thus, the burden shifted back to plaintiff to demonstrate that defendant's proffered reason was a mere pretext for unlawful retaliation. The trial court held that plaintiff failed to present evidence to create a genuine issue of material fact regarding pretext. We disagree.

A plaintiff can establish that a defendant's proffered legitimate reasons for the adverse employment action are a pretext "'(1) by showing the reasons had **_no_** basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision.'" *Campbell v Dep't of Human Servs, 286 Mich App 230, 241; 780 NW2d 586 (2009)*, quoting *Feick v Monroe Co, 229 Mich App 335, 343; 582 NW2d 207 (1998)*. "False and shifting reasons are acceptable methods of demonstrating that the employer's alleged nondiscriminatory reasons are in fact pretextual." *Fuller v Mich Dep't of Transp, 580 Fed Appx 416, 426 (CA 6, 2014)* (analyzing, *inter alia*, a plaintiff's ELCRA claims).[2]

On this record, plaintiff cannot demonstrate that defendant's proffered reason for the termination lacks any basis in fact. On the contrary, plaintiff *admitted* that he committed the insubordination and misconduct that defendant cited to justify his termination.

Even so, given the seeming falsehoods in the chief's report, and the fact that the township manager admits that she relied on that report when deciding to terminate plaintiff, we conclude that a triable question of fact remains regarding pretext. In essence, plaintiff's theory of the case is that, in retaliation for plaintiff taking part in *Severs*, the chief intentionally took steps over the course of several months to bait plaintiff into a terminable offense then seized upon that offense as grounds for termination. Although it is a close question, after reviewing the entire record we are unwilling to decide as a matter of law that **_no_** rational fact-finder could reasonably infer that the chief's *Severs*-related animus against plaintiff was the actual factor motivating the termination decision. Hence, we conclude **[*20]** that the trial court erred by granting defendant summary disposition under *MCR 2.116(C)(10)*.

We reverse and remand this matter to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction. As the prevailing party, plaintiff may tax costs pursuant to *MCR 7.219*.

/s/ David H. Sawyer

/s/ Joel P. Hoekstra

/s/ Kurtis T. Wilder

---

---

[2] We recognize that *Fuller* is not binding here but nevertheless find it persuasive. See *Fed Home Loan Mtg Ass'n v Kelley, 306 Mich App 487, 495; 858 NW2d 69 (2014)* ("Though not binding on this Court, federal precedent **[*19]** is generally considered highly persuasive when it addresses analogous issues.") (quotation marks and citation omitted).

# *Perry v. Covenant Med. Ctr., Inc.*

United States District Court for the Eastern District of Michigan, Northern Division

March 7, 2016, Decided; March 7, 2016, Filed

Case No. 15-cv-11040

**Reporter**

2016 U.S. Dist. LEXIS 28451 *

AMANDA PERRY, Plaintiff, v. COVENANT MEDICAL CENTER, Inc., Defendant.

**Subsequent History:** Motion granted by *Perry v. Covenant Med. Ctr., Inc., 2016 U.S. Dist. LEXIS 65261 ( E.D. Mich., May 18, 2016)*

Motion granted by, in part, Motion denied by, in part, Motion denied by, Motion denied by, As moot, Costs and fees proceeding at *Perry v. Covenant Med. Ctr., Inc., 2017 U.S. Dist. LEXIS 20420 ( E.D. Mich., Feb. 14, 2017)*

## Core Terms

terminating, discipline, patient, summary judgment, retaliation, pretext, argues, disability, reasons, motive, temporal proximity, documentation, disciplinary, witness statement, prima facie case, subordinate, deposition, employees, adverse employment action, non discriminatory reason, return to work, intermittent, providers, shifting, rude, proffered reason, expectations, Coordinator, progressive, discharged

**Counsel:** [*1] For Amanda Perry, Plaintiff: Kevin J. Kelly, Victor J. Mastromarco, Jr., The Mastromarco Firm, Saginaw, MI.

For Covenant Medical Center, Inc., Defendant: Carolyn P. Cary, Dickinson Wright PLLC, Saginaw, MI.

**Judges:** Honorable THOMAS L. LUDINGTON, United States District Judge.

**Opinion by:** THOMAS L. LUDINGTON

## Opinion

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Amanda Perry filed suit against her former employer, Defendant Covenant Medical Center ("Covenant") on March 19, 2016, claiming that she was wrongfully terminated from her position as an office coordinator for a group of physicians. Specifically, Perry claims that Covenant violated the Family Medical Leave Act ("*FMLA*"), *29 U.S.C. § 2611, et seq.*, and Michigan's People with Disabilities Civil Rights Act ("PWDCRA") when it terminated her employment.

On December 21, 2015 Defendant Covenant filed a motion for summary judgment, seeking judgment on both of Perry's claims. Mot. for Summ. J., ECF *No*. 18. The motion will be denied. Perry has demonstrated that a question of material fact exists regarding whether Defendant's proffered reason for terminating her employment was pretextual under both the *FMLA* and the PWDCRA.

I.

Plaintiff Perry began her employment with Defendant Covenant **[\*2]** on September 17, 2010 as a part-time biller. Mot. for Summ. J. Ex. 1. She eventually received a full-time position, and was then promoted to the position of Office Coordinator on August 26, 2012. *Id.* at Ex. 2. In her new position, her initial assignment was to coordinate the physician practices at Covenant's Bridgeport and Frankenmuth locations. *Id.* at Ex. 3.

On March 4, 2014 Plaintiff Perry requested intermittent *FMLA* leave in order to take care of her son, who had been in a car accident. *Id.* at Ex. 7. Human resources approved the leave request on March 5, 2014. *Id.*

On May 3, 2014, Perry's supervisor provided her with an annual performance evaluation. *Id.* at Ex. 6. Perry received high scores in the areas of "Working Together", "Excellence", "Customer Service", "Accountability", "Enthusiasm", "Quantity of Work", "Quality of Work" and "Responsiveness". *Id.* She received average scores in the areas of "Respect" and "Communication". *Id.* Overall, her performance was ranked as exceeding expectations, and her evaluation stated, "Amanda is an asset to Covenant and CMGG. She demonstrates a positive attitude and enthusiasm while performing her job duties. She willingly embraces challenges and **[\*3]** consistently seeks opportunities to improve quality and managed care revenue." *Id.*

Defendant alleges that during the late spring and early summer of 2014, Perry had a number of performance issues at work. Specifically, Defendant contends that Ms. Krueger began having concerns with the way Perry communicated and handled conflict with her staff in mid-May regarding the termination of a probationary employee. The only evidence that Defendant offers in support of these claims of early performance issues are notes taken by Ms. Krueger dated months after the alleged incidents took place and Ms. Krueger's own partial deposition testimony. *See* Mot. for Summ. J. Ex. 8; Ex. 5 at 11-12. In her response to summary judgment, Perry challenges this documentation as an "after-the-fact attempt to build a paper trail...." Resp. to Summ. J. 20.


**A.**

That summer Perry began suffering from numerous mental health issues, both resurgent and newly diagnosed. Perry testified that in July of 2014 she informed Ms. Kreuger that she had previously been diagnosed with bipolar disorder. Perry Dep. 23-24. Perry testified that she informed Ms. Kreguer of her diagnosis because she was "crying nonstop", "having suicidal **[\*4]** feelings" and that she "just wanted to die, but [] had to stay alive for her grandson and kids." *Id.* at 29-30. She also testified that she had not yet been diagnosed with Post-Traumatic Stress Disorder ("PTSD") at that time and "didn't know what was going on." *Id.* at 24. During her deposition, she acknowledged that she was worried about her mind shattering, and was not capable of working at that time. *Id.* at 30-31.

On July 23, 2014 Perry obtained a note from Jessica Frantz, PA-C that excused Perry from missing work from July 22, 2014 to July 25, 2014 due to medical reasons. Resp. to Summ. J. Ex. 6. The next day, July 24, 2014, employee Cheryl Thompson filled out a Notification of Need for Leave of Absence form for Perry, noting that Perry required intermittent leave beginning on July 22, 2014. *Id.* at Ex. 7. Then, on July 28, 2014, Perry requested intermittent leave under the *FMLA* for her own serious health condition. *Id.* at Ex. 8. In the event that her *FMLA* request was denied, she alternatively requested personal leave due to "Bipolar II Exacerbation/nervous breakdown & post-traumatic stress disorder." *Id.*

Perry's intermittent *FMLA* request was approved on August 5, 2014. *Id.* at Ex. 9. Perry testified that she initially **[\*5]** took just a day or two off, but then took off from August 12 to August 14. Perry Dep. 25, 28. She testified that she met with Ms. Krueger after returning to work that Friday, August 15, 2014. *Id.* During the meeting, Ms. Krueger informed Perry that she had been in contact with HR, and that they thought it best if Perry went on continuous leave to "get it together." *Id.* at 26. Ms. Krueger's notes from the meeting indicate that she mandated continuous *FMLA* leave, and that she told Perry to stop disclosing personal details to her, but to instead report them to HR. *Id.* at Ex. 10. Ms. Krueger's notes also indicate that she told Perry that she needed to be able to perform her job at "100% functionality when she returns." *Id.* Perry testified she was not capable of working at that time, and she agreed with Ms. Krueger that she needed to take time off to get herself together. Perry Dep. 30-31. The following Monday, Perry submitted paperwork for continuous leave. *Id*; *See also* Resp. to Summ. J. Ex 11.

**B**.

Perry returned to work from her continuous *FMLA* leave on October 6, 2014. Perry Dep. 33. Upon her return, Perry discovered that Covenant had reorganized the responsibilities of three out of the four office **[*6]** coordinators while she was out on leave. *Id.* at 33-35. Perry was *no* longer responsible for the Frankenmuth and Bridgeport offices, but was instead assigned to Bay City and Freeland. *Id.* at 34. Upon hearing of her reassignment, Perry became upset and cried. *Id.* Perry testified that Ms. Krueger did not take her to the office or introduce her to the staff or doctors. *Id.* at 54. She also testified that she was not allowed to retrieve her log-in books and files where she had left them at the Bridgeport office. *Id.* She did not receive her books and files until a week later when Ms. Krueger brought them to her. *Id.* at 55.

After returning from *FMLA* leave, Perry continued to request time off from work to attend Doctor's appointments. In response to these requests, Ms. Krueger emailed Perry to tell her that, in addition to requesting time off in the system, Perry would have to e-mail Ms. Krueger her time off requests because they had been "so short staffed" and it was the only way that Ms. Krueger could "keep it straight." Ms. Krueger also informed Perry that she was responsible for making arrangements to have her responsibilities covered when she needed to be out. Resp. to Summ. J. Ex. 12.

**i**.

Two weeks after her return from *FMLA* leave, **[*7]** on October 21, 2014, Ms. Krueger placed Perry in Step One of Covenant's progressive disciplinary procedure. Ms. Krueger documented that she had verbally counseled Perry regarding violations of Covenant's standards of conduct related to an incident with a patient who had called in to renew his prescriptions. Mot. for Summ. J. Ex. 11. According to Ms. Krueger's report, after Perry spoke with the patient on the phone on October 13, 2014 the patient complained to Doctor Hamade that Perry was rude and abrupt. *Id.* The patient had allegedly threatened to remove his entire family from the practice. *Id.* Perry contended that she had not been rude to the patient, but that the patient had been rude to her. *Id.*

The Step One documentation also states that on October 14, 2014 Ms. Krueger had received a complaint from an employee that Perry was "displaying anger and frustration when the telephone would ring" and that Perry informed the employee that her job "was too much for one person to do." *Id.* The employee also informed Ms. Krueger that Perry was abrupt in responding to her questions. *Id.* Finally, the Step One discipline report noted that on October 17, 2014 Doctor Hamade complained to Ms. Krueger **[*8]** that Perry had been rude and abrupt when he asked her to take care of a prescription that he had signed. *Id.* Both Ms. Krueger and Perry signed the Step One discipline report. *Id.*

**ii**.

Perry did not progress to Step Two discipline, but instead received Step Three disciplinary counseling on November 18, 2014. Mot for Summ. J. Ex. 12. The Step Three discipline was partially based on an incident on November 10, 2014, in which Perry was informed at 8:39 AM that a TCA was required to attend a meeting in HR at 1:00 PM, and that Perry should therefore work with the providers who would be short-staffed while the TCA was gone. *Id.* When the TCA arrived at the meeting, she informed Ms. Krueger that Perry had notified neither the office nor the providers that the TCA would be gone, but had just texted the TCA to tell her that she was required to go to HR. *Id.* According to the discipline report, this behavior constituted poor communication and leadership, and a failure to follow through on manager instructions. *Id.* Perry contended that she did in fact notify the office that the TCA would be gone. *See* Mot. for Summ. J. Ex. 15.

The Step Three discipline was also based on an incident in which Perry displayed **[*9]** poor communication with a "midlevel" who was making numerous coding errors in the online system. *Id.* Ms. Krueger had informed Perry to speak with the midlevel to determine what the nature of the coding problem was. *Id.* The midlevel later informed Ms.

Krueger that Perry just told her that she needed more system training, and that Perry's communication was abrupt and lacked detail and information. *Id.* The discipline report noted that "[t]he ability to effectively and specifically communicate with providers and the practice personnel is a performance expectation and requirement for Practice Coordinators." *Id.*

The Step Three discipline was also based on a November 14, 2014 incident in which Perry cried and displayed "unprofessional emotional behavior" while working at the front desk in the Freeland office. *Id.* According to the discipline report, three office staff personnel and providers witnessed Perry crying at the front desk and informed Ms. Krueger of the incident. The report stated that Perry's behavior was disruptive and that patients were present in the waiting room at the time and could see Perry in the office. *Id.* The report further noted that Perry's behavior violated the standard **[*10]** of conduct set forth in Policy 509. *Id.* In response, Perry claimed that she had just teared up and that **_no_** patients had been present to witness the incident. *See* Mot. for Summ. J. Ex. 15.

Finally, the Step Three discipline report noted that Perry provided unsatisfactory telephone messages to the providers, and that Perry was not properly training new employees on the proper documentation of patient information and messages. *Id.* Both Perry and Ms. Krueger signed the Step Three Discipline report.


**iii**.

After her Step-Three disciplinary counseling, Perry applied for review of her discipline pursuant to Covenant's Alternative Dispute Resolution appeal procedure. *See* Resp. to Summ. J. Ex. 17. Pursuant to that process, an employee may submit documentation and submit witnesses to challenge disciplinary actions. *Id.*

To challenge her Step One discipline Perry asked a subordinate, Carly Roque, to prepare a statement on her behalf. Perry Dep. 56. In her statement, Ms. Roque stated that she had witnessed a phone call between Perry and a patient in October, 2014. *Id.* Ms. Roque further stated that the patient was requesting a refill of his medication, but that he had not had an appointment in about a **[*11]** year, so Perry requested that he come in to the office for an appointment. *Id.* Ms. Roque stated that Perry did not yell and was not rude to the patient. *Id.*

To challenge her Step Three discipline Perry asked another subordinate, Kim Scales, to prepare a statement on her behalf regarding the incident in which Perry cried in the office. Specifically, on a Saturday Perry asked Ms. Scales to provide a statement that there were **_no_** patients in the waiting room at the time of the incident. Perry Dep. 58. Perry also told Ms. Scales that she needed a witness statement from her that she had called her on the day that the TCA had to attend the meeting at HR. *Id.* Perry testified that in asking Ms. Scales to prepare such a statement, "I said, I remember telling you this, this, and this. And she agreed to do the witness statement." *Id.* Perry asked Ms. Scales to have the statement ready by that Monday evening. *Id.* at. 59.

When Perry went to the office to collect the statements, Ms. Roque provided Perry with a witness statement, but Ms. Scales did not. *Id.* Instead, Ms. Scales acted nervous, and asked Perry if she could provide Perry with the statement the next day since she was "too busy" that day. *Id.* **[*12]** The next morning, Perry texted Ms. Scales to say, "[l]et me know if you need me to cover so you can do that note. It doesn't have to be anything crazy long just the facts. Even handwritten. And you could even fax it to me. Just let me know." Resp. to Summ. J. Ex. 19; *See also* Perry Dep. 60. Perry then sent another message stating, "[i]f you don't want to do it it's fine too. Just let me know." Resp. to Summ. J. Ex. 19. In response, Ms. Scales texted Ms. Perry, "Mandy I feel bad for what your [sic] going through right now. I just feel like with me being new I don't really want to get involved. I was thinking over the weekend and I don't recall the details of what we discussed. I'm sorry." *Id.*


**iv**.

This attempt to obtain witness statements ultimately led to Perry's Step Four discharge. According to the Step Four discharge report, a midlevel working in Perry's practice informed Ms. Krueger that Perry had contacted both Ms. Roque and Ms. Scales to write statements on her behalf. Reps to Summ. J. Ex. 21. Ms. Kreuger called both Ms.

2016 U.S. Dist. LEXIS 28451, *12

Roque and Ms. Scales and verified that Perry had indeed asked them for witness statements. *Id.* Ms. Scales informed Ms. Krueger that Perry had asked her to make two statements on her behalf: (1) that Ms. Scales "recalled the conversation that [Perry] had with her regarding office staffing and the provider schedules pertaining to the date/time that one of the clinical staff needed to report to HR for a meeting" and (2) "that there were **no** patients in either the office or the waiting room on the Friday that [Perry] was upset and crying at the front desk." *Id.* The Step Four report notes that this conduct constituted "[f]alsifying claims, records, or reports including incident reports..." and "[i]mmoral, indecent, illegal, or unethical or dishonest conduct or behavior" under Policy #509. Perry was discharged, effective **[\*13]** November 25, 2014. *Id.* She refused to sign the Step Four report. *Id.* Perry also received a notice of termination, stating that she had been discharged due to her "[i]nability to perform as an effective leader." Resp. to Summ. J. Ex. 21.

**C**.

Perry challenged both her Step Three corrective action and her Step IV discharge. The disciplinary actions were first upheld by Ms. Krueger on December 8, 2014. Resp. to Summ. J. Ex. 23. Perry then met with David H. Nall, the vice president of the Covenant physician network. Rep. to Summ. J. Ex. 24. After the meeting, Mr. Nall again upheld Perry's discharge in a letter dated January 12, 2015. *Id.* Mr. Nall's letter explained that, while Perry had the ability to complete task-oriented responsibilities, her "challenges came with the skills and abilities required to lead and advise staff amongst various levels of communication and establishing expectations." *Id.*

Perry responded by filing suit on March 19, 2015. ECF **No.** 1. In her complaint, Perry alleges that her termination violated the *FMLA's* anti-retaliation provision, *29 U.S.C. § 2615(a)(2)* and the PWDCRA's prohibition against discriminating against persons with disabilities, *MCL § 37.1202(1)(b)*. After the close of discovery, on December 21, 2015 Defendant **[\*14]** Covenant moved for summary judgment on both of Perry's claims. ECF **No.** 18.

**II**.

A motion for summary judgment should be granted if the "movant shows that there is **no** genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52*.

**A**.

Defendant first moves for summary judgment as to Perry's *FMLA* retaliation claim. The *FMLA* entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Arban v. West Publ'g Corp., 345 F.3d 390, 400 (6th Cir.2003)* (quoting **[\*15]** *29 U.S.C. § 2612(a)(1)(D)*). Upon returning from *FMLA* leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. *29 U.S.C. § 2614(a)(1)*. The *FMLA* makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," *29 U.S.C. § 2615(a)(1)*, or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id.* at *§ 2615(a)(2)*.

The Sixth Circuit has recognized two discrete theories of recovery under the *FMLA*: (1) the "interference" theory arising under *§ 2615(a)(1)*, and *(2)* the "retaliation" theory arising from *§ 2615(a)(2)*. *Seeger v. Cincinnati Bell Telephone Co., LLC, 681 F.3d 274, 282 (6th Cir. 2012)*. Plaintiff Perry brings her *FMLA* claim under the retaliation theory. ECF *No*. 1, ¶¶ 48-60. The central question in an *FMLA* retaliation case is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir.2006)*. In answering that question, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their *FMLA* rights." *Id.*

**i.**

Where, as here, a plaintiff sets forth an *FMLA* retaliation claim based **[*16]** on circumstantial evidence alleging a single motive for discrimination, it is evaluated under the familiar *McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc., 667 F.3d 757, 762 (6th Cir.2012)*. Plaintiff thus had the initial burden of establishing a prima facie case of retaliation by showing: (1) Plaintiff was engaged in a statutorily protected activity; (2) Defendant knew that Plaintiff was exercising her *FMLA* rights; (3) Plaintiff suffered an adverse employment action; and (4) a causal connection existed between the protected *FMLA* activity and the adverse employment action. *Id. at 761*. For the purposes of its motion for summary judgment only, Defendant concedes that Perry has established a prima facie case of retaliation. Mot. for Summ. J. 12.

**ii.**

Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id. at 761-62*. A defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence **[*17]** which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*.

In its motion for summary judgment, Defendant argues that Perry's employment was terminated because she was "consistently unable to meet the reasonable expectations of her job." Mot. for Summ. J. 12. Defendant argues that this was evidenced by Perry's poor communication, poor management, and ultimately, an incident in which she attempted to pressure a subordinate into providing a false statement on her behalf. *Id*. Poor performance, as alleged by Defendant, is a legitimate, non-retaliatory reason for terminating an employee. *See Johnson v. United States Dept. of Health and Human Services, 30 F.3d 45, 47 (6th Cir. 1994)*.

**iii.**

Because Defendant has satisfied its burden of production, the burden shifts back to Plaintiff to demonstrate that Defendant's proffered reason for terminating her employment was pretextual. A plaintiff generally shows pretext by showing that the proffered reason: (1) had **no** basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir. 1998)*; *Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)* (overruled on other grounds). However, as noted by the Sixth Circuit, "[t]he three-part test need not be applied **[*18]** rigidly. Rather, [p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Technical College, 698 F.3d 275, 287 n.6 (6th Cir. 2012)*.

**a.**

Plaintiff Perry first attempts to show pretext through the first method, arguing that Defendant's alleged reason for terminating her had **_no_** basis in fact. Perry contests each ground that her progressive discipline was based on, arguing that she was not rude to a patient, did not cry in front of patients, did not communicate poorly with fellow employees, and did not ask subordinates to supply false statements but only asked them to write what they witnessed. Perry argues that Defendant's claim that she had poor communication and management skills is belied by her "Exceeds Expectations" score on her May, 2015 performance review. Perry also argues that Defendant provided her with shifting and inconsistent reasons for her discharge.

In arguing that Plaintiff did not satisfy her burden of showing that Defendant's proffered reason for terminating her employment has **_no_** basis in fact, Defendant relies on the "honest belief rule." This rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee **[*19]** cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." _Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001)_. To determine whether Defendant had an honest belief that Plaintiff was poorly performing her job, the Court must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." _Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001)_. In this regard, the decisional process used by the employer need not be optimal or leave "**_no_** stone unturned." _Smith v. Chrysler Corp., 155 F.3d at 807_. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." _Id_. Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions." _Id_. "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly **[*20]** held." _Id. at 807-08_.

Defendant claims that it honestly believed that Plaintiff Perry was unable to meet the reasonable expectations of her job. In support of this contention, Defendant points to notes compiled by Ms. Krueger regarding complaints allegedly received from third parties prior to Perry's continuous _FMLA_ leave. _See_ Mot. for Summ. J. Ex. 8. These notes are unsubstantiated even by Ms. Krueger's own deposition testimony, and will be disregarded.[1]

Defendant also points to Perry's disciplinary reports cataloging Perry's progressive discipline after her return from continuous _FMLA_ leave. _See_ Mot. for Summ. J. Ex. 11-13. The discipline reports set forth alleged complaints that Ms. Krueger received from third parties regarding Perry's poor performance. _Id_. While substantiated in part by Ms. Krueger's deposition testimony, each of the reports was prepared by Ms. Krueger, who was also Perry's direct supervisor, the person who made the decision to terminate Perry, and the person who initially upheld the termination decision after Perry appealed. Defendant has not provided this Court with any depositions **[*21]** or affidavits of any other Covenant employees to substantiate Ms. Krueger's testimony or reports.

Importantly, Perry disputes the basis of each step of her discipline in both her initial appeal and in her deposition. _See_ Mot. for Summ. J. Ex. 15. The case therefore presents a question of Perry's word against Ms. Krueger's. A determination of the case thus depends on an assessment of the credibility of both Perry and Ms. Krueger, which is for a jury to determine. If a jury determines that Ms. Krueger, the decision maker, is not credible, then the jury could also determine that Defendant did not honestly believe that Perry was poorly performing her job. Construing the evidence in the light most favorable to Perry, Defendant's motion for summary judgment must be denied.

**b**.

Defendant also asserts that Plaintiff did not satisfy her burden of proving that the alleged poor performance did not actually motivate the termination of her employment under the third method of proving pretext. To establish pretext by advancing some evidence that the proffered explanation did not actually motivate the discriminatory action, a

---

[1] The Court considers only the excerpts of Ms. Krueger's deposition that has been provided by the parties.

plaintiff can "attack[] the employer's explanation 'by showing circumstances **[\*22]** which tend to prove an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000)* (citation omitted) (quoting *Manzer, 29 F.3d at 1084*) (internal quotation marks omitted). To make a showing of pretext in this manner, "plaintiff may not rely simply upon his prima facie evidence but must, instead introduce additional evidence of ... discrimination." *Manzer, 29 F.3d at 1084*.


**1.**

Perry argues that the temporal proximity of her return from continuous *FMLA* leave and her placement in Step One discipline is a strong indicator of pretext. Although "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual," *Skrjanc, 272 F.3d at 317*, temporal proximity can be used as indirect evidence to support a claim of pretext. *See Asmo, 471 F.3d at 598*.

Defendant alleges that temporal proximity provides weak evidence in this case, since Perry initially took *FMLA* leave on March 3, 2014 to care for her son. Perry's *FMLA* leave to care for her son was intermittent, and there is **no** evidence in the record that Perry **[\*23]** took an extended amount of time off work. Perry began taking intermittent *FMLA* leave to care for her own serious medical issues on July 22, 2014, and went on continuous *FMLA* leave from August 15, 2014 to October 6, 2014. Two weeks after she returned from her continuous *FMLA* leave, on October 21, 2014 she was placed in Step-One discipline. Less than two months after her return from continuous *FMLA* leave she was discharged.

With respect to claims for *FMLA* retaliation, the Sixth Circuit has held that a span of less than three months is sufficient to create an inference of a causal connection. *See Clark v. Walgreen Co., 424 F. App'x 467, 473 (6th Cir. 2011)* ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two."); *Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007)* (holding that a three-month time lapse between the plaintiff's request for *FMLA* leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here Perry's employment was terminated about one and a half months after she returned from her continuous *FMLA* leave. A jury could find that this close temporal proximity constitutes some evidence of retaliation.


**2 [\*24] .**

As noted above, temporal proximity alone is generally not enough to establish pretext. *Skrjanc, 272 F.3d at 317*. Perry argues that temporal proximity, together with Defendant's shifting reasons for her discharge, different treatment after her return to work, after-the-fact creation of a paper trail, skipping Step Two of its disciplinary procedures, and hostile remarks by Ms. Krueger establish pretext such that Defendant's motion for summary judgment must be denied.

First, Perry attempts to argue that Defendant's shifting and inconsistent reasons for her discharge constitutes evidence of discrimination. Perry argues that her Step-Four discipline report states that she was terminated for asking a subordinate to falsify a witness statement. She argues that she was then informed in her Notice of Separation that she was terminated due to her inability to be an effective leader, and was then informed in her appeal process that she lacked leadership skills and abilities. An employer's changing and inconsistent rationales for making an adverse employment decision can call into question the credibility of the proffered reason and serve as evidence of pretext. *See Cicero v. Borg—Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir.2002)*. As pointed out by Defendant, however, **[\*25]** there is **no** evidence that Defendant's rationale for terminating Perry changed in any way. Instead, the given reasons — asking a subordinate to falsify a witness statement, ineffective leadership, and lack of leadership skills and abilities — are consistent and related rationales. Defendant Covenant's assertions

revolve around the single idea that Perry was an ineffective leader and manager who communicated improperly with her fellow employees and subordinates.

Perry also argues that the fact that she was treated differently after returning to work constitutes evidence of pretext. "Where an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be inferred." *Lamer v. Metaldyne Co. LLC, 240 F. App'x 22, 30 (6th Cir. 2007)*. Plaintiff emphasizes her May 2014 performance review in which she received high marks in excellence accountability, quality of work, and responsiveness. Mot. for Summ. J. Ex. 6. Perry contrasts this performance review with the discipline she began receiving almost immediately after her return to work. While a jury could find that this different treatment was a result of Perry's declining performance, a jury could also find the different treatment was **[*26]** a result of impermissible retaliation.

Next, Perry argues that Defendant's after-the-fact creation of a paper trail may constitute evidence of impermissible retaliation. Perry points to Defendant's Exhibit 8, comprising of Ms. Krueger documentation of complaints and grievances against Perry. Mot. for Summ. J. Ex. 8. The Sixth Circuit has held that "the deliberate building of an adverse file on an employee can, on the right set of facts, constitute evidence of pretext." *Oldham v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 124 F.3d 198*, *4 [published in full-text format at *1997 U.S. App. LEXIS 25224*] (6th Cir. 1997). Many of the events listed in Exhibit 8 are wholly unsubstantiated, even by Ms. Krueger's own deposition testimony, and many of the incidents were not documented until months after their alleged occurrence. Mot. for Summ. J. Ex. 8. Furthermore, they were documented by a single person — Ms. Krueger. A jury could determine that this unsubstantiated record constitutes an after-the fact attempt to build a paper trail to buttress Defendant's justification for terminating Perry's employment. It therefore may constitute some evidence of pretext.

In addition to these arguments, Plaintiff Perry emphasizes the fact that Defendant skipped Step Two of its progressive disciplinary procedures. Perry also points to Ms. Krueger's "hostile" **[*27]** handwritten notes indicating that she mandated Perry to go on continuous *FMLA* leave and conveyed that Perry had to be at 100 percent performance upon her return. Mot. for Summ. J. Ex. 10. All of this evidence together creates a material question of fact as to the actual motive for Perry's termination. Because a jury could find that poor performance was not the real reason for Perry's termination and that *FMLA* retaliation was the real reason, Defendant's motion for summary judgment will be denied on this ground as well.

**B**.

Defendant also seeks summary judgment on Plaintiff's disability discrimination claim, in which Plaintiff alleges that Defendant violated the PWDCRA by terminating her employment because of her disability. "[T]he PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent he disabled individual from performing the duties of a particular job." *Peden v. City of Detroit, 470 Mich. 195, 680 N.W.2d 857, 863 (Mich. 2004)*.

To establish a prima facie case of discrimination under the PWDCRA, a plaintiff must establish: (1) that she is disabled as defined by the PWDCRA; (2) that the disability **[*28]** is unrelated to her ability to perform the duties of her particular job; and (3) that she was discriminated against in one of the ways described in the statute. *Peden, 680 N.W.2d at 863*. Consistent with the tripartite analysis set forth in *McDonnell Douglas*, the defendant must then provide nondiscriminatory reasons for the adverse action. *Vorachek v. Security Federal Credit Union, 2009 U.S. Dist. LEXIS 111408, 2009 WL 4506440, at *3 (E.D. Mich. Dec. 1, 2009)*.

**i**.

Defendant argues that Perry is unable to establish a prima facie case of discrimination under the *FMLA* because Perry's disability was related to her ability to perform her job duties. Defendant emphasizes Perry's testimony that,

prior to taking *FMLA* leave, she informed Ms. Krueger of her diagnosis in July, 2014, and that upon her return on October 6, 2014, Perry did not ask for any special accommodation other than occasional time off for medical appointments. Perry Dep. 70. Defendant also emphasizes Perry's testimony that she informed Ms. Krueger of her diagnoses because she was crying non-stop and having suicidal feelings, and that she and her physician admitted during that time that Perry was incapable of performing her job when she had "flare-ups".

Perry counters that Defendant has presented **no** evidence that Perry was unable to perform her job *after her return* from **[*29]** *FMLA* leave. Accordingly, Perry argues that Defendant has presented **no** evidence that she was unable to perform the duties of her job at the time she was terminated. *See Demyanovich v. Cadon Plating & Coatings, L.L.C., 747 F.3d 419, 434 (6th Cir. 2014)*. Construing the evidence in a light most favorable to Perry, Perry has created a prima facie case of discrimination under the PWDCRA.


**ii**.

Because Perry has established a prima facie, Defendant bears the burden of articulating a legitimate, nondiscriminatory reason for terminating her. *Id. at 434*. As Defendant argued in response to Perry's *FMLA* retaliation claim, Defendant contends that Perry was terminated because she was consistently unable to perform the duties of her job. For the reasons discussed above, there is a genuine, material dispute as to whether that justification is pretextual. Defendant's motion for summary judgment will therefore be denied as to Perry's claim under the PWDCRA.


**III**.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF **No**. 18, is **DENIED**.

Dated: March 7, 2016

/s/ Thomas L. Ludington

THOMAS L. LUDINGTON

United States District Judge

---

## *RANDALL v. AMERITECH SERVS.*

Court of Appeals of Michigan

March 23, 1999, Decided

No. 198013

**Reporter**

1999 Mich. App. LEXIS 1319 *

VIOLET JONES and GREGORY D. RANDALL, Plaintiffs-Appellees, v AMERITECH SERVICES, INC., and PAMELA COLTON, Defendants-Appellants, and WILLIAM OLIVER and THOMAS YAMBASKY, Defendants.

**Notice:** **[\*1]** IN ACCORDANCE WITH THE MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** Wayne Circuit Court. LC No. 93-317724 CL.

**Disposition:** Affirmed.

## Core Terms

plaintiffs', employees, trial court, defendants-appellants, race discrimination, age discrimination, disparate impact, merit pay, prima facie case, discharged, termination, summary disposition, method of proof, infer, statistical evidence, motion for jnov, motivation, factual dispute, no merit, hire, admissible evidence, disparate treatment, calendar year, skills, trial court's decision, abuse of discretion, determining factor, employment action, years old, circumstances

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

*HN1*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews a trial court's decision to admit evidence for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

*HN2*[⬇] **Standards of Review, Abuse of Discretion**

An appellate court reviews jury instructions for abuse of discretion. Jury instructions must accurately state the law, and must be warranted by the evidence presented.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Criminal Law & Procedure > Trials > Motions for Mistrial

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Civil Procedure > Appeals > Standards of Review > General Overview

Civil Procedure > ... > Standards of Review > Harmless & Invited Errors > General Overview

*HN3*[⬇] **Relief From Judgments, Motions for New Trials**

When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

Civil Procedure > Appeals > Appellate Briefs

*HN4*[⬇] **Appeals, Appellate Briefs**

A party may not merely announce a position or assert an error, and then leave it to the appellate court to discover and rationalize the basis of the arguments and search for authority to sustain or reject the position.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Relief From Judgments > Additur & Remittitur > General Overview

Civil Procedure > ... > Relief From Judgments > Additur & Remittitur > Remittiturs

*HN5*[⬇] **Standards of Review, Abuse of Discretion**

When presented with a motion for remittitur, the trial court must determine whether the jury's award is supported by the evidence. The appellate court reviews a trial court's ruling on a motion for remittitur for an abuse of discretion.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN6*[⬇] **Standards of Review, De Novo Review**

A motion under *Mich. Ct. R. 2.116(C)(10)* tests the factual support for a claim. The court should consider the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted in the action to determine whether a genuine issue of material fact exists to warrant a trial. An appellate court's review of the trial court's decision is de novo.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > ... > Summary Judgment > Appellate Review > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN7*[⬇] **Standards of Review, De Novo Review**

Appellate review of a motion for summary disposition is de novo. *Mich. Ct. R. 2.116(C)(8)* tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. The motion must be granted if no factual development could justify the plaintiff's claim for relief.

**Judges:** Before: Murphy, P.J., and Fitzgerald and Gage, JJ. Hilda R. Gage, J, dissenting.

# Opinion

PER CURIAM.

In this age and race discrimination case, defendants-appellants, Ameritech Services, Inc. (ASI) and Pamela Colton, appeal as of right from a judgment entered in favor of plaintiff Gregory Randall following a jury trial. ASI also appeals as of right from a judgment entered in favor of plaintiff Violent Jones. We affirm.

Plaintiffs' claims stem from a company-wide downsizing plan, known as the Company Resizing Plan (CRESP), that was implemented within Ameritech Corporation and ASI in 1992-1993. Plaintiffs lost their jobs as a result of CRESP in November 1993.

Defendants-appellants first argue that the trial court erred in admitting evidence of a statement made by trial witness, Jim Goetz. We disagree. *HN1*[⬆] We review a trial court's decision to admit evidence for abuse of discretion. *Gore v Rains & Block, 189 Mich App 729, 737; 473 NW2d 813 (1991)*.

The statement **[*2]** at issue was made by Goetz during a September 1993 videoconference, during which Goetz said, "we want to get back and start bringing in some folks that are under 45 years old." The record reveals that in November 1992, when plaintiffs were terminated from their positions, Goetz was employed by ASI as director for System Integration Services. Ten months later, in September 1993, when Goetz made the challenged statement, he was serving as vice-president for the information technology division of the newly-created Network Services Unit, which was apparently the successor to the entity that formerly employed plaintiffs. According to Goetz, the CRESP process that resulted in the loss of plaintiffs' jobs ended in November 1992. Although Goetz testified that he was not involved in decisionmaking in the CRESP process, he admitted that he served as "facilitator" in the process, which entailed ensuring that the right people were involved in CRESP sessions and that the sessions were conducted pursuant to CRESP guidelines. Even though Goetz's role as a facilitator did not directly involve plaintiffs' positions, we believe that Goetz was sufficiently involved in the CRESP process to justify the **[*3]** trial court's decision to admit the challenged statement, and thus, on this record, we cannot say that the trial court's decision to admit the statement constituted an abuse of discretion.

Defendants-appellants next argue that the trial court erred in instructing the jury with a modified version of SJI2d 6.01(d). We disagree. *HN2*[⬆] We review jury instructions for abuse of discretion. *Colbert v Primary Care Medical, PC, 226 Mich App 99, 103; 574 NW2d 36 (1997)*. Jury instructions must accurately state the law, and must be warranted by the evidence presented. *Klinke v Mitsubishi Motors Corp, 219 Mich App 500, 515; 556 NW2d 528*

*(1996)*, aff'd *458 Mich 582; 581 NW2d 272 (1998)*. We have reviewed the record and the jury instructions in their entirety, and we conclude that the challenged instruction was supported by the evidence and accurately stated the law and, therefore, did not constitute an abuse of discretion.

Defendants-appellants next argue that plaintiffs' attorney's closing argument deprived them of a fair trial. The manner in which an appellate court should review an allegation of improper conduct of **[*4]** an attorney was set forth in *Reetz v Kinsman Marine Transit Co, 416 Mich 97, 102-103; 330 NW2d 638 (1982)*:

> **HN3**🔼] When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [Footnotes omitted.]

First, we agree with defendants-appellants' claim regarding the impropriety of plaintiffs' attorney's closing **[*5]** argument that a defense witness, Larry Coe, "was brought in here because he's black." However, because the trial court properly sustained the defense objection to the remark, and because the remark was isolated and there was no request for a curative instruction, we conclude that defendants-appellants were not deprived of a fair trial because of the remark. Next, we find that plaintiffs' attorney's misstatement of the law concerning age discrimination during closing argument did not deprive defendants-appellants of a fair trial because the error was cured by plaintiffs' counsel's acknowledgment of the error before the jury and because the jury instructions ultimately given by the trial court were an accurate statement of the law. Finally, we have carefully reviewed the other remarks challenged by defendants-appellants and conclude that they provide no basis for disturbing the jury's verdict.

Defendants-appellants next argue that the trial court erred in denying their respective motions for a directed verdict, a new trial, and judgment notwithstanding the verdict (JNOV). However, we agree with plaintiffs that these issues should be deemed abandoned because they were insufficiently **[*6]** briefed by defendants-appellants. In their brief on appeal, defendants-appellants merely identify the appellate standards of review for the respective decisions of the trial court, and then proceed to discuss the evidence without addressing the trial court's reasoning for the decisions, citing or discussing any case law on discrimination, or relating any case law on the theories of liability to the evidence. **HN4**🔼] A party may not merely announce a position or assert an error, and then leave it to this Court to discover and rationalize the basis of the arguments and search for authority to sustain or reject the position. *Goolsby v Detroit, 419 Mich 651, 655 n 1; 358 NW2d 856 (1984)*. Moreover, we note that we have reviewed the trial court's reasoning for denying the respective motions and found record support for each of the trial court's decisions. Therefore, even if we were to review these issues, we would not disturb the jury's verdict.

Defendants-appellants next argue that the trial court erred in denying its motion for remittitur. **HN5**🔼] When presented with a motion for remittitur, the trial court must determine whether the jury's award is supported by the evidence. **[*7]** *Szymanski v Brown, 221 Mich App 423, 431; 562 NW2d 212 (1997)*. This Court reviews a trial court's ruling on a motion for remittitur for an abuse of discretion. *Id.*

Although it is true that plaintiff Randall provided false information about his wages, this fact was brought out by defendants-appellants' attorney during cross-examination. Randall admitted that he provided false information on tax returns after he was discharged, and also that he provided false information when applying for unemployment benefits. Further, Randall admitted to providing false information during discovery when answering interrogatories and supplying a supporting affidavit, and that he did not supplement those answers or produce earnings records. However, defendants-appellants received the benefit of an instruction based on SJI2d 6.01, which permitted the jury to infer that the missing earnings records would have been adverse to Randall "if you believe that the evidence was under the control of plaintiff and could have been produced by him and no reasonable excuse for Mr. Randall's

failure to produce evidence has been shown." Further, in denying remittitur, the trial court **[*8]** found no basis for punishing Randall for his alleged fraud committed with regard to others (e.g., the Internal Revenue Service) and that ASI should not benefit from that alleged fraud. The trial court also considered the skillfulness of the cross-examination that exposed Randall's failure to disclose income during discovery and the fact that the jury was charged based on SJI2d 6.01. The trial court ultimately concluded that remittitur should be denied because there was no showing that damages were, as a matter of law, incorrect or beyond what a reasonable jury might do faced with this evidence. On this record, we cannot say that the trial court abused its discretion in denying remittitur.

Defendants-appellants next argue that the trial court erred in denying their motions for summary disposition. Specifically, defendants-appellants challenge two decisions in the trial court concerning motions for summary disposition. The first challenge concerns a motion for summary disposition filed by ASI and three ASI supervisors under *MCR 2.116(C)(8)* and *(10)*. Defendants-appellants argued in the trial court that plaintiffs failed to support a prima facie case of race or age discrimination, and **[*9]** that plaintiffs' response to their motion was deceptive, untrue, and intended to mislead the court. On appeal, defendants-appellants argue that summary disposition under *MCR 2.116(C)(10)* should have been granted.

*HN6*[↑] A motion under *MCR 2.116(C)(10)* tests the factual support for a claim. *Spiek v Dep't of Transportation, 456 Mich 331, 337; 572 NW2d 201 (1998).* The court should consider the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted in the action to determine whether a genuine issue of material fact exists to warrant a trial. *Id.* Our review of the trial court's decision is de novo. *Id.* First, we again note the cursory nature of defendants-appellants' argument on appeal, and we agree with plaintiffs that this issue should be considered abandoned. *Goolsby, supra.* However, we have nonetheless examined the record and found that the trial court did not err in denying the motion for summary disposition.

Defendants-appellants' second challenge concerns the trial court's denial of their partial motion for summary disposition on plaintiffs' disparate impact theory. The partial motion for summary **[*10]** disposition pertains only to ASI. *HN7*[↑] Appellate review of a motion for summary disposition is de novo. *Spiek, supra. MCR 2.116(C)(8)* tests the legal sufficiency of the claim on the pleadings alone to determine whether the plaintiff has stated a claim on which relief may be granted. *Id.* The motion must be granted if no factual development could justify the plaintiff's claim for relief. *Id.*

The question whether a disparate impact theory should be recognized in Michigan under *MCL 37.2202*; MSA 3.548(202) has been previously addressed in *Farmington Education Ass'n v Farmington School Dist, 133 Mich App 566, 573-574; 351 NW2d 242 (1984)*:

Although there currently exist no holdings by the Michigan appellate courts which embrace the disparate impact theory, for several reasons we believe that this theory is available to litigants pressing claims under the Elliot-Larsen Civil Rights Act. First, while the Michigan courts are not compelled to construe the act in accord with the construction given Title VII, thus far, where they have failed to follow federal precedents under Title VII, they have concluded that the **[*11]** state act provides greater rights to aggrieved litigants. Second, there are indications that the Michigan Supreme Court will hold that a disparate impact theory may be advanced under the Elliott-Larsen Civil Rights Act. . . . Third, the Michigan Civil Rights Commission adopted interpretive guidelines in 1972 which recognize the theory of disparate impact. Although these guidelines are not conclusive, this Court has recognized that they are entitled to careful consideration and has found them persuasive in the past. Fourth, defendant advances no compelling reasons, based either on policy or presumed legislative intent, to reject the disparate impact analysis. [Footnotes and citations omitted.]

Moreover, a disparate impact theory of liability for age discrimination has been recognized by this Court, at least in dicta, in more recent decisions. See *Meagher v Wayne State Univ, 222 Mich App 700, 708-709; 565 NW2d 401 (1997)* (discussing fact that age discrimination may be proven using different methods of proof); *Lytle v Malady, 209 Mich App 179, 185; 530 NW2d 135 (1995)* (recognizing the theory based by citation to **[*12]** *Farmington Ed Ass'n, supra*, but finding that only a disparate treatment theory was presented by competent evidence), aff'd in part and rev'd in part at *456 Mich 1; 566 NW2d 582 (1997)* (without addressing a disparate impact theory), vacated in part by

*Lytle v Malady (On Rehearing), 458 Mich 153; 579 NW2d 906 (1998)*. Also, in *Lytle (On Rehearing), supra* at 177 n 26, our Supreme Court quoted with approval from this Court's dicta in *Lytle, supra at 185*, on the availability of a disparate impact theory. Accordingly, based upon the cases cited herein, we conclude that the trial court did not err in denying defendants-appellants' partial motion for summary disposition with respect to their claim that plaintiffs should not be allowed to proceed on a disparate impact theory of age discrimination. Further, we find that plaintiffs' claims of disparate impact were supported by the evidence.

Affirmed.

/s/ William B. Murphy

/s/ E. Thomas Fitzgerald

**Dissent by:** Hilda R. Gage

# Dissent

GAGE, J (dissenting).

Because I believe the statement of Jim Goetz was erroneously admitted, that its admission severely prejudiced **[*13]** defendants-appellants, and that plaintiffs' verdicts were otherwise unsupported by sufficient evidence, I respectfully dissent. To permit these verdicts to stand would constitute a manifest injustice. I would grant defendants-appellants JNOV with respect to all of plaintiffs' discrimination claims.

This case arises out of the termination of plaintiffs' employment with ASI as part of an involuntary reduction-in-force program known as CRESP [Company RESizing Plan]. While the majority fails to describe the steps involved in the CRESP process, I note them briefly because an understanding of these steps is important to an understanding of what I believe is the proper outcome of this case. CRESP was implemented in two stages. Stage I ranked employee performance using numerical information (e.g., an employee's merit pay for calendar years 1990 and 1991), but allowed adjustments to individual rankings for anomalies that were not accounted for by this process (e.g., recent promotions). A goal of Stage I was to target about thirty percent of employees for an in-depth evaluation of their performance. In Stage II, committees evaluated employees at the bottom of the Stage I rankings in groups **[*14]** established using such factors as departmental boundaries and the employees' salary grades. The committees ranked employees in each Stage II group using criteria established by a training manual. ASI officers then reviewed these Stage II rankings and determined how many employees in each group should be discharged.

After the plaintiffs, both of whom are African-Americans and over the age of forty, were discharged during 1992 as part of this CRESP process, they filed the instant action against ASI for age and race discrimination under the Elliot-Larsen Civil Rights Act, *MCL 37.2101 et seq.*; MSA 3.548(101) *et seq.* Other defendants were also named in the action, but only plaintiffs' race and age discrimination claims against ASI and plaintiff Randall's race discrimination claim against a former supervisor, defendant Colton, are at issue in this appeal. Specifically, the questions before us concern a jury's special verdict for plaintiff Randall of $ 570,000 against the defendants-appellants, Colton and ASI, for race discrimination and against ASI for age discrimination, jointly and severally, and a jury's special verdict for plaintiff Jones of $ 650,000 **[*15]** against ASI for age and race discrimination.

I.

Regarding defendants' first issue on appeal, I believe the admission of the Goetz statement was a critical error. This Court does not disturb a trial court's evidentiary ruling absent an abuse of discretion. *Gore v Rains & Block, 189 Mich App 729, 737; 473 NW2d 813 (1991)*. In the case at bar, the trial court abused its discretion in ruling to admit the challenged evidence because plaintiffs did not present a sufficient foundation to establish the relevancy of Goetz's prior statement under *MRE 401*. Alternatively, the evidence should have been excluded under *MRE 403*.

The trial record reflects that Goetz made the statement in question during a videoconference held after plaintiffs were discharged. Prior to the videoconference, ASI, which had functioned as a service corporation for other companies of the Ameritech Corporation, underwent further organizational restructuring. According to Goetz's testimony, ASI became part of a restructured Network Services Unit, which included employees from both the former ASI and the Ameritech Corporation. Goetz further testified that he was the vice-president for the information [*16] technology (IT) organization of the restructured Network Services Unit when he held a videoconference in September of 1993 for the purpose of communicating with employees within the IT organization as whole. During the videoconference, Goetz stated that the IT organization had open positions and would do selective hiring from outside of this organization. In response to a question about the job skills that would be sought from outside, Goetz made the following statement on an intent to hire employees, which is the subject of this issue:

> There are somewhat I would call professional skills that we are looking for. Eric mentioned a couple. Evelyn Woods is always looking for a few good marketing data based people.
>
> So, there are those professional skills, but part of these open positions are just our solid professional openings that we would recruit from college or recruit your friends and neighbors who want to develop into super IT professionals.
>
> So, some of them are specialty skills, professional skills . . ., marketing, client service, in some cases some technologies . . . .
>
> So, some of those type professional skills, but some of this you'll see are just analysts, entry level [*17]  analyst jobs *where we want to get back and start bringing in some folks that are under 45 years old.*
> * * *
> Before I close, every now and then I say something really stupid, and when my wife isn't around to tell me what it is, somebody else is.
>
> My comment earlier looking for people under 45, all I mean is that we want to be open to hiring people from colleges again. That's all I mean. It's my view that hiring professionals is also something we are going to do, and if that professional is of any age, we are open to that as well. Sorry about that comment. Without my wife to kick me, someone here at the table took care of it. [Emphasis added.]

When an evidentiary issue concerns the relevancy of evidence, the starting point is *MRE 401*, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Two separate questions must be answered, namely, the materiality of the evidence (e.g., was it of consequence to the determination of the action) and its probative force (e.g., whether it makes a fact of consequence to the action [*18] more or less probable without the evidence). *People v Brooks, 453 Mich 511, 517-518; 557 NW2d 106 (1996)*. The proponent of evidence has the burden to establish a proper foundation. *People v Burton, 433 Mich 268, 304 n 16; 445 NW2d 133 (1989)*.

Because Goetz's "under 45 years old" statement could only pertain to age discrimination, the issue of consequence to plaintiffs' action is whether age was a determining factor in the ASI employment decision to select plaintiffs for discharge under the CRESP plan applied to them during 1992. See *Meagher v Wayne State Univ, 222 Mich App 700, 710; 565 NW2d 401 (1997)*. Plaintiffs correctly argue that proof of motive would be relevant evidence. *Lytle v Malady (On Rehearing), 458 Mich 153, 176; 579 NW2d 906 (1998)*. However, the material issue is ASI's motive, and it would defy reason to impute Goetz's statement of intent to hire employees under the age of forty-five years to ASI based on disconnected facts. *Cf. Adams v National Bank of Detroit, 444 Mich 329, 366-368; 508 NW2d 464 (1993)*. Isolated comments, [*19] unrelated to the challenged action, do not show discriminatory animus in termination decisions. *Cone v Longmont United Hosp Ass'n, 14 F3d 526, 531 (CA 10, 1994)*.

Hence, Goetz' statement of an intent to hire employees under the age of forty-five years has probative force relative to ASI's motive only if Goetz's statement can be imputed to ASI at the time that the decision to discharge plaintiffs was made. Weighing against finding a sufficient nexus between Goetz's statement and the discharge decision to impute the statement to ASI was plaintiffs' failure to show that Goetz had a role in either developing the CRESP plan under which they were discharged or in applying that CRESP plan to their particular circumstances. Neither the fact that plaintiffs were employed in the IT organization of ASI that became a part of the restructured Network

Service Unit, nor Goetz's position when plaintiffs were discharged, establishes a sufficient nexus. Although Goetz himself was employed in the IT organization of ASI when plaintiffs were discharged, the trial evidence does not establish that Goetz was the vice-president at that time.

Another factor weighing against finding a sufficient **[*20]** nexus between Goetz's statement and plaintiffs' discharges to satisfy the probative force standard for relevant evidence was plaintiffs' failure to present evidence that ASI intended to create any of the possible open positions mentioned by Goetz at the time that plaintiffs were discharged. Although plaintiffs claim that Goetz's statement was made in the midst of the same downsizing plan under which they were terminated, the trial evidence infers only that a number of voluntary and involuntary downsizing plans were implemented over a number of years. Plaintiffs did not present evidence that the particular CRESP process under which they were terminated was still in effect when Goetz made his statement or that Goetz was otherwise speaking to the intent of a plan in existence as part of that CRESP process when he said that "we want to get back and start bringing in some folks that are under 45 years old."

Adding to these deficiencies in plaintiffs' foundational facts is trial evidence that plaintiff Jones was forty-five years old when she was discharged and that plaintiff Randall would actually fit under the age limit mentioned by Goetz when he was discharged because plaintiff Randall **[*21]** was under forty-five years old. Goetz's age statement, thus, does not apply to plaintiff Randall's age and, at best, marginally applies to plaintiff Jones. Of further significance is the fact that plaintiffs' age discrimination claims were not based on a failure to rehire them and that plaintiffs offered no evidence on younger employees actually being hired by the restructured Network Services Unit. In a typical case involving an employer's claim of a bona fide reduction in work force, the actual replacement of an eliminated employee raises a question of fact about the bona fide nature of the work force reductions. See *Lytle (On Rehearing), supra* at 177-178 n 27. Hence, it is important to emphasize that the evidence before us does not concern the actual conduct of the restructured Network Services Unit. It is properly viewed as proffered evidence on the issue of corporate intent. Indeed, plaintiffs' attorney used evidence of Goetz's statement of intent during closing arguments to argue that Goetz "let the corporate cat out of the corporate bag" and "told you what they *intended* to do" (emphasis added).

A trial court abuses its discretion when an unprejudiced person, **[*22]** considering the facts on which the trial court acted, would say there was no justification or excuse for the ruling made. *Gore, supra* at 27. Because plaintiffs did not show a logical nexus between their discharges under CRESP and Goetz's statement of intent that justified imputing discriminatory animus to their discharges, or otherwise making it more probable than not that they were discharged for the purpose of being replaced by employees under the age of forty-five years, I must conclude that the trial court abused its discretion in admitting the evidence of Goetz's statement.

Alternatively, I would hold that the trial court should have excluded the evidence under *MRE 403* because any diminutive probative value of Goetz's statement was substantially outweighed by the danger of unfair prejudice. Under the circumstances of this case, a danger existed that Goetz's statement would have been given undue or preemptive weight by the jury. *People v Mills, 450 Mich 61, 75-76; 537 NW2d 909 (1995)*, mod *450 Mich 1212 (1995)*.

I would further hold that the trial court's error requires that we vacate the jury's special verdict findings that ASI discriminated **[*23]** against the older portion of its work force (including plaintiffs) and that ASI intentionally discriminated against plaintiffs based upon age. Having assessed the error in light of the weakness of the untainted evidence on age discrimination and the entire record, *People v Smith, 456 Mich 543, 555; 581 NW2d 654 (1998)*, it is clear that ASI was prejudiced by the erroneously admitted evidence. Indeed, as discussed in Part III of my opinion, ASI should have been granted judgment notwithstanding the verdict because, as a matter of law, plaintiffs did not prove age discrimination with admissible evidence. I would find, however, that the trial court's evidentiary error was harmless relative to Colton because she was not charged with age discrimination. Hence, Colton's substantial rights were not affected by the error. *MRE 103(a)*; *Temple v Kelel Distributing Co, Inc, 183 Mich App 326, 329; 454 NW2d 610 (1990)*.

II.

Regarding defendants' allegations of improper remarks by plaintiffs' counsel, I concur with the majority's conclusion that none of these challenged remarks warranted reversal.

III.

Defendants-appellants also contend **[*24]** that the trial court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict (JNOV). For reasons to be discussed below, I would hold that the defendants-appellants were entitled, as a matter of law, to JNOV on all of plaintiffs' theories of liability. Defendants-appellants' attorney did not state specific reasons for a directed verdict as required by *MCR 2.515*. The specific reasons were presented to the trial court in the motion for JNOV. Because this Court only reviews grounds for sustaining a directed verdict that were articulated to the trial court, *Garabedian v William Beaumont Hosp, 208 Mich App 473, 475; 528 NW2d 809 (1995)*, and the same standards apply to motions for directed verdicts and JNOV, *Jenkins v Raleigh Trucking Services, Inc, 187 Mich App 424, 427; 468 NW2d 64 (1991)*, I have limited my review to the trial court's denial of the motion for JNOV. This Court's review of a trial court's decision regarding a motion for JNOV is de novo because we must determine whether, on reviewing the evidence and all legitimate inferences in the light most favorable to plaintiffs, plaintiffs **[*25]** established their discrimination claims as a matter of law. *Forge v Smith, 458 Mich 198, 204; 580 NW2d 876 (1998)*. If plaintiffs did not establish their discrimination claims, then the claims should not have been submitted to the jury.

Although the jury was asked to decide claims of race and age discrimination, all of plaintiffs' theories of liability were based on the same statute, which provides that an employer shall not:

> fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of . . . race . . ., age . . . . [*MCL 37.2202(1)(a)*; MSA 3.548 (202)(1)(a).]

Discrimination under this statutory provision may be proven using different methods of proof, but the inquiry is always the same, namely, whether the employment action was because of the impermissible consideration. See *Meagher, supra at 710*. This inquiry essentially presents an issue of causation. *Harrison v Olde Financial Corp, 225 Mich App 601, 610 n 12; 572 NW2d 679 (1997)*. The **[*26]** impermissible consideration must be a determining factor in the employment decision. *Meagher, supra at 710*.

A. RACIAL DISCRIMINATION - DISPARATE TREATMENT

In determining if JNOV was proper on plaintiff Randall's claim against Colton, I note that the theory for liability brought against Colton was that she discriminated against plaintiff Randall because of race in determining that he should receive no merit pay for calendar year 1991. If proven, Colton's conduct would be causally linked to his discharge because merit pay was used in the CRESP process to determine if an employee should be placed in Stage II for further evaluation.

Although plaintiff Randall argues on appeal that direct evidence of racial discrimination was proven at trial, I find no record support for this argument. Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employment decision. *Harrison, supra at 610*. The disparate treatment theory of intentional race discrimination claimed by plaintiff Randall gives rise to the three-stage method of proof, which affords a plaintiff the ability to establish **[*27]** a prima facie case of discrimination with the aid of a presumption. *Meagher, supra at 709-710*.

"Prima facie case" in this context does not mean that a plaintiff produced sufficient evidence to allow a case to go to a jury, but rather that enough evidence was produced to create a rebuttable presumption of discrimination based on the claimed impermissible factor. See *Lytle (On Rehearing), supra* at 173, and *Meagher, supra at 710-711*. Typically, under the disparate treatment method of proof applied to employment terminations, the plaintiff establishes the prima facie case by showing that he or she (1) was a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was discharged under circumstances giving rise to an inference of unlawful discrimination. *Lytle (On Rehearing), supra* at 172-173. As the term "prima facie"

suggests there must at least be a logical connection between each element of the prima facie case and the illegal discrimination. _Meagher, supra at 711._

If a prima facie case is established, the burden shifts to the defendant to **[*28]** articulate a legitimate nondiscriminatory reason for the employment action. _Lytle (On Rehearing), supra_ at 173. If the defendant produces such evidence, even if it is later refuted or disbelieved, the presumption drops away and the burden of proof shifts back to plaintiff. _Id. at 174._ Plaintiff must then show that there was a triable issue that the defendant's proffered reasons were not true reasons, but rather a pretext for discrimination. _Id. at 174._ In the context of a motion for summary disposition under _MCR 2.116(C)(10)_, this burden is met when the plaintiff presents "admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." _Id. at 176._ Plaintiff must present sufficient admissible evidence to create a reasonable factual dispute that the proffered reason for the employment action was a mere pretext and that discrimination based on the impermissible factor was a true motivation behind the employment action. _Id. at 157._

Although the **[*29]** instant case involved a motion for JNOV, the test in _Lytle (On Rehearing)_ is appropriate because a motion for JNOV, like a motion for summary disposition under _MCR 2.116(C)(10)_, is subject to de novo review and is only appropriate if the claim is insupportable at trial. _Cf. Lytle (On Rehearing), supra_ at 176-177, to _Forge, supra at 204_. The only significant difference is that the motion for JNOV is decided with the benefit of the full factual development on the plaintiff's case presented at trial. It is not a pretrial motion that is viewed liberally by a court to determine if a genuine issue of material fact is shown. _Lytle (On Rehearing), supra_ at 176-177.

Because this is a reduction in work force case, I have assumed that plaintiff Randall established a prima facie case of race discrimination arising from his discharge by establishing his membership in a protected class [African-American], an adverse employment action [plaintiff Randall was discharged], his qualifications for the position, and the retention of similarly situated Caucasian employees by ASI. I also believe that ASI effectively rebutted the presumption of discrimination **[*30]** with the evidence on the reduction in force explanation for plaintiff Randall's discharge. _Cf. Lytle v Malady, 456 Mich 1, 34; 566 NW2d 582 (1997)_ wherein Justice Riley relied on _Matras v Amoco Oil Co, 424 Mich 675, 683; 385 NW2d 586 (1986)_, as standing for the proposition that, "in the context of an RIF we assume that the burdens of production required by the parties under the approach have already been met. As a result, because the burden of production has been satisfied, all its presumptions 'drop out' . . . ." See also _Matras, supra at 684_ (in a reduction in force case, sufficient evidence must be presented on the ultimate question of whether the unlawful consideration was a determining factor in the decision to discharge).

However, the factual circumstances of this case are unusual because, while plaintiff Randall's prima facie case of race discrimination claim against Colton arises from the termination of his employment under the CRESP process, plaintiff Randall attempts to causally link Colton to the termination by attacking her decision that he receive no merit pay for calendar year 1991. Thus, it **[*31]** is necessary that plaintiff Randall establish race discrimination in the determination of that merit pay. Colton's proffered reasons for no merit pay must be considered in analyzing this claim, which included evidence that, while plaintiff Randall's work in the latter part of 1991 was satisfactory, plaintiff Randall was a recent transferee to her Problem and Change Management Control Center (PCMCC) group and plaintiff Randall's supervisor before the transfer did not recommend merit pay for calendar year 1991. I will assume for purposes of analysis that, as with the broader CRESP process that underlies plaintiff Randall's claim, that the proofs were sufficient for all presumptions to drop out.

The dispositive question before us concerns the third stage of the disparate treatment test addressed in _Lytle (On Rehearing)_. Hence, determinations are required regarding whether plaintiff Randall presented sufficient admissible evidence to create a reasonable factual dispute on whether Colton's proffered reason for no merit pay was a mere pretext and whether race discrimination was a true motivation behind her recommendation. Viewing the evidence in a light most favorably to plaintiff Randall, **[*32]** I would hold that he failed to meet this burden. Even if the jury disbelieved Colton's testimony that she relied on the recommendation of plaintiff Randall's prior supervisor, plaintiff Randall would be left with entirely circumstantial and comparative evidence about a small group of employees in the PCMCC whose merit pay was determined by Colton. Neither the evidence on how Colton assigned work to

employees having the same salary grade as plaintiff Randall, nor the evidence on the merit pay received by the other employees for calendar year 1991, reasonably infers that race discrimination was a true motivation for Colton's determination that plaintiff Randall should receive no merit pay.

Viewed most favorably to plaintiffs, the evidence established that both African-American and Caucasian employees received merit pay, but that Colton determined that certain male employees of both races should receive no merit pay. The employee receiving the highest merit pay of $ 2,400 in plaintiff Randall's salary grade was a Caucasian female who assisted Colton develop a standard for change management in the PCMCC. A Caucasian male employee, who helped develop standards in problem management, received **[*33]** the second highest merit pay of $ 1,800. The other female employees, all of whom were Caucasian, received merit pay, but there was some testimony that females were assigned to visible jobs that result in more merit pay. Although male employees also received merit pay, one Caucasian male [Leon Terry] and two African-American males [plaintiff Randall and Kenneth McClendon] received no merit pay. McClendon, like plaintiff Randall, transferred to the PCMCC during the latter part of 1991. There was no evidence of other employees transferring into the PCMCC during 1991 under circumstances similar to McClendon and Randall.

Although these proofs as a whole may raise a question on whether Colton had an inclination to favor female employees during calendar year 1991, I would conclude that reasonable persons could not find that race was a determining factor in how Colton determined merit pay. Hence, I would reverse the trial court's denial of JNOV as to defendant Colton. [1] Plaintiff presented insufficient evidence to submit Randall's race discrimination claim to the jury.

 **[*34]**  With regard to plaintiff Randall's race discrimination claim against ASI, I believe that the trial court erred in denying JNOV in favor of ASI to the extent that the jury's finding that ASI intentionally discriminated against plaintiff Randall based on race may have been based on Colton's conduct. Further, I am not persuaded that plaintiff Randall presented any theory of race discrimination against ASI at the trial, independent of Colton's conduct, that established an issue of fact for the jury. Although there was exhibit evidence of a letter addressed to an Ameritech Bell Group president, which stated that it was from "employees of ASI/IT" and expressed concerns about the treatment of minority employees, the trial record does not establish that the concerns expressed in that letter were offered and admissible as substantive evidence of the truth of the matters asserted consistent with the Michigan Rules of Evidence. See eg., *MRE 801 et seq.* Without this showing, neither the letter, nor any legitimate inferences that could be drawn from it, established sufficient admissible evidence to create a reasonable factual dispute on race discrimination for the jury.

Further, I am not **[*35]**  persuaded that plaintiff Randall's layperson analysis on certain documentation on merit pay for 1990 and 1991 was sufficient admissible evidence to establish a reasonable factual dispute for the jury. Plaintiff Randall's testimony reflects that he reviewed the documentation to identify younger male employees with less merit pay than he received for 1990 and 1991. Although plaintiff Randall did not use race to identify employees whom he believed were treated differently than he was for purposes of being placed in Stage II, plaintiff Randall's testimony indicates that most of the younger males he identified were Caucasian. Plaintiff Randall argues that this evidence creates an issue for the jury on race discrimination.

Plaintiff Randall's argument is similar to his theory raised with regard Colton's determination of merit pay because plaintiff Randall is attempting to establish race discrimination relative to the point where he was placed in Stage II and then to causally link that discrimination to the discharge decision. But for his placement in Stage II, plaintiff Randall's theory is that he would not have been discharged. At the same time, plaintiff Randall's argument is distinguishable **[*36]**  from his theory raised with regard to Colton because plaintiff Randall's layperson analysis was limited to numerical information (e.g., how much merit pay was received and the percentage of target that merit pay represents) and traits (e.g., age and gender) about employees having the same salary grade as he did within the larger IT organization. Plaintiff Randall did not make an individualized and fact-specific analysis of the employees' situation in the smaller units within the IT organization where they were assigned to work. Where, as in this case, an

---

[1] Although Colton served on the committee that evaluated plaintiffs' performance in Stage II of the CRESP progress, plaintiff Randall also failed to present evidence at trial to establish a claim of race discrimination against Colton based on this conduct.

attempt is made to have the jury infer race discrimination from such numerical information, it is incumbent upon the plaintiff to establish its statistical value.

While statistical evidence can be used to prove a claim of disparate treatment, *Phelps v Yale Security, Inc, 986 F2d 1020, 1023 (CA 6, 1993)*, and *Dixon v W W Grainger, Inc, 168 Mich App 107, 118; 423 NW2d 580 (1987)*, there are many ways to assess the significance or relevancy of statistic evidence. For instance, a question can be raised on whether proper groups were used for a comparison. See *Abbott v Federal Forge, Inc, 912 F2d 867* **[*37]** *(CA 6, 1990)* (discussing the use of statistic evidence in a disparate impact case). Courts decide on a case-by-case basis if the statistics are up to the task. *Id.*

In the case at bar, plaintiff Randall's layperson analysis was not shown to have statistical significance and no expert testimony was presented to establish same. Further, plaintiff Randall's layperson analysis was not relevant because it was based on age and gender, rather than race. A reasonable juror could not infer from plaintiff Randall's layperson analysis of the documentation that race discrimination was a determining factor in the decision to have plaintiff Randall placed in Stage II. Plaintiff Randall also failed to otherwise establish any conduct on the part of ASI which supports a reasonable inference that he was discharged because of his race. Therefore, I would hold, as a matter of law, that the trial court erred in denying ASI's motion for JNOV on plaintiff Randall's race discrimination claim

Similarly, with regard to plaintiff Jones' race discrimination claim against ASI, I would find that plaintiff Jones established no reasonable factual dispute for the jury on her claim. Like plaintiff Randall, plaintiff **[*38]** Jones attempted to show that a prior supervisor [William Oliver] engaged in race discrimination when determining that she should receive no merit pay for one of the calendar years [1990] used in the CRESP process to determine if employees should be placed in Stage II. However, viewed most favorably to plaintiff Jones, she did not present sufficient admissible evidence from which reasonable minds could infer that Oliver treated her differently from other employees within his group, because of race, when determining merit pay or that race discrimination was otherwise a true motivation behind his decision.

Finally, as with plaintiff Randall, I would find that plaintiff Jones has not established any theory of race discrimination against ASI, independent of Oliver's conduct, that established an issue of fact for the jury. Hence, I would reverse the trial court's denial of ASI's motion for JNOV on plaintiff Jones' claim of race discrimination.

## B. AGE DISCRIMINATION - DISPARATE TREATMENT

I next address whether the trial court erred in denying JNOV as to both plaintiffs based on a disparate treatment method of proving age discrimination. Unlike the race discrimination theories, plaintiffs' **[*39]** age discrimination case rested largely on statistical evidence presented by their expert witness. Although statistical evidence can be relevant in establishing a prima facie case or that proffered reasons for a defendant's conduct are pretextual, *Dixon, supra at 118*, in this case, plaintiffs' statistical evidence was insufficient to create a reasonable factual dispute for the jury.

Plaintiffs did not establish the prima facie case for age discrimination set forth in *Lytle (On Rehearing), supra* at 177, because they did not present evidence that they were replaced by younger employees. However, even assuming that plaintiffs sufficiently established some other circumstance giving rise to an inference of unlawful age discrimination so as to establish a prima facie case, they did not meet the standards at the third stage of proof to establish that the CRESP reduction-in-force process was a mere pretext to discriminate and that age discrimination was the true motivation behind their discharge.

Statistical evidence that fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext. See *Furr v Seagate Technology, Inc, 82 F3d 980, 986* **[*40]** *(CA 10, 1996)* (discussing intentional age discrimination claim under the federal Age Discrimination in Employment Act of 1967 (ADEA), *29 USC 621 et seq.*). When an employment decision is based upon an age-correlated but analytically distinct factor, there must be additional evidence that the employer was motivated by discriminatory animus. *Bramble v American Postal Workers Union, 135 F3d 21, 26 (CA 1, 1998)*, and *Hazen Paper Co v Biggins, 507 U.S. 604; 113 S Ct 1701;*

*123 L. Ed. 2d 338 (1993)*. "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with age." *Hazen Paper Co, supra, 507 U.S. at 609*. Employees are to be evaluated on their merits, and not their age. *Id. at 610-611*. However, the mere use of subjective criteria will not prove intentional age discrimination. *Furr, supra at 987*.

The statistical evidence presented by plaintiffs' expert, standing alone, does not infer that age was a determining factor in the decision to discharge plaintiffs because the **[\*41]** correlation that he drew between age and termination merely shows that CRESP had a disproportionate effect on employees who were forty years of age or older. It did not infer that age was a criterion applied within ASI to determine the merit pay used to rank employees for the CRESP process. Nor did it infer that ASI decided merit pay based on age, rather than performance.

Weighing against finding a reasonable factual dispute for the jury is the evidence that plaintiffs' ages were very close to the forty-year division used by their expert to analyze the impact of age. Indeed, while plaintiffs' expert charted the correlation between terminations and age in ten-year increments for plaintiffs' salary grade in the IT organization at ASI, the only substantial disparity shown was for employees in their fifties where the termination rate reached forty percent. The small group of employees in their sixties had a termination rate of zero percent, while the termination rate for larger groups of employees in the thirties and forties were 20.5 and 22.8 percent, respectively. Because discrimination based on age, and not class membership, is prohibited, substantial age differences would have been **[\*42]** a more reliable indicator of intentional age discrimination. *O'Connor v Consolidated Coin Caterers Corp, 517 U.S. 308, 312-313; 116 S Ct 1307; 134 L. Ed. 2d 433 (1996)*.

In sum, because plaintiffs' expert conducted a single-factor analysis based on age and plaintiffs' ages were close to the forty-year line drawn by plaintiffs' expert for their "protected class," I believe the statistical evidence was insufficient to create a reasonable factual dispute for the jury on age discrimination, even assuming that a prima facie case was established. Thus, the trial court should have granted JNOV on this method of proof.

C. AGE DISCRIMINATION - DISPARATE IMPACT

Finally, I find merit in ASI's claim that the trial court erred in denying its motion for JNOV as to both plaintiffs based on a disparate impact method of proving age discrimination. For purposes of this issue, I have assumed that a disparate impact method of proof is cognizable under *MCL 37.2202*, MSA 3.548(202) for age discrimination, consistent with Michigan cases that have recognized this method of proof, albeit, the cases do not involve circumstances where evidence **[\*43]** was found to support the legal theory. *Lytle (On Rehearing), supra* at 177 n 26; *Meagher, supra at 708-709*. [2]

_____

[2] My resolution of this issue makes it unnecessary to address ASI's claim, which has been raised in the context of a challenge to the trial court's denial of a motion for summary disposition, that a disparate impact method of proving age discrimination should not be recognized in Michigan as a matter of law. I note that Michigan courts have looked to § 703 of Title VII of the Civil Rights Act of 1964, *42 USC 2000e-2*, for guidance in construing Michigan's statute, *MCL 37.2202*; MSA 3.548(202), because it is modeled after § 703 of Title VII. *Farmington Education Ass'n v Farmington School Dist, 133 Mich App 566, 575; 351 NW2d 242 (1984)*. However, a significant difference between these statutes is that Title VII does not address age discrimination. Age discrimination is the subject matter of the ADEA, *29 USC 623*. Differences between the ADEA and Tittle VII is a factor that caused at least one federal court to conclude that a disparate impact theory is not cognizable under the ADEA. See *Ellis v United Airlines, Inc, 73 F3d 999 (CA 10, 1996)*. This rationale is not easily extended to *MCL 37.2202* because Michigan has a single statute covering discrimination based on race, age and other unlawful considerations. At the same time, there is nothing in *MCL 37.2202*; MSA 3.548(202) to foreclose taking into account the distinctions between the various unlawful considerations listed in the statute. As was observed in *Ellis, supra at 1009*, a disparate impact analysis in race cases is not easily extended to age cases given that challenged facially neutral factors almost certainly will generate different impacts for different age groups because each point in the life cycle tends to be associated with different distributions. Further, as was noted in *Meagher, supra at 710*, what suffices in one factual situation may be inadequate in other factual situations to meet the burden of proof. Hence, as long as a disparate impact theory continues to be recognized as a possible method of proof for any of the unlawful considerations in *MCL 37.2202*; MSA 3.548(202), I believe that it is appropriate to resolve the issue on a case by case basis, rather than to dismiss a particular method of proof as a matter of law.

 [*44]  A disparate impact theory differs from a disparate treatment because no discriminatory motive is required. *Smith v Consolidated Rail Corp, 168 Mich App 773, 776; 425 NW2d 220 (1988)*. Disparate impact involves employment practices that are facially neutral in their treatment of different groups but, in fact, fall more harshly on one group than on another and cannot be justified by business necessity. *Id. at 776*. However, a completely neutral practice will always have a disparate impact on some group, and discrimination need not always be inferred from such consequences. *Id. at 776*.

Looking for guidance to how a disparate impact test has been applied to age discrimination when that test has been recognized as a cognizable method of proof for the ADEA, *29 USC 623*, I conclude that plaintiffs' proofs do not meet the threshold requirements for establishing a prima facie case based on statistical evidence and, accordingly, reverse the denial of ASI's motion for JNOV based on this method of proof. To establish the prima facie case, a plaintiff must identify a specific employment practice used by the employer. *Abbott, supra at 872.* [*45]  Next, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that that the employment practice caused an adverse effect because plaintiffs were in a protected group. *Id. at 872*. As with any prima facie case, there must be at least a logical connection between the elements of the prima facie case and the illegal discrimination to establish "a legally mandatory, rebuttable presumption." *Meagher, supra at 711*, citing *O'Conner, supra.*

The employment practice in the case at bar was the CRESP reduction-in-force process, and the protected age group was identified as persons who were forty years and older. However, the adverse effect (discharge) was correlated with age by plaintiffs' expert without taking into account nondiscriminatory explanations for the CRESP process. Plaintiffs' expert also failed to show a substantial disparity between plaintiffs' ages and the line drawn for his analysis at forty years. Viewed most favorably to plaintiffs, this is insufficient statistical evidence, in kind and degree, to show that the CRESP process caused plaintiffs' discharge because they were over forty years of age.  [*46]  Hence, because plaintiffs did not prove a prima facie case of disparate impact, the trial court erred in denying JNOV on the disparate impact method of proof. There was insufficient evidence to have the jury consider this claim.

IV.

Finally, I address defendants' argument that the trial court improperly read SJI2d 6.01 to the jury. In the event a party fails to produce a witness or piece of evidence, this instruction permits the jury to "infer that the evidence would have been adverse" to the nonproducing party. The court gave SJI2d 6.01 for defendants' failure to produce certain records on anomalies used to exclude employees from Stage II evaluations in the CRESP process. In the absence of other evidence supporting plaintiffs' race and age discrimination claims, the adverse inference instruction alone is insufficient to create a triable issue for a jury. Cf. *Stanojev v Ebasco Services, Inc, 643 F2d 914, 924 n 7 (CA 2, 1981)*, wherein the second circuit observed the following when finding that an adverse inference instruction for an employer's nonproduction of certain personnel records did not alone support an inference of age discrimination:

> If it were assumed [*47]  that the other evidence was sufficient to make out a prima facie case, the jury could have been allowed to draw such an adverse inference. See *San Antonio v Timko, 368 F2d 983, 985 (CA 2, 1966)*. But that inference could not serve to supply the missing element of a prima facie case, namely, replacement of Stanojev by a younger employee or keeping the post open to receive one.
> The charge was not helpful because it did not say what inference could be drawn. Considering what inference may be drawn in the analogous case of failure of a party to call a witness that would ordinarily be favorable to him, Judge Friendly made the perspicacious observation:
>
> It would have been more accurate to characterize the inference . . . as permitting the jury "to give the strongest weight to the evidence already in the case in favor of the other side . . . ." The jury should not be encouraged to base its verdict on what it speculates the absent witnesses would have testified to, in the absence of some direct evidence. *Felice v Long Island Railroad Co, 426 F2d 192, 195 n 2 (CA 2, 1970)*, cert den *400 U.S. 820; 91 S Ct 37; 27 L. Ed. 2d 47 (1970)* [*48]  (citations omitted).

It is my belief that the adverse inference permitted by SJI2d 6.01 cannot by itself preclude JNOV for defendants regarding plaintiffs' race and age discrimination claims.

The defendants-appellants were entitled to JNOV on all of plaintiffs' methods of proof for establishing liability, and therefore I find it unnecessary to address the remaining issues raised by the defendants-appellants.

I would reverse.

/s/ Hilda R. Gage

# *Slagle v. Hella Elecs. Corp.*

Court of Appeals of Michigan

April 13, 2023, Decided

No. 360198

**Reporter**

2023 Mich. App. LEXIS 2599 *; 2023 WL 2938766

MARK SLAGLE, Plaintiff-Appellant, v HELLA ELECTRONICS CORPORATION, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Reconsideration denied by *Slagle v. Hella Elecs. Corp., 2023 Mich. App. LEXIS 4087 (Mich. Ct. App., June 8, 2023)*

Leave to appeal denied by *Slagle v. Hella Elecs. Corp., 2023 Mich. LEXIS 1841 (Mich., Oct. 31, 2023)*

**Prior History:**  [*1] Wayne Circuit Court. LC **No**. 20-012636-CD.

*Slagle v. Hella Elecs. Corp., 2022 Mich. App. LEXIS 4140 (Mich. Ct. App., July 13, 2022)*

## Core Terms

complaints, warranty, gender, termination, pretext, engineers, e-mails, plaintiff's claim, prima facie case, work environment, sex, summary disposition, similarly situated, non discriminatory reason, discriminated, retaliation, pretextual, coworkers, plant, different treatment, protected activity, trial court, transferred, woman, adverse employment action, unlawful discrimination, employment decision, reasonable jury, inappropriate, counseling

**Counsel:** For MARK SLAGLE, Plaintiff - Appellant: DAIMEON COTTON.

For HELLA ELECTRONICS CORPORATION, Defendant - Appellee: BRETT J. MILLER.

**Judges:** Before: RICK, P.J., and SHAPIRO and LETICA, JJ.

## Opinion

PER CURIAM.

In this employment discrimination case, plaintiff appeals by right the trial court's order granting summary disposition to defendant HELLA Electronics Corporation under *MCR 2.116(C)(10)* (**no** genuine issue of material fact). For the reasons stated in this opinion, we affirm.

I. BACKGROUND

This case arises out of an interpersonal work conflict between plaintiff and a coworker, Kathryn Cox. Defendant hired plaintiff in 2014 as a warranty engineer at its Michigan location. Warranty engineers are tasked with analyzing customer warranty claims for defendant's automotive parts. Defendant hired Cox in December 2017 as the warranty coordinator at its Michigan location. Plaintiff and Cox were part of the warranty group managed by David Huang.

Cox was the only woman in the group, and within a year, she was making complaints about her work environment and specifically plaintiff. Cox claimed in a September 2018 e-mail to defendant's Human Resources department (HR) that defendant had belittled **[*2]** her in a group meeting and was asking her to do non-job-related tasks such as taking out her garbage. HR advised Cox to set appropriate boundaries with her coworkers.

In January 2019, plaintiff and other warranty engineers began making complaints about Cox to Huang. The engineers told Huang that they were having difficulties working Cox, that she was not following procedures, and that she was not open to discussion or constructive criticism. Plaintiff claims that Huang would respond to these complaints by stating, "She's a woman. Be nice to her." In February 2019, plaintiff spoke with Huang's supervisor, Wade Williams. Plaintiff testified that he made the following complaints about Cox to Williams: "[S]he takes everything personally. We can't talk with her, have a good conversation. The high drama[,] . . . [she] doesn't accept responsibility." Williams and Huang both testified that they were aware of a work environment problem within the warranty group.

In April 2019, Cox sent another e-mail to HR stating that she had struggled with her coworkers in the warranty group since the beginning of her employment and that her work environment had only become more uncomfortable for her. Cox was **[*3]** hopeful that a solution could be reached. Around this time, plaintiff heard from coworkers that Cox had said that her "second office is in HR" and she had a list of inappropriate comments that plaintiff had made to her that were too "atrocious" to repeat. After learning of these purported statements, plaintiff started making complaints about Cox to HR employee Amy Helner. The first meeting was on April 24, 2019, and Helner testified that her feedback to plaintiff was to focus on his work and not his personal opinions of colleagues. On May 9, 2019, plaintiff returned to Helner to speak about Cox. According to Helner's notes from this meeting, plaintiff informed Helner that he could not work with Cox, that she talks all the time, that he does not like her and that she is annoying. Plaintiff's deposition testimony corroborates that this was the nature of his complaints. Helner testified that plaintiff was very angry that day and that the focus was on having him leave the HR office. Helner informed Huang and corporate counsel about this meeting.

The final meeting between plaintiff and Helner occurred on June 25, 2019. Helner had e-mailed plaintiff to reschedule their scheduled meeting for **[*4]** that day; plaintiff denies seeing that e-mail before going to Helner's office to discuss Cox. In any event, there is **_no_** dispute that when plaintiff arrived at Helner's office she told him she could not meet with him and that plaintiff refused to leave until she did. Plaintiff testified that Helner was irritated with him, telling him that "[t]his matter has reached a company president, reached the top levels of the company." Helner testified that plaintiff was "raising his voice and was physically agitated that I rescheduled the meeting." Plaintiff claims that he told Helner at this meeting that if the gender roles had been reversed, i.e., if he was a woman and Cox was a man, that his complaints would have been taken seriously and addressed by now. Helner did not recall plaintiff making a statement to that effect. She also testified that plaintiff's complaints about Cox were never about gender: "It was about the fact that they did not get along."

On July 19, 2019, Huang and Helner informed plaintiff that his position was being transferred to Mexico and would not be replaced, effectively ending plaintiff's employment with defendant. At this time, plaintiff was 65 years old, and the other **[*5]** warranty engineers were 29 years old (Josh Childress), 37 years old (Jason Gibson), and 59 years old (Ijaz Uddin). According to defendant, the position transfer to Mexico had long been in the works. Defendant produced an e-mail from a quality manager in 2018 indicating that there should be an in-house warranty engineer at defendant's production plant in Mexico. Williams and Huang both averred in affidavits that the decision to transfer plaintiff's position was made in "mid-to late 2018." They explained that plaintiff's position was chosen because he was the warranty engineer servicing Daimler Truck North America (DTNA), whose parts were built in the Mexico plant.

After plaintiff's employment ended, his job duties were temporarily assumed by other members of the warranty team, primarily by Childress, who complained of having to perform the DTNA work in addition to his existing responsibilities for **_no_** additional compensation. The DTNA work was transferred to Mexico in September 2019. Also in September 2019, the warranty group was referred to a counseling program to improve the group dynamics. According to Childress, the purpose of the counseling was to determine if the work environment **[*6]** had improved

following plaintiff's departure. Cox resigned on September 25, 2019, citing the poor work environment. Childress did the same a couple days later.

Plaintiff brought suit under the _Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq._, asserting claims of sex and age discrimination as well as retaliation.[1] The thrust of these claims is that plaintiff was treated differently from similarly situated employees on the basis of sex and age. Essentially, plaintiff's claims rest on the facts that he and Cox were making complaints about one another, and other younger engineers were also making complaints about Cox, yet plaintiff is the only one who lost his job.

After discovery was completed, defendant moved for summary disposition under _MCR 2.116(C)(10)_, primarily on the basis that plaintiff's employment was terminated for a legitimate, nondiscriminatory reason, i.e., his job was transferred to Mexico. Defendant argued that plaintiff could not show that defendant's decision to transfer his position was pretextual, and even he if could, plaintiff could not show that it was pretext for unlawful discrimination. In response, plaintiff maintained that the position transfer to Mexico was a pretext to end his employment, relying heavily on the letter from **[*7]** defendant's corporate counsel explaining that plaintiff's work performance was the exclusive reason for termination of his employment. After hearing oral argument, the trial court granted defendant's motion for summary disposition, reasoning that plaintiff failed to create a question of fact that the decision to relocate his engineering work to Mexico was pretextual or retaliatory. The court noted that this decision predated plaintiff's complaints to HR.

II. ANALYSIS

A. DISPARATE TREATMENT

Plaintiff first argues that the trial court erred by granting summary disposition of the sex and age discrimination claims. While we agree with plaintiff that there is a question of fact on whether defendant's proffered nondiscriminatory reason for plaintiff's discharge was pretextual, we nonetheless affirm the trial court because plaintiff has not shown that a reasonable jury could conclude that the discharge was a pretext for unlawful discrimination.[2]

ELCRA prohibits employers from discriminating on the basis of sex and age. _MCL 37.2202_ states:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, **[*8]** compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"[C]ourts have recognized two broad categories of claims under this section: 'disparate treatment' and 'disparate impact' claims." _Wilcoxon v Minnesota Mining & Mfg Co, 235 Mich App 347, 358; 597 NW2d 250 (1999)_. This case

---

[1] Plaintiff also alleged sexual harassment and national-origin discrimination. However, he has abandoned these claims by failing to brief them on appeal. See _State Treasurer v Sprague, 284 Mich App 235, 243; 772 NW2d 452 (2009)_ ("Failure to brief a question on appeal is tantamount to abandoning it.").

[2] We review de novo a trial court's decision on a motion for summary disposition. See _El-Khalil v Oakwood Healthcare, Inc, 504 Mich 152, 159; 934 NW2d 665 (2019)_. "Summary disposition under _MCR 2.116(C)(10)_ is proper if there is **_no_** genuine issue about any material fact and the moving party is entitled to judgment . . . as a matter of law." _Bergen v Baker, 264 Mich App 376, 381; 691 NW2d 770 (2004)_. In reviewing a motion under this subrule, courts "considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, _MCR 2.116(G)(5)_, in the light most favorable to the party opposing the motion." _Quinto v Cross & Peters Co, 451 Mich 358, 362; 547 NW2d 314 (1996)_. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." _West v GMC, 469 Mich. 177, 183; 665 N.W.2d 468 (2003)_. This Court may affirm a trial court when it reaches the correct result for different reasons. _Sabbagh v Hamilton Psychological Servs, PLC, 329 Mich App 324, 345; 941 NW2d 685 (2019)_.

2023 Mich. App. LEXIS 2599, *8

concerns disparate treatment because plaintiff alleges that defendant intentionally discriminated against him on the basis of sex and age. See *White v DOT, 334 Mich. App. 98, 107; 964 N.W.2d 88 (2020)*.

Because there is "**no** direct evidence of impermissible bias," plaintiff's claim of intentional discrimination must proceed under the *McDonnell Douglas*[3] burden-shifting framework. *Hazle v Ford Motor Co, 464 Mich 456, 462; 628 NW2d 515 (2001)*. First, the plaintiff must set forth a prima facie case, which gives rises to a presumption of discrimination. *Id. at 463*. There are variations of the prima facie case because, as the Michigan Supreme Court has explained, "the elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Id. at 463 n 6*. See also *Furnco Constr Corp v Waters, 438 U.S. 567, 577; 98 S Ct 2943; 57 L Ed 2d 957 (1978)* ("The method suggested in *McDonnell Douglas* . . . was never intended to be rigid, mechanized, or ritualistic."). The formulation of the prima facie case most applicable in this case is the "modified *McDonnell Douglas* prima facie approach" **[*9]** outlined in *Town v Mich Bell Tel Co, 455 Mich 688, 695; 568 NW2d 64 (1997)* (opinion by BRICKLEY, J.), which "requires an employee to show that the employee was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct."

The parties dispute only the fourth element, i.e., whether plaintiff was similarly situated to the other workers in the warranty group. As to the sex discrimination claim, plaintiff claims that he and Cox were similarly situated because they were both making complaints to HR about one another. Similarly, with respect to age discrimination, plaintiff was the oldest warranty engineer and some younger engineers also made complaints about Cox to their manager, Huang. Only plaintiff was affected by defendant's adverse conduct because he lost his job and Cox and the other engineers did not. We agree with plaintiff that for purposes of his claims, the relevant shared characteristic between he and his coworkers is that they all made complaints to HR or their manager relating to the warranty group's work environment. While there are significant differences between **[*10]** plaintiff's conduct and that of his coworkers that will be discussed, the prima facie case is merely the first stage of the *McDonnell Douglas* framework and has been described as a "minimal requirement[]." See *St Mary's Honor Ctr v Hicks, 509 U.S. 502, 506; 113 S Ct 2742; 125 L Ed 2d 407 (1993)*.[4] Further, "[t]he purpose of the prima facie case is to force the defendant to provide a nondiscriminatory explanation for the adverse employment action." *Town, 455 Mich at 699*. Accordingly, we will accept that plaintiff has established a prima facie case and move to the evidence relating to defendant's proffered nondiscriminatory reason for the adverse employment action. See *id.*

"[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle, 464 Mich at 464*. If the defendant gives a legitimate, nondiscriminatory reason for the employment decision, the presumption of discrimination is rebutted, "and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Sniecinski v Blue Cross & Blue Shield of Mich, 469 Mich 124, 134; 666 NW2d 186 (2003)*.

Defendant has articulated a legitimate, nondiscriminatory reason for termination of plaintiff's **[*11]** employment, i.e., his job was transferred to defendant's Mexico plant. "A plaintiff can establish that a defendant's articulated legitimate, nondiscriminatory reasons are pretexts (1) by showing the reasons had **no** basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major v Village of Newberry, 316 Mich App 527, 542; 892 NW2d 402 (2016)* (quotation marks and citation omitted). Plaintiff's attempt to show pretext fails under the second category. That is, there is **no** dispute that plaintiff's position was in fact transferred to Mexico. But plaintiff argues that defendant's preference to have a warranty engineer at the Mexico plant was not the "actual factor[]

---

[3] *McDonnell Douglas Corp v Green, 411 U.S. 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)*.

[4] This Court is "not bound by federal precedent interpreting analogous questions under *Title VII of the federal Civil Rights Act, 42 USC 2000e et seq.*, but that caselaw is generally considered persuasive." *White, 334 Mich App at 112-113*.

motivating the decision" to transfer plaintiff's job. *Id.* Plaintiff contends that the actual motiving factor behind the transfer was to end his employment.[5]

The trial court concluded that plaintiff could not show pretext because the decision to transfer his position was made in 2018, months before he started making complaints of Cox. In support of this position, defendant has provided two e-mails from a quality manager, Dr. Christopher Bode, to Huang and Williams. These e-mails, sent in November 2017 and February 2018 respectively, show Bode's preference (and perhaps a company policy) of having an "in-plant" warranty engineer at the production plants and that having such an engineer at the Mexico plant was "urgent." Huang and Williams provided affidavits attesting that the decision to transfer plaintiff's position to the Mexico plant was made in "mid-to late 2018."

While we acknowledge that Bode's e-mails constitute evidence in defendant's favor, there are reasons why they should not be deemed dispositive. First, aside from these initial e-mails, defendant has not provided any e-mails or documentation corroborating Huang and William's account that the decision to transfer plaintiff's position was made in mid to **[*13]** late 2018. Cf. *Smith v Alabama Dep't of Pub Safety, 64 F Supp 2d 1215, 1219 (MD Ala, 1999)* (holding that the reason for transferring plaintiff from one city to another had not been shown as pretextual when the decision was "the result of a *well-documented* departmental reorganization.") (emphasis added). And summary disposition solely on the basis of a witness's affidavit or deposition testimony, even if not directly contradicted by other evidence, is inappropriate because "the jury is free to credit or discredit any testimony." *Kelly v Builders Square, Inc, 465 Mich 29, 39; 632 NW2d 912 (2001)*.

Further, while questions about a defendant's business judgment do not create an issue of fact regarding whether a decision was pretext, *Town, 455 Mich at 695*, pretext may be shown by questioning the believability of the employer's proffered explanation, see *Opara v Yellen, 57 F4th 709, 723 (CA 9, 2023)*. Here, defendant has not adequately explained why it would not provide any notice to plaintiff and the other warranty engineers of the purportedly long pending position transfer and instead disclose this information simultaneously with plaintiff's termination, leaving others to suddenly assume plaintiff's duties in addition to their normal workload. Evidence that members of the warranty team were required to attend counseling following plaintiff's termination also supports a finding of pretext. Childress **[*14]** attested that the purpose of this counseling was to determine if the work environment had improved following plaintiff's departure, which indicates that the position transfer to Mexico was not the real or only reason for termination of plaintiff's employment.

Finally, plaintiff relies on a September 2019 letter from defendant's corporate counsel stating that, after an investigation, plaintiff was terminated because of his work performance. The letter makes **_no_** mention of the position transfer to Mexico as the reason for termination of plaintiff's employment. "[A]n employer's shifting factual accounts and explanations for an adverse employment decision can often support a reasonable inference that the facts are in dispute and that an employer's stated reason was not the real reason for its decision." *Donley v Stryker Sales Corp, 906 F3d 635, 638 (CA 7, 2018)*. See also *Walker v Johnson, 418 U.S. App DC 364; 798 F3d 1085, 1092 (2015)* ("A plaintiff may support an inference that the employer's stated reasons were pretextual . . . by citing the employer's . . . inconsistent or dishonest explanations[.]"). Defendant argues that the letter is inadmissible hearsay and also not admissible under *MRE 408*.[6] However, it appears that the letter would be admissible as nonhearsay under *MRE*

---

[5] Defendant seems to suggest that because it is "objectively true" that the position was transferred to Mexico, that plaintiff cannot show pretext. Defendant is mistaken for the reasons discussed above, i.e., the nondiscriminatory reason can be pretextual even if it has "a basis in fact," so long as the plaintiff shows that the proffered reason was "not the actual factor[] motivating the decision." *Major, 316 Mich App at 542*. The Sixth Circuit has more fully explained the rationale behind this method of proving pretext:

A plaintiff using the second option admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, but attempts to indict the credibility of his employer's explanation by showing circumstances which tend to **[*12]** prove that an illegal motivation was more likely than that offered by the defendant. [*Johnson v Kroger Co, 319 F3d 858, 866 (CA 6, 2003)* (quotation marks and citation omitted).]

801(d)(2) as an adoptive admission by defendant's agent. [*15] With respect to MRE 408,[7] while the letter was sent in response to a demand letter from plaintiff and mentions plaintiff's hope for "a better settlement" than his severance package, defendant's counsel was not offering or accepting a compromise to settle the case, nor was defendant's counsel negotiating with plaintiff's counsel such that MRE 408 would apply. Accordingly, we conclude that the letter would be admissible, and it plainly provides strong support for plaintiff's claim of pretext.

In sum, viewing the evidence in a light most favorable to plaintiff, a reasonable jury could conclude that defendant's legitimate, nondiscriminatory reason for plaintiff's termination was pretextual. However, a question of fact on pretext does not necessarily establish a question of fact on the ultimate [*16] question of whether plaintiff was unlawfully discriminated against. As the Supreme Court has explained:

> [D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. *In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for age or sex discrimination*. Therefore, . . . in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff. [*Lytle v Malady (On Rehearing), 458 Mich 153, 175-176; 579 NW2d 906 (1998)* (emphasis added).]

See also *Town, 455 Mich at 697* ("Ultimately, the plaintiff will have the burden of producing evidence, whether direct or circumstantial, that proves that discrimination was a determining factor in the employer's decision.").

As discussed, plaintiff's claim rests on an assertion that he was treated differently from similarly situated employees who [*17] were also making complaints. As to sex discrimination, plaintiff's theory of the case is encapsulated by his alleged complaint to HR that "[i]f I was a woman and [Cox] was a man, and I was a woman talking to you about these concerns that I have with this male counterpart, I'm sure that you would have done something about this situation." But to create an inference of disparate treatment on the basis that he was treated differently than a similarly situated employee of a different gender, plaintiff must prove that "all of the relevant aspects" of his employment situation were "nearly identical" to those of his coworker's employment situation. See *id. at 699-700*. A review of the record evidence shows that plaintiff cannot meet this burden.

First, there are material differences between the nature of plaintiff and Cox's complaints. Cox's concerns about plaintiff related to how he was treating her. Specifically, Cox complained in an e-mail to HR that plaintiff belittled her in a meeting and plaintiff would ask her to do non-job-related tasks such as taking his garbage out. In short, Cox was claiming that plaintiff was subjecting her to insensitive criticism in front of others and inappropriate comments. [*18] In contrast, plaintiff's complaints against Cox largely related to her personality, and Helner's advice to plaintiff was to focus on work and not his personal opinions of his colleagues.[8] While plaintiff also

---

[6] "The reviewing court should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion." *Jewett v Mesick Consol Sch Dist, 332 Mich App 462, 470; 957 NW2d 377 (2020)*.

[7] MRE 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

[8] Plaintiff testified that he also expressed concerns to Helner that Cox would engage in workplace violence. Plaintiff's concern was based on Cox's "general demeanor" and the fact that she "was not a petite woman." There are **_no_** allegations of actual workplace violence against Cox.

complained about Cox's work performance, there is **_no_** indication in the record that defendant found these complaints to have serious merit.

There is also the manner in which plaintiff and Cox expressed their complaints. The record shows that beginning as early as September 2018, Cox stated her concerns to HR in calmly worded e-mails. Cox never made specific demands relating to plaintiff. Instead, her complaints were aimed at improving her work environment. Plaintiff only began making complaints to HR after he learned of Cox's complaints. Helner testified that on two occasions plaintiff came to her office to complain about Cox and even though she told him she was busy, he refused to leave until she agreed to meet with him. Plaintiff's own testimony shows that he refused to leave Helner's office on June 25, 2019:

> So I went in there, and she said she couldn't meet with me. She had other more important matters to deal with. So I stood in front of her chair, and she said she could talk **[*19]** with me. She said, "Okay. I've got a couple of minutes." She's sitting at her desk. At her desk, there's two chairs. I'm standing behind them, and I said, "Look. Nothing has been done here. We've got to do something."

Helner also testified that plaintiff was angry in these unscheduled meetings and that the focus was on getting him to leave the HR office. She informed defendant's manager and corporate counsel of these instances.

When the circumstances of plaintiff's and Cox's complaints are considered, there is **_no_** basis for a reasonable jury to conclude that defendant's alleged decision to end plaintiff's employment was based on his gender. Rather, the evidence strongly suggests that plaintiff was exhibiting the most problematic behavior of the warranty group. Defendant could have reasonably determined that plaintiff's behavior toward both Cox and Helner warranted dismissal. Indeed, the required counseling in September 2019 to address whether the work environment had improved following plaintiff's departure points to such a conclusion. Plaintiff may dispute Cox and Helner's accounts and any conclusion that he was the problem with the warranty team, but *from the employer's perspective* **[*20]** , plaintiff and Cox were not similarly situated in all relevant aspects and their complaints were not nearly identical. Defendant was receiving complaints and reports of plaintiff from Cox and Helner indicating a lack of self-control, short temper, inappropriate conduct and an inability to set aside his personal opinion of a colleague. Plaintiff's complaints about Cox, on the other hand, concerned her work performance—which could have been addressed by defendant if it agreed with plaintiff's assessment—and his dislike of her personality. Given these differences, the mere fact that plaintiff and Cox both made complaints about each other does not allow for a reasonable inference that defendant's termination of plaintiff's employment was motivated by his gender.

Plaintiff does not identify other evidence supporting that conclusion. Plaintiff claims that Cox was provided "counseling" or instructions, and he was not. Plaintiff is referring to the advice given to Cox by HR employee Crystal Rodriguez in November 2018 on how to deal with plaintiff. However, Helner also gave plaintiff advice, i.e., focus on his work and not his personal opinions of colleagues. There is **_no_** indication that plaintiff **[*21]** gave this advice any credence. Plaintiff also claims that Huang stated, "Be nice to her. She's a woman," when presented with complaints about Cox. But plaintiff does not even attempt to argue that this stray, isolated statement shows that defendant treated women more favorably than men. Courts consider five factors to determine whether stray remarks are probative of discrimination:

> (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. [*Major, 316 Mich App at 543-544.*]

Huang was a decision maker in plaintiff's termination, but his alleged statements are not related to the decision-making process. Nor are they clearly reflective of discriminatory bias against men. Plaintiff does not claim that Huang's statements were "part of a pattern of biased comments." *Id.* And there is **_no_** indication in the record that Huang made such a statement close in time to the termination of plaintiff's **[*22]** employment.

Given the lack of evidence indicating gender discrimination, any conclusion to that effect would necessarily be based on speculation, and speculation or conjecture is insufficient to establish that unlawful discrimination was a motivating factor for the adverse employment action. *Sniecinski, 469 Mich at 140*. This same reasoning applies to

plaintiff's age discrimination claims. While younger warranty engineers also made complaints about Cox, plaintiff was the only one who brought those concerns to HR, where on at least one occasion he inappropriately refused to leave Helner's office until she spoke with him. Further, it appears that plaintiff was the only warranty engineer that Cox specifically complained about. Because plaintiff was not similarly situated to the other engineers in all relevant aspects, a reasonable jury could not conclude that plaintiff was unlawfully discriminating against on the basis of age solely because other engineers also complained about Cox.

In sum, multiple members of the warranty group made complaints relating to the work environment. But the nature of the complaints against plaintiff, and the manner in which he pursued his own complaints, negate any inference of discrimination **[*23]** on the basis that similarly situated employees outside of plaintiff's protected classes were treated differently. And plaintiff has provided _**no**_ other evidentiary basis from which a reasonable jury could conclude that defendant terminated plaintiff because of his gender or age. Accordingly, the trial court correctly granted summary disposition of plaintiff's claims.

B. RETALIATION

The trial court also correctly granted summary disposition of plaintiff's retaliation claim because he cannot show that he engaged in "protected activity."

ELCRA states in pertinent part:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act. [_MCL 37.2701(a)_.]

"To establish a prima facie case of unlawful retaliation under [ELCRA], a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between **[*24]** the protected activity and the adverse employment action." _DeFlaviis v Lord & Taylor, Inc, 223 Mich App 432, 436; 566 NW2d 661 (1997)_.

Plaintiff claims that he was retaliated against after he made claims of gender discrimination to defendant's HR. Defendant argues that this claim fails because plaintiff did not engage in protected activity. A protected activity for purposes of ELCRA is "opposing a violation of the [ELCRA]'s antidiscrimination provision." _White, 334 Mich App at 114_.

An employee need not specifically cite [ELCRA] when making a charge under the act. However, the employee must do more than generally assert unfair treatment. See _Mitan v Neiman Marcus, 240 Mich App 679, 682; 613 NW2d 415 (2000)_ (holding complaints amounting to generic claims of "job discrimination" did not qualify as a charge made under the _Persons with Disabilities Act, MCL 37.1101 et seq._). The employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to [ELCRA]. [_Barrett v Kirtland Community College, 245 Mich App 306, 318-319; 628 NW2d 63 (2001)_.]

In this case, plaintiff began making complaints about Cox in January 2019 when he and other warranty engineers met with Huang. Plaintiff testified that he did not bring up concerns at this meeting that he was being treated differently because of his gender. Nor did plaintiff bring up gender concerns when he spoke with Williams in February 2019. Plaintiff testified **[*25]** that "[g]ender was not the big issue at that time." Thus, plaintiff's initial, repeated complaints about Cox were "generic, non-sex-based complaints regarding his working conditions and . . . those complaints were not based on sex." _Barrett, 245 Mich App at 319-320_. Plaintiff testified that his concern about being treated differently from Cox on the basis of gender "was not the primary focus initially until I determined that there was a pattern." Plaintiff claims that he told Helner at their last meeting on June 25, 2019, that if his and Cox's gender roles were reversed, something would have been done about his complaints. Helner denies that plaintiff told

him this, but we must accept plaintiff's deposition testimony as true for purposes of defendant's motion under *MCR 2.116(C)(10)*. See *Sabbagh v Hamilton Psychological Servs, PLC, 329 Mich App 324, 346; 941 NW2d 685 (2019)*.

Even so, we conclude that a last-minute complaint to this effect would not have "clearly convey[ed] to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to the [ELCRA]." *Barrett, 245 Mich App at 319*. Again, the work environment problems in the warranty group were well-established. There were repeated complaints from multiple members of the group beginning as early as September 2018. Before June 25, 2019, none of the **[*26]** complaints indicated that a member of the group believed they were being discriminated against by defendant on the basis of gender. Moreover, plaintiff's complaints were aimed at Cox's work performance and his dislike of her personality. As Helner testified, plaintiff's complaints were "about the fact that [he and Cox] did not get along." Plaintiff's own thorough notes and timeline of events confirm that his claimed complaint about gender discrimination was merely an isolated statement in a laundry list of complaints that he presented to defendant over several months.[9]

Under the circumstances of this case, plaintiff's single alleged statement about gender role-reversal would not have clearly conveyed to an objective employer that plaintiff was raising the specter of a gender discrimination claim. Because plaintiff did not engage in protected activity, he cannot establish a prima facie case of retaliation.

Affirmed. Defendant may tax costs as the prevailing party. *MCR 7.219(A)*.

/s/ Michelle M. Rick

/s/ Douglas B. Shapiro

/s/ Anica Letica

[9] Further, at the time the disputed comment was made, plaintiff's claim of preferential treatment had **_no_** basis in fact. That is, both plaintiff and Cox had been repeatedly complaining about each other, and neither had obtained a favorable resolution. Accordingly, the facts at that time did not support plaintiff's view that a woman making complaints against a man would have received more favorable treatment from defendant.

## *Smith v. HHS*

Court of Appeals of Michigan

March 24, 2022, Decided

No. 356328

**Reporter**

2022 Mich. App. LEXIS 1651 *; 2022 WL 880455

JAMIE M. SMITH, Plaintiff-Appellant, v DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** **[*1]** Ingham Circuit Court. LC No. 19-000147-CD.

*Smith v. HHS, 2021 Mich. App. LEXIS 5412 (Mich. Ct. App., Sept. 10, 2021)*

## Core Terms

disability, direct evidence, termination, reasons, summary disposition, unlawful discrimination, case-read, adverse employment action, non discriminatory reason, prima facie case, trial court, give rise, discriminate, articulated, Quotation, marks, circumstantial evidence, circumstances, reflects, pretext, silence, shifts

**Counsel:** For SMITH JAMIE M, Plaintiff - Appellant: JAMES K. FETT.

For HEALTH AND SERVICES DEPARTMENT OF HUMAN, Defendant - Appellee: ERIK A. GRILL.

**Judges:** Before: CAVANAGH, P.J., and MARKEY and SERVITTO, JJ.

## Opinion

PER CURIAM.

Plaintiff, Jamie M. Smith, was employed by defendant, the Department of Health and Human Services. She brought suit against defendant following her termination from employment. Plaintiff alleged that defendant engaged in disability discrimination in violation of the Persons with Disabilities Civil Rights Act (PWDCRA), *MCL 37.1101 et seq.* Plaintiff appeals by right the trial court's order granting defendant's motion for summary disposition under *MCR 2.116(C)(10)*. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was diagnosed with multiple sclerosis (MS) in 2004 and began working for defendant as an eligibility specialist in 2007. In 2015, plaintiff took a medical leave of absence related to her MS and, after being off work for about a year and a half, she returned to her job in July 2016. During her first six months back at work, plaintiff was assigned a limited caseload. Plaintiff's six-month review reflected that she had satisfied most, but not all, of her performance objectives. **[*2]** Following that six-month review, plaintiff was assigned a full caseload.

In March 2017, a new supervisor, Daryl Showers, was appointed to oversee plaintiff's position. Upon beginning his job as supervisor, Showers spoke with plaintiff's previous supervisor and learned that plaintiff needed additional assistance completing her work and was not meeting performance standards. Showers increased plaintiff's "case read status" from 50% to 100%, meaning that 100% of her cases would first have to be reviewed before they could be submitted. In reviewing plaintiff's work, Showers observed that she had problems with timeliness and accuracy. He commenced daily meetings to help plaintiff identify and prioritize casework and provided her with itemized explanations of errors and related corrections. Showers also implemented a new series of expectations for plaintiff. From the time Showers started as plaintiff's supervisor until her termination in December 2017, plaintiff received poor performance reviews and formal counseling every six weeks for the same issues, including failure to meet standards of promptness, failure to consistently return phone calls, and failure to complete reviews on time.

In **[*3]** this case, plaintiff relied heavily on the following testimony that she gave during her deposition:

> *A.* I asked [Showers] a couple times, not asked, I stated to him on more than one occasion that I said I feel like, after returning from another extended medical leave due to my MS, I said I feel that I have been targeted as an undesirable employee and that, you know, I'm being singled out, that I'm being, you know, picked on.
>
> *Q.* Okay.
>
> *A.* And he made no comment at all, he didn't deny it, he obviously didn't confirm it, but he didn't say no, no, that's not it. I said I feel like I am being discriminated against. I feel I've been targeted as an undesirable employee. I said it on more than one occasion and he would not deny it, he had nothing to say, he just kind of stared awkwardly at me.

In plaintiff's complaint, she alleged that Showers intended to effectuate plaintiff's failure by assigning her a full caseload at 100% read status, which was unprecedented and drastically reduced her productivity. Plaintiff contended that Showers excessively scrutinized her work performance because of her disability and that she would have been able to satisfactorily perform her job if Showers had treated **[*4]** plaintiff as he treated her peers. Plaintiff further alleged that her termination constituted an adverse employment action that was made on the basis of unlawful discrimination, i.e., plaintiff's MS disability.

Defendant moved for summary disposition under *MCR 2.116(C)(10)*, arguing that plaintiff failed to produce any evidence that she was discharged because of her disability or that defendant's reasons for terminating her employment were pretextual. The trial court granted defendant's motion, concluding that plaintiff failed to present direct or circumstantial evidence of discrimination. The trial court further determined that even if plaintiff had established a prima facie case of discrimination, defendant presented a legitimate, nondiscriminatory reason for plaintiff's termination absent any counter evidence produced by plaintiff demonstrating pretext. Plaintiff filed a motion for reconsideration, which the trial court denied. Plaintiff now appeals.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND SUMMARY DISPOSITION PRINCIPLES

We review de novo a trial court's decision on a motion for summary disposition. *Hoffner v Lanctoe, 492 Mich 450, 459; 821 NW2d 88 (2012)*. In *Batista v Office of Retirement Servs, ___ Mich App ___, ___; ___ NW2d ___, 2021 Mich. App. LEXIS 4915 (2021) (Docket No. 353832)*; **[*5]** slip op at 9, this Court set forth the principles governing examination of a motion brought under *MCR 2.116(C)(10)*:

> *MCR 2.116(C)(10)* provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to *MCR 2.116(C)(10)* tests the factual support for a party's action. "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on *subrule (C)(10)*," *MCR 2.116(G)(3)(b)*, and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, *MCR 2.116(G)(5)*. "When a motion under *subrule (C)(10)* is made and supported . . ., an

adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." *MCR 2.116(G)(4)*. A trial court may grant a motion for summary disposition under *MCR 2.116(C)(10)* if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with **[\*6]** respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under *MCR 2.116(C)(10)*. Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party. A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. [Quotation marks and citations omitted; ellipses in original.]

## B. DISABILITY DISCRIMINATION

Under the PWDCRA, an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." *MCL 37.1202(1)(b)*; see *Peden v Detroit, 470 Mich 195, 203-204; 680 NW2d 857 (2004)*. "To prove a discrimination claim under the [PWDCRA], the **[\*7]** plaintiff must show (1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Chmielewski v Xermac, Inc, 457 Mich 593, 602; 580 NW2d 817 (1998)*. Discrimination may be established by direct or circumstantial evidence. *Sniecinski v Blue Cross & Blue Shield of Mich, 469 Mich 124, 132; 666 NW2d 186 (2003)*.

## 1. DIRECT EVIDENCE

First, plaintiff argues that Showers's silence in the face of plaintiff's accusation of discrimination constituted direct evidence of discrimination. Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Sniecinski, 469 Mich at 133* (quotation marks and citations omitted). In *Bachman v Swan Harbour Assoc, 252 Mich App 400, 433; 653 NW2d 415 (2002)*, this Court discussed the nature of direct evidence of discrimination:

> In this case, plaintiff testified that during the course of a confrontation with defendant Dawn Combs, Combs stated: "I don't know who you people think you are but you are not going to get any special treatment here." Plaintiff claims that this statement constitutes direct evidence of discrimination. Although this remark may be subject to varying interpretations, we agree that plaintiff has presented direct evidence of discrimination **[\*8]** under the PWDCRA. Further, defendant Combs' alleged remark occurred before plaintiff was assessed a $50 furniture moving fee, which, as stated below, could be construed as treating plaintiff differently. Although defendant Combs denied making such a comment, the matter was one of credibility, and it is the jury's duty to weigh credibility. [Quotation marks and citations omitted.]

And in *DeBrow v Century 21 Great Lakes, Inc, 463 Mich 534, 538; 620 NW2d 836 (2001)*, our Supreme Court observed:

> Here, the plaintiff has direct evidence of unlawful age discrimination. The plaintiff testified during his deposition that, in the conversation in which he was fired, his superior told him that he was "getting too old for this shit." We recognize that this remark may be subject to varying interpretations. It might reasonably be taken as merely an expression of sympathy that does not encompass a statement that the plaintiff's age was a motivating factor in removing him from his position as an executive. However, it is well established that, in reviewing a decision on a motion for summary disposition under *(C)(10)*, we must consider the documentary evidence presented to the trial court in the light most favorable to the nonmoving party. According to the plaintiff's deposition testimony, **[\*9]** the remark was made during the conversation in which the plaintiff's superior informed him that he was being fired. Considered in the light most favorable to the plaintiff, this remark

could be taken as a literal statement that the plaintiff was "getting too old" for his job and this was a factor in the decision to remove him from his position. While a factfinder might be convinced by other evidence regarding the circumstances of the plaintiff's removal that it was not motivated in any part by the plaintiff's age and that the facially incriminating remark was no more than an expression of sympathy, such weighing of evidence is for the factfinder, not for this Court in reviewing a grant of a motion for summary disposition. [Quotation marks and citations omitted.]

In this case, plaintiff does not rely on anything Showers said to her as proof of direct discrimination; rather, plaintiff relies on Showers's silence during personal confrontations in which she told him that she had been "singled out," "targeted," "picked on," and "discriminated against." In *Ali v Stetson Univ, Inc, 340 F Supp 2d 1320, 1324-1325 (MD Fla, 2004)*, the federal court addressed a comparable argument and ruled as follows:

Plaintiff claims that, during his grievance hearing, his mother **[*10]** asked members of Stetson's appeals board if Plaintiff was suspended "because of his name," that is, Plaintiff's Iranian ethnicity. According to Plaintiff, the board, which included Dean Espinosa, did not answer his mother's allegation. Plaintiff argues that the failure of the board, and particularly of Espinosa, to respond "can be seen as an admission of race discrimination" and thus as direct evidence of discrimination.

Even if such a failure to respond "can be seen as an admission of race discrimination," it is nevertheless not direct evidence. To say that the board's silence "can be seen" as reflecting an intent to discriminate necessarily implies that it may also be seen otherwise. For example, the board's failure to respond might be seen instead as reflecting its offense at the insinuation that its actions were discriminatory. Whatever might have been behind the board's silence, it is not in the nature of a remark "whose intent could be nothing other than to discriminate." Rather, it is only by inference that one could conclude that the board's failure to respond indicated its assent to the question asked of it. Thus, Plaintiff's direct evidence argument fails. [Legal and record **[*11]** citations omitted.]

We find this reasoning by the federal court to be persuasive and adopt it for purposes of our case. Accordingly, we conclude as a matter of law that Showers's silence in the face of plaintiff's discrimination accusations did not constitute direct evidence of disability discrimination.

2. CIRCUMSTANTIAL EVIDENCE

Because plaintiff failed to present direct evidence of discrimination, she was required to present sufficient circumstantial evidence to establish a prima facie case of discrimination. In *Sniecinski, 469 Mich at 133-134*, our Supreme Court discussed the proper analysis:

In cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden-shifting approach set forth in *McDonnell Douglas Corp v Green, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)*. This approach allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination. To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving **[*12]** rise to an inference of unlawful discrimination. Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination. [Quotation marks and citations omitted.]

In the context of the instant case, the fourth element pertains to presenting evidence that plaintiff was terminated under circumstances giving rise to an inference of unlawful discrimination. Defendant does not dispute that plaintiff was disabled, was generally qualified for her job, and suffered an adverse employment action. At issue, therefore, is whether plaintiff's termination occurred under circumstances giving rise to an inference of unlawful discrimination.

Plaintiff argues that Showers, prompted by plaintiff's disability and periodic need for medical leave, imposed onerous performance standards, which were a radical departure from defendant's standard practice, as part of his scheme **[\*13]** to set plaintiff up for failure.

The circumstances surrounding plaintiff's case-read status do not give rise to an inference of unlawful discrimination. The record supports plaintiff's contention that she was assigned a full caseload and placed on 100% case-read status, which was not a typical assignment for employees without performance issues, but it was not unheard of with respect to new employees or those with performance issues. Although the record reflects that plaintiff met or exceeded most expectations at the time of her six-month performance review, the record also reveals that her previous supervisor conveyed new concerns about plaintiff's performance to Showers, who then increased her case-read requirement to 100%. Rather than giving rise to an inference of discrimination, the imposition of the 100% case-read status supports the inference that plaintiff's supervisors noticed performance issues and thus wanted all of her work to be reviewed.

Showers's actions after increasing plaintiff's case read-status similarly did not give rise to an inference of unlawful discrimination. As Showers reviewed plaintiff's work, he noticed that plaintiff was not submitting all her cases for **[\*14]** review as required, and she produced a significant number of errors in the cases that she did submit. The record reflects that Showers implemented a plan that correlated with the issues he observed in plaintiff's performance. There is nothing to suggest that Showers's plan was motivated by plaintiff's disability or her having taken a medical leave six months earlier.

Moreover, even if plaintiff had successfully presented a prima facie case of discrimination,[1] defendant rebutted the presumption by articulating a legitimate, nondiscriminatory reason for imposing the more stringent case-read requirements and then terminating plaintiff's employment.

Again, "[o]nce a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Sniecinski, 469 Mich at 134.* And "[i]f a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination." *Id.* "An employer's legitimate, nondiscriminatory reasons for firing an employee can be established as pretext (1) by **[\*15]** showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Jewett v Mesick Consol Sch Dist, 332 Mich App 462, 475; 957 NW2d 377 (2020)* (quotation marks and citation omitted).[2]

---

[1] It is arguable that Showers's silence when confronted with plaintiff's claims of discrimination constituted evidence that the termination occurred under circumstances giving rise to an inference of unlawful discrimination.

[2] "[T]he fact that a plaintiff has established a prima facie case of discrimination under *McDonnell Douglas* does not necessarily preclude summary disposition in the defendant's favor." *Hazle v Ford Motor Co, 464 Mich 456, 463-464; 628 NW2d 515 (2001).* A prima facie case under *McDonnell Douglas* does not describe the plaintiff's burden of production, but merely establishes a rebuttable presumption. *Id. at 464.* Therefore, "once a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Id.* Our Supreme Court in *Hazle, id. at 464-466,* further explained the analytical process, stating:

The articulation requirement means that the defendant has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel. If the employer makes such an articulation, the presumption created by the *McDonnell Douglas* prima facie case drops away.

At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff. . . . [A] plaintiff must not merely

2022 Mich. App. LEXIS 1651, *15

In this case, plaintiff's previous supervisor related concerns about plaintiff's performance to Showers, who also began to notice issues with plaintiff's performance and consequently imposed an increased review requirement. Plaintiff continued to demonstrate an inability to satisfactorily perform her duties after the case-read status was increased to 100%, and her performance continued to deteriorate in the following months, which ultimately culminated in her termination from employment. Plaintiff's inadequate performance was a legitimate, nondiscriminatory reason for the **[*17]** adverse employment actions.

After defendant articulated legitimate, nondiscriminatory reasons for terminating plaintiff's employment, the burden shifted back to plaintiff to show that defendant's reasons were a mere pretext for discrimination. Plaintiff argues that defendant's reasons for firing her were pretextual because Showers imposed the 100% case-read requirement on his first day as supervisor, before he even had a chance to develop an informed opinion that plaintiff was not performing at an acceptable level.

The record reflects, however, that plaintiff's performance issues began before Showers started as supervisor. Therefore, the timing of the change in plaintiff's case-read status does not support plaintiff's argument that defendant's articulated reasons for the adverse employment action were without any basis in fact, were not the actual reasons motivating the termination, or were otherwise insufficient to justify the decision to fire plaintiff. In fact, plaintiff acknowledged that the negative remarks contained in the formal counseling documents and performance reviews were accurate. Moreover, the record reveals that plaintiff had issues beyond her inability to meet standards **[*18]** of promptness, such as failing to consistently return client calls and making errors in her work. Plaintiff has failed to show that the documentary evidence was sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor in terminating plaintiff's employment. Because defendant articulated proper reasons for plaintiff's discharge and plaintiff failed as a matter of law to demonstrate that defendant's reasons were pretextual, the trial court properly granted summary disposition in favor of defendant.[3]

We affirm. Having fully prevailed on appeal, defendant may tax costs under *MCR 7.219.*

/s/ Mark J. Cavanagh

/s/ Jane E. Markey

/s/ Deborah A. Servitto

---

**End of Document**

---

raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination.

The **[*16]** inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision. The only difference is that, for purposes of a motion for summary disposition or directed verdict, a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision. [Citations and quotation marks omitted; second alteration in original.]

---

[3] Plaintiff also argues, with little analysis, that the trial court made a slew of errors in its opinion granting defendant's motion for summary disposition, the correction of which would lead to a different result. Our review of the record does not bear out plaintiff's allegations in this regard, except she is correct that the trial court apparently misconstrued the record as it related to the 25 other employees on case-read status. The record indicates that those employees were placed on 100% case-read status by a variety of supervisors over the course of several years, not by Showers at the time he became supervisor. But the trial court's misstatement was not of sufficient import so as to undermine our conclusion that the court properly granted defendant's motion for summary disposition for the above-explained reasons. We further conclude that the trial court did not abuse its discretion by denying plaintiff's motion for reconsideration given that plaintiff failed to show that a different ruling on the motion for summary disposition would result from correction of any errors. See *MCR 2.119(F)(3).*

# *Sobotka v. Olympia Ent., Inc.*

Court of Appeals of Michigan

February 14, 2025, Decided

No. 366281

**Reporter**

2025 Mich. App. LEXIS 1230 *; 2025 WL 511120

ALBERT SOBOTKA, Plaintiff-Appellee/Cross-Appellant, v OLYMPIA ENTERTAINMENT, INC., Defendant-Appellant/Cross-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History: [*1]** Wayne Circuit Court. LC No. 22-004643-CD.

*Sobotka v. Olympia Ent. Inc., 2023 Mich. App. LEXIS 4383 (Mich. Ct. App., June 21, 2023)*

## Core Terms

termination, urinating, pretext, drain, summary disposition, prima facie case, disability, prostate, adverse employment action, proffered reason, garage, fired, major life activity, plaintiff's claim, disability-discrimination, age-discrimination, discipline

**Counsel:** For ALBERT SOBOTKA, Plaintiff - Appellee: DEBORAH L. GORDON, ELIZABETH MARZOTTO TAYLOR, SARAH GORDON THOMAS.

For OLYMPIA ENTERTAINMENT INC, Defendant - Appellant: MARGARET CARROLL ALLI, DANIEL G. COHEN, COLLAPSE ALL EXPAND ALL.

**Judges:** Before: YOUNG, P.J., and GARRETT and WALLACE, JJ.

## Opinion

PER CURIAM.

In this wrongful-termination action, defendant, Olympia Entertainment, Inc., appeals by leave granted[1] the trial court's order granting in part and denying in part its motion for summary disposition. Plaintiff, Albert Sobotka, cross-appeals the same order.

The two claims at issue in this appeal are plaintiff's claim of age discrimination and plaintiff's claim of disability discrimination. On appeal, defendant challenges the trial court's denial of its motion for summary disposition with respect to the age-discrimination claim, while plaintiff on cross-appeal challenges the trial court's grant of summary disposition on the disability-discrimination claim. Because we discern no errors requiring reversal, we affirm.

---

[1] *Sobotka v Olympia Entertainment, Inc*, unpublished order of the Court of Appeals, entered September 20, 2023 (Docket No. 366281).

## I. BASIC FACTS

Plaintiff started working with defendant (or defendant's predecessor)[2] in the 1970s as a maintenance worker [*2] at Olympia Stadium, where the Detroit Red Wings played professional hockey. Since 1979, plaintiff held the title of Operations Manager and was primarily responsible for maintaining the ice for the playing and practice rinks. Plaintiff was well known for driving the Zamboni around and picking up tossed octopi from the ice surface during the playoffs. The Red Wings even created a mascot for the playoffs named "Al the Octopus."

Plaintiff had less than 10 workers that helped him work on the ice, and they were colloquially called the "ice crew." Before his February 2022 termination, plaintiff reported to Jim Bullo, who was the Director of Operations at Little Caesars Arena (LCA). Bullo, in turn, reported to Tim Padgett, who reported to Keith Bradford. Plaintiff's performance evaluations over the years have been quite good, including the one that concluded for the 2021 calendar year.

The employment handbook at the pertinent time provided the following regarding "prohibited misconduct":

> The purpose of the section below is to provide colleagues with clarity regarding acts and omissions considered inappropriate by Olympia Entertainment, and which may lead to disciplinary action up to and including [*3] termination of employment. Neither this provision, nor any other provision in this Handbook, is intended to negate the existence of the at-will employment relationship.
>
> It is not possible to list all the forms of behavior that are considered unacceptable; however, below are examples of acts and/or omissions which constitute unacceptable on-the-job conduct and which may result in disciplinary action, up to and including termination of employment, depending on the circumstances. While a colleague may be terminated at will by the company, the company may choose to exercise its discretion to utilize forms of discipline that are less severe than termination. Examples include oral or written warnings, suspension from work without pay (consistent with all applicable wage and hour laws), periodic performance reviews or performance improvement plans, and reassignment of responsibilities. Although one or more of these steps may be taken in connection with a particular colleague, the company may terminate the employment relationship without following any particular series of steps whenever it determines, in its sole discretion, that such action is appropriate.[3]
>
> * * *
>
> . . . The Company is not required [*4] to provide any form or [sic—of] progressive discipline, and, in its sole discretion, has the right to terminate a colleague for violation of any of its company policies, or any other lawful reason, at any time, even for a first offense.

In anticipation of a doubleheader event that was occurring on February 12, 2022,[4] the company held a meeting regarding the transition that would occur between events, i.e., getting the venue set up for each event. The meeting was conducted remotely via videoconference in late January 2022 (around January 28, 29, or 30, 2022). Plaintiff testified that, at some point on the call, Padgett told plaintiff something to the effect of "you're just old," "you're

---

[2] The company has changed names multiple times over the decades. When plaintiff started working with the Red Wings in the 1970s, the company was called Olympia Arenas, which was later changed to Olympia Entertainment. After that, it seems that the company may have changed its name to Ilitch Sports + Entertainment. But it is not entirely clear from the record what Ilitch Sports + Entertainment is. Some witnesses described it as a name change, while another described it as a "brand." Regardless, defendant is not arguing that it is not the proper party.

[3] The handbook then lists three pages of examples of inappropriate conduct. There is no dispute that "urinating in an open workspace" is not listed. However, there are references to the list being nonexhaustive, and it does mention "indecent conduct," which arguably applies to this situation.

[4] Specifically, there was a Detroit Red Wings hockey game scheduled in the afternoon and a collegiate hockey game scheduled for that evening.

getting old," or "you're old."[5] Plaintiff did not think Padgett was joking, was shocked by the comment, and responded with something like, "That's funny."

A few days later on February 2, 2022, the Red Wings were scheduled to host a home game. Plaintiff had just completed surfacing the ice with a Zamboni that morning before the teams had their practice sessions. After parking the Zamboni in the garage,[6] plaintiff urinated into what is known as a "snow pit" or "ice pit," which is a drain that spans across the [*5] front of the parked Zambonis in the garage — it is rectangular, approximately 20 feet long and 5 feet wide.[7] After the Zambonis shave off ice layers from the skating surface, the collected ice[8] is then dumped from the Zambonis into the drain. When plaintiff urinated into the drain, he was standing on the ledge of the drain at the left front corner of the left Zamboni, with his back to the doorway of the garage.

Unbeknownst to plaintiff, Matt Hartkopf, one of plaintiff's direct reports, walked by the outside of the Zamboni room while plaintiff was urinating. From the main corridor, when Hartkopf looked thorough the doorway, he saw plaintiff urinating into the drain.[9] Hartkopf later that evening sent an e-mail to Jasmine Howard, who was part of defendant's Human Resources (HR) Department, about what he witnessed.[10]

Howard, in turn, talked with Michele Bartos, who was the Senior Vice President of HR, and Bartos directed Howard and Bullo talk to plaintiff about the allegation. During that conversation, which took place on February 4, 2022, plaintiff freely admitted to urinating in the drain. Plaintiff indicated that it was not a "big deal" and that it was a common practice among the crew. Plaintiff [*6] was informed that he was being suspended for a week "pending further investigation" and was escorted out of the building.[11]

When Bartos heard that plaintiff claimed that urinating in the drain was a common practice, she instructed Howard to interview plaintiff's staff. Bullo and Howard's interview of the staff confirmed that at least two maintenance workers and a supervisor had heard that people urinated into the drain at Joe Louis Arena, but the interview did not reveal that anyone else had done likewise at LCA.[12] During the investigation, Howard on February 8, 2022, contacted plaintiff to reiterate the "seriousness" of the offense and offered him the opportunity to name who else had engaged in similar behavior; plaintiff declined to name anyone. Minutes after this conversation, plaintiff called Howard back and stated that he had gone to the doctor and had been diagnosed with a "prostate issue."[13] Howard

---

[5] Padgett in his deposition denied making the remark.

[6] The garage houses two Zambonis.

[7] Plaintiff alleges to have felt the sudden urgent need to urinate, due to his then-untreated prostate issue, and did not want to urinate in his pants. He testified that he had suffered similar bouts of urgency at work, prior to the date of the subject incident, and that he had managed to run about 40 feet to the restroom, barely arriving in time. He testified that the distance he would have had to travel to the restroom on February 2, 2022 was about twice as far away as it had been on those prior occasions.

[8] There is no dispute that the collected ice is dirty. In fact, due to the nature of hockey, there can be blood, sweat, spit, phlegm, and other items in the ice that is placed into the drain.

[9] There are two doorways connecting the Zamboni garage with the main corridor. There is a large overhead garage-style door for the Zambonis, and there is a regular doorway for people to the left of the overhead door. Hartkopf described that when he looked through the regular door, he saw plaintiff's back, but he also could see through the gap between plaintiff's legs a stream of urine going into the snow/ice drain.

[10] Hartkopf also complained about another "issue" regarding plaintiff, but HR deemed that allegation unfounded — that allegation is not part of defendant's decision to terminate plaintiff and is not pertinent for this appeal.

[11] The direction to issue the suspension and have plaintiff escorted out of the building came from Bartos.

[12] We note that before moving into the LCA in 2017, the Detroit Red Wings had played at Joe Louis Arena since 1979. Before 1979, the team played at historic Olympia Stadium, which is where defendant derives its name.

[13] Plaintiff was later diagnosed with benign prostate hyperplasia (BPH). As plaintiff's urologist explained, all men's prostates grow as they grow older. In some men, however, this growth can put pressure on the bladder and cause urinary symptoms, such as

relayed to Bartos what plaintiff mentioned. Bartos, in turn, talked to Bullo and Padgett about whether they were aware of such an issue, and they were not. No one in defendant's organization followed up with plaintiff on his claim.

Before a decision was made to terminate plaintiff's employment, [*7] there were many meetings that were held. Bartos provided a recommendation to Bradford that plaintiff be terminated because "it was misconduct, it was unprofessional, and it was poor judgment from a manager level. We have an expectation level that our managers conduct themselves in a certain way." Bullo and Padgett also recommended that plaintiff be fired.[14] Bradford testified that he was the ultimate decision-maker and fired plaintiff. Bradford stated that he made the decision to terminate once he learned that the urination occurred; he did not consider any purported prostate issue. He explained that, in his mind, urinating in an open space at work with the potential for other people to observe is a terminable offense that cannot be allowed. Plaintiff was notified on February 17, 2022, that his employment was terminated effective immediately. David Jones, who was 38 years old at the time (i.e. 29 years younger than plaintiff) and working in another area of the company, was hired to fill plaintiff's position.[15]

Plaintiff filed his lawsuit on April 19, 2022. The only pertinent counts are plaintiff's claim of age discrimination in violation of the *Elliott Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq.*, and plaintiff's claim of discrimination [*8] of a disability in violation of the *Persons With Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq.*[16]

Defendant moved for summary disposition under *MCR 2.116(C)(10)*. Regarding the age-discrimination claim, defendant argued that, assuming plaintiff could prove a prima facie case, he could not show that the proffered reason for his termination—urinating at an open work space—was pretextual. Defendant averred that there was no evidence that Bradford, the decision-maker, had any age-related animus toward plaintiff or that he was influenced by Padgett, who allegedly made the age-related comment. With respect to the disability-discrimination claim, defendant argued that plaintiff's claim fails as a matter of law because (1) he is not disabled, (2) defendant was not aware of any disability, and (3) in any event, plaintiff cannot show how the proffered reason for termination was pretextual.

In response, plaintiff argued that he could show pretext through Padgett's comments to plaintiff that he was "old." Plaintiff also argued that he could establish pretext by showing that the reason defendant gave was not the actual factor motivating the decision. Plaintiff maintained that his excellent 50-year history with the company weighs heavily in finding that the proffered reason [*9] for termination was pretextual. Further, plaintiff asserted that the fact that defendant opted to not use progressive discipline is a relevant factor that weighs in favor of pretext. Finally, he argued that contradictory statements made by Bradford and Padgett support his argument that the incident regarding the drain was a pretext for firing him because it lacked "all credibility." Regarding the disability-discrimination claim, plaintiff argued that he established a prima facie case under a "perceived as" or "regarded as" theory under the PWDCRA because defendant knew of plaintiff's prostate issue at the time of his firing. Plaintiff also contended that the same evidence of pretext under the age-discrimination claim applies to this claim.

The trial court in the motion hearing denied defendant's motion with respect to the age-discrimination claim, stating:

---

[14] Viewing the evidence in a light most favorable to plaintiff, Padgett did recommend, or at least voiced support, for plaintiff's firing. Although Padgett at one point denied making any such firing "recommend[ation]," elsewhere in his deposition, he mentioned that he had expressed his thoughts and was in favor of termination and that he told both Bullo and Bradford it was a terminable offense. The natural inference is that Padgett indeed shared his opinion that plaintiff be fired. Whether that is construed as a "recommendation" or a mere "expression of an opinion" is to make a distinction without a recognizable difference in our view.

[15] Jones had previous experience with the company working on the ice at Joe Louis Arena.

[16] A third count of retaliation in violation of the PWDCRA also was alleged, but plaintiff voluntarily dismissed that claim, leaving only the two discrimination claims.

Plaintiff can establish a prima facie case of age discrimination. He's met all the elements.

Defendant has articulated a non-discriminatory reason for its decision to terminate Plaintiff. However, I do find that's a question of fact, whether this non-discriminatory reason is a pretext for age discrimination, given the severity of the **[*10]** discipline.

But the court granted the motion with respect to the disability-discrimination claim because there was no evidence that the decision-maker perceived plaintiff as disabled.

## II. SUMMARY DISPOSITION

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Odom v Wayne Co, 482 Mich 459, 466; 760 NW2d 217 (2008)*. A motion brought under *MCR 2.116(C)(10)* tests the factual support for the claim. *Spiek v Dep't of Transp, 456 Mich 331, 337; 572 NW2d 201 (1998)*. "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed, 470 Mich 274, 278; 681 NW2d 342 (2004)*. The motion should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kisiel v Holz, 272 Mich App 168, 170; 725 NW2d 67 (2006)*.

## A. AGE-DISCRIMINATION CLAIM

The ELCRA prohibits employers from discriminating against employees on the basis of, among other things, age. *MCL 37.2202(1)(a)*. "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc, 499 Mich 586, 606; 886 NW2d 135 (2016)*. A plaintiff can establish a claim of discrimination through direct or circumstantial evidence. *Hazle v Ford Motor Co, 464 Mich 456, 462-466; 628 NW2d 515 (2001)*.

When there is no direct evidence of discrimination, as plaintiff concedes is the case here, **[*11]** Michigan courts employ the familiar burden-shifting approach set forth in *McDonnell Douglas v Green, 411 U.S. 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)*, which requires a plaintiff to prove by circumstantial evidence that he was unlawfully terminated by the defendant. *Hazle, 464 Mich at 462-463*. Under this approach, a plaintiff must first offer a "prima facie case" of discrimination. *Id. at 463*. A plaintiff must prove that (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the job, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination.[17] *Id*. In its motion for summary disposition, defendant accepted that plaintiff could establish a prima facie case.[18]

Once a plaintiff presents evidence to establish a prima facie case, the defendant is then required to articulate a legitimate, nondiscriminatory reason for the termination. *Id. at 464*. Defendant easily accomplished this when it cited plaintiff's urinating in the open workplace as the reason for the termination.

If the defendant meets this requirement, the rebuttable presumption of a prima facie case "drops away," and the burden returns to plaintiff to show that defendant's articulated reason was mere pretext. *Id. at 465-466*. Pretext can be established **[*12]** by showing that the proffered nondiscriminatory reason of the adverse employment action (1) had no basis in fact, (2) was not the actual factor motivating the decision, or (3) was insufficient to justify the decision. *Major v Village of Newberry, 316 Mich App 527, 542; 892 NW2d 402 (2016)*.

---

[17] Alternatively, the fourth element can be established by showing that the defendant treated a similarly situated person not in the protected class differently than him. *Town v Mich Bell Tel Co, 455 Mich 688, 695; 568 NW2d 64 (1997)*.

[18] As such, to the extent defendant argues on appeal that its motion should have been granted on the basis that plaintiff cannot prove a prima facie case, that argument is waived. Defendant never sought summary disposition on this ground, and defendant cites no law requiring a trial court to address issues or arguments not presented. Furthermore, because the argument was not raised in the trial court, it is unpreserved on appeal and therefore waived. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC, 347 Mich App 280, 301; 14 NW3d 472 (2023)*.

Although plaintiff avers that he can prove pretext by showing that the proffered reason had no basis in fact, we disagree. Plaintiff relies on various management personnel describing his urination as taking place "publicly" or in "public" to show that the reason had no basis in fact. Plaintiff maintains that the back of the Zamboni garage is not a "public" area, i.e., members of the public were not permitted to be around the area at that time and plaintiff testified that the only people who would have ordinarily been in the garage at that time in the morning were three or four male members of the ice crew. Bradford equated "public" to being "an open environment in the workplace." While others may quibble with Bradford's interpretation of the word, it is clear that the relied-upon fact of plaintiff urinating in the drain in the Zamboni garage was based in fact. Management was not under the impression that anyone but Hartkopf witnessed the incident. Whether management **[*13]** viewed this incident as being "public" is not pertinent. Therefore, plaintiff cannot show pretext through this method.

Next, is the issue of whether plaintiff presented evidence that his urinating in the snow/ice drain was not the actual factor motivating the decision. Plaintiff suggests that this is the case based on evidence that Padgett commented on him being "old" just a few days before the urination incident.[19] Defendant argues that the comment is of no consequence because Bradford, the decision-maker, was unaware of it and because Padgett never influenced Bradford's decision. Although there is no evidence that Padgett was responsible for making the decision to terminate plaintiff's employment, there is evidence that he shared his opinion that plaintiff should be terminated with the decision-maker, Bradford. Further, there is evidence that Bradford testified falsely when he denied that Padgett ever gave him his opinion on the issue of whether plaintiff should be fired.[20]

"[S]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." _Eiland v Trinity Hosp, 150 F3d 747, 752 n 1 (CA 7, 1998)_ **[*14]** , quoting _Dey v Colt Constr & Dev Co, 28 F3d 1446, 1459 (CA 7, 1994)_;[21] see also _Jewett v Mesick Consol Sch Dist, 332 Mich App 462, 473; 957 NW2d 377 (2020)_ (describing that under a "cat's paw" theory, "discriminatory animus held by a supervisor with no decision-making authority over an affected employee can be attributed to the employer if the biased supervisor's conduct is nevertheless a proximate cause of the adverse employment action").

From Padgett's age-related comment to plaintiff, a jury could infer that Padgett's opinion that termination should occur was impermissibly based, in part, on plaintiff's age.[22] The question therefore becomes what significance this "tainted" input to Bradford has.[23] The fact that Bradford may have misrepresented having received an opinion from Padgett weighs in plaintiff's favor because the jury may determine that the misrepresentation, if it occurred, creates an inference that Padgett's opinion affected Bradford's decision to fire plaintiff (i.e., viewing the inconsistent deposition testimony in the light most favorable to plaintiff, the inference is that Padgett told Bradford that he believed plaintiff should be terminated and Bradford falsely denied having received that opinion because he knew

---

[19] Although Padgett denied making the comment, we must view the facts in the light most favorable to plaintiff, and plaintiff testified that the comment occurred.

[20] While Bradford denied that Padgett ever gave his opinion on whether to terminate plaintiff's employment, his testimony was directly contradicted by Padgett's testimony (i.e., Padgett testified that he did give Bradford his opinion).

[21] Although not binding, federal precedent generally is considered highly persuasive, and is often consulted for guidance in discrimination cases. _Wilcoxon v Minnesota Mining & Mfg Co, 235 Mich App 347, 360 n 5; 597 NW2d 250 (1999)._

[22] Defendant relies on _Sniecinski v Blue Cross & Blue Shield of Mich, 469 Mich 124; 666 NW2d 186 (2003)_, for the proposition that Padgett's comment was a "stray remark," which should be afforded no weight. In _Sniecinski_, the plaintiff's reliance on a supervisor's discriminatory remarks was misplaced because there was no evidence that the supervisor's animus was a cause for the adverse employment action. Instead, it was the operation of a neutral policy that resulted in the adverse employment action. _Id. at 135-140_. But in this case, unlike in _Sniecinski_, there is evidence that the person who made the discriminatory remark had direct input to the decision-maker.

[23] Taking the evidence in a light most favorable to plaintiff, this Court must infer from his comments that Padgett held age-related, discriminatory animus.

that his reliance upon Padgett would support plaintiff's age discrimination claim). Although the record **[*15]** shows that virtually everyone involved in the process held the opinion that plaintiff should be terminated, it is up to a jury to decide how much weight it thinks Padgett's comments carried. We note that, at this stage of the proceedings, plaintiff only needs to show that there is a question of fact to survive summary disposition. *Hazle, 464 Mich at 465 n 10*. We therefore conclude that, when viewing the evidence in a light most favorable to plaintiff, there is a question of fact whether Padgett's alleged discriminatory animus provided factual information or other input that may have affected the adverse employment action taken by Bradford. See *Jimkoski v Shupe, 282 Mich App 1, 5; 763 NW2d 1 (2008)* (stating that this Court is liberal in finding genuine issues of material fact).

Defendant also argues that the evidence was inadequate to show that its proffered reason for termination was insufficient to justify the decision. Plaintiff, on the other hand, avers that defendant firing plaintiff for a relatively minor offense and without engaging in any progressive discipline is evidence of pretext. Although a plaintiff can establish pretext by showing that the proffered reason for the adverse employment action was insufficient to justify the decision, the soundness of **[*16]** an employer's business judgment may not be questioned as a means of showing pretext. *Meagher v Wayne State Univ, 222 Mich App 700, 712; 565 NW2d 401 (1997)*, citing *Dubey v Stroh Brewery Co, 185 Mich App 561, 566; 462 NW2d 758 (1990)*. Defendant deemed it inappropriate for its employees to potentially expose themselves in the workspace, and to use its facilities in the manner plaintiff did, and also thought that those in its management positions should set an example for the company. These are business judgments, which plaintiff cannot challenge as being misguided or illogical as evidence of pretext.

Regardless, as previously noted, plaintiff has presented evidence, through Padgett's age-related comment and Bradford and Padgett's inconsistent sworn testimony, that plaintiff's urinating in the snow/ice drain may not have been the actual factor motivating the decision to terminate. Accordingly, we affirm the trial court's denial of defendant's motion for summary disposition for this count. See *Kyocera Corp v Hemlock Semiconductor, LLC, 313 Mich App 437, 449; 886 NW2d 445 (2015)* ("We will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs.").

## B. DISABILITY-DISCRIMINATION CLAIM

Under the PWDCRA, an employer shall not, among other things, "[d]ischarge or otherwise discriminate against an individual with respect to compensation or **[*17]** the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." *MCL 37.1202(1)(b)*. The Legislature, however, defined the term "disability" to include situations where an individual is "regarded as having a determinable physical or mental characteristic described" under *MCL 37.1103(d)(i)*. *MCL 37.1103(d)(iii)*. Consequently, an employer can violate *MCL 37.1202* by engaging in the practices prohibited under that section if the employer "regarded" the person as having a disability, even if the person did not in fact have a determinable physical or mental characteristic described under *MCL 37.1103(d)(i)*.[24] Thus, to set forth a prima facie case of discrimination under a "perceived as" or "regarded as" theory under the PWDCRA, plaintiff must show that (1) defendant regarded him as having a determinable physical or mental characteristic, (2) defendant perceived the characteristic as substantially limiting one or more of plaintiff's major life activities, and (3) defendant regarded the characteristic as being unrelated to plaintiff's ability to perform his duties. *Michalski v Bar-Levav, 463 Mich 723, 731-732; 625 NW2d 754 (2001)*.

Plaintiff cannot establish a prima facie case. Even assuming the first prong is met because plaintiff informed Howard that he has a "prostate issue," the second prong cannot be satisfied. There is no evidence that anyone

---

[24] *MCL 37.1103(d)(i)* defines "disability" to be, in pertinent part:

A determinable physical or mental characteristic of an individual, which may **[*18]** result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

(A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

from defendant perceived plaintiff's prostate issue as substantially limiting one or more of plaintiff's major life activities. Plaintiff's base averment that he had a prostate issue—with nothing more—was inadequate to allow an inference that those who learned of this issue regarded it as substantially limiting one or more of plaintiff's major life activities.[25] To do otherwise would be to engage in speculation. See *Karbel v Comerica Bank, 247 Mich App 90, 97-98; 635 NW2d 69 (2001)* (recognizing that although circumstantial evidence can be sufficient to establish a case, it must be more **[*19]** than conjecture and speculation).

Plaintiff relies on *Workman v Frito-Lay, Inc, 165 F3d 460 (CA 6, 1999)*, for the proposition that "[a] plaintiff *who sets forth evidence that he must be free to go to the bathroom whenever he feels the urge* is significantly restricted as to the condition, manner, or duration under which he can perform a major life activity and has presented enough to go to the jury on whether he is perceived as disabled." (Emphasis added.) Reliance on this principle is misplaced. In *Workman*, the plaintiff had irritable bowel syndrome, which at one point required her to have bowel movements 10 to 14 times a day. *Id. at 463*. The plaintiff, through her doctor, communicated to the defendant that "it was important for [her] to be able to use the restroom when the urge occurred." *Id.* Here, notably, no similar communication was made to defendant. Instead, someone in defendant's position had to speculate on the ramifications of the issue raised by plaintiff, i.e., when he informed Howard that he had been diagnosed by his doctor with a prostate issue. In turn, one would have to speculate that defendant thought plaintiff's prostate issue rose to the level of affecting a major life activity.

Accordingly, because plaintiff has failed to establish **[*20]** a prima facie case as it pertains to his claim under PWDCRA, the trial court properly granted summary disposition to defendant on this claim.

Affirmed. No taxable costs as neither party prevailed in full.

/s/ Adrienne N. Young

/s/ Kristina Robinson Garrett

/s/ Randy J. Wallace

---

**End of Document**

---

[25] Even plaintiff acknowledges in his cross-appellant brief that "an employer must know enough information about the employee's condition to conclude that he is disabled." There simply is not enough information available to defendant for it to conclude that plaintiff was disabled.

## *Spica v. Schrotenboer*

Court of Appeals of Michigan

March 12, 2015, Decided

No. 317510

**Reporter**
2015 Mich. App. LEXIS 496 *

JESSE MARCUS SPICA, Plaintiff-Appellee, v KEVIN J. SCHROTENBOER, LOIS MAXINE SCHROTENBOER, Defendants-Appellants and KALES, INC, Defendant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** **[*1]** Kent Circuit Court. LC No. 11-008456-NI.

## Core Terms

trial court, good cause, damages, defaults, pain, injuries, meritorious defense, non economic damages, defendants', pain and suffering, permanent, future damage, back pain, suffering, scar, awarding, failure to respond, default judgment, emotional, evidentiary hearing, manifest injustice, present cash value, entry of default, physical injury, two year, disturbances, irregularity

**Judges:** Before: M. J. KELLY, P.J., and MURPHY and HOEKSTRA, JJ.

## Opinion

PER CURIAM.

In this personal injury action arising from an automobile accident, defendants Kevin Schrotenboer and Lois Schrotenboer appeal as of right from the judgment entered in favor of plaintiff Jesse Spica in the amount of $750,000. Because the trial court did not abuse its discretion in refusing to set aside the defaults entered against defendants and because the award of $750,000 in noneconomic damages was not clearly erroneous, we affirm.

In the early morning hours of June 26, 2011, plaintiff was walking westbound on 11 mile Road NE in Courtland Township, MI. At that time, he was struck by a vehicle driven by Kevin. The vehicle in question was owned by Kevin's mother, Lois. Both Kevin and plaintiff had been drinking the night of the accident. Kevin, a karaoke operator at a local bar, Kales, Inc., was driving home with a blood alcohol content of 0.10. Plaintiff, who was a twenty-year-old pedestrian at the time of the accident, had a blood alcohol content of 0.255. As a result of the accident, plaintiff suffered numerous injuries and Kevin faced criminal charges involving operating a motor **[*2]** vehicle while intoxicated causing serious injury, *MCL 257.625(5)(a)*.

On September 6, 2011, plaintiff filed the present civil suit against Kevin, Lois, and Kales, Inc.[1] Relevant to Lois and Kevin, plaintiff's complaint asserted three claims: (1) negligence against Kevin involving allegations that Kevin's operation of the vehicle violated several criminal codes, (2) ownership liability against Lois, *MCL 257.401*, and (3)

---

[1] Kales, Inc was dismissed from the lawsuit with prejudice and it is not a party to this appeal.

negligent entrustment against Lois, _MCL 257.625(1)_. Neither Kevin nor Lois responded to plaintiff's complaint, and in October of 2011, defaults entered against both Kevin and Lois.

Approximately a year later, plaintiff filed a motion for entry of default judgment and requested an evidentiary hearing on the issue of damages. Kevin and Lois objected to plaintiff's motion for entry of default judgment and moved the trial court to set aside their defaults. The trial court denied their motion, finding that they had not demonstrated the good cause required by _MCR 2.603(D)(1)_. Thereafter, the trial court conducted an evidentiary hearing, during which it heard testimony from plaintiff and his parents pertaining to plaintiff's injuries. Medical records, **[*3]** photographs of plaintiff's injuries in the hospital, and life expectancy tables were also introduced into evidence by plaintiff.

Following the evidentiary hearing, the trial court rejected defendants' assertion of comparative negligence by plaintiff, and determined that the accident did not occur on the travelled portion of the road, but rather that Kevin drove off the road and hit plaintiff who was walking in the "weeds." Based on plaintiff's injuries and the testimony regarding his pain and suffering, the trial court awarded $400,000 in initial noneconomic damages, from the time of the accident to the time of the hearing, and $350,000 in future noneconomic damages. When awarding future damages the trial court specified that it had accounted for a reduction to present value. Defendants now appeal as of right.

Defendants first argue that the trial court abused its discretion in refusing to set aside the defaults entered against them in October of 2011. In particular, they maintain that they demonstrated both good cause and the existence of a meritorious defense as required to set aside a default under _MCR 2.603(D)(1)_.

On appeal, we review a trial court's decision on a motion to set aside a default for **[*4]** a clear abuse of discretion. _Shawl v Spence Bros, Inc, 280 Mich App 213, 220; 760 NW2d 674 (2008)_. An abuse of discretion "involves far more than a difference in judicial opinion." _Alken-Ziegler, Inc v Waterbury Headers Corp, 461 Mich 219, 227; 600 NW2d 638 (1999)_. Instead, an abuse of discretion will be found "only when the trial court's decision is outside the range of reasonable and principled outcomes." _Shawl, 280 Mich App at 220-221_ (citation omitted).

The relevant court rule for setting aside a default is _MCR 2.603(D)_, which states, in pertinent part, that:

> (1) A motion to set aside a default or a default judgment, except when grounded on lack of jurisdiction over the defendant, shall be granted only if good cause is shown and an affidavit of facts showing a meritorious defense is filed.[2]

In other words, pursuant to _MCR 2.603(D)(1)_, to set aside a default, there must be "both good cause, i.e., a reasonable excuse for the failure to answer, and a meritorious defense." _Saffian v Simmons, 477 Mich 8, 14; 727 NW2d 132 (2007)_. The burden of demonstrating good cause and a meritorious defense falls on the defaulting party. _Id. at 15_.

To demonstrate good cause, the defaulting party must show either: "(1) a procedural irregularity or defect, or (2) a reasonable excuse **[*5]** for not complying with the requirements that created the default." _Barclay v Crown Bldg & Dev, Inc, 241 Mich App 639, 653; 617 NW2d 373 (2000)_. Ordinarily, an attorney's negligence is attributable to the client and such negligence "does not constitute grounds for setting aside a default judgment." _Park v American Casualty Ins Co, 219 Mich App 62, 67; 555 NW2d 720 (1996)_. Regarding a meritorious defense, _MCR 2.603(D)(1)_ "requires an affidavit of facts establishing a meritorious defense." _Huntington Nat'l Bank v Ristich, 292 Mich App 376, 392; 808 NW2d 511 (2011)_. The affiant must have "personal knowledge of the facts, state admissible facts with particularity, and show that the affiant can testify competently to the facts set forth in the affidavit." _Id._

Notably, "good cause" and "meritorious defense" are separate inquiries, _Barclay, 241 Mich App at 653_, and "[i]t is important that the 'good cause' and 'meritorious defense' elements of a motion to set aside be considered separately." _Zaiter v Riverfront Complex, Ltd, 463 Mich 544, 553 n 9; 620 NW2d 646 (2001)_. Nonetheless, it has

---

[2] _MCR 2.603(D)(3)_ states that, in addition, "the court may set aside a default and a default judgment in accordance with _MCR 2.612_." In this case, however, defendants arguments are premised on _MCR 2.603(D)(1)_ and _MCR 2.612_ is inapplicable.

been recognized that there is "some interplay between the two[.]" *Shawl, 280 Mich App at 237*. Specifically, "if a party states a meritorious defense that would be absolute if proven, a lesser showing of 'good cause' will be required than if the defense were weaker, in order to prevent a manifest injustice." *Alken-Ziegler, Inc, 461 Mich at 233-234*. However, this notion of "manifest injustice" may not be construed as "a third form of good cause that excuses a failure to comply with the court rules where there is [*6] a meritorious defense." *Barclay, 241 Mich App at 653*. "Rather, manifest injustice is the result that would occur if a default were to be allowed to stand where a party has satisfied the 'meritorious defense' and 'good cause' requirements of the court rule." *Alken-Ziegler, Inc, 461 Mich at 233*. In other words, "[w]hile a lesser showing of good cause will suffice where the meritorious defense is strong, *good cause must still be shown* in order to prevent a manifest injustice." *Barclay, 241 Mich App at 653* (emphasis added). Consequently, it is not necessary to reach the meritorious defense inquiry where a party fails to make a showing of good cause. See *Zaiter, 463 Mich at 553 n 9*. See, e.g., *Midwest Mental Health Clinic, PC v Blue Cross & Blue Shield of Mich, 119 Mich App 671, 675; 326 NW2d 599 (1982)*.

In the present case, regarding good cause, defendants assert that good cause exists for their failure to respond because: (1) Lois does not recall receiving the complaint and summons, (2) plaintiff delayed a year between the entry of defaults and his motion for entry of default judgment, and (3) Kevin's defense attorney in his criminal proceedings misadvised them regarding the civil proceedings. In addition, they allege the existence of meritorious defenses, namely plaintiff's purported contributory negligence, which they assert entitles them to make a lesser showing of good cause. Each of defendants' arguments is without [*7] merit.

First, while Lois maintains she does not remember being served with the complaint, she does not, however, actually allege any defect with the service or process, nor does she actually deny that the service occurred. To the contrary, the proofs of service in this case plainly show that Kevin and Lois were properly served with the summons and complaint, and yet they failed to respond as required by *MCR 2.108(A)(1)*. Lois's lack of memory regarding these events does not amount to a procedural irregularity or otherwise excuse her failure to respond.

Second, defendants are mistaken in their assertion that plaintiff's delay in seeking a default judgment somehow establishes a procedural irregularity which entitled them to set aside their defaults. The defaults establishing defendants' liability entered in October of 2011 and it is these defaults regarding their liability which defendants now seek to set aside. Although it is true that plaintiff waited a year before seeking a default judgment regarding the issue of damages, this delay *after* the entry of defaults does not render those defaults improper or irregular. Instead, it appears that defendants mistakenly conflate the defaults relating to the issue [*8] of liability with the issue of damages, when in fact these are two separate inquiries. See generally *White v Sadler, 350 Mich 511, 517, 520-521; 87 NW2d 192 (1957)*; *Kalamazoo Oil Co v Boerman, 242 Mich App 75, 79; 618 NW2d 66 (2000)*. We simply cannot see how plaintiff's delay in seeking a judgment on the issue of damages somehow rendered irregular previously entered defaults regarding the question of defendants' liability or otherwise excuses defendants' failure to respond to plaintiffs' complaint. In short, such delay does not constitute good cause for setting aside the defaults under *MCR 2.108(A)(1)*.

Third, defendants have not shown good cause based on the purported misadvice they received from Kevin's defense attorney. In particular, according to Kevin's affidavit, he discussed the civil matter with his criminal defense attorney and his attorney informed him that "the civil case would be handled after completion of the criminal case." Kevin then informed Lois of this advice. Both defendants averred that after receiving notice of plaintiff's motion to enter a default judgment, Kevin spoke with his attorney and "learned that the information from [the] criminal attorney was wrong or that [Kevin] misunderstood the matter."

Considering the explanation provided in defendants' affidavits, as a factual matter, defendants' argument [*9] lacks merit because it is not entirely clear precisely what advice was offered by Kevin's attorney or that defendants' failure to respond can be attributed to this advice. Simply stating that the civil case would be handled after the criminal case is not tantamount to instructing Kevin not to answer the complaint. Moreover, there is no evidence from Kevin's criminal attorney, such as an affidavit, verifying this alleged conversation or the substance of his or her advice. This lack of information regarding the conversation is particularly problematic because, although defendants suggest that the attorney may have provided misinformation, both Kevin and Lois also acknowledge that it could be

that *Kevin* "misunderstood the matter." It might well be then that Kevin's misunderstanding, not misinformation from the attorney, led to defendants' failure to respond. On this record, defendants have not presented sufficient evidence to support their version of events and they have thus failed to demonstrate good cause. See *Saffian, 477 Mich at 15*. And, in any event, even assuming misinformation from Kevin's criminal attorney, "[a]n attorney's negligence is attributable to the client and normally does not constitute grounds **[*10]** for setting aside a default judgment." *Park, 219 Mich App at 67*. See also *Amco Builders & Developers, Inc, 469 Mich at 96*. Consequently, defendants may not rely on purported mistakes by Kevin's criminal defense attorney as a basis for establishing good cause. See *Park, 219 Mich App at 67*.

In sum, defendants have not demonstrated good cause for their failure to respond to plaintiff's complaint. Because defendants have not demonstrated good cause, there can be no manifest injustice in the trial court's denial of their motion to set aside the defaults and we find it unnecessary to address whether defendants' affidavits evidenced the existence of a meritorious defense. See *Zaiter, 463 Mich at 553 n 9*; *Barclay, 241 Mich App at 653*. Instead, given that defendants have failed to demonstrate good cause, we conclude that the trial court did not abuse its discretion in refusing to set aside the defaults under *MCR 2.603(D)(1)*. See *Barclay, 241 Mich App at 653*.

On appeal, defendants next argue that the trial court's award of $750,000 in damages was clearly erroneous. In particular, they maintain that the award was speculative and excessive because plaintiff failed to offer medical testimony or otherwise adequately establish the extent of his injuries. In the absence of medical testimony, defendants contend that there was no proof that plaintiff's injuries resulted from the accident or **[*11]** that these injuries were ongoing and permanent so as to justify an award of future damages. Lastly, defendants maintain that the trial court clearly erred by failing to reduce the award of future damages to gross present cash value as required by *MCL 600.6306(1)(e)*.

We review an award of damages following an evidentiary hearing for clear error. *Woodman v Miesel Sysco Food Serv Co, 254 Mich App 159, 190; 657 NW2d 122 (2002)*. Under this standard, this Court will not "set aside a nonjury award merely on the basis of a difference of opinion." *Marshall Lasser, PC v George, 252 Mich App 104, 110; 651 NW2d 158 (2002)* (citation omitted). Rather, "[c]lear error exists only when the appellate court is left with the definite and firm conviction that a mistake has been made." *Herald Co, Inc v Eastern Mich Univ Bd of Regents, 475 Mich 463, 471; 719 NW2d 19 (2006)* (quotation marks and citation omitted).

In Michigan, "tort damages generally include the damages that naturally flow from the injury, which may include both economic damages, such as damages incurred due to the loss of the ability to work and earn money, as well as noneconomic damages, such as pain and suffering and mental and emotional distress damages." *Hannay v Dep't of Transp, 497 Mich. 45, 67; 860 N.W.2d 67 (2014)*. "Damages are an issue of fact, and questions of fact are, of course, generally decided by the trier of fact." *McManamon v Redford Twp, 273 Mich App 131, 141; 730 NW2d 757 (2006)*. The party asserting the claim bears the burden of proving damages with reasonable certainty. *Unibar Maintenance Servs, Inc v Saigh, 283 Mich App 609, 634; 769 NW2d 911 (2009)*. Thus, damages based on speculation **[*12]** or conjecture are not recoverable. *Id*. Damages are not speculative, however, merely because they cannot be proven with mathematical certainty; and, once liability has been established, less certainty as to the amount of damages is required. *Ensink v Mecosta Co Gen Hosp, 262 Mich App 518, 525; 687 NW2d 143 (2004)*.

Noneconomic damages in particular include "past and future disability and disfigurement, shame and mortification, mental pain, and anxiety, annoyance, discomfiture, and humiliation, denial of social pleasure and enjoyments, and fright and shock." *May v William Beaumont Hosp, 180 Mich App 728, 758; 448 NW2d 497 (1989)* (internal citations omitted).[3] When assessing noneconomic damages, it should be remembered that "a dollar amount can never truly

---

[3] On appeal, defendants assert that the trial court did not specify the nature of the damages awarded, meaning it is uncertain whether the damages were noneconomic in nature. The trial court record, and in particular the trial court's explanation of the damage award, makes plain, however, that the damages were those to compensate for plaintiff's emotional and mental distress as well as his pain and suffering relating to his physical injuries. This was an award of noneconomic damages, while in contrast

be placed on an individual's pain and suffering," and consequently, noneconomic damages are an "imprecise" means of compensation. _Freed v Salas, 286 Mich App 300, 334, 336; 780 NW2d 844 (2009)_. Moreover, "no two persons sustain the same injury or experience the same suffering." _Id. at 336_, quoting _Precopio v Detroit, 415 Mich 457, 471; 330 NW2d 802 (1982)_. Consequently, "no two cases precisely resemble each other, especially where noneconomic damages are involved . . . ." _May, 180 Mich App at 758_. For this reason, although comparisons among cases may sometimes prove helpful when contemplating the appropriateness of a noneconomic damages award, "[a]n appellate court should not attempt to reconcile widely varied past awards for analogous **[*13]** injuries which in the abbreviated appellate discussion of them seem somewhat similar." _Freed, 286 Mich App at 336_, quoting _Precopio, 415 Mich at 471_.[4]

In terms of the proof necessary to establish damages, although a lay witness may not testify regarding contested medical issues beyond the scope of his or her lay knowledge, _Howard v Feld, 100 Mich App 271, 273; 298 NW2d 722 (1980)_, an injured party may testify to facts within his or her knowledge, including the existence of a physical injury, _Gibson v Traver, 328 Mich 698, 702; 44 NW2d 834 (1950)_. See also _MRE 701_. Likewise, "expert testimony is not required to establish pain, suffering, inconvenience, and other such elements of noneconomic damage because they are within the purview of common knowledge." _Young v Nandi, 276 Mich App 67, 77; 740 NW2d 508 (2007)_, vacated in part on other grounds _482 Mich. 1007, 759 N.W.2d 351 (2008)_. Given a plaintiff's ability to testify regarding his or her injuries and suffering, medical testimony is also "not necessary to prove future pain and suffering where the nature of the injury is such that nonexpert witnesses can plainly see or can infer from the injury that there will be future pain and suffering, or where the nature of the injury, its duration, and lack of recovery at the time of trial, make it clear that pain and suffering will continue for at least sometime into the future." 2 Stein on Personal Injury Damages Treatise § 8:26 (3d ed.). See, e.g., _Fogel v Sinai Hosp of Detroit, 2 Mich App 99, 102-103; 138 NW2d 503 (1965)_. The credibility **[*15]** of a witness's testimony is a question for the trier of fact. _Marshall Lasser, PC v George, 252 Mich App 104, 110; 651 NW2d 158 (2002)_.

In this case, the trial court did not clearly err in awarding the damages in question. Regarding the award of $400,000 in damages from the time of the accident until the hearing, defendants do not attempt to compare this amount to similar cases or to otherwise explain why the particular dollar amount was inappropriate. Instead, they more generally assert on appeal that plaintiff failed to prove the extent of his physical injuries and damages because he did not offer medical testimony. This argument is unavailing given that a lay witness may testify to the existence of his personal injuries. See _Gibson, 328 Mich at 702_. The trial court heard plaintiff's testimony regarding the nature and effects of his injuries, and the credibility of this testimony was a question for the trier of fact. _Marshall Lasser, PC, 252 Mich App at 110_. Moreover, although there was no expert testimony, plaintiff did offer medical records and photographs into evidence to confirm the nature and extent of his injuries sustained in the automobile accident. Plaintiff's testimony, as corroborated by medical records, revealed that, as a result of the accident, plaintiff suffered: (1) an extensive head laceration, requiring **[*16]** 85 stitches in the emergency room and subsequent plastic surgery, (2) anterior temporal parenchymal contusion, (3) left superior and inferior pubic rami fractures, i.e., a broken pelvis, and (4) a broken back, specifically, a T3 end plate fracture, an L5 pars interarticularis fracture, and minimally displaced superior articulate facet fracture at C7. In light of this evidence, the trial court did not clearly err in concluding that the serious physical injuries in question resulted from the automobile accident.[5]

---

there is no indication that the trial court awarded economic damages such as work-loss or payment for medical expenses. See generally _Hannay, slip op at 18_; _May, 180 Mich App at 758_.

[4] This case involves noneconomic tort damages arising from the ownership and use of a motor vehicle, meaning that, pursuant to _MCL 500.3135(1)_, defendants are "subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." _McCormick v Carrier, 487 Mich 180, 189-190; 795 NW2d 517 (2010)_; _Rory v Contl Ins Co, 473 Mich. 457, 465, 703 N.W.2d 23 & n 10 (2005)_. Defendants **[*14]** do not contest on appeal whether plaintiff satisfied this threshold requirement.

[5] To the extent defendants assert that the award of damages was inappropriate given plaintiff's contributory negligence, the trial court did not clearly err in rejecting defendants claims of contributory negligence. The evidence offered by plaintiff—including, photographs of tire tracks in the weeds, evidence that plaintiff habitually walked in the "weeds," and reports indicating that

In addition to plaintiff's physical injuries, the evidence showed that plaintiff had mental and emotional injuries resulting from the accident, including depression, anxiety, and sleep disturbances. That these concerns related to the accident was a fair inference from the evidence, specifically given testimony that plaintiff had no mental or psychological issues before the accident and now suffers from these problems afterward. Moreover, plaintiff indicated that his sleep disturbances involved nightmares with headlights coming at him on the road, providing further evidence that plaintiff's new emotional and psychological disturbances resulted from the accident.

Given plaintiff's physical, mental and emotional symptoms resulting from the accident, the trial court did not clearly err in awarding $400,000 in noneconomic damages to plaintiff as compensation for his pain and suffering in the two years between the time of the accident and the evidentiary hearing. In particular, plaintiff and his mother both described an arduous physical and mental recovery for plaintiff following the accident. As a twenty-year-old, plaintiff was forced **[*18]** to spend months in a hospital bed at his parents' home, dependant on his family for basic activities such as showering or using the bathroom. Plaintiff needed in-home physical therapy, he wore a back brace for months, used a wheelchair, and rarely left the house. His mother described plaintiff as crying in pain when completing simple tasks such as leaving his bed. Even when he left his parents' home for college in the fall, he still needed to use a back brace and he suffered the embarrassment of having to seek assistance from his college roommates for various basic activities. He underwent plastic surgery for his facial laceration, but was still left with a scar on his face which made him self-conscious, particularly as he attempted to pursue college studies in broadcasting. Plaintiff also needed pain medications to cope with the pain in his back. Further, his back pain had hindered his ability to perform daily tasks such as chores, yard work, etc. For example, it made sitting for more than 20 minutes at a time quite painful, meaning plaintiff had difficulty accomplishing his school work in college. Plaintiff had also been an active young man, who had enjoyed playing soccer and other **[*19]** sports his entire life; but, following the accident his back pain prevented plaintiff from partaking in such activities. Plaintiff also had lingering knee pain which doctors were unable to resolve. Mentally, he was also left with sleep disturbances, an inability to focus, anxiety and depression, for which he saw a therapist and took medication to help him focus. Given this evidence of plaintiff's pain and suffering from the time of his accident until the time of trial, the trial court did not clearly err in awarding plaintiff $400,000 in damages for this timeframe. Noneconomic damages for pain and suffering are, by their very nature, an imprecise means of compensation and defendants have not shown clear error in the amount awarded.

Similarly, regarding damages for future pain and suffering, the trial court did not clearly err in awarding plaintiff $350,000 for future pain and suffering. Again, defendants make no effort to compare or contrast this amount to other damage awards in similar cases. They instead argue that there is no evidence, and in particular no medical evidence, that plaintiff's injuries are permanent or that his pain and suffering will persist into the future. It is **[*20]** true, as defendants note on appeal, that many of plaintiff's physical injuries have healed and, for instance, he no longer needs a back brace or a wheelchair. It is nonetheless also true, however, that plaintiff has been left with significant back pain and knee pain which greatly hinders his everyday life and his enjoyment thereof. That this pain persisted at the time of trial, more than two years after the accident, allows for the conclusion that plaintiff's pain will likely be permanent. Plaintiff specifically testified that he initially experienced some improvement of his physical pain following his accident, but that at the time of the hearing his level of pain had been constant for approximately one year. Further, the evidence showed that plaintiff continued to seek medical assistance for his back pain, he was still on medication for his back pain, and he had been advised by his doctors that his back pain was likely something he would simply have to endure. This back pain was by no means insignificant given that it left plaintiff unable to perform many routine tasks such as yard work, chores, and even activities that required sitting for long periods, such as school work. It also **[*21]** prevented plaintiff from enjoying more vigorous activities such as soccer and other sports, which he had previously enjoyed. Given that more than two years after the accident plaintiff remained unable to engage in these activities because of his back pain, the trial court's conclusion that the effects of the injuries were permanent was not mere speculation, rather it was a fair inference from the evidence. In other words, on the evidence presented, the nature of plaintiff's injuries and their duration was such that the trial court did not

---

plaintiff was discovered 25 or more feet from the road—demonstrated that plaintiff was walking in the weeds, off the travelled portion of the road, when Kevin, who was operating a motor vehicle while intoxicated, drove off the road and struck plaintiff. On these facts, the trial court did not clearly **[*17]** err in rejecting any assertions of contributory negligence.

clearly err in concluding the resulting pain and suffering was permanent. See generally 2 Stein on Personal Injury Damages Treatise § 8:26 (3d ed.).

Likewise, given the evidence presented, the trial court reasonably concluded that the accident left plaintiff with a permanent scar on his face. The trial court had the opportunity to personally view this scar, and the court noted for the record that, at the time of trial, the scar ran "down the middle of [plaintiff's] face" and that it was visible from a distance of 8 to 10 feet. That the scar remained so visible more than two years after the accident, despite treatment in the emergency room and plastic **[*22]** surgery a year later, strongly suggests that the scar will be permanent and that it will continue to cause plaintiff the self-coconsciousness he described at the hearing. Aside from plaintiff's self-consciousness about his scar, plaintiff's mental and emotional injuries, including his inability to focus, his depression and anxiety, as well as his sleep disturbances have persisted for more than two years, and he continued to take medication to help him focus. The evidence also showed that plaintiff was expected to live another 56.6 years. Overall, given plaintiff's life expectancy, the permanent nature of plaintiff's physical pain, the permanent scar to his face, and his lingering mental and emotional distress, the trial court did not clearly err in awarding future damages in the amount of $350,000 in gross present cash value.

Lastly, contrary to defendants' arguments, they are not entitled to have the award of future damages reduced to reflect gross present value because the trial court has already conducted this calculation. Specifically, pursuant to *MCL 600.6306(1)(e)*, future noneconomic damages must be reduced to "gross present cash value." In this case, consistent with this requirement, the trial **[*23]** court specified that the award of future damages accounted for a reduction to present cash value. Although the trial court did not provide details regarding its calculations, see *MCL 600.6306(2)*, defendants point to nothing in the plain statutory language which would require the court to make these calculations on the record. Instead, all that is required by the statutory language is that the noneconomic future damages included in an order of judgment are reduced to present cash value. See *Hashem v Les Stanford Oldsmobile, Inc, 266 Mich App 61, 93; 697 NW2d 558 (2005)*. Because the trial court indicated that the future damages in this case had been reduced in this manner, defendants have received the reduction required under *MCL 600.6306(1)(e)* and they are not entitled to a further reduction. See *Hashem, 266 Mich App at 92-93*; *Setterington v Pontiac Gen Hosp, 223 Mich App 594, 607; 568 NW2d 93 (1997)*.

Affirmed. Having prevailed in full, plaintiff may tax costs pursuant to *MCR 7.219*.

/s/ Michael J. Kelly

/s/ William B. Murphy

/s/ Joel P. Hoekstra

---

**End of Document**

# *Williams v. State HHS*

Court of Appeals of Michigan

October 28, 2021, Decided

No. 355203

**Reporter**

2021 Mich. App. LEXIS 6158 *; 2021 WL 5027962

MARY WILLIAMS, Plaintiff-Appellee, v STATE OF MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant-Appellant and KRISTIN ANDERSON, Defendant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Leave to appeal denied by *Williams v. State, 2022 Mich. LEXIS 1117 (Mich., June 3, 2022)*

**Prior History:** [*1] St. Clair Circuit Court. LC No. 17-002595-CD.

*Williams v. HHS, 2019 Mich. App. LEXIS 5548, 2019 WL 4455889 (Mich. Ct. App., Sept. 17, 2019)*

## Core Terms

termination, discriminatory, prima facie case, criminal contempt, employees, atmosphere, summary disposition, retaliation, non discriminatory reason, give rise, unlawful discrimination, collateral estoppel, background evidence, firing, contempt of court, employment action, comparable, litigate, factors, pretext, reasons, argues, circumstantial evidence, make a false statement, circumstances, complaints, quotation, marks, vague, bias

**Counsel:** For MARY WILLIAMS, Plaintiff-Appellee: NANETTE L. CORTESE.

For STATE OF MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant-Appellant: KENDELL S. ASBENSON.

**Judges:** Before: SHAPIRO, P.J., and BORRELLO and O'BRIEN, JJ.

## Opinion

Per Curiam.

Defendant Department of Health and Human Services appeals by leave granted[1] the trial court order denying DHHS's motion for summary disposition under *MCR 2.116(C)(10)* in this action alleging employment discrimination and retaliation. We affirm the denial of summary disposition on the discrimination claim, but reverse the denial of summary disposition on the retaliation claim.

I. BACKGROUND

---

[1] *Williams v Mich Dep't of Health & Human Servs*, unpublished order of the Court of Appeals, entered November 18, 2020 (Docket No. 355203).

Plaintiff worked for DHHS for 27 years, from 1989 to 2016, holding several different positions during her career. In 2016, plaintiff was working in the St. Clair County DHHS office as a foster care specialist. In this role she appeared at a permanency planning hearing. Plaintiff had been asked to complete an "ICPC request"[2] relating to a child potentially being placed with her father out of the state, and had also, more recently, been asked to look into a potential alternative plan. Plaintiff had worked on the **[*2]** ICPC request but not yet finished it. After the court clarified that the alternative plan was not feasible, the court inquired if the ICPC request was complete:

> *The Court*: Has it been done?
>
> *Ms. Williams*: It hasn't been done yet because—
>
> *The Court*: You haven't made the request yet?
>
> *Ms. Williams*: No, we have not.
>
> *The Court*: Well, I met with you and your supervisor and told you that that had to be done.
>
> *Ms. Williams*: I was following the directions of my supervisor.
>
> *The Court*: Instead of following the directions of the Court?
>
> *Ms. Williams*: Sorry, yes, you're right.
>
> *The Court*: Get it done.

The court, Judge Elwood L. Brown, met with plaintiff's supervisor, Kristin Anderson, and Program Manager Deborah Walbecq, regarding this incident. The court eventually held a show-cause hearing regarding whether plaintiff had committed criminal contempt of court by falsely implying to the court that Anderson had directed plaintiff not to work on the ICPC request. The court found plaintiff guilty of criminal contempt of court. This Court eventually affirmed plaintiff's conviction on appeal, holding that, while plaintiff's words "could be open to multiple interpretations," there was sufficient evidence to support **[*3]** her conviction.[3]

After plaintiff's contempt of court conviction, Judge Brown sent an e-mail to the DHHS St. Clair County Director, William Weston:

> Bill,
> It is with regret that I tell you that having found Mary Williams in contempt of court for not being truthful in response to questions that I asked her directly during a review hearing regarding [a minor child] that I can no longer trust that she will be forthright and truthful in the future. I ask that she not be assigned to present reports in cases before me.
> Judge Brown

Soon thereafter, Walbecq conducted an investigation of the incident and recommended plaintiff be terminated because her conduct constituted "neglect of duty," "inappropriate behavior," and "conduct unbecoming a state employee." Plaintiff was terminated effective October 6, 2016.

Plaintiff filed the instant action alleging, among other things,[4] that her termination constituted racial discrimination and retaliation in violation of the *Civil Rights Act (CRA), MCL 37.2010 et seq.* Plaintiff is African-American and previously filed Equal Employment Opportunity Commission (EEOC) charges against DHHS alleging discrimination.

---

[2] ICPC refers to the Interstate Compact on the Placement of Children. See *MCL 3.711 et seq.*

[3] *In re Williams*, unpublished per curiam opinion of the Court of Appeals, issued December 28, 2017 (Docket No. 334460), pp 4-5.

[4] All of plaintiff's other claims have been dismissed or are no longer at issue. Anderson was dismissed from this action because she was not served with process.

DHHS's initial motion for summary disposition under _MCR 2.116(C)(7)_ and _(C)(8)_ was denied, and this Court **[*4]** affirmed with regard to plaintiff's CRA claims.[5]

After the close of discovery, DHHS moved for summary disposition, arguing that plaintiff failed to establish a prima facie case of discrimination or retaliation, and that she has not created a fact question that DHHS's reason for firing plaintiff was pretextual.

In response, plaintiff argued, in part, that the pervasive racism in the St. Clair County DHHS office supported an inference of discrimination. Plaintiff relied on her deposition testified that her coworkers would make toy blackbirds crow the "n" word when they walked by her; that she was called offensive nicknames, including "Trouble" and "Sunshine;" that she was told repeatedly to smile so she would not seem like an "angry black woman"; and that coworkers posted offensive cartoons of monkeys. Plaintiff also asserted that Walbecq, who completed the DHHS investigation leading to plaintiff's discharge, was a perpetrator of racist behavior. Plaintiff testified that she reported an offensive comment made by Walbecq about African-American homes smelling like fried chicken, after which Anderson began spraying air freshener whenever plaintiff visited **[*5]**  Anderson's office. Plaintiff also provided the deposition transcript of Cheryl Howell, who is African-American and worked for DHHS in the St. Clair County Office in various roles from 2002 through about 2013. Howell confirmed that she experienced racism at the St. Clair office and testified that Walbecq had sent her a picture of a monkey "walking like a regular person and talking like a rapper."[6]

After hearing oral argument, the trial court denied DHHS's motion for summary disposition, holding that "[a] genuine issue of material fact has been presented."

II. ANALYSIS

A. COLLATERAL ESTOPPEL

As an initial matter, DHHS argues that collateral estoppel bars plaintiff from arguing that she did not make a false statement to Judge Brown and that there was no factual basis for her criminal contempt conviction.[7]

"The doctrine of collateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties when the prior proceeding culminated in a valid final judgment and the issue was actually and necessarily determined in that prior proceeding." _King v Munro, 329 Mich App 594, 599; 944 NW2d 198 (2019)_ (quotation marks and citation omitted). Three elements are generally required for the application of collateral **[*6]** estoppel: "(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity to litigate the issue; and (3) there must be mutuality of estoppel." _Monat v State Farm Ins Co, 469 Mich 679, 682-684; 677 NW2d 843 (2004)_ (quotation marks and citation omitted). "To be necessarily determined in the first action, the issue must have been essential to the resulting judgment[.]" _Bd of Co Rd Comm'rs for Co of Eaton v Schultz, 205 Mich App 371, 377; 521 NW2d 847 (1994)_.

To begin, the question of whether plaintiff made a false statement to Judge Brown was actually litigated in the criminal contempt proceedings. The show-cause order stated that plaintiff "was asked a direct question by the court

---

[5] _Williams v Dep't of Health & Human Servs_, unpublished per curiam opinion of the Court of Appeals, issued September 17, 2019 (Docket No. 343261), pp 4-5.

[6] Howell showed the e-mail to plaintiff, who described the monkey as being dressed with a gold chain around his neck, a gold tooth and a pimp hat.

[7] We review de novo the application of legal doctrines such as collateral estoppel. See _Estes v Titus, 481 Mich 573, 578; 751 NW2d 493 (2008)_.

[8] The third element need not be considered in this case because, when "collateral estoppel is being asserted defensively against a party who has already had a full and fair opportunity to litigate the issue, mutuality is not required." _Monat, 469 Mich at 695_.

and it appears . . . that it was intentionally false." After the hearing, Judge Brown found beyond a reasonable doubt that plaintiff misrepresented "the status of the Interstate Compact when she indicated that it had not been done because her supervisor told her not to do it." Thus, whether plaintiff made a false statement to the court was the crux of the criminal contempt matter, and Judge Brown's ruling was affirmed on appeal. In direct conflict with this prior adjudication, plaintiff maintains in this case that she did not make a false **[*7]** statement to Judge Brown. Because this specific issue was actually litigated in the prior action, the first element of collateral estoppel is satisfied.

Plaintiff does not dispute that there is sufficient privity between the special prosecutor who presented proofs at the show-cause hearing on behalf of the State of Michigan and DHHS such that the "same parties'" requirement is met in this case. See _People v Gates, 434 Mich 146, 156; 452 NW2d 627 (1990)_ (holding that "both the department and the prosecutor's office are creatures of the state and thus should be considered to be the same party" for purposes of collateral estoppel). We further conclude that plaintiff had a full and fair opportunity to litigate this issue in the criminal contempt proceedings. Plaintiff obtained appellate review of the criminal contempt judgment; the issue was one of fact, not law; there are no differences in the quality or extensiveness of the proceedings that would warrant relitigation; there was a higher burden of persuasion in the criminal contempt case; and plaintiff has not demonstrated a clear and convincing need for a new determination of the issue. See _Monat, 469 Mich at 683 n 2_ (outlining the factors to consider when determining whether "a party has had a 'full and fair' opportunity **[*8]** to litigate an issue[.]").

For these reasons, we hold that plaintiff is collaterally estopped from arguing that she did not commit contempt of court.

B. RACE DISCRIMINATION

Next, DHHS argues that plaintiff has not made out a prima facie case of discrimination and that she has not created a fact question that DHHS's reason for firing plaintiff was pretextual.[9]

The CRA precludes employers from discriminating on the basis of race:
(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status. [_MCL 37.2202_.]

Plaintiff has not produced direct evidence that discrimination motivated her firing, and so she must rely on the _McDonnell Douglas_[10] framework. _Hazle v Ford Motor Co, 464 Mich 456, 463; 628 NW2d 515 (2001)_. "To establish a prima facie case of discrimination, plaintiff must prove by a preponderance of the evidence that (1) she was a member of the protected class; (2) she suffered an adverse employment action, in this case . . . discharge; (3) she

---

[9] We review de novo a grant or denial of summary disposition. _State Farm Fire & Cas Co v Corby Energy Servs, Inc, 271 Mich App 480, 482; 722 NW2d 906 (2006)_. "In reviewing a motion under _MCR 2.116(C)(10)_, this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." _Walsh v Taylor, 263 Mich App 618, 621; 689 NW2d 506 (2004)_. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." _West v Gen Motors Corp, 469 Mich 177, 183; 665 NW2d 468 (2003)_.

[10] _McDonnell Douglas Corp v Green, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)_.

was qualified for the position; but (4) she was discharged under **[*9]** circumstances that give rise to an inference of unlawful discrimination."[11] *Lytle v Malady (On Rehearing), 458 Mich 153, 172-173; 579 NW2d 906 (1998)*.

1. PRIMA FACIE CASE—QUALIFICATION REQUIREMENT

"An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations." *Town v Mich Bell Tel Co, 455 Mich 688, 699; 568 NW2d 64 (1997)* (opinion by BRICKLEY, J.). This Court has described the qualification prong of a prima facie case as requiring "only minimal qualification." *Wilcoxon v Minnesota Mining & Mfg Co, 235 Mich App 347, 369; 597 NW2d 250 (1999)*.

There is no dispute that, prior to her criminal contempt conviction, plaintiff was qualified for her position. Indeed, Anderson testified that plaintiff was "meeting all of her stats." Yet DHHS contends that, following the contempt conviction, plaintiff was no longer qualified for her position considering Judge Brown's request that she not appear before him.

This argument raises the question of whether the employer's legitimate, nondiscriminatory reason for the termination should be considered in determining whether the plaintiff satisfied the "qualified" prong of the prima facie case. While we are not aware of any Michigan caselaw addressing this issue, the Sixth Circuit Court of Appeals has held that "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of **[*10]** a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v Catholic Diocese of Toledo, 206 F3d 651, 660-661 (CA 6, 2000)*.[12] We find this approach persuasive. As the Sixth Circuit reasoned, consideration of the employer's nondiscriminatory reason at the outset "improperly import[s] the later stages of the *McDonnell Douglas* inquiry into the initial prima facie stage." *Id. at 660*.

Further, it is unclear that DHHS's proffered reason actually rendered plaintiff unqualified for her job. While testifying in court was part of plaintiff's job duties, DHHS has not argued that Judge Brown had actual authority to forbid plaintiff from appearing in his courtroom in the future. Moreover, Judge Brown's e-mail was not a court order, but a request. For all the record shows, then, plaintiff could still have appeared in front of Judge Brown, albeit to his possible displeasure. Moreover, plaintiff testified that there was another judge and a magistrate who also heard foster care cases in St. Clair County, and that plaintiff appeared more often before the magistrate than before Judge Brown. Plaintiff also testified that she could have performed **[*11]** her job in "any [other] county." Anderson testified that she also "felt that Ms. Williams could still do the job." And plaintiff was only required to show that she was minimally qualified.

For these reasons, we conclude that plaintiff satisfied the "qualified" prong.

B. PRIMA FACIE CASE—INFERENCE OF DISCRIMINATION

Next, DHHS argues that plaintiff has not presented evidence giving rise to an inference of unlawful discrimination.

There are "multiple ways of proving the ultimate question of discrimination in a circumstantial evidence case." *Hecht v Nat'l Heritage Academies, Inc, 499 Mich 586, 607-608; 886 NW2d 135 (2016)*. Here, plaintiff relies on her testimony that white employees at the St. Clair County DHHS office were disciplined less harshly than African-Americans as well as the racist behavior displayed by some of the employees and managers at that office.

---

[11] "[T]he elements of the *McDonnell Douglas* prima facie case should be tailored to fit the factual situation at hand." *Hazle, 464 Mich at 463 n 6*. Considering that *Lytle, 458 Mich 153*, was also a termination case, we will follow the formulation of the prima facie case stated there.

[12] "We are not bound by federal precedent interpreting analogous questions under *Title VII of the federal Civil Rights Act*, but that caselaw is generally considered persuasive." *White v Dep't of Transp, 334 Mich. App. 98; 964 N.W.2d 88 (2020) (Docket No. 349407); slip op at 6*.

DHHS argues that evidence regarding the discipline of white employees has no probative value because those employees were not similarly situated to plaintiff. "An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination." *Hecht, 499 Mich at 608*. However, for this type of evidence to *alone* give rise to such an **[*12]** inference, "the 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant respects." *Id.* (citation omitted). In terms of the seriousness of the offenses committed by the other employees, both parties cite caselaw holding that the infractions must be of "comparable seriousness." See e.g., *Wright v Murray Guard, Inc, 455 F3d 702, 710 (CA 6, 2006)* (emphasis and citation omitted).

Plaintiff testified about several white employees who violated work rules and were not fired. These included two employees who had daycare fraud "proven against them," and were simply required to "pay the money back." In contrast, plaintiff was given a five-day suspension in 2014—reduced from termination after arbitration—for sharing her PIN in a manner that allowed a caregiver to improperly obtain Department Child Care benefits. And plaintiff can use evidence of older conduct as "background evidence," even if that conduct is no longer actionable. *Campbell v Human Servs Dep't, 286 Mich App 230, 238; 780 NW2d 586 (2009)* (holding "acts occurring outside the limitations period, although not actionable, may, in appropriate cases, be used as background evidence to establish a pattern of discrimination"). Considering the substantial similarities and the drastically different responses by DHHS, these prior incidents have **[*13]** probative value.

Plaintiff also testified that one employee who showed up to work intoxicated many times was simply given rides home, and another who was caught hunting or fishing without a license was moved to another job. Plaintiff did not testify what positions these coworkers held, and gave only wide date ranges, if any. Given the dissimilarities and the vague information provided by plaintiff, we agree with DHHS that these incidents have little probative value.

However, plaintiff also relies on DHHS's decision to merely demote Anderson after she improperly disclosed confidential information about the child protection case underlying plaintiff's contempt of court conviction that was then made public. This incident is of comparable severity as Anderson agreed that a breach of confidentially could result in termination. And it is particularly compelling considering that Anderson's misconduct related to the same child protection case that resulted in plaintiff's termination.

Assuming plaintiff's "similarly situated employee" evidence does not create an inference of discrimination by itself, other circumstantial evidence may be considered when evaluating "the ultimate question of discrimination." **[*14]** *Hecht, 499 Mich at 609* (holding that plaintiff is not limited to the "similarly situated" method to show circumstances suggesting race discrimination).

As noted, plaintiff offered evidence suggesting there was a significant discriminatory atmosphere toward African-American workers at the St. Clair County DHHS office. Background evidence of racial discrimination, harassment, or slurs can support an inference of intentional discrimination in at least some circumstances. The United States Supreme Court has stated that a plaintiff can establish pretext in an intentional discrimination case by presenting "evidence of respondent's past treatment of petitioner, including the instances of the racial harassment which she alleges . . . ." *Patterson v McLean Credit Union, 491 US 164, 188; 109 S Ct 2363; 105 L Ed 2d 132 (1989)*, quoted in *Hazle, 464 Mich at 469*. In that case, the racial harassment constituted staring, disparate assignment of tasks, disparate criticism, and a discriminatory statement, all committed by a supervisor. *Patterson, 491 US at 178*.

Other federal courts have addressed the use of background evidence of discrimination to create an inference of discrimination at the prima facie case stage. For instance, the Sixth Circuit Court of Appeals has held that:

> Circumstantial evidence establishing the existence of a discriminatory atmosphere **[*15]** at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff. While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add "color" to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff. [*Rachells v Cingular Wireless Employee Servs, LLC, 732 F3d 652, 665 (CA 6, 2013)* (holding that the plaintiff had established a prima facie case based in part on such evidence) (citations omitted).

Further,

> "evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment." Thus, even the conduct of a nondecisionmaker may be probative of whether an adverse action directed at a plaintiff was racially motivated. [*Id.* (citation omitted).]

The court identified the following factors to determine whether evidence of a discriminatory atmosphere is probative of intentional discrimination:

> "the [actor]'s position in the [employer's] hierarchy, the purpose and content of the [conduct], and **[*16]** the temporal connection between the [conduct] and the challenged employment action, as well as whether the [conduct] buttresses other evidence of pretext." [*Id.* (citations omitted).]

The Michigan Supreme Court has outlined similar factors to determine whether discriminatory remarks constitute direct evidence of bias or are merely "stray remarks" that should be excluded from evidence:

> Factors to consider in assessing whether statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. [*Sniecinski v Blue Cross & Blue Shield of Mich, 469 Mich 124, 136 n 8; 666 NW2d 186 (2003)*.]

Applying the "stray remarks" framework, the factor weighing most strongly against consideration of plaintiff's background evidence is that none of the evidence was "related to the decision-making process" resulting in plaintiff's termination. Much, but not all, of plaintiff's evidence could also be characterized as "vague and ambiguous"—for **[*17]** example, Anderson's spraying of air freshener or body spray, which could be taken as either racially discriminatory or an innocent misunderstanding. More generally, some of plaintiff's testimony is vague on who made the racist statement or act and their position. For example, plaintiff could not identify who was behind the blackbird imagery or who made the birds crow racial slurs.

On the other hand, some of the conduct is linked to Walbecq, who conducted DHHS's investigation of the contempt of court incident. Plaintiff testified that Walbecq said African-American homes smelled like fried chicken. Walbecq told plaintiff to smile to "soften up [her] expression." Howell testified that Walbecq refused to act when confronted about a manager referring to nonwhite managers as "colored people" at an event Walbecq organized at which only white managers were present. See *Rachells, 732 F3d at 665* (considering a decisionmaker's "non-responsiveness to . . . complaints that . . . evaluations were racially motivated" as evidence of "whether a discriminatory atmosphere existed"). Howell also confirmed that Walbecq sent her a picture of a monkey that Howell found offensive.

Further, there is strong evidence Walbecq had influence **[*18]** in plaintiff's termination. Walbecq conducted the investigation finding that plaintiff had violated several DHHS work rules. Anderson's testimony indicates that it was Weston, the St. Clair County Director, and Walbecq, the St. Clair County Program Manager, who made the recommendation to DHHS's Human Resources department to terminate plaintiff. Any doubt of Walbecq's involvement in the decision to terminate was removed by DHHS's answers to interrogatories stating that Walbecq "conducted the investigation and recommended termination of Plaintiff." This is sufficient evidence to create a material question of fact on whether Walbecq influenced the decision to terminate plaintiff's employment. See *Harrison v Olde Fin Corp, 225 Mich App 601, 608 n 7; 572 NW2d 679 (1997)* (holding the plaintiff "established a question of material fact regarding whether" a "decision was influenced by a person" when there was testimony the decisionmaker "consulted with and considered" that person's views).

With regard to whether the incidents were "close in time" to plaintiff's firing, the specific timing of many of the events is vague. The background evidence of racial animus offered by plaintiff spans at least a decade, from some time before 2008 or 2009—when plaintiff moved "upstairs"—to **[*19]** about the time of plaintiff's termination in 2016. Older evidence, even if "not actionable, may, in appropriate cases, be used as background evidence to establish a

pattern of discrimination." *Campbell, 286 Mich App at 238*, but older evidence is less likely to be probative of the reasons for plaintiff's termination.

Some of plaintiff's evidence does concern relatively recent conduct. Plaintiff testified that the blackbirds continued to appear, though they were no longer crowing racial slurs, until soon after Anderson became plaintiff's supervisor, which was in approximately February 2016. Plaintiff testified that she was bypassed for overtime in approximately October 2015. Plaintiff testified that Anderson began spraying air freshener whenever plaintiff was in Anderson's office after plaintiff reported Walbecq's "fried chicken" remark to Anderson. The strong implication is this occurred after Anderson became plaintiff's manager in approximately February 2016. The use of nicknames for plaintiff, as well as plaintiff being told to smile on the phone so she would not sound like an "angry black woman," were repeated throughout plaintiff's time at the St. Clair office.

Finally, the evidence of a discriminatory atmosphere, **[*20]** taken as a whole, appears much more reflective of a pattern than of isolated incidents. Viewed in the light most favorable to plaintiff, there is evidence of repeated use of racially discriminatory comments, imagery, and nicknames against African-American workers in the St. Clair County DHHS office, and evidence that management generally downplayed these issues, along with evidence of negative employment consequences, such as being bypassed for overtime, and workers of color not being given questions ahead of time for a position.

In sum, we conclude that the evidence of a discriminatory atmosphere in this case can be considered as probative circumstantial evidence of whether plaintiff was terminated for discriminatory reasons. And the totality of plaintiff's evidence reasonably suggests a discriminatory bias behind her termination. Accordingly, she has established a prima face case of discrimination.

C. PRETEXT

"[O]nce a plaintiff establishes a prima facie case of discrimination, the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle, 464 Mich at 464*. If the **[*21]** employer has offered evidence of a legitimate nondiscriminatory reason for the employment decision, "the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id. at 465* (quotation marks and citation omitted). A plaintiff can show that the legitimate, nondiscriminatory reason is pretext for discrimination also in one of three ways: "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Major v Newberry, 316 Mich App 527, 542; 892 NW2d 402 (2016)*.

DHHS has presented evidence that it fired plaintiff for a nondiscriminatory reason—because she misled the court at the permanency planning hearing and Judge Brown asked that she not appear before him in the future. As discussed, plaintiff is collaterally estopped from arguing that there was no factual basis for her criminal contempt conviction. Plaintiff's other argument in support of pretext essentially **[*22]** amount to a contention that her termination was an overly severe consequence, which would not have been imposed on her but for the fact that she is African-American. If she were not African-American, she might have been simply demoted, transferred, or disciplined in some other way.

For the reasons discussed, we conclude that the same evidence supporting a reasonable inference of discrimination also creates a genuine fact issue that the nondiscriminatory reason for plaintiff's firing is pretextual. See *Town, 455 Mich at 697* ("The proofs offered in support of the prima facie case may be sufficient to create a triable issue of fact that the employer's stated reason is a pretext, as long as the evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis."). Accordingly, we affirm the denial of summary disposition on the discrimination claim.

D. RETALIATION

DHHS also argues that the trial court erred by not dismissing plaintiff's claim for retaliation. The CRA states:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made **[*23]** a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act. [*MCL 37.2701*.]

"[T]o establish a prima facie case of unlawful retaliation under the *Civil Rights Act*, a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *El-Khalil v Oakwood Healthcare, Inc, 504 Mich 152, 161; 934 NW2d 665 (2019)* (quotation marks and citation omitted).

Plaintiff argues only that she engaged in protected activity by filing EEOC complaints, and that her termination was an adverse employment action. Plaintiff makes no attempt to address the knowledge and causation elements of the prima facie case. The record contains one EEOC complaint dated March 23, 2015. In her deposition testimony, plaintiff indicated she filed a total of three EEOC complaints. One of the other two was in 2014, and no date was given for the third.

The March 23, 2015 EEOC complaint is dated over a year before the June 27, 2016 permanency planning hearing which gave rise to plaintiff's contempt of court conviction, and 18 months before her October **[*24]** 6, 2016 termination. A "[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action." *Garg v Macomb Co Cmty Mental Health Servs, 472 Mich 263, 286; 696 NW2d 646 (2005)*, amended on den of reh *473 Mich 1205 (2005)*. Plaintiff has not offered any evidence to suggest a connection between the filing of her complaints and her termination. Plaintiff cannot rely solely on "temporal proximity"—in the form of a gap of more than a year—to demonstrate a causal connection between her EEOC complaints and her termination. See *id*. Plaintiff has failed to make out a prima facie case of retaliation, and so we reverse the denial of summary disposition on this claim.

III. CONCLUSION

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. No costs may be taxed under *MCR 7.219(F)* as neither party has prevailed in full.

/s/ Douglas B. Shapiro

/s/ Stephen L. Borrello

**Concur by:** Colleen A. O'Brien (In Part)

**Dissent by:** Colleen A. O'Brien (In Part)

# Dissent

O'BRIEN, J. (*concurring in part and dissenting in part*)

I agree with the majority's decision to reverse the trial court's denial of summary disposition on plaintiff's retaliation claim. Unlike the majority, however, I would also reverse the trial court's denial **[*25]** of summary disposition on plaintiff's discrimination claim. I therefore respectfully dissent from that portion of the majority opinion.

2021 Mich. App. LEXIS 6158, *25

In my opinion, plaintiff has failed to present sufficient evidence to support the fourth factor of the *McDonnell Douglas*[1] framework—that "she was discharged under circumstances that give rise to an inference of unlawful discrimination." *Lytle v Malady (On Rehearing), 458 Mich 153, 172-173; 579 NW2d 906 (1998)*. As the majority notes, "[a]n employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination." *Hecht v Nat'l Heritage Academies, Inc, 499 Mich 586, 608; 886 NW2d 135 (2016)*. Both parties argue, and the majority seems to accept, that the conduct committed by the other employees must be of "comparable seriousness."

The majority opines that Anderson's conduct of breaching confidentiality about the child protection case underlying plaintiff's contempt conviction was of comparable seriousness to plaintiff's conduct that led to her discharge. I disagree. Anderson accidentally breached confidentiality about a case, then reported herself and took responsibility for her actions, accepting a voluntary demotion. In contrast, plaintiff never took responsibility for making a false statement [*26] to Judge Brown, even after she was convicted of criminal contempt for lying to the judge and that conviction was affirmed on appeal. Accordingly, I do not believe that these instances are sufficiently comparable to give rise to an inference of unlawful discrimination.[2]

Further, while plaintiff has produced evidence tending to establish a discriminatory atmosphere at the St. Clair County DHHS office, she has failed to produce any evidence from which a factfinder could infer possible discriminatory bias by one of the person's responsible for discharging plaintiff. The record establishes that Joseph Collins (the director of Human Resources) made the decision to terminate plaintiff, and that this decision was made with the assistance of Pamela Bennet (the Labor Relations Manager), Tenera Trotter (the Labor Relations Representative), and William Weston (the director of the St. Clair County DHHS). Plaintiff presented no evidence that these decisionmakers engaged in discriminatory conduct that could give rise to an inference that the decision to discharge plaintiff was the result of unlawful discrimination. See *Carter v Atrium Hosp, 997 F3d 803, 809 (CA 8, 2021)* (explaining that the fourth element for a prima facie case requires evidence of [*27] discriminatory bias by a decisionmaker, not fellow employees).

While plaintiff has presented evidence that Walbecq engaged in discriminatory conduct, Walbecq was not part of the decision to terminate plaintiff. Rather, Walbecq only recommended termination after completing her investigation. Walbecq took no part in the ultimate decision to terminate plaintiff.[3] Moreover, unlike in the case cited by the majority—*Harrison v Olde Fin Corp, 225 Mich App 601, 608 n 7; 572 NW2d 679 (1997)*—not a single decisionmaker in this case testified, so there is no evidence that they "consulted with" Walbecq before terminating plaintiff, and I would conclude that there is no evidence that the decisionmakers' decision to terminate plaintiff was otherwise "influenced" by Walbecq.

In sum, while plaintiff's allegations paint a troubling image of the discriminatory atmosphere at the St. Clair County DHHS office, I would nevertheless conclude that the evidence was insufficient to support that plaintiff "was discharged under circumstances that give rise to an inference of unlawful discrimination." *Lytle, 458 Mich at 173*.

Alternatively, accepting that plaintiff established a prima facie case of discrimination, I would conclude that she failed to rebut defendant's nondiscriminatory reason for its employment [*28] decision. See *Hazle v Ford Motor Co, 464 Mich 456, 464-465; 628 NW2d 515 (2001)*. It cannot be seriously argued that, if a job requires testifying in court, an employee's falsely testifying—and being held in criminal contempt for that false testimony—is not a compelling, nondiscriminatory reason for terminating that employee. In light of this compelling reason that

---

[1] *McDonnell Douglas Corp v Green, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)*.

[2] Also, it is not clearly established that Anderson's race differed from plaintiff's race, although that could arguably be inferred from the record.

[3] It could be argued that Anderson implied at her deposition that Walbecq was part of the decision to discharge plaintiff, but Anderson admitted that she (Anderson) was not part of the decision to terminate plaintiff and that she did not actually know who made the decision to terminate plaintiff. Accordingly, to the extent that it could be argued that Anderson testified at her deposition that Walbecq was part of the decision to discharge plaintiff, Anderson was, by her own admission, speculating.

defendant had for terminating plaintiff, I would conclude that evidence of a discriminatory atmosphere at the St. Clair County DHHS office would not be "sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id. at 465* (quotation marks and citation omitted).

/s/ Colleen A. O'Brien

---

**End of Document**