No. 24-2011

# United States Court of Appeals for the Sixth Circuit

---

Kenneth Lowe,

*Plaintiff-Appellant,*

v.

Walbro, LLC,

*Defendant-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 1:18-cv-12835
(The Honorable Thomas L. Ludington)

---

## PLAINTIFF-APPELLANT KENNETH LOWE'S BRIEF ON APPEAL

---

Jonathan R. Marko (P72450)
Christopher Putrycus (P84991)
**MARKO LAW, PLLC**
220 W. Congress, Fourth Floor
Detroit, MI 48226
P:(313)777-7529 / F:(313)771-5785
jon@markolaw.com
Attorney for Plaintiff-Appellant

Thomas R. Warnicke (P47148)
**LAW OFFICES OF THOMAS R. WARNICKE, PLLC**
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
P:(248)410-3031 / F:(248)232-7832
tom@warnickelaw.com
Attorney for Plaintiff-Appellant

# TABLE OF CONTENTS

INDEX OF AUTHORITIES....................................................................... ii

I.      The Court Already Found Plaintiff's Claim Jury-Worthy
Walbro and The District Court Cannot Undo That With
Misstated Evidence and Usurped Credibility Judgments ................ 1

     A.     Davidson's Termination Remarks—Already Held
Sufficient by This Court—Came Into Evidence at Trial ........... 5

     B.     Defendant Misrepresents the Trial Record to Evade
Controlling Authority Supporting Submission to the Jury ......... 20

II.      The District Court Erred in Conditionally Granting a New
Trial, As the Jury's Verdict Was Supported by the Evidence,
Free From Prejudice, and Within Its Discretion ............................. 27

     A.     The Jury's Non-Economic Award Was Reasonable and
Fully Supported by the Record ..................................................... 27

     B.     Defendant's Unpreserved Challenge to Backpay
and Front Pay Cannot Support the New Trial Order ................. 30

CONCLUSION AND RELIEF REQUESTED ..................................................... 32

CERTIFICATE OF COMPLIANCE....................................................................... 33

CERTIFICATE OF SERVICE ........................................................................... 34

ADDENDA ........................................................................................................... 35

# INDEX OF AUTHORITIES

## Cases

*Bordeaux v. Celotex Corp.*,
203 Mich. App. 158, 164 (1993)........................................................................ 10

*CSX Transp., Inc. v. Hensley*,
556 U.S. 838, 841 (2009).................................................................................. 10

*France v. Edwards*,
No. 347343, 2020 Mich. App. LEXIS 3095, *9-10
(Ct. App. Apr. 30, 2020) .................................................................................. 19

*Guarantee Bond & Mortgage Co. v. Hilding*,
246 Mich. 334 (1929) ....................................................................................... 18

*Hanson v. Madison Cty. Det. Ctr.*,
736 F. App'x 521, 537–38 (6th Cir. 2018) ........................................................ 7

*Holloway Const. Co. v. State*,
44 Mich. App. 508, 533 (1973) ......................................................................... 18

*Howe v. City of Akron*,
801 F.3d 718, 744 (6th Cir. 2015) .................................................................... 30

*Javis v. Bd. of Educ.*,
393 Mich. 689, 704 (1975) ................................................................................. 8

*Lowe v. Walbro, LLC*,
972 F.3d 827, 834–35 (6th Cir. 2020) ........................................................ *passim*

*Mengelkamp v. Lake Metro. Hous. Auth.*,
549 F. App'x 323, 333 (6th Cir. 2013) .............................................................. 31

*Muhammad v. Skinner*,
193 F. Supp. 3d 821, 832 (E.D. Mich. 2016) .................................................... 12

*Olympic Fastening Sys., Inc. v. Textron Inc.*,
504 F.2d 609, 617 (6th Cir. 1974) .................................................................... 30

*People v Giamporcaro*,
No. 312556, 2013 Mich. App. LEXIS 1966, at *6-7
(Ct. App. Dec. 3, 2013) ................................................................. 6

*People v. Bass*,
317 Mich. App. 241, 274–75 (2016) .......................................... 18

*People v. Graves*,
458 Mich. 476, 486 (1998) ......................................................... 27

*People v. Lemmon*,
456 Mich. 625, 642 (1998) ........................................................... 6

*People v. Walker*,
No. 362638, 2023 Mich. App. LEXIS 5857 at *10-11
(Ct. App. Aug. 17, 2023) ........................................................... 17

*Rasimas v. Mich. Dep't of Mental Health*,
714 F.2d 614, 628 (6th Cir. 1983) ............................................. 31

*Rosenthal v. Faygo Bevs., Inc.*,
701 F. App'x 472, 480 (6th Cir. 2017) ..................................... 23

*Slapak v. Tiger Mgmt. Grp., LLC*,
594 F. App'x 290, 296 (6th Cir. 2014) ..................................... 23

*Starks v. Jackson*,
No. 1:17-cv-399, 2018 U.S. Dist. LEXIS 38159, *25–26
(W.D. Mich. Feb. 7, 2018) ......................................................... 12

*Thurman v. Yellow Freight Sys.*,
90 F.3d 1160, 1171 (6th Cir. 1996) ........................................... 30

*Tobin v. Providence Hosp.*,
244 Mich. App. 626, 641 (2001) ................................................ 27

*Tuttle v. Detroit, J. & C. R. Co.*,
193 Mich. 390, 395-96 (1916) ...................................................... 7

*United States v. Letner*,
273 Fed. Appx. 491, 495 (6th Cir. 2008) ............................................................ 19

*United States v. Moreno*,
899 F.2d 465, 469–70 (6th Cir. 1990) ................................................................. 6

*Watrous v. Conor*,
266 Mich. 397, 401–02 (1934) ............................................................................ 28

*Weber v. Infinity Broad. Corp.*,
No. 02-74602, 2005 U.S. Dist. LEXIS 40724, *16
(E.D. Mich. Mar. 7, 2016) ................................................................................... 28

*West v. Tyson Foods*,
374 F. App'x 624, 643 (6th Cir. 2010) ................................................................. 28

*Wisnaski v. Afman*,
341 Mich. 453, 458–59 (1954) ........................................................................... 7

# I. THIS COURT ALREADY FOUND PLAINTIFF'S CLAIM JURY-WORTHY—WALBRO AND THE DISTRICT COURT CANNOT UNDO THAT WITH MISSTATED EVIDENCE AND USURPED CREDIBILITY JUDGMENTS.

## A. Davidson's Termination Remarks—Already Held Sufficient by This Court—Came Into Evidence at Trial.

Neither Defendant's response nor the district court's reversal of the jury's liability finding provides a valid basis for discarding this Court's prior holding—or the district court's own earlier recognition—that Plaintiff presented sufficient evidence of age discrimination to reach a jury. Walbro largely sidesteps the actual trial record, distorts the evidence, and substitutes its own post hoc credibility judgments for those of the jury, which found—on ample evidence—that Ken Lowe's termination was impermissibly motivated by age. Its recycled arguments are no more persuasive now than they were before the verdict and do not warrant disturbing it.

The most glaring flaw in both Walbro's response and the district court's ruling is their failure to confront—let alone refute—the fact that the very evidence this Court previously identified as direct proof of age discrimination, Davidson's termination meeting statements, was admitted at trial. In an effort to excuse the district court's complete omission of this evidence, Walbro points to Lowe's initial trial testimony denying that any age-related comments were made during his termination—contrary to his deposition and the same evidence this Court already found sufficient to support a jury question. Although the district court erroneously

refused to permit impeachment or refresh Lowe's recollection with his deposition testimony, Lowe later partially walked back that denial. Regardless, Davidson's age-based remarks were independently admitted through Walbro's own expert, Dr. Benedek, who testified that Lowe reported the comments to her, and whose written report—explicitly attributing Davidson's "you're getting up there in years" remark to the termination meeting—was presented to the jury.

Well-established case law confirms that inconsistencies in testimony go to credibility—not admissibility—and must be resolved by the jury. As this Court made clear in *United States v. Moreno*, 899 F.2d 465, 469–70 (6th Cir. 1990), "[c]redibility of testimony is a question for the jury, not for the court. . . . Any inconsistency in his testimony or any impairment in his perception or recollection properly are questions of his credibility, not of his competency as a witness." Michigan law is equally clear: testimony discrepancies create a jury question and preclude directed verdict. In *People v Giamporcaro*, No. 312556, 2013 Mich. App. LEXIS 1966, at *6-7 (Ct. App. Dec. 3, 2013), the Michigan Court of Appeals held that "the trial court may not grant a directed verdict if it requires determination of witness credibility. A conflict in testimony presents a question of credibility. . . and credibility is a jury determination." *Id*.; see also *People v. Lemmon*, 456 Mich. 625, 642 (1998) ("issues of witness credibility are for the jury, and the trial court may not substitute its view of credibility for the constitutionally guaranteed jury determination thereof").

Michigan courts have repeatedly confirmed that conflicts between trial and deposition testimony present classic jury questions—not grounds for judgment as a matter of law. The Michigan Supreme Court in *Wisnaski v. Afman*, 341 Mich. 453, 458–59 (1954), squarely held:

> Appellants direct attention to certain contradictory statements made by plaintiff in the course of her testimony and on a previous occasion in a deposition. However, it rested with the jury to determine from all the testimony what the facts actually were. **<u>Inconsistencies in plaintiff's statements do not prevent the application of the rule that the Court, in determining whether a motion for a directed verdict for defendants should have been granted, is bound to place on the testimony the interpretation most favorable to plaintiff</u>**.

*See also*, *Tuttle v. Detroit, J. & C. R. Co.*, 193 Mich. 390, 395-96 (1916) (finding that conflicting assertions and "inconsistent" testimony "claimed lack of memory" during cross-examination still fall under "the well-settled rule that the credibility of a witness and consistency of his statement are matters for the jury rather than for the court").

Likewise, this Court in *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 537–38 (6th Cir. 2018), reversed a district court for improperly discrediting a plaintiff's inconsistent testimony and usurping the jury's role. The Hanson Court analyzed the law of this Circuit on testimonial inconsistency and found the district court committed reversible error:

> The court inappropriately "discredit[ed] [Hanson's] entire version of the events." *Coble*, 634 F.3d at 870. . . . In **rare cases**, "testimony can and should be rejected without a trial if, in the circumstances, no reasonable

person would believe it." *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997). However, "**proof that a party** . . . **has made prior inconsistent statements is not a rare event in our courts. Juries are regularly called upon to consider evidence of that sort, and we all know that prior inconsistency does not inexorably lead to defeat**."

*Id.* at 537-38 (emphasis added).

The Court emphasized that "we allow cases to proceed to trial even though a party's evidence is inconsistent, because '[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.'" *Id.*

Moreover, the Michigan Supreme Court, drawing on the former standard jury instruction regarding impeachment by prior inconsistent statements, recognized that such instructions "matter-of-factly inform[] the jury that they may consider previous statements of a party '[i]n deciding whether you should believe him.'" *Javis v. Bd. of Educ.*, 393 Mich. 689, 704 (1975). The *Javis* Court emphasized that "[t]he jury retains the full responsibility to weigh all of the testimony and to determine what effect, if any, prior inconsistencies are to have on the party's credibility." *Id*. It further held that "[a] properly instructed jury may in its deliberations have concluded that such discrepancies [between a witness's deposition and trial testimony] were only natural problems associated with recalling past events." *Id*. at 704–05.

Here, the asserted inconsistency between Lowe's deposition testimony—regarding Davidson's ageist termination statements, which this Court already found sufficient *alone* to submit Lowe's ELCRA claim to a jury—and his later trial

8

testimony presents a credibility question exclusively for the jury, not the district court or Defendant. As detailed in Plaintiff's brief on appeal, Lowe's account that Davidson told him "[y]ou are getting up there in years, you're getting close to retirement age. We, the company, are going to go in a different direction," was introduced through the testimony of Dr. Benedek. She stated, without objection, that Lowe relayed this to her during his psychiatric evaluation. (RE 119, PageID 3157–3160; Doc. 18, Page 21–23). Her report, used for impeachment, confirmed this statement was made at the termination meeting—consistent with Lowe's deposition.

Any tension between Lowe's initial inability to recall Davidson's remarks at trial—over five years later—and Benedek's testimony and report is not dispositive; it merely presents a textbook credibility dispute. The district court, in granting renewed JNOV, ignored this critical evidence and supplanted the jury's role. Defendant's response brief likewise dodges this inconsistency, inviting this Court to adopt Walbro's self-serving view over the jury's finding.

But as both this Court and Michigan courts have long held, testimonial inconsistencies—whether between witnesses or within the same witness—create jury questions, not grounds for judgment as a matter of law. The district court committed reversible error by failing to interpret the record in Plaintiff's favor and by disregarding evidence supporting the jury's finding, including Benedek's

testimony and report that confirmed Davidson made the ageist statements at Lowe's termination meeting.

Further reinforcing the jury's authority here is the undisputed fact that it was properly instructed on credibility. Michigan and federal courts presume jurors follow such instructions. See, e.g., *Bordeaux v. Celotex Corp.*, 203 Mich. App. 158, 164 (1993); *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009).

Here, the district court instructed the jury at length:

Another part of your job as jurors is to decide how credible or believable each witness was. **This is your job**. **It is not mine**. **It is up to you to decide if a witness's testimony was believable and how much weight you think it deserves**. You are free to believe everything that a witness said or only part of it or none of it at all, but you should act reasonably and carefully in making these decisions.

. . . Ask yourself if the witness testified inconsistently while on the witness stand or if the witness said or did something or failed to say or do something at any other time that is inconsistent with what the witness said while testifying here in court.

If you believe that the witness was inconsistent, then ask yourself if this makes the witness's testimony less believable. Sometimes it might; other times it might not. . . .

And ask yourself how believable the witness's testimony was in light of all the other evidence. **Was the witness's testimony supported or contradicted by other evidence that you found believable?** . . .

. . . Use your common sense and your everyday experience in dealing with other people and then **decide what testimony you believe and how much weight you think it deserves.**

\* \* \*

10

**<u>Remember that you alone decide how much of a witness's testimony to believe and how much weight it deserves.</u>**

(RE 120, PageID 3232–3234) (emphasis added).

The jury, presumed to have followed these instructions, was free to credit Benedek's report—made closer in time to the events—over Lowe's later confusion. Her testimony directly corroborated Lowe's deposition and contradicted his temporary lapse. Significantly, Benedek was Walbro's own expert, and her acknowledgment of Lowe's report undermined her own client's position—lending her account even greater weight.

As *Javis* affirms, the jury was entitled to weigh those discrepancies and determine which account was more credible. Similarly, the jury was free to reject the denials of Davidson and Rard—particularly given their obvious self-interest and other demonstrably inaccurate testimony, including their claims about the 2017 stack ranking and the fabricated "observed behavior report."

Nor was the jury required to discredit Lowe's trial testimony based on his initial inability to recall Davidson's ageist remarks. The jury was entitled to view that lapse as a natural product of the five-year delay between Lowe's termination and trial, his prolonged emotional distress, and his lack of legal sophistication. They could reasonably conclude the lapse was not a lie, but a reflection of human memory and circumstance—precisely the type of judgment juries are entrusted to make.

11

This Court recognized in *Hanson* that inconsistencies may stem from factors like elapsed time or emotional strain, and that such variances do not undermine credibility per se. As the Western District of Michigan noted in *Starks v. Jackson*, No. 1:17-cv-399, 2018 U.S. Dist. LEXIS 38159, *25–26 (W.D. Mich. Feb. 7, 2018):

> The idea that memory fades as time passes is hardly novel. *See*, *e.g.*, *United States v. Owens*, 484 U.S. 554, 562. . . (1988) ("'[a]s time goes by, a witness' memory will fade . . . .'"); *Oneida Cnty, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 266 n.16. . . (1985) ("'No human transactions are unaffected by time . . . peculiarly matters which rest in memory . . . which consequently fade with the lapse of time . . . .'") (dissenting opinion); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13. . . (1980) ("[A]s time passes memories fade . . . ."). A corollary to that principle might be that one would have better recall of recent events than older events. It is certainly not unreasonable to invite that inference.

Similarly, in *Muhammad v. Skinner*, 193 F. Supp. 3d 821, 832 (E.D. Mich. 2016), the court rejected the notion that a plaintiff's inconsistent memory warranted dismissal:

> [E]ven if Plaintiff's testimony regarding his memory of the events was inconsistent, the Sixth Circuit has held that a plaintiff's inconsistent testimony can establish genuine issues of material fact because such inconsistencies go to the credibility of the witness and not the admissibility of the testimony. *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010).

So too here. Lowe's memory lapse did not nullify his consistent prior statements, nor did it make Benedek's testimony or report inadmissible or incredible. The jury was fully entitled to weigh all this in context and conclude Davidson made the age-related comments.

In fact, Lowe later clarified at trial that he had asked Davidson why he was being terminated, and that Davidson's response referenced his age. Viewed in the light most favorable to Plaintiff—as is required in post-verdict review—this testimony confirmed what this Court already recognized as direct evidence of discrimination. Both the district court and Defendant disregard the jury's right to weigh credibility and the controlling standard that all evidence must be viewed in Plaintiff's favor.

That context was set from the outset of trial by Defendant's own opening statement. Defense counsel launched a scorched-earth attack on Lowe's credibility, accusing him of perjury and claiming he fabricated his deposition testimony with the aid of his attorney during a break:

> You will see beyond a shadow of a doubt that Mr. Lowe has lied up to this point, and I predict he will continue to lie. And one of the things you're going to hear that he lied about were those statements, those statements that Mr. Davidson allegedly made about his age.

> And how do we know that those are lies? Well, first and foremost we know they are lies because they just didn't happen. Tom Davidson will testify about that, and so will Debbie Rard, who, by the way, is three years younger than Mr. Lowe. And she was in that separation meeting the entire time. And she will tell you that that comment was not made.

> * * *

> How else will we know that that comment that was made at the termination meeting or the separation meeting about you're going one way, we're going to other, how do we know that's false? Because I took Ken Lowe's deposition under oath, and I asked him, tell me every single thing you can remember about that meeting. He said nothing about that

13

comment. It was only after a 15-minute break that his attorney requested . . . Guess what happened the very first thing that came out of the break? Mr. Lowe literally said, "I just remembered one thing." "What is that, Mr. Lowe?" "Oh, during the separation meeting, Tom Davidson said to me, 'Oh, you're retirement age. We're going one way, you're going the other.'"

. . . Does that sound to you like someone who is credible? I think not. It's pure fiction. That's what they are selling you during this trial. Pure fiction.

(RE 115, PageID 2465–2467).

This inflammatory accusation framed the entire trial around Lowe's credibility. Walbro invited the jury to resolve whether Lowe or Davidson and Rard were telling the truth. Now on appeal, Defendant seeks to discredit the very credibility determination it demanded.

Lowe's redirect testimony directly rebutted that accusation:

Q.    Okay. Deposition. Do you remember -- you were sitting here. Do you remember during the opening statement of the Walbro attorneys, where it was suggested that you never made any statements about age at your deposition prior to having a break?

**A.    False.**

\* \* \*

Q.    Okay. And how long was the deposition, Ken?

**A.    Four hours.**

Q.    Did you have to take a bathroom break at all during this deposition?

**A.    We took a break one time, possibly two.**

14

Q.    Okay. Did you tell Mr. Cessante that there was age-related comments made at your termination before the break?

**A.    Yes, sir.**

Q.    Did he ask you -- do you remember additional things after the break?

**A.    Yes, he did.**

Q.    Did you tell him, again, that there was age-related things that were said --

**A.    Yes.**

Q.    -- when he asked a second time?

**A.    Yes, I did.** (RE 118, PageID 2869–2871).

This exchange reaffirmed Lowe's consistent account and rebutted the notion that he had fabricated anything. His redirect testimony, Benedek's report and testimony, and his deposition together provided ample evidence that Davidson made the age-related termination remarks—evidence the jury was entitled to credit and which the district court was not permitted to override.

Lowe's redirect made clear that (1) Davidson made age-based comments at the termination meeting, and (2) Lowe testified to those statements under oath during his deposition—both before and after the break. This aligned directly with Dr. Benedek's trial testimony and expert report, both admitted into evidence and confirming that Lowe reported the statements to her. Under the jury instructions, the

15

jury was free—indeed, presumptively required—to weigh that evidence against the denials of Davidson and Rard and determine which account was credible.

The district court's core rationale for granting JNOV—that Davidson's ageist comments "were never presented to the jury"—is simply false. The statements were presented repeatedly: through Dr. Benedek's report, her testimony, and Lowe's redirect. Defendant's effort to obscure that fact—after framing the trial around credibility—must fail.

The jury was presented with direct evidence of age discrimination that this Court already deemed legally sufficient to reach a jury. That evidence was heard, weighed, and credited. The district court's decision to cast it aside—and Defendant's post hoc invitation to affirm that error—must be rejected.

In its Response Brief, Walbro offers additional self-serving conclusions about Lowe's credibility and the impact of his assertedly inconsistent testimony— conclusions not relied upon by the district court, unsupported by the record, and aimed at salvaging a ruling it knows cannot stand under binding precedent.

On page 22, Walbro provides a skewed, perfunctory summary of Lowe's and Benedek's testimony, mischaracterizing the evidence, distorting the record, and drawing every inference in its favor—impermissibly usurping the jury's role to claim, flatly, that Davidson never made any ageist remarks and that Lowe "lied" in both his deposition and evaluation.

16

Walbro's argument hinges entirely on Lowe's initial trial testimony, where he failed to recall the statements, and from that omission leaps to the sweeping claim that Lowe "admitted" the remarks were never made. It ignores Lowe's subsequent testimony—given directly in response to defense counsel's accusation of perjury— where he reaffirmed that Davidson made the comments, that he relayed them during his deposition, and that he reported them to Dr. Benedek. That testimony, coupled with Benedek's report, confirmed the age-related remarks occurred—testimony the jury plainly credited.

Moreover, Lowe's explanation regarding the time lapse and his emotional distress gave the jury a reasonable, human basis to conclude his initial omission was a memory lapse—not a lie. The jury could view his later testimony as a good-faith clarification. Accepting Defendant's position would mean any imperfect memory renders a witness's account inadmissible—a result that would erase redirect examination and strip juries of their constitutional role in assessing credibility.

Walbro's legal premise fares no better. Michigan law is clear: an inconsistency in testimony does not equate to falsity, let alone perjury. In *People v. Walker*, No. 362638, 2023 Mich. App. LEXIS 5857 at *10-11 (Ct. App. Aug. 17, 2023), the Michigan Court of Appeals rejected the very same argument Walbro raises here—that inconsistencies alone prove a witness's trial testimony false:

> Thus, the jury was aware of the alleged inconsistencies and was permitted to consider them when evaluating the victim's credibility.

**Merely because the victim's testimony may have been inconsistent with a prior statement or conflicted with other witnesses' testimony does not establish that her testimony was in fact false**. Rather, the inconsistencies created questions of fact for the jury to resolve.

*Id.* at *11 (internal citation omitted) (emphasis added).

Likewise, in *People v. Bass*, 317 Mich. App. 241, 274–75 (2016), the Court rejected the defendant's attempt to discredit a witness's trial testimony simply because it contained new detail not present in earlier statements:

> [E]ven assuming, for the sake of argument, that Bouldin's trial testimony *was* inconsistent with her prior statements, such inconsistencies do not establish that Bouldin's trial testimony was actually false. **Although an inconsistent prior statement may be a mechanism to impeach a witnesses' credibility at trial, it is not definitive evidence that the trial testimony is false**. *Id.* (emphasis added).

These cases squarely reject Walbro's central claim: that Lowe's initial omission renders his subsequent consistent testimony, Benedek's testimony, and her report inherently false or unworthy of jury consideration. Rather, as *Bass* and *Walker* confirm, any inconsistencies merely raised a credibility issue for the jury to resolve—as they did here in Plaintiff's favor.

Nor can Walbro convert Lowe's early testimony into a binding judicial admission. It is blackletter law that: "An admission is not conclusive of the facts stated therein and admissions may be varied or contradicted by other evidence." *Holloway Const. Co. v. State*, 44 Mich. App. 508, 533 (1973) (citing *Guarantee Bond & Mortgage Co. v. Hilding*, 246 Mich. 334 (1929)).

18

Thus, even if Lowe's initial trial testimony were construed as an "admission" that Davidson made no ageist statements—which it plainly was not—such an "admission" would not strip the jury of its authority to weigh all the conflicting evidence, including Benedek's independent corroboration and Lowe's redirect. Courts have repeatedly held that inconsistent testimony does not constitute a conclusive admission nor invalidate a party's case as a matter of law.

Finally, it bears emphasis that the district court improperly denied Plaintiff's counsel the opportunity to refresh Mr. Lowe's recollection or impeach him with his prior deposition testimony—despite Plaintiff's express indication that, after five years, his memory needed to be refreshed, and despite defense counsel's repeated accusations that he had lied under oath. (RE 118, PageID 2962–2972). Both Michigan and federal courts have consistently recognized that a party may impeach or refresh the recollection of any witness, including their own, using deposition testimony. *See, e.g., France v. Edwards*, No. 347343, 2020 Mich. App. LEXIS 3095, *9-10 (Ct. App. Apr. 30, 2020); *United States v. Letner*, 273 Fed. Appx. 491, 495 (6th Cir. 2008). Yet the district court, after being presented with the applicable evidentiary rule, responded only: "That's my ruling, right or wrong." (RE 118, PageID 2972). While the error likely added to the confusion and prevented the jury from hearing the full context of Lowe's deposition testimony in real time, it ultimately proved harmless: Lowe later clarified his testimony, reaffirming the

Davidson statements, and Dr. Benedek independently corroborated them in both her trial testimony and her report.

In sum, the district court's central justification for overturning the jury's verdict—that Davidson's ageist termination meeting statements were never presented to the jury—is flatly refuted by the trial record. As established above, that very evidence—explicitly recognized by this Court as sufficient, standing alone, to submit Plaintiff's ELCRA claim to the jury—was presented multiple times, by multiple witnesses, including Plaintiff and Walbro's own expert, Dr. Benedek. The jury was properly instructed to weigh credibility and resolve any inconsistencies, which it did. By refusing to credit that evidence and substituting its own credibility determination for the jury's, the district court not only invaded the province of the jury, but also disregarded this Court's prior holding in this very case. Walbro now invites this Court to ratify that error and allow it to escape liability a second time—on the very ground this Court already rejected. But this case was, and remains, jury-submissible under the standard this Court has already articulated. The record now confirms what was previously assumed: the jury heard the evidence, weighed it, and rendered a verdict. That verdict must be reinstated.

**B.    Defendant Misrepresents the Trial Record to Evade Controlling Authority Supporting Submission to the Jury.**

As shown above, Davidson's ageist termination-meeting remarks—previously held by this Court to constitute sufficient direct evidence—were admitted

at trial. But that evidence was only part of a broader record of direct and circumstantial proof of discrimination and pretext, including multiple ageist statements by Davidson, shifting justifications for Lowe's firing, and an adverse inference from Walbro's failure to produce a critical stack ranking—all of which the jury was entitled to weigh.

The district court itself found this body of evidence sufficient to deny directed verdict. Yet a year later, it reversed itself—without explanation, without new law, and without new evidence. Defendant now tries to preserve that reversal by recasting the record in its favor, mischaracterizing testimony, and drawing credibility inferences barred on post-verdict review. This is legally unsupportable.

First, Defendant claims Lowe was terminated solely due to the elimination of his Area Manager role. But the record squarely contradicts that narrative. Rard testified that Walbro was "hiring like crazy" at the time—including 15 salaried, 50–100 union, and 12 technician positions. (RE 116, PageID 2538–39). Davidson admitted there was plenty of work to do, that Lowe's duties had to be redistributed, and that Walbro was turning a profit. (RE 117, PageID 2717–18, 2795–96). Lowe testified that he remained capable of adapting to blow molding. (RE 118, PageID 2820–24).

Former operations director John Graves, Davidson's predecessor, confirmed that Lowe remained helpful with blow molding and that the plant was largely

unchanged since he left in 2014. (RE 116, PageID 2586–87, 2623). That Graves no longer supervised Lowe was irrelevant to the jury's consideration of his firsthand observations.

This Court has already recognized the jury could credit Lowe's account—that Davidson first stripped his duties, then used that diminished role to justify termination—as a "two-step, choreographed process" evidencing pretext. *Lowe v. Walbro, LLC*, 972 F.3d 827, 834–35 (6th Cir. 2020). With no negative reviews or credible proof of performance issues, this Court rightly held: "Walbro has not demonstrated as a matter of law that it would have terminated Lowe regardless of any age-related animus." *Id*. at 835.

Next, Defendant asserts that age played no role because Davidson and Rard denied discussing age. But Lowe testified Rard mentioned his age twice at the termination meeting—prompting him to ask if he was being fired because of his age, which neither Rard nor Davidson denied. (RE 117, PageID 2838). The district court cited this testimony in denying directed verdict. (RE 119, PageID 3130–31). At minimum, it created a credibility issue.

Rard and Davidson also gave conflicting accounts of the termination script: whether it came from legal or was a template, whether it was to be read verbatim or used as talking points, and whether key details in the script (like who would escort Lowe out) were accurate. (RE 116, PageID 2528–34; RE 117, PageID 2731, 2750–

52, 2774–79). These inconsistencies gave the jury ample reason to discredit their narrative.

Defendant also selectively quotes Lowe's testimony to suggest he conceded Rard was truthful and Davidson's remark was a joke. But immediately after calling Rard "truthful," Lowe flatly rejected her claim that age played no role:

Q.    So if she's truthful, and she said it's not a factor, she was telling the truth, right?

**A.    I don't believe so, sir.** (RE 118, PageID 2932).

Similarly, Lowe clarified that while he initially thought Davidson's "retirement" comment was a joke, he reconsidered after reflection. (RE 117, PageID 2829; RE 118, PageID 2936). That remark was among those cited by the district court in denying directed verdict.

Defendant's framing—attempting to treat Lowe's subjective impressions as dispositive—ignores the rule that such testimony is irrelevant to the legal analysis. *See Slapak v. Tiger Mgmt. Grp., LLC*, 594 F. App'x 290, 296 (6th Cir. 2014); *Rosenthal v. Faygo Bevs., Inc.*, 701 F. App'x 472, 480 (6th Cir. 2017).

Defendant also tries to minimize more than half a dozen ageist remarks made by Davidson. But unlike the vague or isolated comments in cases like *Blizzard* or *Rowan*—often made by non-decisionmakers—Davidson admitted he participated in Lowe's termination. (RE 117, PageID 2719–20). This Court already rejected

23

Walbro's argument that Davidson's role was too diluted to matter. See *Lowe*, 972 F.3d at 834. Defendant's reliance on fact-distinct cases is unavailing.

Likewise, Defendant's argument that Lowe's survival of the 2016 and 2017 RIFs negates discriminatory animus fails. Davidson had no role in the 2016 RIF and was not the final decisionmaker in 2017. (RE 117, PageID 2801, 2810–11). That Lowe was spared in earlier layoffs proves nothing about the discriminatory motive behind his later termination.

Defendant also attempts to relitigate the adverse inference stemming from its failure to produce Davidson's 2017 stack ranking—despite a court order. But it cannot simultaneously argue the document was irrelevant while relying on Davidson's unrebutted testimony about it. That testimony went unrebutted only because the document was never produced. The stack ranking, by Davidson's own account, was his sole documentation of Lowe's supposed performance deficiencies—the very rationale for stripping duties and eliminating the role. The jury was properly instructed to apply an adverse inference, and it was free to view the missing ranking as further undermining Davidson's credibility.

In fact, Davidson and Rard both acknowledged Lowe's consistently positive performance before Davidson's tenure. (RE 116, PageID 2492, 2575; RE 117, PageID 2695–99, 2793–95, 2829–34). Meanwhile, Davidson's justifications repeatedly shifted—performance, behavior, position elimination—each inconsistent

with prior statements and unsupported by reviews. (RE 117, PageID 2688–90). That inconsistency alone was evidence of pretext.

Finally, Defendant claims it had no obligation to give Lowe a performance review. But this Court already rejected that argument: "A reasonable jury. . . could determine that the lack of any such evaluation undercuts Walbro's explanation. . . [and] bolsters Lowe's 'two-step' theory." *Lowe*, 972 F.3d at 836.

Nor can Defendant avoid the verdict by invoking the business judgment rule. The jury was explicitly instructed—by both sides—not to second-guess Walbro's decisions unless motivated by discrimination. (RE 120, PageID 3237, 3271–74, 3284). Defendant offers no basis to presume the jury ignored its charge.

This case was not based on isolated comments or speculation. It was supported by a robust evidentiary record. Defendant's strategy—distinguishing each case and piece of evidence in isolation—ignores what the law plainly allows: a holistic view of the facts.

The jury had ample evidence of discriminatory motive, including:

1. Davidson's age-related statements during the termination meeting.

2. More than six ageist comments by Davidson in the months prior to termination.
3. Conflicting accounts of whether age was mentioned during the separation meeting.

4. Evidence that Lowe's duties were systematically removed after Davidson's arrival.

5. Testimony from Graves contradicting claims that Lowe lacked adaptability or value.

6. Evidence that Walbro was actively hiring when Lowe was terminated.

7. The district court's own recognition that Davidson's ageist comments raised a jury question.

And ample evidence of pretext, including:

1. Shifting and inconsistent justifications for termination—including performance, behavior, and position elimination.

2. Davidson's contradictory and self-serving explanations regarding Lowe's performance.

3. Absence of any negative performance reviews under Davidson's supervision.

4. Walbro's failure to produce the 2017 stack ranking, in violation of a court order.

5. The adverse inference the jury was instructed to apply as a result.

6. Davidson's admission that the company was profitable and had ample work when Lowe was fired.

7. Testimony that Davidson was a key decision-maker in the termination process.

8. Inconsistent testimony between Davidson and Rard about the preparation and content of the termination script.

9. Plaintiff's efforts to adapt to new technology and to mitigate his damages through job applications.

Taken together, this was not a close case. The jury's verdict was supported by extensive proof. That Defendant dislikes the result does not entitle it to rewrite the record. Its attempt to recast the jury's fact-finding as legal error must be rejected.

## II. THE DISTRICT COURT ERRED IN CONDITIONALLY GRANTING A NEW TRIAL, AS THE JURY'S VERDICT WAS SUPPORTED BY THE EVIDENCE, FREE FROM PREJUDICE, AND WITHIN ITS DISCRETION.

### A. The Jury's Non-Economic Award Was Reasonable and Fully Supported by the Record.

Walbro contends that the district court correctly ordered a conditional new trial based on its dissatisfaction with the size of the jury's non-economic damages award and its erroneous conclusion that Plaintiff failed to prove discrimination. Neither rationale survives scrutiny under the deferential standard owed to jury verdicts, particularly for non-economic damages.

The jury was properly instructed to base its award solely on Plaintiff's damages—not on sympathy, prejudice, or a desire to punish. (RE 120, PageID 3238–3242). Jurors are presumed to follow such instructions. *See People v. Graves*, 458 Mich. 476, 486 (1998); *Tobin v. Providence Hosp.*, 244 Mich. App. 626, 641 (2001). The district court's speculation that the verdict was driven by passion or prejudice lacks any record support. In fact, both parties explicitly reinforced these instructions during closing argument. (RE 120, PageID 3256, 3271–3274).

As detailed in Plaintiff's Brief on Appeal, the non-economic damages award was supported by expert and lay testimony. Dr. Sheiner diagnosed Lowe with Major Depression and PTSD features due to his abrupt termination after 41 years. Lowe and his fiancée described severe emotional distress—including insomnia, withdrawal, and loss of purpose—and even Walbro's expert acknowledged visible symptoms. Courts in *Palenkas*, *Campbell*, *Griffey*, *Fischer*, *Paulitch*, *Spica*, and *Unibar* have upheld similar awards, particularly where testimony is corroborated, even absent formal treatment.

The jury's credibility determinations were its to make. Walbro's reliance on *Weber* is misplaced. Both the Sixth Circuit and Michigan courts have rejected comparisons to verdicts in "similar" cases as a basis to overturn a jury award— especially in discrimination cases, where personal harm is highly individualized. See *Watrous v. Conor*, 266 Mich. 397, 401–02 (1934); *West v. Tyson Foods*, 374 F. App'x 624, 643 (6th Cir. 2010). *Weber* is distinguishable in any event: the plaintiff there relied solely on uncorroborated personal testimony and offered no independent evidence of emotional distress. *See Weber v. Infinity Broad. Corp.*, No. 02-74602, 2005 U.S. Dist. LEXIS 40724, *16 (E.D. Mich. Mar. 7, 2016).

That Lowe did not pursue formal mental health treatment is immaterial. This Court has upheld emotional distress awards without it where plaintiffs credibly

28

described the impact. The jury heard that credible testimony here—from Lowe, his fiancée, and experts—and weighed it accordingly.

Rather than confront that evidence, Walbro relies on superficial comparisons, as if a judicial cap exists on emotional distress damages. It does not. Michigan law recognizes that emotional harm is inherently subjective, fact-specific, and not suited to comparison. *See Palenkas*, 432 Mich. 527, 538 (1989). Lowe's long tenure, abrupt dismissal, and post-termination isolation were real, concrete harms—well within the jury's province to weigh.

Even if comparisons were proper, Plaintiff identified several ELCRA cases with comparable damages based on similar harms. In *Griffey*, the plaintiffs suffered public humiliation and had job duties eroded before discharge. In *Rushing*, the plaintiff—like Lowe—was falsely accused of misconduct as a pretext for termination. In both cases, the awards stood.

That Walbro can cite lower awards from less egregious facts proves nothing. The only relevant question is whether this jury's award was supported by the record. It was. The jury heard substantial testimony about the psychological toll of being discarded after 41 years of service—and responded accordingly.

Because the verdict was grounded in competent evidence, untainted by improper argument, and well within the jury's discretion, the district court's conditional new trial order must be reversed. Walbro's dissatisfaction with the result

is not a legal error—and falls far short of the burden required to discard the jury's judgment.

## B.    Defendant's Unpreserved Challenge to Backpay and Front Pay Cannot Support the New Trial Order.

Defendant's challenge to the jury's backpay and front pay awards fails from the outset. The district court did not rely on either in its conditional new trial ruling, and Defendant did not cross-appeal. Its effort to relitigate these issues—after losing them below—is procedurally barred. See *Olympic Fastening Sys., Inc. v. Textron Inc.*, 504 F.2d 609, 617 (6th Cir. 1974).

Even if preserved, the argument lacks merit. The district court twice held sufficient evidence supported submission of backpay and front pay—once pretrial (RE 98, PageID 2142–2148) and again after Plaintiff's case-in-chief (RE 119, PageID 3221–3222). The jury was properly instructed (RE 120, PageID 3238–3240), and its economic awards were supported by unrebutted expert testimony and credibility-based findings well within its purview.

Backpay is presumptively awarded once liability is found. See *Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015); *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1171 (6th Cir. 1996). Defendant bore the burden to prove failure to mitigate, yet presented no vocational expert, no rebuttal economist, and no job market evidence. Plaintiff testified to his job search, unemployment efforts, and résumé submissions (RE 117, PageID 2852–2855; RE 118, 2902–2926, 3038–3039).

30

Defendant's "retirement" claim was contradicted by multiple witnesses and even its own expert, who admitted mislabeling Lowe's departure (RE 119, PageID 3166–3167).

The jury's $443,418 backpay award mirrored Dr. Macpherson's calculations, which were properly discounted and unrebutted. (RE 118, PageID 2995–3004). Under *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 628 (6th Cir. 1983), any ambiguity must be resolved against the discriminator.

The district court also expressly found the front pay claim supported by evidence of Plaintiff's intent to work until age 70 and efforts to mitigate. (RE 119, PageID 3221–3222; RE 118, PageID 2885, 2999–3000). Dr. Macpherson's front pay analysis was conservative, unrebutted, and properly discounted. *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 333 (6th Cir. 2013).

Defendant's focus on the lack of post-2022 job applications ignores Dr. Macpherson's testimony on the "discouraged worker effect" (RE 118, PageID 3014, 3025–3026)—which the jury was free to credit, especially given Plaintiff's rural location and Defendant's failure to offer any comparable job evidence.

In short, Defendant's challenge falls far short of the manifest injustice standard. The district court never found these awards excessive, and they formed no basis for the new trial order. This Court should not affirm on a ground the lower court itself rejected.

## CONCLUSION AND RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court reverse the district court's October 22, 2024 Order (RE 143) granting judgment as a matter of law, vacating the October 2023 jury verdict, and conditionally granting a new trial; reverse the corresponding Judgment (RE 144); reinstate the November 2, 2023 Judgment in Plaintiff's favor (RE 114); and remand for further proceedings.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date: June 13, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B), I certify that this brief complies with the type/volume limitation. The number of words in this brief is 6,422 excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date: June 13, 2025

# CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, a copy of Plaintiff-Appellant Kenneth Lowe's Brief on Appeal was filed electronically. Notice of this filing will be sent to the filing parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Respectfully Submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
220 W. Congress Street, Fourth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 470-2011
Email: jon@markolaw.com

Date: June 13, 2025

**ADDENDA**

**ADDENDUM CONTAINING DESIGNATION OF RELEVANT DOCUMENTS IN THE DISTRICT COURT ELECTRONIC RECORD BY PLAINTIFF-APPELLANT**

Plaintiff-Appellant, pursuant to 6 Cir. R. 30(b) and 30(g)(1), hereby designates the following filings in the electronic record of the District Court:

| Record Entry | Description of Entry | Page ID # Range | Date |
|---|---|---|---|
| 98 | Order Granting Denying Def.'s MIL to Limit Back Pay and Bar Front Pay Damages | 2456-2459 | 10/12/23 |
| 114 | Judgment | 2460-2479 | 11/02/23 |
| 115 | Trial Tr. Vol I. held on 10/24/23 | 2480-2675 | 11/13/23 |
| 116 | Trial Tr. Vol II. held on 10/25/2023 | 2676-2675 | 11/13/23 |
| 117 | Trial Tr. Vol III. held on 10/26/2023 | 2676-2859 | 11/13/23 |
| 118 | Trial Tr. Vol IV. held on 10/27/2023 | 2860-3050 | 11/13/23 |
| 119 | Trial Tr. Vol V. held on 10/30/2023 | 3081-3162 | 11/16/23 |
| 120 | Trial Tr. Vol VI. held on 10/31/2023 | 3225-3307 | 11/17/23 |
| 143 | Order and Opinion Granting Def.'s Motion for Judgment as a Matter of Law, Vacating October 2023 Judgment, Entering Judgment for Defendant, Conditionally Granting New Trial | 4107-4123 | 10/22/25 |

# ADDENDUM CONTAINING
# UNPUBLISHED AUTHORITY
# CITED IN THIS BRIEF

*France v. Edwards*,
  No. 347343, 2020 Mich. App. LEXIS 3095
  (Ct. App. Apr. 30, 2020)

*People v Giamporcaro*,
  No. 312556, 2013 Mich. App. LEXIS 1966
  (Ct. App. Dec. 3, 2013)

*People v. Walker*,
  No. 362638, 2023 Mich. App. LEXIS 5857
  (Ct. App. Aug. 17, 2023)

*Starks v. Jackson*,
  No. 1:17-cv-399, 2018 U.S. Dist. LEXIS 38159
  (W.D. Mich. Feb. 7, 2018)

*Weber v. Infinity Broad. Corp.*,
  No. 02-74602, 2005 U.S. Dist. LEXIS 40724
  (E.D. Mich. Mar. 7, 2016)

## *France v. Edwards*

Court of Appeals of Michigan

April 30, 2020, Decided

No. 347343

**Reporter**
2020 Mich. App. LEXIS 3095 *; 2020 WL 2096053

DEBORAH MARIE FRANCE, Plaintiff-Appellee, v FRANKLIN LEE EDWARDS and BEATTIE FARMS, LLC, Defendants-Appellants, and DONALD A. BEATTIE and RICHARD FRANCE, Defendants.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Leave to appeal denied by *Fr. v. Franklin Lee Edwards & Beattie Farms, 2021 Mich. LEXIS 661 (Mich., Apr. 27, 2021)*

**Prior History:**  **[*1]** Muskegon Circuit Court. LC No. 14-049833-NF.

*France v. Edwards, 2019 Mich. App. LEXIS 670 (Mich. Ct. App., Apr. 2, 2019)*

## Core Terms

Farms, trial court, tractor, trigger, remarks, turn signal, questions, new trial, deposition, comments, deposition testimony, panic attack, cured, encounter, anxiety, driving, future damage, defense counsel, evidence show, credibility, damages, broken, lights, version of events, unfair prejudice, punish, steps, instruct a jury, objected, answers

**Judges:** Before: MARKEY, P.J., and JANSEN and BOONSTRA, JJ.

## Opinion

Per Curiam.

In this action to recover damages for injuries sustained in a collision between an SUV and a farm tractor, defendants, Franklin Lee Edwards and Beattie Farms, LLC, appeal by right the trial court's orders denying relief after a jury returned a verdict in favor of plaintiff, Deborah Marie France. We affirm.

I. BASIC FACTS

Edwards worked for Beattie Farms. On the morning of June 2, 2012, he prepared his 19,000-pound tractor by attaching two farm implements to it. He also needed to fuel the tractor, but the fuel station was on the other side of Skeels Road some distance west of his location. Edwards said that he drove the tractor up to Skeels Road and looked for traffic. There were two cars coming, but they were quite a distance away, so he pulled out into traffic. He said that he drove at about four miles per hour. He let the first car pass and then looked behind him and saw that the second car, an SUV, was still far enough back that he could turn left into the farm. He turned into the farm's driveway, and the SUV suddenly slammed into the side of the tractor. He immediately stopped **[*2]** the tractor.

Richard France testified that he was driving his SUV west on Skeels Road. His wife, Deborah France, was in the front passenger seat and his adult son was in the backseat behind Deborah. Richard said that he saw Edwards enter traffic and stated that he quickly closed up the distance to the slow-moving tractor, so he decided to pass the tractor on the left. Richard said that there were no other cars in front of him. Richard slowed, looked for oncoming traffic, and saw a Jeep driving eastbound. After the Jeep passed, Richard moved over into the eastbound lane, and began to accelerate around Edwards's tractor. He got up to about 15 miles per hour and was past the second farm implement attached to the tractor when Edwards suddenly turned left in front of him. He said that Edwards did not signal or look before turning. Richard drove into the tractor between its front and back wheels. The tractor then dragged the SUV partially into the farm's driveway before Edwards stopped.

Emergency responders had to remove the passenger door to extract Deborah from the SUV. Deborah suffered a broken ulna that required two surgeries and took approximately 10 months to heal. There was also evidence **[*3]** that she suffered from anxiety and panic attacks after the accident whenever encountering farm vehicles on the area roads, especially when encountering farm vehicles owned by Beattie Farms.

At trial, Edwards and Beattie maintained that the evidence showed that Richard was at fault for the accident. A witness, Brad Church, who was delivering supplies to the farm, testified that he saw the accident. He said that Richard drove off Skeels Road into a drainage ditch along the side of the road, and then slammed into the tractor, which was already in the farm's driveway. The owner of Beattie Farms, Donald Beattie, testified that he saw tire marks in the drainage ditch after he came out to see what had happened. Edwards and Beattie Farms argued that the evidence showed that Richard was driving too fast, and they suggested that he recklessly tried to pass the tractor at a high speed before it reached a no-passing zone.

Deborah's counsel, however, argued that the evidence showed that Edwards carelessly turned without signaling or looking behind him while Richard was carefully and legally passing Edwards on the left. The jury found in Deborah's favor and awarded her $225,000 in past damages and **[*4]** $25,000 in future damages. This appeal followed.

## II. USE OF DEPOSITIONS

We first address the argument that the trial court allowed Deborah's trial counsel to improperly impeach witnesses with deposition testimony.

This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Mitchell v Kalamazoo Anesthesiology, PC, 321 Mich App 144, 153; 908 NW2d 319 (2017)*. A trial court abuses its discretion when it selects an outcome that is outside the range of reasonable outcomes. *Id. at 153-154*. However, this Court reviews de novo whether the trial court properly interpreted and applied the rules of evidence. *Id. at 154*.

A deposition may not be admitted at trial except as provided in the rules of evidence. See *MCR 2.308(A)*. A transcript of a deposition is normally hearsay that would be inadmissible at trial unless an exception applied. See *MRE 801(c)*; *MRE 802*; *Shields v Reddo, 432 Mich 761, 766-767; 443 NW2d 145 (1989)*. However, a transcript of testimony by a party opponent is by definition not hearsay. See *MRE 801(d)(2)*. Similarly, if a witness testifies at trial and is subject to cross-examination, an inconsistent statement made by the witness at a deposition is defined to not be hearsay. See *MRE 801(d)(1)(A)*. Extrinsic evidence of a prior inconsistent statement, such as a deposition transcript, is normally not admissible unless the witness is afforded the opportunity to explain or deny the statement **[*5]** and the opposing party is afforded the opportunity to interrogate the witness. *MRE 613(b)*. However, those limitations do not apply to admissions of a party opponent as defined under *MRE 801(d)(2)*. See *MRE 613(b)*. An answer to an interrogatory is admissible to the same extent as a deposition. See *MCR 2.309(D)(3)*.

At trial, Deborah's counsel questioned Beattie about the distances from the staging area for the farm's equipment and the various fields where the workers used the equipment. Deborah's counsel indicated to Beattie that he had told him that the workers had to drive up to six miles to work the fields to the south and Beattie corrected him, stating that it was "[a]bout a mile south and a mile east." Deborah's counsel then asked Beattie to look at his deposition and stated that he would read it after Beattie had had an opportunity to find the lines.

2020 Mich. App. LEXIS 3095, *5

Defense counsel objected to that proposed procedure on the ground that he had to present the deposition to refresh the witness's recollection and could not read it. At first, the trial court agreed, but Deborah's counsel noted that he was impeaching Beattie and so did not need to refresh his recollection first. Opposing counsel responded that he should then give Beattie the opportunity **[*6]** to read the answer first. After giving Beattie the opportunity to read the deposition transcript, Deborah's counsel read the question and the related answer into the record, and opposing counsel again objected, but the trial court allowed Deborah's counsel to proceed. After reading the question-and-answer, counsel asked whether he read the testimony correctly, and Beattie agreed. He then asked Beattie to state which answer was correct, and Beattie explained what he thought was the more accurate answer. Deborah's counsel repeated that procedure throughout Beattie's testimony.

Because Beattie was the owner of Beattie Farms and its agent, his statements were not hearsay. See *MRE 801(d)(2)(D)*. Therefore, the statements that he made at the deposition were not barred by the hearsay rule, see *MRE 802*, and were not subject to the requirements of *MRE 613(b)*. In any event, counsel complied with *MRE 613(b)* for each of the cited examples. Counsel gave Beattie the opportunity to read the deposition or interrogatory answer, allowed him to explain the differences between his statements, and Beattie Farms clearly had the opportunity to examine Beattie for further clarification. As such, the trial court did not abuse its discretion when it allowed **[*7]** Deborah's counsel to proceed in this fashion with regard to each of the cited examples. See *Mitchell, 321 Mich App at 153-154*.

Deborah's counsel utilized the same basic procedure with Church. He questioned Church about relevant events and when Church gave an answer that was arguably inconsistent with his deposition testimony, counsel gave Church the opportunity to read the deposition, and then read the question-and-answer into the record. After reading the deposition testimony, Deborah's counsel asked clarifying questions and gave Church the opportunity to explain the discrepancies. As for the final example involving Church, Deborah's counsel did not read the deposition testimony into the record—defense counsel read it into the record in an effort to rehabilitate Church by showing that his deposition testimony was consistent with his trial testimony.

Although Church was not a party opponent, see *MRE 801(d)(2)*, his inconsistent statements were nevertheless not hearsay under *MRE 801(d)(1)(A)*, and so were not barred under *MRE 802*. Moreover, for each instance involving Deborah's counsel, counsel complied with the requirements of *MRE 613(b)*. Accordingly, the trial court did not abuse its discretion when it allowed Deborah's counsel to read Church's deposition into the **[*8]** record. See *Mitchell, 321 Mich App at 153-154*.

The same is true for Edwards, who was a party opponent under *MRE 801(d)(2)*. In each cited example, Edwards gave testimony that was arguably inconsistent with his deposition testimony, and Deborah's counsel gave Edwards an opportunity to read the deposition before he himself read the questions and answers into the record. After reading the deposition, Deborah's counsel asked Edwards clarifying questions and defense counsel had the opportunity to examine him about his answers. The deposition testimony was substantively admissible, and, even though not required to follow the procedures stated under *MRE 613(b)*, Deborah's counsel adequately complied with that rule nonetheless. The trial court did not abuse its discretion when it allowed that procedure. See *Mitchell, 321 Mich App at 153-154*.

On appeal, Edwards and Beattie Farms maintain that Deborah's counsel improperly used the depositions because he did not ask foundational questions of the witnesses, which would demonstrate that the depositions were admissible. Instead, they claim that Deborah's counsel merely read the deposition questions and answers into the record and let the answers stand as though proved. Edwards and Beattie Farms cite Justice BRENNAN'S dissent in *Hileman v Indreica, 385 Mich 1; 187 NW2d 411 (1971)*, for the **[*9]** proposition that a party cannot read deposition testimony into the record in this way.

In *Hileman*, Justice BRENNAN took the position that the trial court properly excluded the use of the deposition testimony at issue in that case because the plaintiff in that case could not impeach her own witness under the rules then applicable and, even if used to impeach the witness, the plaintiff was attempting to admit the testimony as

substantive evidence, which was improper. *Id. at 28-29* (BRENNAN, J., dissenting). Setting aside the fact that the majority did not adopt Justice BRENNAN's views on the proper use of deposition testimony, our Supreme Court has since the decision in *Hileman* adopted new court rules and rules of evidence, which govern the admission and use of deposition testimony as already described. Indeed, under modern practice, a party may attack the credibility of any witness, even his or her own witness. See *MRE 607*. Moreover, deposition testimony is admissible in modern practice as provided under the rules of evidence, see *MCR 2.308(A)*; and, assuming that the deposition testimony is otherwise relevant and admissible, see *MRE 401*; *MRE 402*, the deposition testimony might not be barred by the hearsay rule, see, e.g., *MRE 801(d)(2)*, and **[*10]** would be admissible as substantive evidence, see *Fassihi v St Mary Hosp of Livonia, 121 Mich App 11, 14; 328 NW2d 132 (1982)*. Accordingly, Justice BRENNAN'S dissent is unpersuasive.

Edwards and Beattie Farms also cite the decision in *Socha v Passino, 405 Mich 458, 469-470; 275 NW2d 243 (1979)*, mod on other grounds *Johnson v Corbet, 423 Mich 304; 377 NW2d 713 (1985)*, for the proposition that the trial court should have required Deborah's counsel to read the deposition testimony into the record using a question by question approach. However, Deborah's counsel complied with that method by reading the questions and answers into the record.

Edwards and Beattie Farms have not identified any errors involving Deborah's counsel's use of deposition testimony.

III. ORDERS IN LIMINE

We next address Beattie Farms and Edwards's argument that the trial court did not properly enforce its orders in limine. This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Mitchell, 321 Mich App at 153*.

A. VALUE OF BUSINESS DEALINGS

Edwards and Beattie Farms first argue that the trial court erred when it allowed Deborah's counsel to elicit testimony about the dollar value of Beattie Farms's purchases from North Central Co-Op despite an order in limine specifically prohibiting Deborah's counsel from doing so.

One issue at trial was whether Church had a motive to conform his testimony to the version of **[*11]** events propounded by Beattie Farms. Church testified that he worked seasonally for North Central Co-Op. He also stated that he knew that Beattie was a significant customer of the co-op, and he acknowledged that he had been a longtime resident of the Fremont area and owned property nearby Beattie Farms's property. To the extent that Beattie Farms was an important customer of the co-op, Church might have felt pressure to testify in a way that helped Beattie Farms. As such, the business relationship between the co-op and Beattie Farms was relevant to determining Church's credibility. See *Lewis v LeGrow, 258 Mich App 175, 211; 670 NW2d 675 (2003)* (stating that evidence that shows bias or prejudice is always relevant).

Although evidence of bias is generally relevant, Edwards and Beattie Farms moved to preclude Deborah from presenting testimony about the value of the business that Beattie Farms had with Church's employer on the ground that it would be unfairly prejudicial. Deborah's counsel argued at the hearing on the motion that the value of the business relationship was important evidence that Church had a motive to distort the facts in favor of Beattie Farms. The trial court determined that the fairest course would be to allow Deborah to elicit **[*12]** testimony that Beattie Farms did a substantial amount of business with Church's employer, but that it was unnecessary to elicit testimony about the specific dollar amount or to admit the invoices. That is, the court apparently balanced the relevance of the evidence against the potential for unfair prejudice, see *MRE 403*, and limited the nature of the evidence. The court, however, warned that Beattie could open the door to the evidence of the dollar value if he denied that his farm did a substantial business with the co-op. The trial court incorporated its oral ruling into an order. The order provided that Deborah "shall not introduce or attempt to introduce into evidence statements, invoices or documents purporting to show the dollar value of business between Beattie Farms, LLC and North Central Co-Op" unless "Don Beattie denies that Beattie Farms, LLC conducts 'significant' business with North Central Co-Op."

At trial, Deborah's counsel asked Beattie about his business relationship with North Central Co-Op. Deborah's counsel asked Beattie to agree that Beattie Farms was the co-op's biggest customer, and Beattie replied that he was "far from their biggest customer." Counsel asked if he meant **[*13]** in the Fremont area, and Beattie clarified that there were "four mega farms within four miles" that "blow me out of the water." He refused to characterize the business that he did with the co-op as involving a significant amount of money. After a sidebar, Deborah's counsel asked about the total dollar value of his business with the co-op:

*Q.* Mr. Beattie, would you disagree in the years '11, '12 and '13 you spent over 1.3 million dollars with the Co-Op?

*A.* In three years, that's possible.

The trial court specifically stated—both orally and in its written order—that Deborah would not be allowed to present evidence of the dollar value of Beattie Farms's business with the co-op *unless* Beattie opened the door to the evidence. The gist of both caveats was that Beattie had to admit that his business was significant enough that the continuation of that relationship would be important to the co-op. At trial, Beattie testified that his business with the co-op was insignificant by comparison with the "mega" farms in the same area. When Deborah's counsel tried to get Beattie to admit that his business with the co-op was enormous, Beattie vacillated about the meaning of the term and wondered whether **[*14]** the term enormous meant one million dollars or five thousand dollars. He offered instead that he was just a good customer. Finally, when Deborah's counsel asked him whether one or two million dollars would be "significant," Beattie testified that he did not spend that much and again stated that he did not know what counsel meant by "significant."

Beattie downplayed the importance of his business to the co-op, which effectively amounted to a denial that he had significant business dealings with it. Beattie's refusal to admit that he was a significant customer of the co-op triggered the caveat that the trial court placed in the order in limine and opened the door to Deborah's counsel's question concerning the dollar value of his business with the co-op. The trial court's decision to allow the question fell within the range of reasonable outcomes. See *Mitchell, 321 Mich App at 153-154*.

Edwards and Beattie Farms also complain that the question itself was vague and implied that Beattie Farms did over $1.3 million in business each year, which added to the unfair prejudice. The trial court properly allowed the question, because it was relevant and, given Beattie's denial that he did significant business with the co-op, the **[*15]** relevance was not substantially outweighed by the danger of unfair prejudice. See *Waknin v Chamberlain, 467 Mich 329, 334; 653 NW2d 176 (2002)* (recognizing that it is only when the probative value of the evidence is substantially outweighed by the danger of unfair prejudice that otherwise relevant evidence becomes inadmissible). Moreover, when read in context with Beattie's response, the testimony indicated that the amount was the total for all three years. Finally, defense counsel could have addressed any ambiguity through further examination, which he did not do. Accordingly, there was no error concerning the question-and-answer involving the dollar value of the business between Beattie Farms and the co-op.

## B. IMPROPER PATTERN EVIDENCE

Edwards and Beattie Farms also argue that Deborah's counsel repeatedly elicited testimony that violated the order prohibiting Deborah from presenting improper pattern evidence. They claim that Richard, Deborah, and Deborah's son, Brian France, each improperly testified that Beattie Farms's employees drive unsafe vehicles.

Before trial, the trial court determined that Deborah would be allowed to present photos that showed that she frequently encounters farm vehicles on the roads as part of her proofs that she was **[*16]** likely to continue to encounter such vehicles and would suffer as a result of her anxiety. The court specifically stated that it did not want Deborah or her counsel to argue or state that the photos demonstrated Beattie Farms's pattern of behavior. The corresponding order reiterated that Deborah could not use the photos to establish a pattern of behavior by the farm's employees regarding the operation of the farm equipment.

Brian testified generally about his mother's anxiety and her extreme responses to seeing farm vehicles on the road. He further testified that he could distinguish Beattie Farms's vehicles from other farm vehicles and opined that 95% of the vehicles that they encounter on the roads are operated by Beattie Farms. He stated that it was an everyday occurrence during the summertime. After this testimony, Deborah's counsel asked Brian whether he had seen the operators of Beattie Farms's vehicles use turn signals, and he said that he had never seen them use turn signals. Defense counsel objected, and the trial court later held a sidebar after which it instructed the jury that "any testimony provided by this witness with regard to his observations of the operations of Beattie **[*17]** farm equipment while his mother is with him is limited only to the issue of whether or not she has sustained damages that relate to observation of equipment after she had this accident." Deborah's counsel asked Brian some additional questions related to that instruction and again inquired whether he had seen the employees use turn signals, which prompted an immediate objection, which the trial court sustained.

After the jury had been excused for the day, defense counsel moved for a mistrial on the ground that Deborah's counsel had violated the court's order in limine, which could not be rectified by an instruction. The trial court agreed that counsel went too far at one point in the examination, but it felt there was no prejudice. The court noted that it had already provided an instruction and would later instruct the jury that the attorney's questions were not evidence. Accordingly, it denied the motion.

The trial court did not abuse its discretion in its handling of Brian's testimony. See *Mitchell, 321 Mich App at 153-154*. The trial court limited Deborah's ability to present evidence that Beattie Farms continued to operate vehicles on the roads that do not have the ability to signal turns and from presenting evidence **[*18]** that the farm's employees do not signal turns even though such evidence was relevant to show why she was more likely to suffer an anxiety attack when driving in the same area as Beattie Farms's vehicles. See *MRE 401; MRE 402*. The court earlier explained that it did not want Deborah to present evidence that tended to show that the farm engaged in a pattern of behavior showing a lack of safety, but it still recognized that she had the right to present evidence to establish her future damages from anxiety. Although Deborah's counsel arguably exceeded the limits placed on Deborah's ability to present such evidence, the trial court instructed the jury that it could only consider Brian's testimony to the extent that it was indicative of Deborah's damages. That instruction cured whatever minimal prejudice might have accompanied the improper pattern evidence, and the subsequent instruction that questions are not evidence cured the prejudice from counsel's attempt again to elicit testimony about Beattie Farms's pattern of unsafely operating vehicles. See *Zaremba Equip, Inc v Harco Nat'l Ins Co, 302 Mich App 7, 25; 837 NW2d 686 (2013)* (stating that courts presume that jurors follow their instructions and that instructions cure most errors). Because there was no prejudice, the trial court **[*19]** properly denied the motion for a mistrial. See *In re Estate of Flury, 249 Mich App 222, 228-229; 641 NW2d 863 (2002)* (stating that a trial court should only grant a mistrial when an error at trial was so prejudicial to one of the parties that the fundamental goals of accuracy and fairness were threatened). Consequently, the trial court did not err in its handling of this testimony.

Edwards and Beattie Farms also complain that the trial court improperly allowed similar pattern evidence when Deborah's counsel examined Richard. Counsel elicited testimony from Richard concerning Deborah's anxiety and her reactions to encounters with Beattie Farms's equipment when driving in the area. Richard testified that he could tell when the vehicle is owned by Beattie Farms because the farm uses John Deere and the other local farmers use Internationals. Deborah's counsel then asked whether, "when you see the John Deere, or the Beattie vehicles that you think they are, are still seeing problems in terms of not having either turn signals—", but opposing counsel interrupted the question with an objection. Unlike the case with Brian's testimony, the trial court overruled the objection. The court allowed the answer, but informed the jury that it could only use the testimony **[*20]** for the purposes of establishing Deborah's damages and not to show that Beattie Farms does not comply with safety requirements for its equipment. Thereafter, Richard testified that they frequently saw Beattie Farms's vehicles with no turn signals or brake lights and with broken mirrors. He further agreed that it was when encountering such vehicles that Deborah had panic attacks. Richard testified that Beattie Farms was still harming his wife through the panic attacks and he felt that Beattie Farms did not care.

On appeal, Edwards and Beattie Farms maintain that the trial court erred by allowing Richard to testify that he and Deborah frequently see Beattie Farms's vehicles without turn signals, brake lights, and mirrors because that testimony violated the court's order in limine. However, the trial court was not bound to enforce its order as originally formulated; it could modify the order to suit the facts developed at trial. See, e.g., *Zantop Int'l Airlines, Inc v Eastern Airlines, 200 Mich App 344, 360; 503 NW2d 915 (1993)*; see also *People v Boyd, 470 Mich 363, 369; 682 NW2d 459 (2004)*. And it is evident from the trial court's ruling with regard to Richard's testimony that it altered its earlier ruling to allow testimony about the condition of Beattie Farms's vehicles. Because the testimony was relevant to the jury's assessment **[\*21]** of the triggers for Deborah's anxiety attacks and the likelihood of repetition, see *MRE 401*, it was admissible, see *MRE 402*. And there is no indication that the danger of unfair prejudice substantially outweighed the evidence's probative value. See *MRE 403*. Moreover, the trial court again instructed the jury that it could only use the testimony to determine whether and to what extent Deborah would suffer future damages arising from the accident, which instruction the jury presumably followed. See *Zaremba Equip, 302 Mich App at 25*. Thus, the trial court took adequate steps to limit any unfair prejudice that might arise from the testimony. See *MRE 105*. On the record before us, we conclude that the trial court did not abuse its discretion when it allowed this testimony. See *Mitchell, 321 Mich App at 153-154*.

Edwards and Beattie Farms argue that the improper pattern testimony continued with Deborah. Deborah agreed at trial that she had told her therapist that her situation had overall been getting better, but that she still had a problem when she encounters equipment owned by Beattie Farms. Her counsel asked her why she continued to have problems with equipment operated by Beattie Farms, as opposed to other farms. Deborah responded: "Because my—my feeling, and this is my opinion, **[\*22]** that they haven't learned anything from this; that it didn't bother them that they almost killed me because they still don't use turning signals."

Defense counsel immediately asked for a sidebar, and the trial court struck the answer and ordered the jury to disregard it. The court then went on and explained its reasoning outside the presence of the jury. It stated that it had been allowing evidence that seeing Beattie Farms's vehicles triggers "flashbacks, panic attacks, [and] would be frightening for herself" because that evidence was relevant to her damages. However, whether she was "mad or disgusted" by Beattie Farms' failure to take steps to make its vehicles safer was not within its ruling. The court stated that Deborah should not be talking about what makes her angry or frustrated or concerned. Thereafter, when asked about what would be justice for her, Deborah informed the jury that she wanted Beattie Farms to "realize what their equipment does by not being fully up to standards." The trial court struck that statement after objection as well.

As the trial court recognized when discussing the same claims in the motion for a new trial, it was improper for Deborah to testify as to **[\*23]** her belief about what would be just because her comments implicated punishment rather than compensation; however, any prejudice was alleviated when the court instructed the jury to disregard her answers. Jurors are presumed to follow their instructions and instructions are presumed to cure most errors. *Zaremba Equip, 302 Mich App at 25*. Accordingly, even to the extent that Deborah's testimony was improper, it did not prejudice the trial.

The trial court carefully balanced Deborah's right to present evidence that she had suffered, and would continue to suffer, panic attacks triggered by Beattie Farms's vehicles as a result of the mental harm caused by the accident against the danger of unfair prejudice accompanying that testimony. To the extent that Deborah's counsel elicited testimony that went beyond the trial court's ruling, the trial court immediately corrected the errors and properly instructed the jury. As such, the questioning did not cause Edwards or Beattie Farms any unfair prejudice.

IV. ATTORNEY MISCONDUCT

Next, Beattie Farms and Edwards argue that Deborah's counsel engaged in a pattern of conduct at trial designed to inflame the jury's passion and bias against Beattie Farms.

This Court reviews de novo as a **[\*24]** question of law whether an attorney's remarks deprived the opposing party of a fair trial. See, e.g., *Reetz v Kinsman Marine Transit, 416 Mich 97, 102-103; 330 NW2d 638 (1982)*. However,

this Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion. See *Zaremba Equip, 302 Mich App at 21*. For remarks that were not objected to at trial, the party claiming error "must prove that (1) the remarks were so prejudicial as to have denied the party a fair trial and that (2) any resulting prejudice could not have been cured by a curative instruction." *Badiee v Brighton Area Sch, 265 Mich App 343, 373-374; 695 NW2d 521 (2005)*.

## A. OPENING STATEMENT

Edwards and Beattie Farms maintain that Deborah's counsel began his campaign by attacking Beattie Farms in his opening statement. The opening statement is the time when the attorneys discuss the evidence to be adduced at trial; and attorneys have wide latitude in outlining to the jury that evidence. See *Taylor v Klahm, 40 Mich App 255, 260-261; 198 NW2d 715 (1972)*. An attorney's remarks ordinarily will not constitute grounds for reversal. *Zaremba Equip, 302 Mich App at 21*. However, remarks may warrant reversal "'where the prejudicial statements' reveal a deliberate attempt to inflame or otherwise prejudice the jury, or to 'deflect the jury's attention from the issues involved.'" *Id.*, quoting *Hunt v Freeman, 217 Mich App 92, 95; 550 NW2d 817 (1996)*.

Our Supreme Court set out the procedure for evaluating whether an attorney's remarks warrant reversal: **[*25]**

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. [*Reetz, 416 Mich at 102-103*.]

Edwards and Beattie Farms first argue that Deborah's counsel made improper comments in his opening statement that were designed to make the jury believe that Beattie Farms was an uncaring and careless business that deserved to be punished. They first cite a passage in which counsel indicated that the evidence would show that Deborah is "furious" at the "Beattie Corporation" because it keeps doing the same thing, which amounts to **[*26]** telling her "you don't matter. We almost killed you but we're going to keep doing business as usual." However, Edwards and Beattie Farms do not explain the context, and they omit the first and last sentences from the cited paragraph, which connect the comments to the broader context of the opening remarks.

Before the cited paragraph, Deborah's counsel summarized the evidence that Deborah had suffered posttraumatic stress from the accident and now suffered from anxiety and panic attacks. He then argued that the evidence would show that Deborah's panic attacks were triggered when passing "these vehicles." He stated that she suffers "anger and panic" because she "keeps seeing the same things that almost killed her." He related that Deborah was "furious at what the Beattie Corporation keeps doing and basically telling her you don't matter. We almost killed you but we're going to keep on doing business as usual." He characterized her continued exposure to the vehicles that trigger her anxiety as torture.

When viewed in context, the statements made by Deborah's counsel foreshadowed evidence that would be elicited concerning Deborah's experiences that trigger her panic attacks: her continued **[*27]** exposure to farm vehicles that lack safety features which cause her to become terrified that she might again become involved in an accident. Although counsel indicated that Deborah was "furious" at the farm because they "just don't get it and they're torturing her," he did not suggest that the jury should suspend its judgment, disregard the evidence, and punish Beattie Farms for being a bad neighbor. See *Hunt, 217 Mich App at 95* (stating that the improper comments must demonstrate that counsel made them in a studied purpose to inflame or prejudice or deflect the jury from the actual issues involved). Rather, he connected the comments to the evidence that he felt would show that Deborah would continue to suffer future damages as a result of seeing vehicles that lack safety features. Because Deborah and her family lived near Beattie Farms and it was a Beattie Farms's tractor that was involved in the accident allegedly

giving rise to the posttraumatic stress, Deborah's counsel could properly argue that the evidence would show that Beattie Farms would be the primary trigger of Deborah's future emotional distress.

Counsel's use of the phrase "they don't get it" and the word "torturing" do suggest morally culpable **[*28]** behavior, but the overall context involved permissible commentary on the evidence that Deborah would suffer future damages from anxiety and that Beattie Farms would be the cause of the harm. To the extent that those comments were somewhat prejudicial, the prejudice could readily have been cured had defense counsel objected and requested an instruction. See *Badiee, 265 Mich App at 373-374*.

Beattie Farms and Edwards next complain that Deborah's counsel improperly informed the jury that Church would testify that Bettie Farms was a big player in the area, had a lot of land, and spent an enormous amount of money with the co-op. However, the context of the cited statement demonstrates that Deborah's counsel was not impermissibly asking the jury to punish Beattie Farms because it was a wealthy business; he asked the jury to examine Church's testimony carefully and to consider whether Church had an incentive to skew the facts to align with Beattie Farms's version of events. Specifically, counsel noted that Church would say that he was an eyewitness to the accident and that he saw Richard's SUV appear out of nowhere, fly across the ditch, and slam into the tractor, which was diametrically opposite of Richard's story, and **[*29]** also contrary to the physical evidence. He noted as well that Church's statement does not appear anywhere in the police reports even though he would say that he spoke to an officer. He suggested that Church was not being truthful because he had a desire to please Beattie Farms. Church's credibility was highly relevant to the issues at trial and, for that reason, Deborah's counsel could properly highlight the expected testimony that tended to show that Church had a motive to remember the facts in a way that benefited Beattie Farms, which included commenting on the evidence that Beattie Farms was well known in the community; owned a lot of land, including land neighboring Church's land; and did a lot of business with Church's employer. See *Reetz, 416 Mich at 108-109* (stating that counsel may properly argue that a witness's version of events is not worthy of belief). The comment was not improper.

Beattie Farms and Edwards finally fault Deborah's counsel for closing his opening remarks with a summary of the reason that Deborah was seeking compensation for her anxiety attacks. Deborah's counsel introduced the theme by first describing Deborah's routine and how her son drives her to watch her other son's children. **[*30]** He noted that their route takes them past Beattie Farms, which triggers her panic attacks: "So folks she's here because it keeps getting triggered. . . . She's tired of getting this trigger, of seeing all these vehicles sitting out there and knowing they're just making a business decision either not to have drivers that understand what's going on and have turn signals on their vehicle, or not having it at all."

Again, the context shows that Deborah's counsel connected his comments to the evidence that would show that Deborah suffered from panic attacks that were triggered as a result of having to drive past Beattie Farms and encounter its vehicles. Counsel indicated that the evidence would further show that Beattie Farms chose not to put additional safeguards on its vehicles and that the lack of additional safeguards exacerbated Deborah's anxiety attacks. Although couched as commentary on the potential for future damages, counsel's statement that Deborah was "tired of getting this trigger" and that she knew that Beattie Farms was simply making a "business decision" not to have these safety devices did suggest that the jury should send a message to Beattie Farms. However, the statement **[*31]** was not particularly egregious and occurred as part of a lengthy discussion about the evidence that showed that Beattie Farms had no intention of modifying its practices, which permitted an inference that Beattie Farms's practices would continue to cause Deborah's anxiety attacks. Given the context, a timely objection and instruction would have clarified the proper scope of the commentary and cured any prejudice that may have accompanied the comment. See *Badiee, 265 Mich App at 373-374*.

B. IMPROPER QUESTIONS

Beattie Farms and Edwards also argue that Deborah's counsel asked improper questions that similarly suggested that the jury should punish Beattie Farms. An attorney's questions may amount to misconduct when the record shows that the questions were not posed in good faith, but were made for the manifest purpose of creating prejudice and influencing the jury. See *In re Ellis Estate, 143 Mich App 456, 462-463; 372 NW2d 592 (1985)*.

2020 Mich. App. LEXIS 3095, *31

Edwards and Beattie Farms first argue that counsel tried to prejudice Beattie Farms by eliciting testimony that Beattie was the "Chief Executive Officer of the Beattie Farm LLC Corporation." Counsel misspoke when he suggested that Beattie was an officer of a corporation. Nevertheless, there was nothing improper about asking Beattie to inform the jury about **[*32]** his position in Beattie Farms because it was relevant to his ability to testify on behalf of Beattie Farms and to his credibility. "It is always permissible upon the cross-examination of an adverse witness to draw from him any fact or circumstance that may tend to show his relations with, feelings toward, bias or prejudice for or against, either party, or that may disclose a motive to injure the one party or to befriend or favor the other." _Hayes v Coleman, 338 Mich 371, 381; 61 NW2d 634 (1953)_. Nothing about the question itself suggested that it was part of a deliberate attempt to mischaracterize Beattie Farms as a "mega-agribusiness." Referring to Beattie as the officer of an "LLC corporation" was confusing, but not prejudicial.

In any event, as shown by the subsequent record, defense counsel objected, the trial court instructed the jury to ignore the question, and Deborah's counsel clarified that the purpose of the questioning was to establish Beattie's authority to act on the farm's behalf; moreover, Beattie testified that he in fact had the final say in the farm's management. The trial court's instruction cured any harm occasioned by Deborah's counsel's misstatement. See _Zaremba Equip, 302 Mich App at 25_.

Beattie Farms and Edwards also argue that Deborah's counsel **[*33]** continued to inject prejudice into the trial by violating the court's order in limine by asking Beattie about his farm's failure to take reasonable steps to improve the safety of its equipment. At trial, Deborah's counsel reviewed pictures of Beattie Farms's equipment with Beattie and asked Beattie whether one picture depicted a broken and rusted mirror. Defense counsel objected on the ground of relevance and Deborah's counsel argued that it was relevant because Deborah continues to see such things and suffer as a result. The trial court overruled the objection.

Deborah's counsel then asked Beattie whether the condition of the equipment showed that his farm was concerned about safety:

Q. And now we're seeing a mirror with a bunch of rust on it. All I'm asking is don't you agree this doesn't exactly say we're concerned about other people's safety?

A. I'm concerned about other people's safety, believe me.

Q. And finally Mr. Beattie, you would agree with me that from 2012 to today you're still operating equipment out there like the cultipacker or other things that have no turn signals and no brake lights?

A. We have slow-moving vehicle signs and working flashing lights on the tractor. You **[*34]** don't have brake lights on equipment. You have flashing lights and most of the equipment don't have turn signals on it. Some of them do come with flashing lights now.

Q. Well we saw the one cultipacker, if it was working would have flashing lights you said, correct?

A. If the wires were working and the lights were put in you could hook it up for flash but it probably got broke. Hey it's planting season. You got to get the crop in. You ain't got time to keep fixin' every little light that breaks, but—

Q. All right. Your business concerns come ahead of those kind of things.

A. No they don't come ahead of them things but it takes time to get some repairs sometimes.

The questions posed by Deborah's counsel did not amount to an improper attempt to prejudice the jury against Beattie Farms. Counsel had the right to explore the condition of Beattie Farms's vehicles because their condition was relevant to whether Deborah would be likely to suffer panic attacks when encountering those vehicles. Moreover, the evidence suggested that there were additional safety features that Beattie Farms could utilize to make its vehicles safer and which might prevent the type of accident at issue in this case. Indeed, **[*35]**

immediately after this line of questioning, Beattie acknowledged that he was aware of remote-controlled turn signals that could be magnetically affixed to equipment for safety. However, he rejected their use because they "probably fall off the first time in the field." Beattie's decision not to take steps to improve the safety of his vehicles was relevant to determining whether Beattie Farms negligently maintained its vehicles and thereby caused the accident, and was also relevant to Deborah's future damages from anxiety attacks occasioned by encounters with vehicles that obviously lack readily available safety features. There was nothing improper about the questions.

Edwards and Beattie Farms also maintain that it was improper to ask Edwards whether Richard and Deborah had opined when they met him that he would not be harmed by Deborah's lawsuit. Edwards at first did not understand what counsel was asking, so counsel rephrased the question:

Q. Well if we pursued a claim against the Beattie Corporation, you were driving, right?

A. Correct.

Q. So did you fear that if we did that you'd somehow be harmed in this claim process, that you'd be at risk somehow?

A. No, not really. It never crossed [*36] my mind at the time.

Although counsel again referred to Beattie Farms as a corporation rather than an LLC, the questions were not improper. Whether Edwards felt that he might be harmed by Deborah's lawsuit was relevant to establish whether he felt pressure to testify in a way that placed the blame for the accident on Richard. See *Hayes, 338 Mich at 381*. As such, the questions were not improper, and they do not suggest that Deborah's counsel was attempting to inflame the jury against Beattie Farms. See *In re Ellis Estate, 143 Mich App at 462-463*.

## C. CLOSING AND REBUTTAL STATEMENTS

Next, Beattie Farms and Edwards identify comments that Deborah's counsel made in his closing and rebuttal statements that they believe unfairly prejudiced the trial. It was counsel's duty to use all legitimate means to persuade the jury that it would be just to find in favor of his client. See *Elliott v AJ Smith Contracting Co, 358 Mich 398, 418; 100 NW2d 257 (1960)*. And, as our Supreme Court has recognized, the "line between a highly persuasive, but fair, argument and an improper appeal to passion is, admittedly, a difficult one to draw." *Id.* For that reason, courts must give counsel some leeway. *Id.*

Edward and Beattie Farms first complain that Deborah's counsel improperly stated that this case was "about a corporation that I think you guys saw [*37] very clearly through Mr. Beattie that wants to play by its own rules." Deborah's counsel made the remark in response to defense counsel's claim in his opening statement that this case was just a broken arm case. Deborah's counsel explained that this case was not just about the broken arm. He informed the jury that Deborah did not want a "dime for anything in the future for that arm." Rather, Deborah's counsel stated, there was the matter of Deborah's future damages from being forced to encounter Beattie Farms' unsafe vehicles, which would trigger her panic attacks; he suggested that she would suffer future panic attacks because the evidence showed that Beattie did not feel obligated to take steps to improve the safety of his equipment:

But I'm going to put the glue together here. When I showed [Beattie] that picture that was taken in 2016 I said does that show a corporation that's worried about safety? And he laughed and said are you kidding me? You think we got time to do this? We got to get the crops in. You know what, I never begrudge a good corporate community partner making as much money as they can because they supply a lot of jobs and they do a lot of great things for the community. [*38] But I do demand that they play by the same rules that we do.

Counsel reiterated that Edwards had an obligation to signal his intent to turn and to take reasonable steps to ensure the safety of passing cars. He maintained, however, that the testimony and evidence showed that Beattie Farms had not taken reasonable steps to ensure the safety of the equipment at issue in the accident and failed to take

reasonable steps to equip its tractors with reasonable safety measures after the accident. Instead, he felt that Beattie intended only to comply with the minimum mandates of the law, as Beattie saw it, and do nothing more. Counsel noted that the evidence showed that Beattie Farms spent "a million-three on fertilizer and not a dime on these portable turn signals." And he reminded the jury that Beattie told them that he had no obligation to use them. Counsel informed the jury that it was the final arbiter of what constituted reasonable conduct.

Deborah's counsel returned to that theme later in his closing. Deborah's counsel stated that "future damages means you have to make a prediction," and he opined that the best indicator of future conduct was past conduct. He then turned to the evidence **[*39]** that Beattie Farms had done nothing to implement reasonable safety measures since the accident:

> Here's 2016, you know, the other pictures are all up here with busted lights and all that kind of stuff. What does the history tell us? Well the history tells us and Mr. Beattie tells us, I don't have to do anything. Law says I don't have to do it. Oaky, that's Beattie's law. If you think that Beattie's law is going to keep on predominating throughout the next years then you should calculate something and it's going to be on a year-by-year basis. And it's above my pay grade to do this with you. I'm sorry. You know, the other one I felt comfortable with. I can deal with finite. But in terms of how much and how much per year and that, again like Debbie said we're just gonna totally leave it in your hands. If you think after today for some strange reason that Beattie says nope we're going to start getting those turn signals, we're going to start getting the remotes, we're going to start repairing our equipment, were going to start replacing those mirrors when they get broken, we're going to do the things that say we're a responsible corporate partner in our community that cares about everybody **[*40]** and Debbie and we acknowledge what we did to her; if you think that light switch is going to go on then the number is zero. Zero. Why? `Cause Debbie's not going—she's going to see functioning turn signals. She's going to see drivers that turn a little bit, wait. She's gonna see this corporate mentality change. And that's the road to recovery. That's what I want. I want zero. But I want that. Now put a gun to my head and say okay Bill bet on it. Then I look back at the history.

Finally, Deborah's counsel restated his position in his rebuttal comments. He argued that the evidence showed that Beattie Farms was negligent and that Richard was not negligent; he also maintained that he adequately proved Deborah's past damages. He earlier argued that she should receive approximately $85,000 to compensate her for the time that she was incapacitated by injury and panic attacks. He also argued that she deserved $30,000 for the pain and suffering associated with her surgeries and $10,000 for the pain and suffering over the years after the last surgery to present.

Turning to his request for future damages, Deborah's counsel related that he believed the evidence showed that Bettie Farms would continue **[*41]** to act in a way that triggered Deborah's anxiety attacks: "Yes, 'cause I don't think they're going to change a thing. I think they're going to keep on exposing her to the same triggers day after day after day." Defense counsel objected that Deborah's counsel was "talking about punishing" Beattie Farms, which was not a proper argument. Deborah's counsel replied that that was not what he was arguing:

> Your honor, I think I was clear in saying that these are the triggers to her panic seeing these items of danger, broken mirrors, not having turn signals, those situations and I will say that to the jury myself. No, this is not what a court of law is about, punishing a defendant. It is strictly for the compensation.

The trial court told him to proceed and noted that it would instruct the jury accordingly. Deborah's counsel then completed his argument:

> So again, if you feel that their conduct is to keep on exposing her to these triggers and they're not going to change and start fixing these things so she's not exposed to those triggers then I'd say to you I believe past history would show that the future is going to have her continue to have these problems.

Examined in context, and while giving **[*42]** leeway to zealous advocacy, see *Elliott, 358 Mich at 418*, the comments were not improper and did not demonstrate an intent to inflame the jury. Whether Beattie Farms took appropriate steps to ensure that its equipment had reasonable safety features was relevant to determining whether Beattie Farms was at fault for the accident at issue. It was also relevant to proving whether Deborah had

encountered unsafe vehicles after the accident and would continue to encounter unsafe vehicles in the future, which had triggered and would continue to trigger her panic attacks. The comment about Beattie's testimony was proper argument that the evidence showed that Beattie was unlikely to improve the safety features of his equipment. And the remarks were not structured as an attempt to invite the jury to punish Beattie Farms for its past conduct, but to address the peculiar circumstances involved in this case—namely, whether the posttraumatic stress caused by the accident would result in Deborah suffering future emotional harm as a result of exposure to vehicles operated by Beattie Farms that have similar safety concerns to the one involved in her accident. Even to the extent that counsel may have overstepped the bounds **[\*43]** of propriety by arguing that Beattie and Beattie Farms just did not care about the safety of others, the prejudice was minimal and does not warrant reversal. See _MCR 2.613(A)_.

Beattie Farms and Edwards similarly argue that Deborah's counsel made improper remarks when commenting about the evidence that the tractor involved in the accident did in fact have turn signals, even though Edwards did not use them. In remarking on this evidence, Deborah's counsel told the jury that for 21/2 years Beattie Farms and Edwards asserted that the tractor did not have turn signals. He stated that it was only just before trial that Beattie Farms changed its mind and informed him that the tractor had turn signals and then, at trial, Beattie Farms just submitted a photo of lever and did not provide any video to show a working signal.

Returning to that topic sometime later, Deborah's counsel argued that Beattie Farms changed its position about the signals because it did not want to look irresponsible: "If we admit we don't have turn signals on these big tractors that's kind of making us look like an irresponsible, unsafe, don't-give-a-darn-about-your-safety corporation." He then noted that Beattie Farms was responsible **[\*44]** for Edwards's negligence either way because of vicarious liability or owner's liability. Deborah's counsel further intimated that Beattie Farms put Edwards in an awkward position in which he had to fall on his "sword" by providing him with no proof that his recollection that the tractor did not have a turn signal was in fact true. He then restated his belief that Beattie Farms put Edwards into that position to avoid looking irresponsible and then exhorted the jury that this had to stop:

> This has got to stop because every time she gets next to one of these things again and relives this knowing they don't care, they're not going to follow the law, my life, somebody else's life, I can see it, I can see it happening. And until, like she said yesterday, until you've been there and see these wheels about to come in and crush you to death don't talk to me Mr. Vander Ploeg about what you think. That's why we're here.

The comment that "[t]his has got to stop" improperly suggested that the jury should use its authority to punish Beattie Farms and prevent it from putting more dangerous vehicles on the road. Likewise, the comment suggesting that Beattie Farms improperly withheld evidence until the **[\*45]** last minute because it did not want to appear as though it did not care about safety of others at trial tended to suggest that Beattie Farms was more than merely negligent, which implicated punitive damages. However, although these comments were improper, the comments were isolated and did not rise to the level of a concerted campaign to inject bias into the case and inflame the jury's passion. See _Hunt, 217 Mich App at 95_. Additionally, a timely objection and instruction could have cured any prejudice at the time of the statement. Finally, the trial court instructed the jury that damages may be "awarded solely for the purpose of compensating the plaintiff" and could not be "awarded for the purpose of punishing Beattie Farms LLC or Franklin Edwards." That instruction cured any prejudice. See _Zaremba Equip, 302 Mich App at 25_.

### D. MAP AND PHOTOS

Beattie Farms and Edwards next argue that the trial court abused its discretion when it allowed Deborah to introduce a map that showed Beattie Farms' extensive land holdings and photos of dilapidated farm equipment that may or may not have been owned by Beattie Farms. However, on appeal Edwards and Beattie Farms do not discuss the trial court's actual rulings regarding this evidence. They also fail to **[\*46]** discuss any relevant, applicable caselaw. As such, we conclude that Beattie Farms and Edwards have abandoned any claim that the trial court erred when it admitted this evidence. See _Mitcham v Detroit, 355 Mich 182, 203; 94 NW2d 388 (1959)_, where our Supreme Court articulated:

> It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his

arguments, and then search for authority to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow.

Edwards and Beattie Farms have therefore essentially abandoned this argument on appeal. See *Woods v SLB Prop Mgt, LLC, 277 Mich. App. 622, 626-627; 750 N.W.2d 228 (2008)*, where this Court concluded that "[a]n argument must be supported by citation to an appropriate authority or policy" and failure to do so constitutes an abandonment of the issue. We decline to address abandoned claims. *Thompson v Thompson, 261 Mich App 353, 356, 683 NW2d 250 (2004)*.

E. IMPROPER ATTACKS ON CREDIBILITY

Finally, Edwards and Beattie Farms argue that Deborah's counsel engaged in misconduct by attacking Church's credibility. In his closing remarks, Deborah's counsel argued that Church's purported eyewitness testimony did not match **[*47]** with the description by the other witnesses or the objective evidence. He suggested that perhaps Church had been coached about the record and came up with contrived answers for some of the more implausible aspects of his testimony. Deborah's counsel agreed that Church was likely there on the day at issue, but he also suggested that Church was not telling the truth:

> Now, do I think he was there? Could have been. Makes too much sense for me for him not to be there somewhere. But he wasn't where he said. And he wasn't watching what he said he was watching. And does it really stretch the imagination to think that this big player over here, okay, this poor me, all these mega farms just dust me, they, you know I'm nowheres [sic] near how big they are. I have a few properties. Remember folks on this map these properties look small. I'm showing you three counties. Let's go down on this. OK we're talking miles and the poor-me farmer then I got to ask how much do you spend on fertilizer? 1.3 million dollars. Now does it stretch the imagination that a player of that size and who they are to North Central Co-Op, that there might be a little, yeah, see if I can help them out. And I agree with you, **[*48]** that's a big stretch. It's a big stretch in the sense that really would he put himself on the stand in here? I don't think he ever in his wildest dreams ever saw him being on here.

Deborah's counsel maintained that Church was motivated to help Beattie Farms because his employer had a vested interest in maintaining a valuable customer. He stated that Church was forced to change his story about the ditch because Beattie had said that Richard must have driven down the ditch line. However, the photo of the SUV taken just days later showed no sign that the SUV drove through muck and three-foot tall grass. They were also forced to contrive a story that had Richard driving at an excessive speed because that would be the only way he could have caught up to Edwards if Edwards's testimony were accepted. But again, he stated, the photo evidence did not show that the SUV suffered much frontal damage; it just suffered a crushed passenger's side front end, which was consistent with Richard's version that the tractor turned suddenly and dragged the SUV into the driveway. Deborah's counsel characterized the story as a lie that had no support in the objective evidence.

Deborah's counsel told the jury **[*49]** that Church had to bring his story into line with Edwards's story because Edwards had already long ago committed to a particular version of the events. He restated his belief that Edwards was being put into the "corporate squeeze" and that was how the "big players play." He further stated that the version of events described by Church were no longer the "Church story by the time it gets to trial"; it was the "Church Beattie Edwards story" and, as a result, the defense needed to "find a way to integrate it that makes some kind of sense." After he completed discussing the problems with Church's testimony, Deborah's counsel stated that that was "why what we say makes every sense in the world but the big players pick on the little players and they stick together."

Deborah's counsel could properly attack Church's credibility on the basis of the discrepancies between his version of the events and the other evidence. See *Reetz, 416 Mich at 108-109*. He could also properly suggest that Church might be motivated to fit his version of events with the version offered by Beattie Farms, which included presenting and discussing the evidence that Church might have been motivated to help Beatie Farms to preserve his employer's **[*50]** relationship with the farm. See *Hayes, 338 Mich at 381*. Nevertheless, Deborah's counsel did

stray into comments suggesting that Beattie Farms was a wealthy enterprise and that it was somehow influencing Church to misstate the facts, which were improper. See *Reetz, 416 Mich at 110-111*. The majority of the comments, however, did focus on proper issues related to Church's credibility. As Deborah correctly notes on appeal, her counsel never actually used the term conspiracy. Rather, as his remarks make clear, he felt Church's version of events had to be "integrated" into the version stated by Edwards and Beattie by the time of trial. Because of the differences, the integration, in Deborah's counsel's view, was not worthy of belief. That argument was not improper. See *Reetz, 416 Mich at 108-109*. In any event, a timely objection and instruction would have cured any prejudice resulting from the remarks. See *Badiee, 265 Mich App at 373-374*. Edwards and Beattie Farms have failed to demonstrate that the remarks by Deborah's counsel about Church's credibility were so improper that they would warrant a new trial.

Beattie Farms and Edwards have failed to show that Deborah's counsel engaged in a systematic effort to inflame the jury or cause it to be biased against Beattie Farms. To the extent that **[*51]** some of the comments by Deborah's counsel were improper, those remarks were not egregious and any prejudice either was cured by the trial court's instructions, see *Zaremba Equip, 302 Mich App at 25*, or could have been cured with a contemporaneous objection, see *Badiee, 265 Mich App at 373-374*. Edwards and Beattie Farms have failed to demonstrate that Deborah's counsel engaged in misconduct that warrants a new trial.

V. BRIBERY EVIDENCE

We next address the claim that the trial court erred when it precluded Beattie Farms and Edwards from allowing Edwards to testify that Richard and Deborah offered him a share of their award if he testified favorably to them. This Court reviews de novo whether a trial court properly interpreted and applied the rules of evidence. *Mitchell, 321 Mich App at 154*. This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Id. at 153*.

The rules of evidence strictly limit the use of character evidence and evidence of other acts that implicate character. See *People v Roper, 286 Mich App 77, 91; 777 NW2d 483 (2009)*. Other-acts evidence may be admissible, even though it implicates character, if offered to prove something other than a person's character. See *MRE 404(b)*. Evidence that Richard and Deborah tried to bribe Edwards to lie at trial clearly implicated character. Nevertheless, before the trial court, **[*52]** Edwards and Beattie Farms argued that the evidence of a bribe was admissible to prove Deborah's motive, opportunity, intent, preparation, scheme, or plan in filing suit. However, Deborah's motive, opportunity, intent, preparation, scheme, or plan in filing her suit was not at issue at trial. Rather, the issue at trial involved common-law negligence. And the testimony about the bribe was not relevant to any issue at trial other than the credibility of Richard and Deborah as witnesses.

The character of a witness may be attacked as provided under *MRE 607*, *MRE 608*, and *MRE 609*. See *MRE 404(a)(4)*. Generally, evidence of character may only be proved by testimony as to reputation or in the form of an opinion. See *MRE 405(a)*. Although a person may be cross-examined about specific instances of conduct on cross-examination, *MRE 405(a)*, proof of specific instances of conduct may only be made when the person's character is an essential element of the charge, claim, or defense, *MRE 405(b)*. Moreover, a party may not prove specific instances of conduct for the purpose of attacking a witness's character by extrinsic evidence; rather, if probative of the witness's character for truthfulness or untruthfulness, the party may inquire into the specific instances of **[*53]** conduct on cross-examination. See *MRE 608(b)*. Therefore, with the exception of cases in which a criminal defendant has put his or her character at issue and denies specific instances on cross-examination, which is not relevant in this case, a party is stuck with the witness's answer to an inquiry about specific instances implicating character. See *Roper, 286 Mich App at 104-105*.

In this case, the trial court correctly applied the rules of evidence, concluding that Edwards and Beattie Farms could inquire on cross-examination of Richard and Deborah whether they offered a bribe to Edwards, but they were barred from presenting extrinsic evidence to contradict their answers under *MRE 608(b)*. The trial court did not abuse its discretion. See *Mitchell, 321 Mich App at 153-154*.

VI. MOTION FOR A NEW TRIAL OR REMITTITUR

Finally, Beattie Farms and Edwards argue that the trial court should have granted their motion for a new trial premised on attorney misconduct and the cumulative effect of the errors at trial, or, in the alternative, should have granted their motion for remittitur. This Court reviews a trial court's decision whether to grant a new trial under *MCR 2.611* for an abuse of discretion. See *Gilbert v DaimlerChrysler Corp, 470 Mich 749, 761; 685 NW2d 391 (2004)*. This Court also reviews for an abuse of discretion a trial court's decision on a motion **[*54]** for remittitur. See *Taylor v Kent Radiology, 286 Mich App 490, 522; 780 NW2d 900 (2009)*.

A trial court may grant a new trial whenever a party's substantial rights were affected by, in relevant part, an "[i]rregularity in the proceedings of the court, jury, or prevailing party, or an order of the court or abuse of discretion which denied the moving party a fair trial", attorney misconduct, where the verdict is excessive or contrary to the great weight of the evidence. See *MCR 2.611(A)(1)*.

In this case, Edwards and Beattie Farms moved for a new trial on the ground that Deborah's counsel engaged in misconduct that deprived them of a fair trial and that the verdict was the result of bias or passion. Counsel's persistent and deliberate effort to incite passion and prejudice during his or her remarks can constitute grounds for a new trial under *MCR 2.611(A)(1)(b)*. See *Gilbert, 470 Mich at 776-779*. However, a trial court may not grant a new trial "unless refusal to take this action appears to the court inconsistent with substantial justice," *MCR 2.613(A)*, which means that a trial court cannot grant a new trial on the basis of a harmless error. See *Johnson, 423 Mich at 326-327* (stating that, under *MCR 2.613(A)*, an error is harmless and will not warrant relief unless it caused such unfair prejudice to the complaining party that allowing the verdict to stand would be inconsistent **[*55]** with substantial justice).

As discussed, the majority of the inappropriate remarks identified by Edwards and Beattie Farms were either not inappropriate or were cured by a timely instruction. With regard to the remarks that were not appropriate and not subject to a contemporaneous curative instruction, the remarks either were cured by the general instructions or could have been readily cured with a timely objection and instruction. Although the cumulative effect of several small errors can warrant a new trial, only actual errors may be aggregated when considering the prejudicial effect. See *Lewis, 258 Mich App at 200-201*. Even aggregating the actual errors discussed, Edwards and Beattie Farms have not demonstrated that the trial court's refusal to take action was inconsistent with substantial justice; as such, they have not shown that they are entitled to a new trial. See *MCR 2.613(A)*; *Johnson, 423 Mich at 327*. As the trial court aptly noted, the trial was not perfect, but it was fair.

The record also does not support the contention that the jury's verdict was the result of passion or bias, or otherwise contrary to the great weight of the evidence. See *MCR 2.611(A)(1)*. The objective evidence strongly supported Deborah's version of events. The damage to Richard's **[*56]** SUV—as shown in the photos—was not consistent with the SUV having been driven along or over an overgrown drainage ditch followed by a highspeed impact. Rather, the damage appeared primarily to have been caused by the tractor's rear wheels crushing the front passenger's side of the SUV and pushing or dragging the SUV. The evidence that emergency responders had to remove the passenger door in order to free Deborah from the SUV also indicated that the damage was primarily to the side of the SUV and not the result of a highspeed impact. That evidence corroborated Richard's testimony that he had just begun to accelerate past the tractor when Edwards abruptly turned and caused an immediate collision. The police report similarly showed that the vehicles came to rest in a position consistent with Richard's testimony. Accordingly, it was not contrary to the weight of the evidence for the jury to find that Richard was not negligent and that the accident was Edwards's fault in combination with Beattie Farms' failure to train its operator or its failure to provide reasonable safety features on its equipment.

Because the evidence also supported the jury's award of damages, the trial court did not **[*57]** abuse its discretion when it denied the motion for remittitur. See *Taylor, 286 Mich App at 522*. Trial courts must exercise the power of remittitur with restraint. See *id.* The court must examine all the evidence in the light most favorable to the nonmoving party to determine whether there was evidence to support the jury's award. If the award was within the range of what reasonable minds would deem just compensation, then the trial court must not disturb the jury's award. *Id.*

On appeal, Edwards and Beattie Farms suggest that the jury's verdict was excessive because it was higher than comparable awards that they compiled. They suggested too that the award was excessive because there was no evidence that Deborah suffered a closed head injury or other traumatic brain injury and she was otherwise fully healed by May 2013.

Deborah presented testimony and evidence that showed that she suffered a nightstick fracture of her right ulna near her wrist. The evidence showed that her surgeon performed surgery to repair the fracture, but the bone did not heal. As a result, she had to have a second surgery with a bone graft. Deborah presented testimony that her injury significantly impaired her function for the approximately **[*58]** one-year period of her recovery, even though she could still participate in many activities. She also presented evidence that she had suffered posttraumatic stress arising from the accident and that she was prone to panic attacks when driving or riding as a passenger along the roads in her community. Other witnesses described the strain that her anxiety placed on her family and marriage. Although there was evidence that Deborah had shown improvement by the time of trial, the evidence supported the conclusion that she suffered from anxiety and emotional distress for years after the accident.

Although a broken bone may in some cases heal quickly and without complications, the evidence in this case showed that the injury twice required surgical intervention and that Deborah was impaired for far longer than the normal recovery period for an ordinary broken bone. The evidence that she suffered from anxiety and was routinely forced to confront the source of that anxiety over a span of years with a toll on her emotional well-being also supported a larger award than would normally follow from a broken bone. It was also evident from the modest award of future damages that the jury found that **[*59]** Deborah's prospects had improved and that the vast majority of the harm occurred in the years leading up to trial, which itself suggested that the jury's compensation for past damages took into consideration her mental suffering. Examining the evidence in the light most favorable to Deborah, it cannot be said that the jury's award fell outside the range of compensation that reasonable minds would deem just. See *id.*

The trial court did not abuse its discretion when it denied the motion for a new trial or remittitur.

VII. CONCLUSION

Beattie Farms and Edwards have not identified any errors on appeal that warrant a new trial. They have also failed to show that the jury's verdict should be reduced.

Affirmed. As the prevailing party, Deborah may tax costs. See *MCR 7.219(A)*.

/s/ Jane E. Markey

/s/ Kathleen Jansen

/s/ Mark T. Boonstra

---

**End of Document**

# *People v. Giamporcaro*

Court of Appeals of Michigan

December 3, 2013, Decided

No. 312556

**Reporter**

2013 Mich. App. LEXIS 1966 *; 2013 WL 6244702

PEOPLE OF THE STATE OF MICHIGAN, Plaintiff-Appellee, v ROBERT CLINTON GIAMPORCARO, Defendant-Appellant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Leave to appeal denied by *People v. Giamporcaro, 495 Mich. 994, 845 N.W.2d 491, 2014 Mich. LEXIS 776 (Apr. 28, 2014)*

**Prior History:** **[*1]** Livingston Circuit Court. LC No. 12-020392-FH.

## Core Terms

sentence, trial court, telephone, defendant argues, guidelines, broke, domestic violence, credibility, jail, felony assault, prejudicial, scoring, knife, stool, sufficient evidence, cellular telephone, time served, convictions, landline, battery, counts, weapon

**Judges:** Before: METER, P.J., and SERVITTO and RIORDAN, JJ.

## Opinion

PER CURIAM.

Defendant appeals as of right from his convictions by a jury of two counts of domestic violence, *MCL 750.81(3)*; two counts of interference with electronic communication, *MCL 750.540(5)(a)*; and three counts of assault with a deadly weapon (felonious assault), *MCL 750.82*. The trial court sentenced defendant as a fourth-offense habitual offender, *MCL 769.12*, to jail terms of one year for each domestic violence conviction and to prison terms of 58 months to 15 years for each of the remaining convictions. We affirm.

Defendant and a woman (hereinafter referred to as "the victim") had been dating for about five years and defendant lived with her on and off over that time. On December 26, 2011, defendant and the victim were having an argument. The victim tried to leave the house but defendant stopped her by picking her up and throwing her backwards across a table. Over the course of the evening, defendant punched the victim in the face three to four times. The victim testified that when she attempted to call 911 with the landline telephone and her cellular telephone, defendant intervened **[*2]** and broke both telephones.

The victim's son tried to distract defendant from the victim, but defendant picked the son up by the throat and threw him into the dining area. At some point, defendant picked up a counter stool and stood over the victim swinging it at her. Defendant also had a knife at one point and told the victim and her son, "tonight we all die." The victim suffered serious facial injuries.

2013 Mich. App. LEXIS 1966, *2

Defendant first argues that the trial court erred in denying his motion for a directed verdict concerning the three charges of felonious assault and the two charges of interfering with electronic communication. He also asserts that the convictions violated due-process protections because they were based on insufficient evidence.[1] We disagree.

We review de novo a trial court's decision concerning a motion for a directed verdict. *People v Parker, 288 Mich App 500, 504; 795 NW2d 596 (2010)*. This Court reviews the evidence "in a light most favorable to the prosecutor to determine whether a rational trier of fact could have found that the essential elements of the offense were proven beyond a reasonable doubt." *People v Couzens, 480 Mich 240, 244; 747 NW2d 849 (2008)*. Circumstantial evidence and the reasonable inferences that can be drawn from that evidence can amount to sufficient evidence supporting a conviction. *People v Carines, 460 Mich 750, 757; 597 NW2d 130 (1999)*. The trial court may not grant a directed verdict if it requires a determination of witness credibility. *People v Mehall, 454 Mich 1, 6; 557 NW2d 110 (1997)*. Indeed, the jury is responsible for determining questions of credibility and intent. *People v Harrison, 283 Mich App 374, 378; 768 NW2d 98 (2009)*. Furthermore, what inferences can be drawn from the evidence and the weight to be given to those inferences are questions left to **[*4]** the jury. *People v Hardiman, 466 Mich 417, 428; 646 NW2d 158 (2002)*.

To establish felonious assault, the prosecutor must prove that the defendant committed "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Nix, 301 Mich App 195, 205; 836 NW2d 224 (2013)* (internal quotation marks and citation omitted). An assault is committed when the defendant "attempt[s] to commit a battery or [commits] an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks, 473 Mich 227, 234; 701 NW2d 136 (2005)*. Moreover, *MCL 750.540(4)* provides that "[a] person shall not willfully and maliciously prevent, obstruct, or delay by any means the sending, conveyance, or delivery of any authorized communication, by or through any . . . telephone line . . . ."

The victim testified that she was on the floor when defendant picked up one of the counter stools and began swinging it at her. She said that she thought defendant was going to hit her with it and that she was afraid for her life. The victim's son also said that he saw defendant standing over the **[*5]** victim with the stool and that it looked like defendant was swinging the stool at the victim. Moreover, he testified that at one point when he was attempting to comfort the victim, defendant grabbed a knife, stood in front of them, and threatened them by saying, "tonight we all die." The victim testified that she recalled defendant saying he was going to kill her and her son. The son said he was scared and felt threatened.

The prosecutor presented sufficient evidence to establish that defendant committed three counts of felonious assault during his serious attack: one with the chair against the victim, one with a knife against the victim, and one with a knife against the son. Based on the testimony, it was reasonable for the jury to infer that both the victim and her son were afraid of an immediate battery and that defendant committed an assault on both. *Starks, 473 Mich at 234*. The prosecutor also presented sufficient evidence to establish that defendant used dangerous weapons—the chair and knife. The knife was a dangerous weapon according to the pertinent statute. *MCL 750.82(1)*. Also, the manner in which defendant was swinging the stool at the victim was violent, and therefore the **[*6]** stool could be reasonably construed as a dangerous weapon. See *People v Kay, 121 Mich App 438, 444; 328 NW2d 424 (1982)* ("the manner in which the instrumentality is used and the nature of the act [sic] determines whether the instrumentality is dangerous"). Lastly, the jury was permitted to make reasonable inferences and, based on the testimony and defendant's actions, it was reasonable to infer that defendant intended to place both the victim and her son in fear of an immediate battery. When viewing the evidence in the light most favorable to the prosecution,

---

[1] Defendant also mentions equal protection in his question presented for appeal. However, he does not develop this argument. "A party cannot leave it to this Court to "'discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position.'" *People v Kevorkian, 248 Mich App 373, 389; 639 NW2d 291 (2001)*, quoting *Mitcham v Detroit, 355 Mich 182, 203; 94 NW2d 388 (1959)*. **[*3]** "Issues insufficiently briefed are deemed abandoned on appeal." *People v Van Tubbergen, 249 Mich App 354, 365; 642 NW2d 368 (2002)*.

we find that the prosecution met its burden of presenting sufficient evidence to establish the essential elements of three counts of felonious assault. Therefore, the trial court did not err in denying defendant's motion with regard to the felonious assault charges, and there was no due-process violation.

Defendant also argues that the trial court erred in denying his directed-verdict motion with regard to the charges of interfering with electronic communication. Defendant argues that because there was some conflicting testimony between the victim and her son about whether the telephones were being used when defendant broke them, **[*7]** there was insufficient evidence to support the convictions. However, the trial court may not grant a directed verdict if it requires a determination of witness credibility. _Mehall, 454 Mich at 6_. A conflict in testimony presents a question of credibility regarding which witness is telling the truth or testifying accurately, and credibility is a jury determination. _Harrison, 283 Mich App at 378_.

The victim said she was attempting to call 911 on the landline telephone when defendant took the phone and threw it on the floor, where the phone broke. She said she then attempted to call 911 on her cellular telephone and defendant again took the telephone and broke it. As noted, _MCL 750.540(4)_ provides that "[a] person shall not willfully and maliciously prevent, obstruct, or delay by any means the sending, conveyance, or delivery of any authorized communication, by or through any . . . telephone line . . . ." The victim's testimony established that she was attempting to make calls when defendant interfered and broke two telephones.

The son also testified that he saw defendant take the victim's cellular telephone and break it. The son testified that when defendant took the cellular telephone **[*8]** he said, "No one's calling the police." The son also testified that when defendant broke the landline telephone, no one was trying to use it. Any conflict in testimony between the victim and her son presented a credibility determination within the province of the jury. The prosecution presented sufficient evidence to establish that defendant broke the landline and cellular telephones to prevent the victim from contacting the police. The trial court did not err in denying defendant's directed-verdict motion concerning the counts of interfering with electronic communication because there were credibility questions for the jury. _Mehall, 454 Mich at 6_. Coextensively, there was no due-process violation.

Next, defendant argues that the trial court violated his federal constitutional rights by failing to consider mitigating circumstances before imposing his prison sentences. Defendant argues that his concurrent sentences of 58 months to 15 years were disproportionate and that resentencing was required. Further, defendant argues that the trial court erred in giving defendant no credit for time served. Alternatively, defendant argues that defense counsel was ineffective for failing to object **[*9]** at sentencing to the allegedly disproportionate sentence and the lack of credit for time served.

A sentence that falls within the guidelines is presumptively proportionate. _People v Armisted, 295 Mich App 32, 51; 811 NW2d 47 (2011)_. Even assuming that this issue has been fully preserved, if a defendant's sentence is within the appropriate guidelines, this Court will only remand for resentencing if there was either "an error in scoring or defendant's sentence was based on inaccurate information." _People v Jackson, 487 Mich 783, 792; 790 NW2d 340 (2010)_.

Defendant's sentencing guidelines were 14 to 58 months and the trial court sentenced him to 58 months to 15 years. There were issues with the scoring of offense variables (OVs) 1 and 2; these changed defendant's scoring but did not change his guidelines. Therefore, even considering trial counsel's argument below against increasing the score of OV 1, the guidelines did not change. Cf. _People v Francisco, 474 Mich 82, 89-91; 711 NW2d 44 (2006)_. Defendant's sentences fell within the appropriate guidelines.

Further, defendant has failed to demonstrate that the sentence was based on inaccurate information. During sentencing, counsel requested **[*10]** various corrections to the presentence investigation report, which the trial court allowed. The trial court also asked defendant if he had gone over the report and if there were additions, corrections, or deletions other than those counsel had addressed. Defendant indicated that there were no other additions or corrections he believed were necessary. On appeal, defendant has failed to indicate how the scoring

was based on inaccurate information. Instead, defendant focuses on the proportionality of the sentence and argues that defendant's strong family support, remorse, substance-abuse problems, and alleged mental-health problems required a lesser sentence. However, as noted, a sentence that falls within the guidelines is presumptively proportionate, *Armisted, 295 Mich App at 51*, and defendant has not articulated how these factors would have changed the information on which the scoring was based. Presumably, the trial court understood all controlling legal principles, see, generally, *People v Sexton, 250 Mich App 211, 228; 646 NW2d 875 (2002)*, and understood that it could sentence within the range of the guidelines or even below the guidelines if substantial and compelling reasons existed  **[\*11]** for doing so, see *MCL 769.34(3)*. Even assuming a challenge to proportionality is proper, see *Armisted, 295 Mich App at 52 n 4*, we find, in light of all the circumstances, that defendant has failed to establish a basis for relief or a related basis for claiming ineffective assistance of counsel.

Defendant also asserts that the length of his 58-month minimum sentence shows that he was punished for exercising his right to go to trial. A trial court may not punish a defendant for exercising his right to a trial. *People v Brown, 294 Mich App 377, 389; 811 NW2d 531 (2011)*. "However, it is not per se unconstitutional for a defendant to receive a higher sentence following a jury trial than he would have received had he pleaded guilty." *Id.* A defendant faces some risks by going to trial, one of which is that the sentence following trial may be higher than that offered in a plea agreement. *Id.* There is nothing in this record other than the lengthier sentence itself to support the assertion that it was intended as punishment for exercising the right to a trial.

Defendant also argues the trial court erred in not giving defendant credit for time served. Michigan's jail-credit statute, *MCL 769.11b*,  **[\*12]** provides:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

However, a defendant is not entitled to jail credit automatically; if the defendant is a parolee, no jail credit is appropriate when "the parolee continues to serve out any unexpired portion of his earlier sentence . . . until discharged by the Parole Board." *People v Idziak, 484 Mich 549, 562; 773 NW2d 616 (2009)*. The *Idziak* Court reasoned that a parolee is not entitled to credit because the parolee is serving a prior sentence, not because he is unable to furnish bond for the new crime. *Id. at 562-563*.

Defendant argues that he was entitled to jail credit on his misdemeanor crimes and asserts that *Idziak* applies only to felonies. Defendant's position is meritless. Defendant was on parole at the time he committed the current crimes. Therefore, when defendant went back to prison he continued to serve time on his prior sentence  **[\*13]** and any time earned was credited to his prior sentence. Therefore, regardless of whether the current crimes were misdemeanors or felonies, defendant's time served was for a prior sentence and not because he could not furnish bond for the new crimes. *Id.* The trial court did not err in denying defendant credit for jail time served at the time of sentencing, and there was no ineffective assistance of counsel because counsel is not ineffective for failing to advance a meritless position or make a futile motion. *People v Fonville, 291 Mich App 363, 384; 804 NW2d 878 (2011)*.

Finally, defendant argues that the trial court erred in admitting evidence of other acts of domestic violence under *MCL 768.27b* because the other acts were unfairly prejudicial in violation of *MRE 403*.[2] Further, defendant argues that *MCL 768.27b* does not permit other acts to be used to establish propensity. We disagree.

This Court reviews a trial court's decision whether  **[\*14]** to admit evidence for an abuse of discretion. *People v McDaniel, 469 Mich 409, 412; 670 NW2d 659 (2003)*. An abuse of discretion occurs when the decision falls beyond

---

[2] Defendant asserts in a conclusory manner that the *MRE 403* error gives rise to due-process and equal-protection claims. He has abandoned these arguments by failing to develop them. See *Kevorkian, 248 Mich App at 389*; *Van Tubbergen, 249 Mich App at 365*.

the range of principled results. *People v Feezel, 486 Mich 184, 192; 783 NW2d 67 (2010)*. However, whether evidence is admissible under a statute may involve a question of statutory interpretation that is reviewed de novo. See *People v Smith, 282 Mich App 191, 198; 772 NW2d 428 (2009)*, and *McDaniel, 469 Mich at 412*.

*MCL 768.27b(1)*, in pertinent part, provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if not otherwise excluded under Michigan rule of evidence *403*." *MCL 768.27b(4)* prohibits the admission of acts occurring more than 10 years before the charged offense, unless the trial court determines that the interests of justice require its admission. The purpose of allowing evidence of prior domestic-violence acts is to give a complete picture of a defendant's history, which will "shed light on the likelihood that a given crime was **[*15]** committed." *People v Cameron, 291 Mich App 599, 610; 806 NW2d 371 (2011)* (internal quotation marks and citation omitted).

*MRE 403* provides that relevant evidence can "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because all evidence tends to be prejudicial to the opposing party, only evidence that is unfairly prejudicial will be excluded. *People v Schaw, 288 Mich App 231, 237; 791 NW2d 743 (2010)*. Evidence tends to be unfairly prejudicial when it is marginally probative and there is a danger that it will be given undue weight by the jury. *Id.*

In this case, the other-acts evidence involved two previous acts of domestic violence. The victim testified that in October 2007 defendant committed domestic violence when he grabbed her by the neck and pushed her against a wall. She said that during that incident defendant also broke the landline telephone. The other incident was in November 2007, when defendant got angry with and hit the son. When the trial court determined that the evidence was **[*16]** admissible, the trial court did not conduct an *MRE 403* balancing test. Instead, the trial court relied exclusively on *MCL 768.27b* to support admission of the evidence. Although the trial court has discretion to admit evidence, the statute and caselaw clearly indicate that the evidence is admissible only if it does not violate *MRE 403*. *MCL 768.27b(1)*; *Cameron, 291 Mich App at 610*. Therefore, the trial court erred in failing to conduct the proper inquiry into whether any prejudicial effect outweighed the probative value.

However, any error the trial court committed was harmless. See, e.g., *MCL 769.26*, which states:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice.

The evidence was relevant because of the similarity in the nature of the acts. The similarity between the incidents and the **[*17]** fact that the incidents involved the same parties made the evidence highly probative. As noted, the purpose of *MCL 768.27b* is to give a complete picture of a defendant's history, which will "shed light on the likelihood that a given crime was committed." *Cameron, 291 Mich App at 610* (internal quotation marks and citation omitted).

Defendant argues that the evidence was highly prejudicial but does not indicate what prejudice resulted. The evidence did not mislead the jury, confuse any issues, waste time, or delay the proceeding; nor was it cumulative. *MRE 403*. Defendant has failed to indicate the prejudice he suffered from the admission of the evidence other than stating that it tended to demonstrate propensity. The evidence was highly probative and this Court and the statute allow the evidence, even if it shows propensity. *Cameron, 291 Mich App at 610, 612*. We find no miscarriage of justice and no basis for reversal.

Affirmed.

/s/ Patrick M. Meter

2013 Mich. App. LEXIS 1966, *17

/s/ Deborah A. Servitto

/s/ Michael J. Riordan

---

**End of Document**

# *People v. Walker*

Court of Appeals of Michigan

August 17, 2023, Decided

No. 362638

**Reporter**

2023 Mich. App. LEXIS 5857 *; 2023 WL 5313737

PEOPLE OF THE STATE OF MICHIGAN, Plaintiff-Appellee, v DAWAYNE ROLIN WALKER, Defendant-Appellant.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Subsequent History:** Review pending at *People v. Walker, 998 N.W.2d 689, 2024 Mich. LEXIS 17, 2024 WL 41256 (Mich., Jan. 3, 2024)*

Leave to appeal denied by *People v. Walker, 2024 Mich. LEXIS 773, 2024 WL 1865793 (Apr. 29, 2024)*

US Supreme Court certiorari denied by *Walker v. Michigan, 2024 U.S. LEXIS 4635 (U.S., Nov. 12, 2024)*

**Prior History:** **[*1]** Oakland Circuit Court. LC No. 2021-278420-FC.

## Core Terms

identification, carjacker, photograph, credibility, in-court, independent basis, identification testimony, knowingly, drove, identification of a defendant, beyond a reasonable doubt, preliminary examination, sufficient evidence, inconsistencies, inside, oil

**Counsel:** For PEOPLE OF MI, Plaintiff - Appellee: JACK MCINTYRE.

For DAWAYNE ROLIN WALKER, Defendant - Appellant: ROBERT S. TOMAK.

**Judges:** Before: BOONSTRA, P.J., and LETICA and FEENEY, JJ.

## Opinion

Per Curiam.

Defendant appeals as of right his jury trial conviction of carjacking, *MCL 750.529a*. He was sentenced as a fourth-offense habitual offender, *MCL 769.12*, to 35 to 75 years' imprisonment. We affirm.

I. BASIC FACTS AND PROCEDURAL HISTORY

Defendant's conviction arises from a carjacking that occurred in Southfield, Michigan. On September 21, 2020, the victim and her friend, TT, were at a park. The victim ordered Chinese food from a restaurant located in a store plaza near Eight Mile and Evergreen Roads, and the friends drove in separate vehicles to that location. The victim noticed two men walking near their vehicles. The victim retrieved her food and entered her 2013 Ford Fusion. The victim ate her food with her driver's door open. She sat with her passenger window down and spoke to TT who was parked in the adjacent parking spot. TT also noticed the two men walking behind and then in front of their vehicles. TT testified that one man was wearing a gray sweatshirt with black jeans and the other **[*2]** wore a periwinkle

jacket with black jeans. Both men were wearing masks. TT asked the victim if she was ready to leave, but the victim decided to stay there and continue eating her food. TT drove away to retrieve a pizza order.

The victim testified that she felt comfortable remaining at the store plaza because there were other people present. As the victim sat in her car and ate, a man entered the passenger side of the car and grabbed her purse. The victim reached for her cell phone and put it under her armpit. Defendant approached the driver's side of the victim's car, pointed a gun at her, and stated: "Bitch, you're getting robbed." Defendant repeatedly struck the victim in the face with the butt of his gun before pulling her out of the car and driving away.

Approximately two minutes after leaving the plaza, TT received a phone call from the victim. The victim seemed terrified and scared as she screamed that she had been hit "upside" the head with a gun and that her car and everything had been taken. TT immediately drove back to the restaurant where the victim was present with injuries, including a knot, to her head and face. Both Detroit and Southfield police officers responded to **[*3]** the scene. The victim's car was recovered minutes later, approximately one-half mile from the carjacking scene. A homeowner's surveillance camera recorded the victim's vehicle crashing into a car parked on the street, and two occupants fleeing the vehicle.

Law enforcement later recovered fingerprint and deoxyribonucleic acid (DNA) evidence from the victim's vehicle. Although the fingerprint evidence did not lead to a suspect, DNA associated with defendant was found on the stolen vehicle's steering wheel and gear shift. Because of the DNA evidence, the police showed a photograph of defendant to the victim, but she did not identify him as her assailant. Additionally, the victim admitted that she did not provide a description of the carjackers to the police after the incident. The victim subsequently identified defendant at the preliminary examination and at trial, stressing that she could identify defendant as the gunman because of his eyes.

During trial, the victim acknowledged that her Ford Fusion was her first car, and she tried to take care of it. The victim testified that she took her vehicle to a car wash and for oil changes, but she denied getting out of her car when she had it **[*4]** serviced. Rather, she remained inside her car during the car washes, and the only interior portion of the vehicle touched during the oil change by a service technician was the hood release button.

Defendant testified he worked at three local car wash and oil change businesses that also vacuumed and cleaned the interior of vehicles. Defendant proffered that his DNA evidence must have been left inside the victim's vehicle when he serviced it. But, he did not have documentary evidence of his employment at those businesses because he was paid in cash and he did not present testimony from his supervisors or coworkers to verify his employment. Although defendant challenged the victim's identification testimony as unreliable and presented a theory of misidentification, the jury convicted him as charged.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first alleges that the prosecution failed to present sufficient evidence to establish his identity as the person who carjacked the victim to support his conviction. We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Bailey, 310 Mich App 703, 713; 873 NW2d 855 (2015)*. When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must **[*5]** view the evidence in a light most favorable to the prosecution and determine whether a rational tier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Miller, 326 Mich App 719, 735; 929 NW2d 821 (2019)*. "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack, 462 Mich 392, 400; 614 NW2d 78 (2000)*.

Defendant does not challenge any of the specific elements of carjacking, but only contends that the prosecution failed to present sufficient evidence to establish his identity as the carjacker. Identity is an essential element in a criminal prosecution. *People v Oliphant, 399 Mich 472, 489; 250 NW2d 443 (1976)*; *People v Fairey, 325 Mich App 645, 649; 928 NW2d 705 (2018)*. The prosecution must prove the identity of the defendant as the perpetrator of a

charged offense beyond a reasonable doubt. *People v Kern, 6 Mich App 406, 409-410; 149 NW2d 216 (1967)*. Positive identification by a witness or circumstantial evidence and reasonable inferences arising from it may be sufficient to support a conviction of a crime. *People v Davis, 241 Mich App 697, 700; 617 NW2d 381 (2000)*; see also *Nowack, 462 Mich at 400*. The credibility of identification testimony is for the trier of fact to resolve, and this Court will not resolve it anew. *Davis, 241 Mich App at 700*.

The victim acknowledged that she did not provide a description of the carjacker after the event, citing the speed of its occurrence, the mask, and her fear. At trial, however, the victim identified **[*6]** defendant as the carjacker.[1] She explained that she saw part of the carjacker's face, particularly his eyes, when he walked past her car before the incident, when they were face-to-face as he pulled her from the car, and when he backed up her car and drove away. The victim testified that she would never forget defendant because of his eyes. This evidence, if believed, was sufficient to establish defendant's identity as the perpetrator beyond a reasonable doubt. *Davis, 241 Mich App at 700*. In addition to the victim's identification testimony, the prosecution also presented evidence that DNA associated with defendant was found on the steering wheel and the gear shift inside the victim's car. This DNA evidence placed defendant inside the victim's car, and it correlated to locations that defendant would have touched as the driver of the vehicle, thereby buttressing the reliability of the victim's identification testimony. Accordingly, viewed in a light most favorable to the prosecution, the evidence was sufficient to establish defendant's identity as the carjacker beyond a reasonable doubt.

Nonetheless, defendant submits that the victim's identification testimony was unreliable because she failed to identify him **[*7]** when shown his photograph. Furthermore, the victim only identified him several months later at the preliminary examination when he wore a jail uniform and sat with defense counsel. Defendant also offered his plausible explanation for why his DNA was in the victim's car, which the jury should have believed. But a jury may choose to believe or disbelieve all or part of the witness's testimony. *People v Baskerville, 333 Mich App 276, 283-284; 963 NW2d 620 (2020)*. And, the credibility of a witness presents a matter of weight, not sufficiency. *Id. at 283*. Although defendant testified that he probably left his DNA in the victim's car when he cleaned it, the victim rejected that assertion, testifying that she did not leave her vehicle when she went through the car wash. The victim further testified that she even remained in her vehicle during oil changes, and the service technician only would have touched the hood release button in her vehicle's interior, a location not near the steering wheel or gear shift.

Defendant's challenges to the victim's identification and his explanation for the presence of his DNA in the victim's car were presented to the jury during trial and are raised on appeal. Indeed, the victim was questioned on both direct and cross-examination about **[*8]** her inability to recognize defendant from a photograph, that she reported to the police that the incident happened quickly and that the carjacker was masked, and that she first identified defendant at the preliminary examination when he was wearing an orange jail uniform. However, any doubt or discrepancy pertaining to the credibility of a witness's testimony presented a jury determination. *Id.* Even if a witness's identification of the defendant is less than positive, the question remains one for the trier of fact. *People v Abernathy, 39 Mich App 5, 7; 197 NW2d 106 (1972)*. Applying these principles, there was sufficient evidence to enable the trier of fact to find beyond a reasonable doubt that defendant was the carjacker who struck the victim and drove her car away.

## III. DEFENDANT'S STANDARD 4 BRIEF

Defendant raises additional issues in a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4. After review, we conclude that none have merit.

## A. SUFFICIENCY OF THE EVIDENCE

Defendant himself asserts that the evidence was insufficient to support his conviction because he provided a plausible explanation for why his DNA would be present inside the victim's car. As explained in Section II, sufficient evidence supports defendant's conviction. The victim refuted **[*9]** defendant's explanation for the presence of his

---

[1] The passenger that entered the victim's car and grabbed her purse remained unknown.

DNA by denying that she ever got out of her car when she took it to the car wash or had the oil changed. The competing testimony created an issue of fact for the jury to resolve, and we are required to "make credibility choices in support of the jury verdict." *Nowak, 462 Mich at 400*.

## B. PROSECUTOR'S CONDUCT

Defendant contends that reversal is required because the prosecutor knowingly presented false testimony at trial. We disagree.

Because defendant did not object to the prosecutor's conduct, or otherwise raise this issue in the trial court, this claim of misconduct is unpreserved. See *People v Bennett, 290 Mich App 465, 475; 802 NW2d 627 (2010)*. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting defendant's substantial rights. *People v Brown, 294 Mich App 377, 382; 811 NW2d 531 (2011)*.

A prosecutor may not knowingly use false testimony to obtain a conviction. *People v Smith, 498 Mich 466, 475-476; 870 NW2d 299 (2015)*. "[A] conviction obtained through the knowing use of perjured testimony offends a defendant's due-process protections guaranteed under the *Fourteenth Amendment*." *People v Aceval, 282 Mich App 379, 389; 764 NW2d 285 (2009)*. Perjury is defined as "a willfully false statement regarding any matter or thing, if an oath is authorized or required." *People v Lively, 470 Mich 248, 253; 680 NW2d 878 (2004)* (emphasis deleted). To prove prosecutorial misconduct premised on perjury, a defendant must demonstrate: (1) that a witness **[\*10]** knowingly made a false statement, and (2) the prosecutor knowingly elicited the false statement. *People v Loew, 340 Mich App 100, 128; 985 NW2d 255 (2022)*, lv gtd. Where a defendant simply surmised that the prosecutor had information to directly contradict the testimony of its most important witness, a claim of prosecutorial misconduct premised on suborned perjury was not established. *Id. at 128-129*. Generally, a conviction for perjury committed during trial testimony cannot be sustained only with contradictory sworn statements by the defendant. See *People v Kennedy, 221 Mich 1, 3-4; 190 N.W. 749*; 190 NW 749 (1922).

Defendant submits that the victim's preliminary examination and trial testimony differed from her statements to the police, which exposed her inconsistent descriptions of the carjacker and established that she did not get a good look at him. Additionally, the responding officer did not record that the victim stated that she could identify the gunman by his eyes. However, these examples of potential inconsistencies fail to demonstrate that the prosecutor knowingly presented false testimony at trial, or, more significantly, show that the prosecutor knowingly presented or allowed false testimony to stand uncorrected. Rather, the prosecutor made no attempt to conceal the inconsistencies in **[\*11]** the victim's statements and testimony. Indeed, defense counsel cross-examined the victim regarding the inconsistencies and, in closing argument, asserted that a not guilty verdict was warranted under the circumstances. Thus, the jury was aware of the alleged inconsistencies and was permitted to consider them when evaluating the victim's credibility. Merely because the victim's testimony may have been inconsistent with a prior statement or conflicted with other witnesses' testimony does not establish that her testimony was in fact false. See *People v Bass, 317 Mich App 241, 275; 893 NW2d 140 (2016)* ("Although an inconsistent prior statement may be a mechanism to impeach a witnesses' credibility at trial, it is not definitive evidence that the trial testimony is false."). Rather, the inconsistencies created questions of fact for the jury to resolve. Accordingly, defendant has failed to demonstrate plain error.

## C. UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE

In his last issue raised as a statement of questions presented, defendant proffers that the victim's in-court identification testimony was inadmissible because it was tainted by an unduly suggestive pretrial identification procedure in which the police showed her a single photograph of defendant. **[\*12]** We disagree.

Because defendant did not object to the victim's in-court identification or otherwise raise any issue concerning the pretrial procedure, this issue is unpreserved. *People v McCray, 245 Mich App 631, 638-639; 630 NW2d 633 (2001)*. Therefore, we review this issue for plain error affecting defendant's substantial rights. *People v Carines, 460 Mich 750, 752-753, 763-764; 597 NW2d 130 (1999)*.

Photographic identification procedures can violate a defendant's due-process rights if they are so impermissibly suggestive as to give rise to a substantial likelihood that there will be a misidentification. *People v Gray, 457 Mich 107, 111; 577 NW2d 92 (1998)*. An improper suggestion may arise when a witness is shown a photograph of only one person because the witness is tempted to presume that the photograph is of the assailant. *Id.* "Showing a witness a single photograph is considered to be one of the most suggestive photographic identification procedures." *People v Woolfolk, 304 Mich App 450, 457; 848 NW2d 169 (2014)*.

In this case, the victim was shown a single photograph of defendant, although she did not make an identification. This alone may be impermissibly suggestive, but the inquiry does not end there. Even if a witness is exposed to an unduly suggestive pretrial identification procedure, the witness's in-court identification will still be permitted if there is an independent basis for the in-court identification. *Gray, 457 Mich at 114-115*. The independent **[*13]** basis inquiry requires a factual analysis, and the validity of a witness's in-court identification must be viewed in light of the totality of the circumstances to determine whether the procedure was so impermissibly suggestive that it led to a substantial likelihood of misidentification. *Id.; People v Kurylczyk, 443 Mich 289, 302; 505 NW2d 528 (1993)*. The following factors are considered in determining whether an independent basis exists for the admission of an in-court identification:

(1) [P]rior relationship with or knowledge of the defendant; (2) opportunity to observe the offense, including length of time, lighting, and proximity to the criminal act; (3) length of time between the offense and the disputed identification; (4) accuracy of description compared to the defendant's actual appearance; (5) previous proper identification or failure to identify the defendant; (6) any prelineup identification lineup of another person as the perpetrator; (7) the nature of the offense and the victim's age, intelligence, and psychological state; and (8) any idiosyncratic or special features of the defendant. [*Davis, 241 Mich App at 702-703*.]

It is not necessary that all factors be given equal weight. *People v Kachar, 400 Mich 78, 97; 252 NW2d 807 (1977)*.

Even assuming that it was impermissibly suggestive to show the victim a single **[*14]** photograph, the record sufficiently establishes that there was an independent basis to support the admissibility of the victim's in-court identification of defendant. The victim had an opportunity to observe the carjacker from a close distance before and during the incident. The victim initially saw the carjacker when he walked past her car before the incident. She saw him again when they were face-to-face as he pulled her out of the car, and when he backed up her car and drove away. According to the victim, she could clearly see defendant's half-masked face, she remembered his eyes, and she would "never forget [his eyes]." Although she did not identify defendant from his photograph, she explained that she recognized the eyes, and, although the photograph was clear, the lighting in the photograph was "[a] little off." She further added that she could identify defendant at the preliminary examination from his eyes because they were in person, as opposed to her looking at a photograph. More than 11 months elapsed between the carjacking and the victim's identification of defendant, and the victim did not know defendant personally. These facts alone do not invalidate the victim's independent **[*15]** basis for identifying defendant because she had ample opportunity to view the perpetrator before and during the carjacking. *Kachar, 400 Mich at 97*. Further, when a witness does not identify a defendant in a pretrial lineup, the witness's in-court identification of a defendant is "a credibility issue that [is] properly before the jury to determine." *People v Barclay, 208 Mich App 670, 676; 528 NW2d 842 (1995)*. The discrepancies noted by defendant do not diminish the validity of the independent basis supporting the victim's identification. Rather, they pertain to the reliability of the identification. Considering the victim's opportunity to observe defendant and the totality of the circumstances, the record supports that there was an independent basis for the identification of defendant. Accordingly, defendant failed to demonstrate plain error.[2]

_____

[2] Defendant states additional issues for the record, but does not include them in the statement of questions presented. An issue that is not raised in the statement of questions presented is generally not properly presented for appellate review before this Court and is considered waived. *People v Fonville, 291 Mich App 363, 383; 804 NW2d 878 (2011)*; *MCR 7.212(C)(5)*. Even so, a Standard 4 brief is filed when a defendant insists on raising particular claims against the advice of counsel. Counsel is to provide procedural advice and clerical assistance to ensure that defendant's brief conforms to this Court's filing requirements. See

2023 Mich. App. LEXIS 5857, *15

Affirmed.

/s/ Mark T. Boonstra

/s/ Anica Letica

/s/ Kathleen A. Feeney

---

**End of Document**

---

Supreme Court Administrative Order No. 2004-6, Standard 4. Because there is no indication that clerical assistance was rendered to ensure that the Standard 4 brief conformed to this requirement, we will briefly address defendant's claims.

Defendant asserts that his right to a speedy trial was violated contrary to the Interstate Agreement on Detainers, *MCL 780.601 et seq.*, premised on defendant's alleged transfer from a Minnesota facility. At the pretrial hearing held on October 27, 2021, the prosecutor noted that defendant was a prisoner of the Michigan Department of Corrections, and a trial by date of November 14, 2021 would apply in the absence of COVID-19 issues and protocols. But defense counsel stated that he was unavailable for trial, citing a medical matter scheduled for surgery. The trial court accommodated the defense request to delay the trial and assessed **[*16]** the delay against defendant. Thereafter, action was taken within 180-days to ready the case for trial promptly and with dispatch. See *People v Lown, 488 Mich 242, 260; 794 NW2d 9 (2011)*. Accordingly, this speedy-trial challenge does not entitle defendant to appellate relief.

Defendant further submits that he was deprived of his right of confrontation when the lead detective was not called to testify at trial and that defendant's attorney never told him that the lead detective was not going to be available or that defendant would not have an opportunity for cross-examination. As to these issues, defendant merely states them for the record without citation to the record or to any legal authority in support of these claims. See *MCR 7.212(C)(7)*; *People v Henry, 315 Mich App 130, 148-149; 889 NW2d 1 (2016)* (When "defendant's brief is bereft of citations to the record or any analysis," this Court may treat the issue as abandoned.); *People v Watson, 245 Mich App 572, 587; 629 NW2d 411 (2001)* ("Defendant's failure to cite any supporting legal authority constitutes abandonment of this issue."). Regardless, the record reflects that the prosecution listed the lead detective as a potential trial witness before trial and that the court identified him as a potential witness during jury voir dire. Even so, the prosecution opted to rest without calling the lead detective as a witness and, after defense counsel presented defendant's testimony at trial, defense counsel **[*17]** informed the court that he had no additional witnesses and rested. Defendant has not demonstrated that plain error occurred because "the right to confrontation is not violated by the prosecution failing to call witnesses that defendant could have called to testify." *People v Cooper, 236 Mich App 643, 659; 601 NW2d 409 (1999)*. Finally, to the extent that defendant's statement for the record implies that counsel performed deficiently by failing to call the lead detective as a witness, defendant has not established that counsel's performance was deficient and that he was prejudiced given the strong evidence presented against him at trial. See *People v Jurewicz, 506 Mich 914; 948 NW2d 448 (2020)*; *People v Horn, 279 Mich App 31, 39; 755 NW2d 212 (2008)*. Consequently, defendant is not entitled to appellate relief on the grounds he has stated for the record.

# *Starks v. Jackson*

United States District Court for the Western District of Michigan, Southern Division

February 7, 2018, Decided; February 7, 2018, Filed

Case No. 1:17-cv-399

**Reporter**

2018 U.S. Dist. LEXIS 38159 *

SIMON STARKS, Petitioner, v. SHANE JACKSON, Respondent.

**Subsequent History:** Adopted by, Writ of habeas corpus denied, Certificate of appealability denied, Judgment entered by *Starks v. Jackson, 2018 U.S. Dist. LEXIS 37741 (W.D. Mich., Mar. 8, 2018)*

**Prior History:** *People v. Starks, 2015 Mich. App. LEXIS 1769 (Mich. Ct. App., Sept. 22, 2015)*

## Core Terms

court of appeals, prosecutorial misconduct, clearly established federal law, state court, credibility, defense counsel, alibi witness, quotation, remember, invite, habeas relief, denigrating, comments, sentence, gun, eyewitness identification, reasonable inference, robbery, memory, merits, counsel's performance, ladies and gentlemen, armed robbery, certificate, ineffective, fairminded, witnesses, robbers, ineffective assistance claim, appellate court

**Counsel:** **[*1]** Simon Starks #897728, petitioner, Pro se, Carson City, MI.

For Shane Jackson, respondent: Jared D. Schultz, MI Dept Attorney General (Appellate), Appellate Division, Lansing, MI; John S. Pallas, MI Dept Attorney General (Appellate), Appellate Division, Lansing, MI.

**Judges:** Honorable PHILLIP J. GREEN, United States Magistrate Judge.

**Opinion by:** PHILLIP J. GREEN

## Opinion

### REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under *28 U.S.C. § 2254*. Petitioner Simon Starks is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility. On February 18, 2014, a Berrien County Circuit Court jury found Petitioner guilty of armed robbery, *MICH. COMP. LAWS § 750.529*, and felony firearm, *MICH. COMP. LAWS § 750.227b*. On March 24, 2014, the court imposed sentences of eleven to twenty years for the armed robbery conviction, consecutive to two years for the felony firearm conviction.

On April 27, 2017, Petitioner filed his habeas corpus petition raising three grounds for relief, as follows:
    I. I. Insufficient evidence of guilt.
    II. Prosecutor's actions denied defendant a fair trial and his due process rights under the Michigan and federal constitutions.
    II. III. Defendant received ineffective assistance of counsel.

(Am. Pet., ECF No. 4, **[*2]** PageID.91-94.) Respondent has filed an answer to the petition (ECF No. 11), stating that the grounds should be denied because they are without merit or procedurally defaulted. Upon review and

applying the standards of the *Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214* (AEDPA), I find that all grounds are without merit. Accordingly, I recommend that the petition be denied.

## Discussion

### I. Factual allegations

On November 1, 2013, at about 6:45 p.m., Daniel Beshires and his wife Tabitha arrived in their minivan at a church at the corner of Highland Avenue and Seeley Street in Benton Harbor, Michigan. (Trial Tr. I, ECF No. 12-6, PageID.325-327.) They were there to look at a 1992 or 1993 full-sized Chevrolet Blazer that had been advertised on Craigslist. (*Id.*) Mr. Beshires had communicated with the seller by telephone. (*Id.*, PageID.330-332.) He had negotiated a price of $600.00. (*Id.*, PageID.332.) They were going to meet at the church at 7:00 p.m. to consummate the transaction. (*Id.*, PageID.331.)

Mr. Beshires waited in the parking lot. (*Id.*, PageID.334-335.) He continued to communicate with the seller by telephone. (*Id.*) After waiting about thirty minutes, Mr. Beshires pulled out of **[*3]** the parking lot. (*Id.*) As he was leaving, a man walked up and asked if Mr. Beshires was there to buy the Blazer. (*Id.*)

Mr. Beshires drove around the church, back to the Blazer. ((*Id.*, PageID.338.) He exited his minivan to evaluate the Blazer. (*Id.*, PageID.339.) The seller attempted to start the vehicle. (*Id.*, PageID.339-340.) It would not start. (*Id.*) The seller hit the lever to release the hood. (*Id.*) As Mr. Beshires opened the hood, the seller pulled a handgun and another person, Petitioner, approached with a handgun as well. (*Id.*, 344-348.) They demanded his money. (*Id.*) Mr. Beshires yielded his wallet to Petitioner. (*Id.*) The robbers told Mr. and Mrs. Beshires to leave; accordingly, he and his wife fled in the minivan. (*Id.*)

Petitioner testified that he was not at that location on November 1, 2013. (Trial Tr. II, ECF No. 12-7, PageID.431-445.) He testified that he was at his girlfriend's house the entire afternoon and evening that day. (*Id.*) Petitioner's girlfriend confirmed his account. (*Id.*, PageID.414-430.)

The prosecutor presented one rebuttal witness: a police officer who had interviewed Petitioner twenty days after the incident. (*Id.*, PageID.446-452.) Petitioner told the officer that he **[*4]** was traveling back and forth between Kalamazoo, Michigan, and South Bend, Indiana, on November 1, 2013. (*Id.*)

The jury deliberated for about an hour before returning its verdict. (*Id.*, PageID.488.)

Petitioner, with the assistance of counsel, appealed his convictions to the Michigan Court of Appeals raising the same three issues he raises in his habeas petition. By unpublished opinion issued September 22, 2015, the court of appeals affirmed the trial court. (Mich. Ct. App. Op., ECF No. 12-10, PageID.516-521.) Petitioner then filed a pro per application for leave to appeal in the Michigan Supreme Court, again raising the same three issues he raises here. That court denied leave by order entered May 2, 2016. (Mich. Ord., ECF No. 12-11, PageID.647.) Petitioner then timely filed the instant petition.

### II. AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone, 535 U.S. 685, 693-94, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)*. An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: **[*5]** "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *28 U.S.C. § 2254(d)*. This standard is "intentionally difficult to meet." *Woods v. Donald, 575 U.S. ___, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015)* (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. *28 U.S.C. § 2254(d)*. This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*; *Bailey v. Mitchell, 271 F.3d 652, 655 (6th Cir. 2001)*. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith, 135 S. Ct. 1, 3, 190 L. Ed. 2d 1 (2014)*; *Bailey, 271 F.3d at 655*. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher, 565 U.S. 34, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011)*. Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall, 742 F.3d 642, 644 (6th Cir. 2014)* (citing *Greene, 565 U.S. at 38*).

A federal habeas court may issue the writ under the **[*6]** "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell, 535 U.S. at 694* (citing *Williams, 529 U.S. at 405-06*). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods, 135 S. Ct at 1376* (quoting *Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011))*. In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall, 572 U.S. 415, 134 S. Ct. 1697, 1705, 188 L. Ed. 2d 698 (2014)* (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy, 160 F.3d 1131, 1134 (6th Cir. 1998)*. A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. *28 U.S.C. § 2254(e)(1)*; *Lancaster v. Adams, 324 F.3d 423, 429 (6th Cir. 2003)*; *Bailey, 271 F.3d at 656*. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata, 449 U.S. 539, 546, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)*; *Smith v. Jago, 888 F.2d 399, 407 n.4 (6th Cir. 1989)*.

### III. Sufficiency of the evidence

Petitioner contends that the evidence **[*7]** offered by the prosecution was lacking in two ways: first, there was no DNA, fingerprints, or other physical evidence linking Petitioner to the crime or crime scene; and second, the victims' claims that they could identify the robbers even though the robbers wore bandanas as masks is wholly incredible. (Am. Pet., ECF No. 4, PageID.91.)

A *Section 2254* challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*, which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins, 506 U.S. 390, 401-02, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)*. Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson, 443 U.S. at 324 n.16*; *Allen v. Redman, 858 F.2d 1194, 1196-97 (6th Cir. 1988)*.

The *Jackson v. Virginia* standard **[*8]** "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson, 443 U.S. at 319.* Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [Court of Appeals'] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler, 658 F.3d 525, 531 (6th Cir. 2011)* (*en banc*) (quoting *Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008)).* This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id. at 534* (quoting *United States v. Oros, 578 F.3d 703, 710 (7th Cir. 2009)).*

The Michigan Court of Appeals applied the *Jackson* standard when it rejected Petitioner's challenge to the sufficiency of the evidence:

> In reviewing the sufficiency of the evidence, this Court must view the evidence - whether direct or circumstantial - in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. *People v Reese, 491 Mich 127, 139, 815 N.W.2d 85; 491 Mich. 127, 815 NW2d 85 (2012); People v Hardiman, 466 Mich 417, 428, 646 N.W.2d 158; 466 Mich. 417, 646 NW2d 158 (2002).* A jury, and not an **[*9]** appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. *People v Wolfe, 440 Mich. 508, 514-515, 489 N.W.2d 748; 440 Mich. 508, 489 NW2d 748 (1992).* Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime. *People v Carines, 460 Mich 750, 757, 597 N.W.2d 130; 460 Mich. 750, 597 NW2d 130 (1999).* The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. *People v Nowack, 462 Mich 392, 400, 614 N.W.2d 78; 462 Mich. 392, 614 NW2d 78 (2000).* We resolve all conflicts in the evidence in favor of the prosecution. *People v Kanaan, 278 Mich App 594, 619, 751 N.W.2d 57; 278 Mich. App. 594, 751 NW2d 57 (2008).*

(Mich. Ct. App. Op., ECF No. 12-10, PageID.517.) Although the court of appeals relied on state authorities, those authorities ultimately are founded in *Jackson v. Virginia. See, e.g., People v. Wolfe, 440 Mich. 508, 489 N.W.2d 748, 751 (1992)* ("This standard was articulated by the United States Supreme Court in *Jackson v. Virginia*, . . . and has been applied regularly in the courts of this state. [citations omitted]."). Thus, it cannot be said that the state courts applied the wrong standard.

The state appellate court also applied the standard properly:

> To establish the crime of armed robbery under *MCL 750.529*, the prosecution **[*10]** must prove beyond a reasonable doubt that the defendant, in the course of committing a larceny of money or property, used force or violence against, assaulted, or placed in fear the complainant, while possessing a dangerous weapon, possessing an article used or fashioned in a manner to give the appearance of being a dangerous weapon, or representing that he or she possessed a dangerous weapon. *People v Chambers, 277 Mich App 1, 7-8, 742 N.W.2d 610; 277 Mich. App. 1, 742 N.W.2d 610 (2007);* M Crim JI 18.1. Further, "it is well settled that identity is an element of every offense." *People v Yost, 278 Mich App 341, 356, 749 N.W.2d 753; 278 Mich. App. 341, 749 NW2d 753 (2008).* A witness's positive identification may establish sufficient evidence of identity. *People v Davis, 241 Mich App 697, 700, 617 N.W.2d 381; 241 Mich. App. 697, 617 NW2d 381 (2000).* With respect to the armed robbery, defendant does not challenge whether there was sufficient evidence to show that an armed robbery occurred; rather, defendant only argues that there was insufficient evidence showing that he was one of the perpetrators. Defendant's identity argument is equally applicable to the felony-firearm conviction.

Here, both victims identified defendant as one of the individuals who committed the armed robbery. The husband testified that he was "100 percent positive" that defendant was the person who took his wallet. The wife testified that she had "no doubt" about her identification of **[*11]** defendant. Further, although defendant

wore a bandana that covered part of his face, the wife asserted that she was able to see defendant from the nose up. She claimed that she was able to identify defendant on the basis of his hair, the shape of his eyes, and his nose. The couple both testified that defendant wielded a gun. Viewing the evidence in a light most favorable to the prosecution, resolving all conflicts in the evidence in favor of the prosecution, and deferring to the jury's assessment of the weight of the evidence and the credibility of the witnesses, we conclude that a rational juror could find that the prosecution proved beyond a reasonable doubt that defendant committed the offenses of armed robbery and felony-firearm. All of defendant's arguments on appeal are ultimately predicated on the weight of the evidence, conflicts in the evidence, and/or the credibility of witnesses, none of which warrant reversal. *Wolfe, 440 Mich at 514-515*; *Kanaan, 278 Mich App at 619*. The testimony against defendant did not contradict or defy physical facts and realities or laws of science, nor was the testimony patently incredible or inherently implausible. *See People v Lemmon, 456 Mich 625, 643-644, 576 N.W.2d 129*; *456 Mich. 625, 576 NW2d 129 (1998)* (addressing a great-weight-of-the-evidence argument). Reversal is unwarranted. **[*12]**

(Mich. Ct. App. Op., ECF No. 12-10, PageID.517-518.)

Where an eyewitness's testimony, if credited, establishes the essential elements of the offense, the *Jackson* standard is satisfied. *Tibbs v. Florida, 457 U.S. 31, 46 n.21, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982)* ("Nadeau provided eyewitness testimony to the crimes. If the jury believed her story, the State's presentation was more than sufficient to satisfy due process."); *see also Couch v. Jabe, No. 92-1269, 1992 U.S. App. LEXIS 31149, 1992 WL 340397, *1 (6th Cir. Nov. 19, 1992)* ("In this case, the testimony of the alleged eyewitness, if believed, was sufficient to support the conviction."). Petitioner's contention that the Beshires' testimony is insufficient depends on his conclusion that it is not credible. Petitioner, therefore, asks this Court to do that which it cannot: assess the credibility of witnesses as part of the *Jackson* analysis. *Herrera, 506 U.S. at 401-02*. Moreover, *Jackson* does not require the presentation of forensic evidence such as DNA or fingerprints. *Sullivan v. Bruce, 44 F. App'x 913, 916 (10th Cir. 2002)* ("The constitution does not require [a] . . . conviction to be supported by DNA evidence."); *Perkins v. Warden, Madison Corr. Inst., No. 3:14-cv-322, 2015 U.S. Dist. LEXIS 34408, 2015 WL 1276450, *7 (S.D. Ohio, Mar. 19, 2015)* ("There is no requirement in the law of presenting forensic evidence such as Perkins' recovered DNA or fingerprints . . . . ").

Petitioner has failed to show that the Michigan Court of Appeals resolution of his sufficiency-of-the-evidence **[*13]** challenge is contrary to, or an unreasonable application of, *Jackson v. Virginia*, the clearly established federal law regarding sufficiency of the evidence. Accordingly, Petitioner is not entitled to habeas relief.


## IV. Prosecutorial misconduct

Petitioner identifies three distinct types of prosecutorial misconduct that denied him a fair trial: the prosecutor appealed to the sympathies of the jury by playing the tape of Mrs. Beshires' 911 call; the prosecutor argued facts not of record; and the prosecutor denigrated Petitioner's defense. (Am. Pet., ECF No. 4, PageID.92.)

A. Appealing to the jurors' sympathy

For a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)* (quoting *Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)*). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)).* In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated **[*14]** or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young, 470 U.S. 1, 11-12, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)*. The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id. at 12-13*; *Darden, 477 U.S. at 181-*

*82*; *Donnelly, 416 U.S. at 646-47*; *Berger v. United States, 295 U.S. 78, 84-85, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)*.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams, 376 F.3d 520, 528 (6th Cir. 2004)* (citing *Bowling v. Parker, 344 F.3d 487, 512 (6th Cir. 2003)*). Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley, 457 F.3d 501, 516 (6th Cir. 2006)* (quoting *Donnelly, 416 U.S. at 645*). Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews, 567 U.S. 37, 47, 132 S. Ct. 2148, 183 L. Ed. 2d 32 (2012)* (internal quotation omitted).

It is certainly fair for the prosecutor to comment on the evidence; indeed, the prosecutor must be afforded considerable leeway. *Byrd v. Collins, 209 F.3d 486, 535 (6th Cir. 2000)* ("Prosecutors 'must be given leeway to argue reasonable inferences **[\*15]** from the evidence.'") (quoting *United States v. Collins, 78 F.3d 1021, 1040 (6th Cir. 1996)*). On the other hand, it is certainly unfair for the prosecutor to seek to inflame the passions of the jury. *Viereck v. United States, 318 U.S. 236, 247-48, 63 S. Ct. 561, 87 L. Ed. 734 (1943)* (Court held it was improper for prosecutor to appeal to the passion and prejudice of the jury); *Johnson v. Bell, 525 F.3d 466, 484 (6th Cir. 2008)* ("[A] prosecutor illicitly incites the passions and prejudices of the jury when he calls on the jury's emotions and fears—rather than the evidence—to decide a case."); *Caldwell v. Russell, 181 F.3d 731, 737 (6th Cir.1999)*, *abrogated on other grounds, Mackey v. Dutton, 217 F.3d 399, 406 (6th Cir. 2000)* ("[The prosecutor] exceeds the legitimate advocate's role by improperly inviting the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof."); *United States v. Solivan, 937 F.2d 1146, 1151 (6th Cir. 1991)* (court held prosecutor may not make arguments "calculated to incite the passions and prejudices of the jurors . . . . ").

Petitioner contends that the prosecutor sought to invoke the sympathy of the jury when she read from the transcript of, and then played, the recording of Mrs. Beshires' frantic 911 call. The Michigan Court of Appeals rejected Petitioner's contention:

> Despite defendant's argument to the contrary, we first hold that the prosecutor did not improperly appeal to the jury for sympathy by simply reading or playing a portion of the wife's 911 call at **[\*16]** the beginning of the prosecutor's opening statement, followed by a recitation of the facts that the prosecutor intended to prove based on the anticipated evidence. *People v Unger, 278 Mich App 210, 237, 749 N.W.2d 272*; *278 Mich. App. 210, 749 NW2d 272 (2008)*. Said portion of the 911 call primarily explained the events that had just unfolded, as ultimately testified to by the victims. In fact, a CD of the 911 call was later admitted into evidence and played without objection. Thus, any assumed misconduct or error in the prosecutor's opening statement was harmless and did not affect defendant's substantial rights. There was no error and no prejudice.

(Mich. Ct. App. Op., ECF No. 12-10, PageID.518-519.)

Essentially, the court of appeals determined that the prosecutor did nothing more than comment on evidence that was ultimately admitted at trial. That determination is well-supported in the record. During her opening, the prosecutor did nothing more than recite statements Mrs. Beshires made during the telephone call. All of the statements were admitted into evidence when the recording of the call was played for the jury. To simply recount evidence properly admitted is the epitome of fair comment on the evidence. The state court's determination that such comment does not rise to **[\*17]** the level of prosecutorial misconduct is entirely consistent with clearly established federal law.

B. Arguing facts not in evidence

A prosecutor is not limited to simply recounting the evidence during closing argument. She may also argue reasonable inferences from the evidence. *Byrd, 209 F.3d at 535*. Nonetheless, it is unquestionably improper for a

prosecutor to argue facts not in evidence. *Abela v. Martin, 380 F.3d 915, 929 (6th Cir. 2004)* (citing *Berger, 295 U.S. at 78*).

Petitioner claims the prosecutor overstepped the bounds of propriety when she argued:

> 1. Petitioner knew the area where the robbery occurred, the alleys, the houses, the neighborhood, and the people well.
> 2. The gun used in the robbery could have been easily hidden in the area.
> 3. It is easy to remember the truth, but hard to repeat lies.
> 4. Mr. and Mrs. Beshires would remember the faces involved because having guns pointed at you or your spouse is traumatic.
> 5. Because Petitioner's alibi witness could not remember what happened on a specific date six weeks after the robbery, it called into question her memory of the events of the date of the robbery.

(Pet'r's Br. on Appeal, ECF No. 12-10, PageID.597-598.)

The Michigan Court of Appeals gave Petitioner's challenges short shrift: "We have carefully reviewed each of **[*18]** the prosecutor's remarks cited by defendant and conclude that they were either directly based on the evidence admitted during the trial or based on reasonable inferences arising from the evidence." (Mich. Ct. App. Op., ECF No. 12-10, PageID.519.) There is no question that the state court applied the correct standard when evaluating the propriety of the prosecutor's remarks.

1. Petitioner's familiarity with the area

The argument to which Petitioner objects, in context, is as follows:

> And if that's not enough, ladies and gentlemen, the defendant got up here, and, of course, after having Miss Pollard come up here and testify that he was with her, he can't come up here and say that he was anywhere near that intersection of Seeley and Highland because that would blow that alibi completely out of the water. But what he did acknowledge to you, ladies and gentlemen, is that he knows this area, he knows the intersections of Highland and McCord and Seeley, and not only does he know that because he's a resident of the area, but he knows that because he takes that way to go to his, what he identified as his baby momma's house or the woman with - by-with - by whom he has another child 'cause she lives **[*19]** south of that on Vineyard. And on top of that, ladies and gentlemen, what he tells you is that he actually hangs out at one of those houses, right there. One two. Two houses down from this church. He knows this area well. He's been to this area. And, in fact, ladies and gentlemen, I would submit to you that he has, cased, this area out. He knows all the alleys. He knows all the houses. He knows the neighborhood. He knows the people. So does it surprise you, ladies and gentlemen, that 5-10 minutes after the robbery that he's nowhere to be found? It shouldn't. He knows where he's going. He knows where he's to hide himself at.

(Trial Tr. II, ECF No. 12-7, PageID.459-460.) The prosecutor's argument finds support in the record.

Petitioner stated he was familiar with the area of Highland and Seeley, specifically familiar with that intersection. (*Id.*, PageID.435.) Petitioner testified the intersection was on the route he walked from his grandmother's house to his babymomma's house. (*Id.*) Petitioner stated he had walked that way quite a few times. (*Id.*, PageID.436.) Moreover, Petitioner stated he had been at his friend's house, just down from the church, seven or eight times. (*Id.*, PageID.437.) **[*20]** Nonetheless, Petitioner claimed he had never paid attention to the area. (*Id.*, PageID.438.)

In light of the Petitioner's professed contact with the area, it is not unreasonable to invite the inference that Petitioner knew his way around. The court of appeals determination that such an argument was permissible is entirely consistent with clearly established federal law. It is certainly not wrong "beyond any possibility of fairminded disagreement[,]" *Parker, 567 U.S. at 47* (internal quotation omitted); therefore, Petitioner is not entitled to habeas relief.

2. Easy concealment of the gun in the area

After the prosecutor argued Petitioner was familiar with the area, she continued: "And can you imagine - Look at those houses, look at all those bushes, look at all that property, that area, can you imagine that it's difficult to hide a gun - to stash a gun? Not really." (Trial Tr. II, ECF No. 12-7, PageID.460.) The prosecutor introduced six aerial images of the area where the crime occurred. (Trial Tr. I, ECF No. 12-6, PageID.249.) The images would have provided the jury a foundation to draw the inferences regarding the available cover. Moreover, Officer Steve Bobo also provided testimony regarding the nature of **[*21]** the area surrounding the church. (Trial Tr. II, ECF No. 12-7, PageID.406-411.) Officer Bobo also testified that a handgun similar to handguns identified by the victims would be easily concealed. (*Id.*, PageID.412.)

It is not unreasonable to invite the inference that a handgun could be easily concealed in an area that offered an abundance of cover. The court of appeals determination that such an argument was permissible is entirely consistent with clearly established federal law. It is certainly not wrong "beyond any possibility of fairminded disagreement[,]" *Parker, 567 U.S. at 47* (internal quotation omitted); therefore, Petitioner is not entitled to habeas relief.

3. Credible witnesses provided consistent and detailed testimony

The third statement to which Petitioner objects brings to mind a quotation often attributed to Mark Twain: "If you tell the truth you don't have to remember anything." *Amfosakyi v. Frito Lay, No. 1:11-cv-651, 2011 U.S. Dist. LEXIS 154188, 2011 WL 7560658 at *1 (M.D. Pa., Dec. 22, 2011)*. The prosecutor's argument delved a little deeper:

> What I would submit to you, ladies and gentlemen, is that everything they told you was extremely detailed, extremely detailed. And I know that Mr. Beshires said that this happened in a 90-second span, but how long did it take him **[*22]** to tell you about that, what, about a half an hour? Why? Because it's very detailed. Because that's what happened. Is it e - It's easy to remember the truth, it is hard to repeat lies. That's why lies are extremely inconsistent with each other. That's why lies change, over time, because it is hard to remember a lie. And that's, frankly, why they're so vague, because it is easier to remember a vague statement than it is a detailed statement, when it didn't happen.

(Trial Tr. II, ECF No. 12-7, PageID.465-466.) That is not so different from the trial court's instructions: "There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions . . . Did the witness seem to have a good memory." (Trial Tr. II, ECF No. 12-7, PageID.478.) In short, the prosecutor was inviting the jury to draw the inference that Mr. and Mrs. Beshires were credible based on the significant detail provided in their testimony. The court of appeals determination that such an argument was permissible is entirely consistent with clearly established federal law. It is certainly not wrong "beyond any possibility of fairminded disagreement[,]" *Parker, 567 U.S. at 47* (internal quotation **[*23]** omitted); therefore, Petitioner is not entitled to habeas relief.

4. The victims' focus on the persons holding them at gunpoint

The prosecutor argued:
> Mr. Beshires' per — perception is: being held up at gunpoint, being threatened for his life — give me all your money, give me your wallet — his focus is right here on the two people that have him at gunpoint. That is his perception. That is his view. Mrs. Beshires' view is: I'm sitting in my van, I'm looking over and I'm seeing my husband get robbed at gunpoint.

(Trial Tr. II, ECF No. 12-7, PageID.464.) The prosecutor raised the issue again in rebuttal:
> He only looked at that guy for 90 seconds. But let me tell you, ladies and gentlemen, he was very — when he looked at that — those two males for 90, long, seconds, staring at the end of — well, basically two guns, certainly Mr. Beshires is gonna remember that face . . . . Mrs. Beshires . . . Do you think that she's not gonna get a good look at his face, he — he's not gonna remember the face of the armed robber that stole her husband's wallet, that stole his money, that stole his sentimental items inside of his wallet? You can bet she's gonna remember his face.

(*Id.*, PageID.470-471.)

Mr. Beshires **[*24]** testified that he was looking at the robbers face-to-face during the entire encounter, even when he turned to permit Petitioner to remove the wallet from his back pocket. (Trial Tr. I, ECF No. 12-6, PageID.346-347, 351-352, 361-362.) He specifically testified that he turned to face the robbers as soon as they drew their guns because, in that circumstance, you "want[] to see what's going on." (*Id.*, PageID.346-347.) There was testimony in the record to support the prosecutor's argument. Moreover, it is not unreasonable to invite the inference that one would pay close attention to a person who is pointing a gun and threatening harm.

The court of appeals determination that such an argument was permissible is entirely consistent with clearly established federal law. It is certainly not wrong "beyond any possibility of fairminded disagreement[,]" *Parker, 567 U.S. at 47* (internal quotation omitted); therefore, Petitioner is not entitled to habeas relief.

5. The alibi witness's failure of memory with respect to a similar incident calls into question her memory of the day of the crime

The prosecutor asked the alibi witness what she had done on a particular day in mid-December, 2013. (Trial Tr. II, ECF No. 12-7, PageID.421-422.) **[*25]** She could not recall. (*Id.*) When the prosecutor told her she had visited Petitioner at the jail that day, she did not dispute that, she simply could not recall. (*Id.*, PageID.423.) The prosecutor then reviewed with the alibi witness that she vividly recalled spending time with Petitioner six weeks earlier on November 1, 2013, the day of the crime. (*Id.*, PageID.423-424.) The prosecutor also tripped the alibi witness up later during the cross-examination by referencing November 2 instead of November 1. (*Id.*, PageID.427-428.) The alibi witness then indicated that it was November 2 when she spent the day with Petitioner. (*Id.*, PageID.428.) Finally, she acknowledged that she did not know the date the robbery occurred. (*Id.*)

During closing argument, the prosecutor attacked the alibi witness's credibility based on her confusion regarding the dates and her inability to recall time spent with Petitioner that was several weeks more recent than the date of the robbery. (*Id.*, PageID.457-459.) The idea that memory fades as time passes is hardly novel. *See, e.g., United States v. Owens, 484 U.S. 554, 562, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988)* ("'[a]s time goes by, a witness' memory will fade . . . .'"); *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State, 470 U.S. 226, 266 n.16, 105 S. Ct. 1245, 84 L. Ed. 2d 169 (1985)* ("'No human transactions are unaffected by time . . . peculiarly matters **[*26]** which rest in memory . . . which consequently fade with the lapse of time . . . .'") (dissenting opinion); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118 n.13, 100 S. Ct. 2051, 64 L. Ed. 2d 766 (1980)* ("[A]s time passes memories fade . . . ."). A corollary to that principle might be that one would have better recall of recent events than older events. It is certainly not unreasonable to invite that inference.

The court of appeals determination that such an argument was permissible is entirely consistent with clearly established federal law. It is certainly not wrong "beyond any possibility of fairminded disagreement[,]" *Parker, 567 U.S. at 47* (internal quotation omitted); therefore, Petitioner is not entitled to habeas relief.

C. Denigrating the defense

Petitioner claims that the prosecutor rendered the trial unfair by denigrating the defense. A prosecutor is free to argue from the evidence that certain defense witnesses are lying, but may not denigrate the defense or defense counsel. *See Hanna v. Price, 245 F. App'x 538, 545-46 (6th Cir. 2007)*; *Bates v. Bell, 402 F.3d 635, 646 (6th Cir. 2006)*. Not every aspersion cast by a prosecutor upon a defense attorney's presentation of a case requires reversal of the guilty verdict. *See Young, 470 U.S. at 11* (stating that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; **[*27]** only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial").

"A prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for the truth." *United States v. August, 984 F.2d 705, 715 (6th Cir. 1992)*; *see also Brown v. McKee, 231 F. App'x. 469, 480 (6th Cir. 2007)* (a prosecutor's isolated comments in closing argument that the defense was attempting to trick the jury is not an improper

disparagement of defense counsel). The comments of which Petitioner complains here were not as strong as those permitted to stand in *August* or *Brown*.

To create "unfairness" the comments must go further than simple impropriety, they must be flagrant. *See Henley v. Cason, 154 F. App'x 445, 447 (6th Cir. 2005)*. They must inflame the jury's passion or distract them from determining petitioner's guilt or innocence. *See Davis v. Burt, 100 F. App'x. 340, 348 (6th Cir. 2004)*. That is a difficult showing where the trial judge typically instructs the jury that the attorneys' arguments, questions, and statements are not evidence. *Byrd, 209 F.3d at 533*.

Petitioner's principle complaint is that the prosecutor mischaracterized the defense. The prosecutor cast the dispute as a credibility contest between Mr. and Mrs. Beshires, on the one hand, and Petitioner and his alibi witness on the **[*28]** other. (Trial Tr. II, ECF No. 12-10, PageID.455, 471-472.)[1] Petitioner claims his defense was that Mr. and Mrs. Beshires were mistaken. (*Id.*, PageID.467-468.)

Petitioner's secondary complaint centers on the prosecutor's treatment of the alibi witness. Petitioner contends the prosecutor argued improperly when he claimed the witness needed to know the alibi date to be credible or that the only way the witness could identify the date was because defense counsel included it in his questions.[2] Petitioner claims his alibi witness knew, and testified unequivocally, that she and Petitioner were together the day after Halloween, even if she did not know the specific calendar date. (*Id.*, PageID.468.)

The Michigan Court of Appeals did not consider the prosecutor's allegedly denigrating comments to be sufficiently flagrant, particularly in light of the court's instruction that such comments were not evidence:

> Defendant also argues that the prosecutor denigrated defendant and the defense theory in several ways. A prosecutor "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda, 448 Mich 261, 283, 531 N.W.2d 659*; *448 Mich. 261, 531 NW2d 659 (1995)*. Here, we have reviewed the alleged instances of denigration and find that the prosecutor **[*29]** was permissibly attacking the defense's alibi theory based on the evidence and reasonable inferences arising therefrom. *Comella, 296 Mich App at 654*; see also *Meissner, 294 Mich App at 456* (explaining that "[p]rosecutors have discretion on how to argue the facts and reasonable inferences arising therefrom, and are not limited to presenting their arguments in the blandest terms possible"). Further, the jury was instructed that arguments by counsel were not evidence, and, once again, "[j]urors are presumed to follow the instructions of the court." *Meissner, 294 Mich App at 457*.

(Mich. Ct. App. Op., ECF No. 12-10, PageID.519-520.)

On its face, the court of appeals' analysis appears to be entirely consistent with clearly established federal law. Moreover, the court of appeals applied that law reasonably. With respect to Petitioner's primary complaint, Petitioner's argument that he challenged the Beshires' testimony as a mistake, not a lie, is a distinction without a meaningful difference. The Merriam-Webster definition of lie includes: "an untrue or inaccurate statement that may or may not be believed true by the speaker . . . ."[3] Under that definition, if the Beshires' identification of Petitioner as the robber were untrue, it would be a lie, even if Mr. and Mrs. Beshires **[*30]** believed it to be true but were mistaken.

---

[1] Specifically, the prosecutor argued: "[Credibility] is what this case is about, ladies and gentlemen; because, quite honestly, it comes down to Mr. and Mrs. Beshires' word against this defendant's word." (Trial Tr. II, ECF No. 12-7, PageID.455.) In rebuttal, the prosecutor was more direct: "Do you believe [the] stories [of Petitioner and his alibi witness] enough . . . to believe Mr. Beshires and Mrs. Beshires are lying to you?" (*Id.*, PageID.472-473.)

[2] The prosecutor argued: "If she's providing an alibi for this defendant, saying that he was at her house, how can she not know what the date is, ladies and gentlemen, how can she not come up right away and say it as . . . November 1st, 2013. And, in fact, the only time she acknowledged what day it was, was when [defense counsel] said, I wanna take your attention back to November 1st of 2013." (Trial Tr. II, ECF No. 12-7, PageID.458.)

[3] https://www.merriam-webster.com/dictionary/lie (last visited Feb. 2, 2018).

With respect to Petitioner's secondary complaint, the record is clear that the alibi witness testified she did not know the date. The prosecutor invited the jury to infer from her ignorance that her testimony was not credible. The alibi witness also testified that, on Halloween, she had invited Petitioner to come over the next day. (Trial Tr. II, ECF No. 12-7, PageID.417.) Defense counsel invited the jury to infer from that statement that the day of Petitioner's visit to the alibi witness's home and the day of the robbery were the same day. (*Id.*, PageID.468.) Both arguments ask the jury to make inferences based on different record testimony. Neither argument is so incendiary that it could be characterized as impermissibly denigrating the other, even if the inferences invited are mutually exclusive.

Petitioner has failed to demonstrate that the court of appeals, determination rejecting this claim was inconsistent with, or an unreasonable application of, clearly established federal law. Accordingly, this prosecutorial misconduct claim is without merit.

## III. Ineffective assistance of counsel

Petitioner claims his trial counsel was ineffective for **[*31]** failing to raise the prosecutorial misconduct issues argued above, failing to present expert testimony on the failings of eyewitness testimony, and for failing to challenge the calculation of the offense variables on factual and constitutional grounds. In *Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel: (1) did counsel's performance fall below an objective standard of reasonableness; and (2) did counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id. at 687-88.* A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id. at 689.* The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955))*; *see also Nagi v. United States, 90 F.3d 130, 135 (6th Cir. 1996)* (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." **[*32]** *Strickland, 466 U.S. at 690.* Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id. at 691.*

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under *§ 2254(d)*, the deferential standard of *Strickland* is "doubly" deferential. *Harrington, 562 U.S. at 105* (citing *Knowles v. Mirzayance, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009))*; *see also Burt v. Titlow, 571 U.S. 12, 134 S. Ct. 10, 13, 187 L. Ed. 2d 348 (2013)*; *Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1403, 179 L. Ed. 2d 557 (2011)*; *Premo v. Moore, 562 U.S. 115, 122, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011)*. In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk, 687 F.3d 723, 740-41 (6th Cir. 2012)* (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington, 562 U.S. at 102*).

In considering Petitioner's claims, the Michigan Court of Appeals applied the following standard:

"To obtain relief for the denial of the effective assistance of counsel, the defendant must show that counsel's performance fell short of . . . [an] objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome . . . would have been different." [*People v Ackley, 497 Mich 381, 389, 870 N.W.2d 858*; *497 Mich. 381, 870 NW2d 858, 862-63 (2015)]* (quotation marks omitted). A defendant **[*33]** must overcome the strong presumption that counsel's performance constituted sound trial strategy, but an appellate court is not permitted to insulate the review of counsel's performance by simply calling it trial strategy — the strategy must be sound, with decisions being objectively reasonable. *Id.* We must determine whether strategic choices were made after less than complete investigation or if a reasonable decision made an investigation unnecessary. *Id.*

(Mich. Ct. App. Op., ECF No. 12-10, PageID.520.) The court of appeals cited state court authority as the source of the standard; however, the case it cited, *People v. Ackley*, expressly relies upon *Strickland*. *Ackley, 870 N.W.2d at 862-63*. Accordingly, there can be no question that the state court applied the correct standard.

A. Failure to challenge prosecutorial misconduct

The Michigan Court of Appeals applied the standard to Petitioner's claim that counsel should have objected to prosecutorial misconduct as follows:

> With respect to the failure to object relative to the alleged instances of prosecutorial misconduct or error, because the prosecutor's challenged comments and remarks were proper, defense counsel was not ineffective, as counsel need not raise futile or meritless **[*34]** objections. *People v Ericksen, 288 Mich App 192, 201, 793 N.W.2d 120*; *288 Mich. App. 192, 793 NW2d 120 (2010)*. And defendant has not established a reasonable probability of a different outcome, i.e., the requisite prejudice, assuming deficient performance.

(Mich. Ct. App. Op., ECF No. 12-10, PageID.520.)

The court of appeals' determination is certainly consistent with Sixth Circuit authority. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw, 591 F.3d 517, 523 (6th Cir. 2010)*; *O'Hara v. Brigano, 499 F.3d 492, 506 (6th Cir. 2007)*; *Chegwidden v. Kapture, 92 F. App'x 309, 311 (6th Cir. 2004)*; *Harris v. United States, 204 F.3d 681, 683 (6th Cir. 2000)*. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley, 706 F.3d 741, 752 (6th Cir. 2013)*. The Supreme Court has reiterated the same principle on more than one occasion: "Because the objection upon which his ineffective-assistance-of-counsel claim was premised was meritless, Fretwell could not demonstrate an error entitling him to relief." *Lafler v. Cooper, 566 U.S. 156, 167, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)* (citing, *Lockhart v. Fretwell, 506 U.S.364, 113 S. Ct. 838, 122 L. Ed. 2d 180, (1993))*. Therefore, Petitioner has failed to establish that the Michigan Court of Appeals' determination with regard to his claim is contrary to, or an unreasonable application of clearly established federal law.

B. Not calling an expert regarding eyewitness identification

The Michigan Court of Appeals determined that Petitioner's trial counsel was not ineffective even though he failed to call an expert witness on eyewitness identification: **[*35]**

> In regard to the failure to call an expert witness relative to eyewitness identifications, defense counsel thoroughly cross-examined the victims on the subject of identifying defendant as one of the perpetrators, resulting in some discrepancies and weaknesses in the victims' testimony that were used by counsel as fodder for arguing misidentification. In *People v Cooper, 236 Mich App 643, 658, 601 N.W.2d 409*; *236 Mich. App. 643, 601 NW2d 409 (1999)*, this Court rejected a similar argument . . . .

> [A]n expert in the case at bar was not necessary and critical to presenting the theory of misidentification. Rather, it was reasonable and sound for defense counsel to rely on the discrepancies in the victims' testimony and the nature of the surrounding circumstances (strangers, nighttime, sudden and stressful situation) in developing the misidentification argument, absent calling an expert on problematic aspects of eyewitness identifications. The jury was certainly capable of grasping the possibility of a misidentification under the circumstances and in light of the testimony even without an expert. Also, given that our review is limited to mistakes apparent on the record, *People v Wilson, 242 Mich App 350, 352, 619 N.W.2d 413*; *242 Mich. App. 350, 619 NW2d 413 (2000)*, we cannot ascertain whether an expert, on cross-examination, may have provided testimony that somewhat damaged **[*36]** or diminished defendant's theory under the facts, or whether defense counsel explored this avenue and reasonably chose not to call an expert after consultation. We hold that defendant has not shown that counsel's performance fell below an objective standard of reasonableness in failing to call an expert, nor has defendant established the existence of a reasonable probability that calling an expert would have changed the outcome of the proceedings.

(Mich. Ct. App. Op., ECF No. 12-10, PageID.520-521) (footnote omitted). The court of appeals addressed ineffective assistance under both Strickland prongs and determined that defense counsel's performance was not deficient and that Petitioner had failed to demonstrate prejudice.

The court of appeals' determinations on both prongs are reasonable. In *Perkins v. McKee, 411 F. App'x 822 (6th Cir. 2011)*, the court rejected the same claim raised by Petitioner:

> Also unavailing is Perkins' claim that his attorney should have called an expert witness to testify about the "inherent problems with eyewitness testimony." Perkins Br. at 25. The Constitution does not require defense counsel to pursue every trial strategy imaginable, whether likely to bear fruit or not. *See Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982)*. No precedent establishes that **[*37]** defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the *Sixth Amendment*. And there is nothing about this case suggesting that such a witness was imperative here.

*Perkins, 411 F. App'x at 833*. Moreover, the Sixth Circuit has noted: "[T]he hazards of eyewitness identification are within the ordinary knowledge of most lay jurors." *United States v. Langan, 263 F.3d 613, 623 (6th Cir. 2001)*. Against that backdrop, the court of appeals conclusion that counsel had a strategic reason to forego expert testimony regarding the shortcomings of eyewitness identification is eminently reasonable.

The court of appeals' determination that Petitioner had failed to demonstrate prejudice is no less reasonable. Defense counsel was not stymied by the absence of expert testimony. He was able to explore factors undermining the identification through cross-examination and argument. *See Jackson v. Bradshaw, 681 F.3d 753, 762-763 (6th Cir. 2012)* (court held defense counsel's failure to call eyewitness identification expert was not unreasonable where counsel was able to explore weaknesses in identifications in cross-examination and argument). Moreover, even though, as Petitioner argues, one can anticipate what such an expert might say based on such testimony **[*38]** in other cases, Petitioner's conclusion that he was prejudiced by the absence of such testimony here is sheer speculation. There is nothing in this record showing what an expert would have said in Petitioner's case. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi, 932 F.2d 643, 650 (6th Cir. 1991)* (footnote omitted).[4]

In sum, Petitioner has failed to show that the court of appeals' determination with regard to this claim is contrary to, or an unreasonable application of, clearly established federal law. Nor has Petitioner demonstrated that the factual determinations upon which the state court's conclusion depends are unreasonable on this record. Accordingly, his claim of ineffective assistance based on counsel's failure to call an expert regarding eyewitness identification is without merit.

C. Failure to challenge the sentence

Finally, Petitioner challenges his trial counsel's effectiveness because counsel failed to challenge Petitioner's sentence based on: (1) the alleged miscalculation of a couple of offense variables; and (2) the constitutionality of determining the minimum sentence range based on facts **[*39]** found by the judge, rather than the jury. The Michigan Court of Appeals refused to consider the issue because Petitioner had failed to develop it in his brief on appeal. (Mich. Ct. App. Op., ECF No. 12-10, PageID.521, n.2) ("[D]efendant has wholly failed to adequately brief and develop a sentencing argument, thereby waiving the issue."). Petitioner's application for leave to appeal in the Michigan Supreme Court merely referred that court to his court of appeals brief; thus, the defect was not remedied when Petitioner presented his issues to the Michigan Supreme Court.

---

[4] *See also Pillette v. Berghuis, 408 F. App'x 873, 887 (6th Cir. 2010)* ("The salient point is that nobody knows what she would have said. Speculation cannot suffice to establish the requisite prejudice.").

2018 U.S. Dist. LEXIS 38159, *39

"If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention — whether in trial, appellate, or habeas proceedings, as state law may require — procedural default will bar federal review." *Magwood v. Patterson, 561 U.S. 320, 340, 130 S. Ct. 2788, 177 L. Ed. 2d 592 (2010)*. To overcome the bar, a petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell, 547 U.S. 518, 536, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)*; *Murray v. Carrier, 477 U.S. 478, 495, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)*; *Hicks, 377 F.3d at 551-52*. The miscarriage-of-justice exception only can be met **[*40]** in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House, 547 U.S. at 536*.

Because Petitioner's issue relates only to sentencing, he is not making a claim of actual innocence based upon new, reliable evidence. Accordingly, he cannot avoid the bar based on the second exception: a fundamental miscarriage of justice. Similarly, Petitioner cannot avoid the bar on the first exception, because he has offered no cause for this failure to brief the issue in the state appellate courts. Even if Petitioner offered an acceptable cause for that failure, however, on this record, he could never establish prejudice.

Petitioner would never be able to show that the result would have been different if his trial counsel had raised the sentencing issues, because the issues were raised in the trial court by appellate counsel, and flatly rejected. After filing the initial notice of appeal, but before briefing in the court of appeals, Petitioner's appellate counsel filed a motion in the trial court to correct Petitioner's sentence based on the arguments he contends trial counsel should have raised. (Mot. & Br., ECF No. 12-10, PageID.532-554.) The trial court reviewed **[*41]** and rejected the factual challenges. (Berrien Cir. Ct. Op., ECF No. 12-10, PageID.555-561.) The trial court reviewed the constitutional challenge; but, was compelled to reject it. (*Id.*) ("The issues decided by *Herron* are currently pending before the Michigan Supreme Court in *People v. Lockridge* . . .; [n]onetheless . . . *Herron* is still binding upon this Court."). Indeed, Petitioner's counsel acknowledged that the state of the law in Michigan at that time did not support his argument. (Mot. Hr'g Tr., ECF No. 12-9, PageID.508) ("I understand the case law is against me . . . .").

The absence of any prejudice prevents Petitioner from overcoming the bar to review raised by his procedural default. It would also foreclose his ineffective assistance claim if the Court were to address the claim on the merits. The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones, 351 F.3d 212, 216 (6th Cir. 2003)* (citing *Lambrix v. Singletary, 520 U.S. 518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997)* ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state **[*42]** law."), and *Nobles v. Johnson, 127 F.3d 409, 423-24 (5th Cir. 1997)* (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also 28 U.S.C. § 2254(b)(2)* ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). The standard for finding prejudice to avoid a procedural default bar is the same as the prejudice standard under *Strickland*. *Carter v. Lafler, No. 17-1409, 2017 WL 4535932, *2 (6th Cir. Aug. 30, 2017)* (citing *Ambrose v. Booker, 684 F.3d 638, 645-49 (6th Cir. 2012))*. Thus, Petitioner's sentencing ineffective assistance claim is procedurally defaulted and meritless.

## Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken. *28 U.S.C. § 2253(c)(1)*. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." *28 U.S.C. § 2253(c)(2)*. The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio, 263 F.3d 466 (6th Cir. 2001)*. Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id. at 467*.

2018 U.S. Dist. LEXIS 38159, *42

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel, 529 U.S. 473, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000)*. Under *Slack*, to warrant a grant of the certificate, "[t]he **[*43]** petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003)*. In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated: February 7, 2018

/s/ Phillip J. Green

PHILLIP J. GREEN

United States Magistrate Judge

---

**End of Document**

# *Weber v. Infinity Broad. Corp.*

United States District Court for the Eastern District of Michigan, Southern Division

December 14, 2005, Decided

Case No. 02-74602

**Reporter**

2005 U.S. Dist. LEXIS 40724 *; 98 Fair Empl. Prac. Cas. (BNA) 523; 17 Am. Disabilities Cas. (BNA) 804

ERIN C.WEBER, Plaintiff, vs. INFINITY BROADCASTING CORP. et al., Defendants.

**Prior History:** *Weber v. Infinity Broad. Corp., 2005 U.S. Dist. LEXIS 61921 ( E.D. Mich., Jan. 10, 2005)*

## Core Terms

damages, defendants', host, perfume, new trial, accommodation, disability, gender, allergy, retaliation, punitive damages, matter of law, morning, costs, cap, remittitur, emotional, midday, salary, juror, non-economic, award damages, compensatory, distress, midnight, reasons, station, Rights, motion for attorney fees, mental anguish

## LexisNexis® Headnotes

Labor & Employment Law > ... > Disability Discrimination > Defenses > General Overview

*HN1*[⬇] **Disability Discrimination, Defenses**

The Michigan Persons with Disabilities Civil Rights Act requires employees to request accommodations in writing, *Mich. Comp. Laws § 37.1210(18)*, but the statute also requires employers to give notice of this requirement. *Mich. Comp. Laws § 37.1210(19)*. The statute expressly conditions an employer's ability to invoke subsection 18 on its own compliance with subsection 19. *Mich. Comp. Laws § 37.1606(5)*.

Labor & Employment Law > ... > Equal Pay > Equal Pay Act > General Overview

*HN2*[⬇] **Equal Pay, Equal Pay Act**

The Equal Pay Act (EPA) provides that an employer shall not pay wages to employees of one gender less than it pays to employees of the opposite gender for work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. *29 U.S.C.S. § 206(d)(1)*. It is not a statutory violation to pay different wage rates if the differential is "based on any factor other than sex." *29 U.S.C.S. § 206(d)(1)*. The essence of an EPA claim is that two jobs are equal, but that different wages are paid to men and to women. The focus of any EPA analysis must be on the nature of the jobs themselves, not the ability or performance of the individuals holding the jobs.

Labor & Employment Law > ... > Equal Pay > Equal Pay Act > Defenses

*HN3*[⬇] **Equal Pay Act, Defenses**

There are many permissible factors, other than gender, which justify a wage differential and do not violate the Equal Pay Act.

Labor & Employment Law > ... > Equal Pay > Equal Pay Act > Defenses

*HN4*[⬇] **Equal Pay Act, Defenses**

The fact that prior salaries were higher is a permissible consideration in an action under the Equal Pay Act.

Labor & Employment Law > ... > Equal Pay > Equal Pay Act > Defenses

*HN5*[⬇] **Equal Pay Act, Defenses**

That each employee's salary was negotiated and determined individually is a permissible factor other than gender for purposes of the Equal Pay Act.

Civil Procedure > ... > Relief From Judgments > Additur & Remittitur > Remittiturs

*HN6*[⬇] **Additur & Remittitur, Remittiturs**

Under Michigan law, in determining whether remittitur is proper, the courts inquire as to: (1) whether the verdict "shocks the judicial conscience"; (2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. As an alternative to granting a new trial, the court may grant a remittitur when "the award clearly exceeds the amount which, under the evidence in the case, was the maximum that a jury could reasonably find to be compensatory" for the plaintiff's loss.

Civil Procedure > Remedies > Damages > Compensatory Damages

*HN7*[⬇] **Damages, Compensatory Damages**

The United States Court of Appeals for the Sixth Circuit has held that damages for mental and emotional distress will not be presumed, and must be proven by "competent evidence." However, emotional injury may be proved without medical support. A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard.

Civil Procedure > Remedies > Damages > General Overview

*HN8*[⬇] **Remedies, Damages**

A jury award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake. A verdict may be deemed excessive only when the amount awarded is greater than the highest amount the evidence will support.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Rights Law > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > Remedies

*HN9*[⬇] **Damages, Punitive Damages**

By statute, a jury may award punitive damages in a discrimination case if the complaining party demonstrates that the respondent engaged in a discriminatory practice with malice or with reckless indifference to her federally protected rights. *42 U.S.C.S. § 1981a(b)(1)*. The terms "malice" and "reckless indifference" pertain not to the employer's awareness that it is engaging in discrimination, but to its knowledge that it may be acting in violation of federal law. This standard requires a plaintiff to prove more than merely intentional discrimination.

Civil Procedure > Remedies > Damages > Punitive Damages

Civil Rights Law > General Overview

*HN10*[⬇] **Damages, Punitive Damages**

In the Sixth Circuit, the imposition of punitive damages in civil rights actions has generally been limited to cases involving egregious conduct or a showing of willfulness and malice on the part of the defendant.

Civil Procedure > Remedies > Damages > Compensatory Damages

Civil Rights Law > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > Remedies

Civil Procedure > Remedies > Damages > Punitive Damages

*HN11*[⬇] **Damages, Compensatory Damages**

The statutory cap imposed by *42 U.S.C.S. § 1981a(b)(3)* on compensatory and punitive damages serves as a benchmark of appropriate damages for a court in a case where the plaintiff did not adequately mitigate her damages.

Civil Procedure > Remedies > Damages > Compensatory Damages

Civil Rights Law > General Overview

Labor & Employment Law > Discrimination > Disparate Treatment > Remedies

Civil Procedure > Remedies > Damages > Punitive Damages

*HN12*[⬇] **Damages, Compensatory Damages**

2005 U.S. Dist. LEXIS 40724, *40724

Under the plain language of the _42 U.S.C.S. § 1981a_, the cap on damages applies to each complaining party in an "action." An "action" is simply a lawsuit brought in court. Put simply, the _§ 1981a_ caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise.

      Civil Procedure > Remedies > Damages > Compensatory Damages

      Civil Rights Law > General Overview

      Labor & Employment Law > Discrimination > Disparate Treatment > Remedies

      Civil Procedure > Remedies > Damages > Punitive Damages

_HN13_[⬇] **Damages, Compensatory Damages**

The limitation in _42 U.S.C.S. § 1981a(b)(3)_ applies to the sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section. The limitation does not apply to backpay. _42 U.S.C.S. § 1981a(b)(2)_.

      Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

_HN14_[⬇] **Relief From Judgments, Motions for New Trials**

The United States Court of Appeals for the Sixth Circuit has interpreted _Fed. R. Civ. P. 59(a)_ as allowing for a new trial when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias.

      Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

_HN15_[⬇] **Relief From Judgments, Motions for New Trials**

A motion under _Fed. R. Civ. P. 59_ is an appropriate means to challenge the size of the verdict. The Court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not to limit the Court's power. It may also grant a new trial if the size of the verdict is against the weight of the evidence.

      Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

_HN16_[⬇] **Relief From Judgments, Motions for New Trials**

In federal cases, whether to grant or deny a motion for new trial is committed to the sound discretion of the trial court.

      Civil Procedure > ... > Jury Trials > Verdicts > Inconsistent Verdicts

**HN17**[⬇] **Verdicts, Inconsistent Verdicts**

When faced with a claim that a verdict is inconsistent, a federal court must look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case.

Civil Procedure > ... > Jury Trials > Jurors > Removal

**HN18**[⬇] **Jurors, Removal**

*Fed. R. Civ. P. 47* permits a court to dismiss a juror for "good cause."

Civil Procedure > ... > Jury Trials > Jurors > Removal

**HN19**[⬇] **Jurors, Removal**

A court's decision to dismiss a juror will not be grounds for reversal unless an abuse of discretion has been committed.

Civil Procedure > ... > Jury Trials > Jurors > Removal

**HN20**[⬇] **Jurors, Removal**

Courts routinely uphold the dismissal of jurors for medical reasons.

**Counsel:** **[*1]** For Erin C. Weber, Plaintiff: Gregory G. Garre, Hogan & Hartson (Washington), Washington, DC; Raymond J. Sterling, Driggers, Schultz, Troy, MI.

For Infinity Broadcasting Corporation, Infinity Broadcasting Corporation of Michigan, Defendants: Daniel B. Tukel, Butzel Long (Detroit), Detroit, MI.

**Judges:** George Caram Steeh, UNITED STATES DISTRICT JUDGE.

**Opinion by:** George Caram Steeh

# Opinion

ORDER GRANTING IN PART DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW [116], GRANTING DEFENDANTS' MOTION FOR REMITTITUR AND DENYING DEFENDANTS' MOTION FOR NEW TRIAL [117], AND GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES AND COSTS WITH THE AMOUNT OF SUCH FEES AND COSTS TO BE DETERMINED [114]

Plaintiff, Erin Weber, was hired as the midday host for defendants' WYCD radio station in Detroit in 1999. Plaintiff was successful, and her show highly rated. Frustrated with the station's refusal to move her to the morning slot when it opened, and frustrated because she was paid less than the male hosts of the morning and afternoon shows, she filed a charge of discrimination with the EEOC for violation of Title VII in 2001. Plaintiff's salary at the time of her discharge was $ 66,000 a year, while male **[*2]** hosts in other time slots were making $ 100,000 to $ 200,000.

Plaintiff had no allergies to perfume before she was hired by WYCD. In 1999, plaintiff had to work a shift in a studio where there had been an accidental spill of chemicals. Plaintiff suffered chemical burns to her airways and sinuses, and testified that she developed a heightened sensitivity to related chemicals. Based on her patient history, plaintiff was initially diagnosed with an allergy to certain chemicals, including various perfumes. One of plaintiff's co-workers, Linda Bullard, wore a perfume which, according to plaintiff, triggered plaintiff's allergic condition. Plaintiff and her physicians requested that accommodations be made to ensure that plaintiff not be exposed to Ms. Bullard's perfume. In response, the station manager, Ms. Maureen Lesourd, directed Ms. Bullard, on threat of discharge, not to wear the offending perfume, Tresor by Lancome. Ms. Bullard herself testified that she never again wore the perfume to work. Nevertheless, plaintiff testified she was exposed to Ms. Bullard's perfume which resulted in a three month leave after an October 2000 exposure, and a two week leave after a June 2001 exposure. **[*3]** Following a medical leave due to a claimed third exposure in September 2001, plaintiff was terminated for allegedly failing to perform production tasks.

Plaintiff has been unable to find work in the country radio industry, asserting it is due to the fact that defendants own virtually every major-market country music station in the United States. Plaintiff brought her lawsuit, which was tried on counts of gender discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act ("MELCRA"), *MCL 37.2101*; disability discrimination in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12102*; disability discrimination in violation of the Michigan Persons with Disabilities Civil Rights Act ("MPDCRA"), *MCL 37.1101*; retaliation in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-3(a)*; retaliation in violation of the Elliott-Larsen Civil Rights Act, *MCL 37.2701 (a)*; violation of the Equal Pay Act ("EPA"), *29 U.S.C. §206(d)(1)*; and retaliation in violation of the Family Medical Leave Act ("FMLA"), **[*4]** *29 U.S.C. § 2615*.

The jury found in favor of plaintiff on her claims of disability discrimination, violation of the EPA, and retaliation. The jury awarded plaintiff $ 514,000 for past economic damages; $ 1,078,000 for future economic damages; $ 2,000,000 for past and future non-economic damages: and $ 7,000,000 for punitive damages under the federal retaliation and federal disability discrimination claims.

Defendants brought post-trial motions for judgment as a matter of law and new trial and/or remittitur. For the reasons stated below, the court grants in part defendants' motion for judgment as a matter of law, grants defendants' motion for remittitur and denies defendants' motion for new trial, and grants plaintiff's motion for attorney fees and costs, with the amounts of such fees and costs to be determined at a later date.

I. Judgment as a Matter of Law

As plaintiff points out, defendants moved for a directed verdict on certain issues after the close of plaintiff's proofs, but did not timely renew their motion after the close of all proofs. This failure on the part of defendants was not due to a lack of effort on their part, but rather due to **[*5]** a direction from the court. The court took defendants' first motion under advisement, and when defendants indicated an intention to renew their motion, the court instructed them to wait until the jury had been given the case. Under these circumstances, defendants will not be penalized for a technical deviation from *Rule 50(b)*'s procedure. See *United States v. Medshares Management Group, Inc., 400 F.3d 428, 447-49 (6th Cir. 2005)*.

Defendants are, however, constrained by the issues raised in their oral *Rule 50* motions. In this case, defendants argued on the record only that there was inadequate evidence on plaintiff's gender discrimination claim and Equal Pay Act claim, and that plaintiff failed to support her disability claim based on failure to accommodate in that her request for accommodation was not in writing and the midnight position was not vacant and available.

The court believes that there is some merit to several of defendants' current arguments for judgment as a matter of law. However, many of these arguments have been waived in a motion after the presentation of all of the proofs. *Gutzwiller v. Fenik, 860 F.2d 1317, 1330 (6th Cir. 1988).* **[*6]** The court has reviewed the evidence in a light most favorable to plaintiff, and, in particular, recognizes serious problems for plaintiff in supporting her claim that she has a perfume allergy. While plaintiff was initially diagnosed with a perfume allergy, plaintiff's ENT specialists, Dr. Schwartzenfeld and Dr. Mohr, were unable to say with reasonable medical

certainty that her symptoms were caused by an allergy, and testified at trial that they believed her problems were likely the result of a form of acid reflux disease. The specialists recommended further testing to refine their diagnosis, however plaintiff did not follow this recommendation and did not pursue testing or treatment for acid reflux. The only evidence that supports a conclusion that plaintiff suffered from a perfume allergy is plaintiff's own testimony, and of course her counsel's argument. The weight of the evidence does not clearly support a finding of a perfume allergy.

Moreover, there are several reasons that plaintiff's perceived allergy does not constitute a disability. In addition to plaintiff's impairment being too intermittent to constitute a disability, it appears to the court that an impairment of her **[*7]** "radio voice" likely does not qualify as a "major life activity," whereas the ability to speak in a standard environment would so qualify. See, _Ross v. GTE Directories Corp., 73 F.Supp.2d 1342 (M.D. Fla. 1999)_, _Crawley v. Runyon, 1998 U.S. Dist. LEXIS 9603, 1998 WL 355529 (E.D. Pa. June 30, 1998)_. Furthermore, for working to be considered a major life activity, the plaintiff must be unable to work in a broad class of jobs. _Sutton v. United Airlines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)_. However, the fact that this court might believe defendants have a valid argument that plaintiff lacks sufficient evidence to prove she had a perfume allergy, or that such allergy qualifies as a disability under state or federal law, is of little consequence where defendants have waived such arguments by failing to raise them at the appropriate time. The court will therefore address only those arguments properly preserved by defendants.

A. Accommodation

1. Request to Accommodate Must be in Writing

**HN1**[⬆] ] The PWDCRA requires employees to request accommodations in writing, _MCL 37.1210(18)_, but the statute also requires employers to give notice of this requirement. **[*8]** _MCL 37.1210(19)_. The statute expressly conditions an employer's ability to invoke subsection 18 on its own compliance with subsection 19. _MCL 37.1606(5)_. There is no indication that defendants complied with subsection 19 in this case.

Moreover, plaintiff did request accommodations in writing, and defendants' own evidence indicated that they construed the note from plaintiff's doctor as a written request for accommodation. Plaintiff's Exhibit 93 is a physician letter stating that plaintiff should not be exposed to Ms. Bullard's perfume. Plaintiff's Exhibit 92 is a letter from plaintiff to Ms. Maureen Lesourd stating that "the Doctor also specifies that for me to return to work, [Ms. Bullard] needs to be kept away". Plaintiff's Exhibit 103 is an e-mail from plaintiff to Lesourd and Lisa Rodman stating that "my doctor has told me - and informed you both in writing - that reexposure [sic] risks me loosing [sic] my voice again for even longer than the last time - and perhaps for a lifetime." Finally, a memorandum from Lesourd to plaintiff notes that defendants "have been accommodating your request for limiting your work duties as **[*9]** your doctor's note of February 21, 2001 requests." There is ample evidence that plaintiff's request for accommodation was in writing for the issue to have gone to the jury.

2. Duty to Accommodate

Defendants argue that there was no duty to accommodate plaintiff by moving her to the midnight shift because there was no vacant position. Ron Brand had been the host of the midnight shift. Ron Chatman testified that when Brand was removed, Chatman took over the shift, and remains there today. Plaintiff argues that they offered her the midnight shift, so it must have been vacant. Also, because the nature of radio is that there cannot be dead air, it was defendants' practice to fill vacancies with temporary hosts while searching for a full-time replacement. Accepting plaintiff's testimony on this issue, there was a factual issue created with respect to the existence of a vacancy on the midnight shift and the jury was permitted to resolve it in plaintiff's favor.

B. Equal Pay Act

**HN2**[⬆] ] The EPA provides that an employer shall not pay wages to employees of one gender less than it pays to employees of the opposite gender for work on jobs "the performance of which requires equal skill, effort, **[*10]** and responsibility, and which are performed under similar working conditions." _29 U.S.C. § 206(d)(1)_. It is not a statutory violation to pay different wage rates if the differential is "based on any factor other than sex." Id. The essence of an

EPA claim is that two jobs are equal, but that different wages are paid to men and to women. The focus of any EPA analysis must be on the nature of the jobs themselves, not the ability or performance of the individuals holding the jobs.

In this case, plaintiff was host of the midday show, and she is comparing herself to men who hosted the morning and afternoon positions. When comparing the specifics of the jobs, one might conclude that they should be paid the same because both jobs require the same skills. Perhaps the midday host should even be paid more for doing a one-person show. However, there was significant testimony regarding the difference between the shows themselves. The morning show is an ensemble show, which was faster paced, with more entertainment and less music. Ron Chatman testified that the morning show plays far fewer songs per hour than midday, and that midday is more music and less entertainment [*11] driven. The midday show is so music oriented that the host actually speaks on-air for less than 10 minutes in a given hour, and the show averages 13 songs per hour. The morning show averages 8 songs per hour.

There was substantial evidence that it is industry practice for hosts of morning and afternoon shows to be paid more than hosts of midday shows. There was uncontroverted testimony from Maureen Lesourd and Lisa Rodman that a female, Karen Delassandro, was offered the position as host of the morning show, with a six-figure salary.

When you compare plaintiff's salary to the people in her exact position, she was the highest paid midday host. She was paid more than the female who preceded her, and more than the male who succeeded her. In addition, plaintiff was paid more than Brian Hatfield, host of the evening show, and Ron Brand, host of the midnight show. Hosts of shows with different formats - which aired at different times of the day and which were of different lengths - and who were coming from a variety of backgrounds, experiences and bargaining positions, were each paid a different wage. Plaintiff admitted that she asked to be paid $ 75,000 when hired, was actually paid $ [*12] 64,000 when she was hired, and is comparing herself to men who were paid $ 200,000. Even if defendants had paid plaintiff exactly what she requested, they still would have been in violation of the EPA according to plaintiff's claim.

*HN3*[⬆] There are many permissible factors, other than gender, which justify a wage differential and do not violate the EPA. See, e.g., *Horner v. Mary Institute, 613 F.2d 706, 714 (8th Cir. 1980)* (paying a higher salary to a male employee because his "experience and ability made him the best person available for the job and because a higher salary was necessary to hire him," was a permissible factor other than gender); *Walter v. KFGO Radio, 518 F.Supp. 1309, 1318 (D.N.D. 1981)* (education, experience, and marketplace value of an individual's skills are permissible factors other than gender); *Wachter-Young v. Ohio Cas. Group, 236 F.Supp. 2d 1157 (D. Or. 2002)* (consideration of prior salaries is an acceptable business purpose which constitutes a factor "other than sex" for EPA purposes).

In this case there was compelling evidence that factors other than gender justified a wage differential, including Chuck Edwards [*13] coming from Dallas to Detroit and his 10 consecutive years of hosting the #1 rated afternoon show in the #1 country market in the nation; and Kevin O'Neill's significant prior experience in Detroit and his having previously teamed with one of the employees who was already part of the WYCD morning drive show. *HN4*[⬆] The fact that prior salaries were higher is also a permissible consideration. *Engelmann v. National Broadcasting Co., 1996 U.S. Dist. LEXIS 1865 (S.D.N.Y. 1996)*. The testimony at trial was *HN5*[⬆] that each host's salary was negotiated and determined individually, which is another permissible factor other than gender. *E.E.O.C. v. Louisiana Network, 809 F.Supp. 1210, 1228 (M.D. La. 1992)*. Chuck Edwards' testimony was that he was able to renegotiate his contract after receiving an offer from a station in Arizona. Negotiation is a permissible factor other than gender to consider in determining wages. *Id.*

There was insufficient evidence to submit to the jury as to whether there was an EPA violation, and there was insufficient evidence for the jury to conclude that the shows were equal, or that any pay differentials were because of gender. There could [*14] be no violation of the EPA, and defendants are entitled to judgment as a matter of law.

II. Remittitur

A. Legal Standard

_HN6_[⬆] Under Michigan law, in determining whether remittitur is proper, the courts inquire as to: (1) whether the verdict "shocks the judicial conscience"; (2) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (3) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (4) whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions." _Palenkas v. Beaumont Hospital, 432 Mich. 527, 443 N.W.2d 354_; _432 Mich. 527, 443 N.W.2d 354 (1989)_. As an alternative to granting a new trial, the court may grant a remittitur when "the award clearly exceeds the amount which, under the evidence in the case, was the maximum that a jury could reasonably find to be compensatory" for the plaintiff's loss. _Bickel v. Korean Air Lines, Co., Ltd.,_ 96 F.3d 151, 156 (6th Cir. 1996).

B. Analysis

1. Non-Economic Damages

The jury awarded $ 2,000,000 **[*15]** for non-economic damages for mental anguish and emotional damages. _HN7_[⬆] The Sixth Circuit has held:

> Damages for mental and emotional distress will not be presumed, and must be proven by "competent evidence." However, emotional injury may be proved without medical support. A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard.

_Moorer v. Baptist Memorial Health Care System, 398 F.3d 469, 486 (6th Cir. 2005)_. _HN8_[⬆] A jury "award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." _Gregory v. Shelby County, 220 F.3d 433, 443 (6th Cir. 2000)_. A verdict may be deemed excessive only when the "amount awarded is greater than 'the highest amount the evidence will support.'" _Palenkas, 432 Mich. App. at 531 (1989)_.

Plaintiff's non-economic damages case was based on her testimony that she suffered emotional trauma and mental anguish as a result of being effectively barred from the career that had been her passion for 25 years. Plaintiff testified that her job **[*16]** was a major part of her identity and pride. Losing her job and the ability to be employed elsewhere in the industry radically altered her financial situation, placing stress on her family life, and causing her to worry about losing her home.

The only evidence introduced at trial regarding the mental anguish and emotional distress suffered by plaintiff consisted of plaintiff's own testimony. Plaintiff's testimony was not corroborated by anybody who would have been in a position to confirm how the loss of her job and the way she was treated by defendants affected plaintiff. Plaintiff conceded at her deposition, at trial, and in her answers to interrogatories, that she did not seek or require any treatment for mental or emotional distress resulting from defendants' actions, nor did she take any medication for any such distress.

Plaintiff relies on the case of _Olsen v. Toyota Technical Center, 2002 Mich. App. LEXIS 2323, No. 229543, 2002 WL 31958183 (Mich. Ct. App. Dec. 27, 2002)_, wherein the court upheld an award of mental distress damages of $ 5 million. The plaintiff in Olsen was terminated after he began missing work due to a disability suffered on the job. Olsen re-injured his back as **[*17]** a result of his employer's refusal to comply with work restrictions and repeated requests for assistance. Olsen needed surgery, was in constant pain, and was basically incapacitated by his injuries. The testimony was that Olsen was unable to sleep, was unable to engage in leisure activities which he had previously enjoyed, and was unable to engage in intimate marital relations. His typical day "consisted of efforts to find some comfort, usually sitting in a special reclining chair designed for people with back injuries or lying in bed." _Id. at 4-5._

In Olsen, the plaintiff experienced disabling physical injuries as a result of his employer repeatedly ignoring work restrictions. In affirming the damage award, the Michigan Court of Appeals referred to "the jury's five million dollar award for pain and suffering damages." _Id. at 9_. The court did not refer to the non-economic damages as being for non-physical mental anguish damages, as plaintiff is arguing here.

In contrast to the facts of _Olsen,_ plaintiff testified that she is able and willing to work. Plaintiff has not undergone surgery for her disability, nor was she in constant, unrelenting pain comparable to that **[\*18]** suffered by the plaintiff in _Olsen._ Plaintiff is able to engage in physical activities - even during episodes of voice strain and throat pain - including going to movies, out to dinner, shopping with friends, and taking a ski weekend with her husband.

_Olsen_ does not provide support for the non-economic damages awarded in this case. There is a lack of supporting testimony or corroboration in this case, even from plaintiff's husband. Plaintiff testified that she has never consulted or treated with any psychiatrist, psychologist or mental health care professional, and that she never felt the need to do so. She admitted that none of her treating physicians ever recommended that she consult with a mental health care provider. Plaintiff has never been prescribed any medications for stress, nerves or depression. Plaintiff admitted that for lengthy periods of time, up to several years at a time, she never even treated with an ENT for the allergy condition that she insists is life threatening. In addition to not pursuing treatment of her perfume allergy, plaintiff did not pursue the diagnosis of reflux. Not even plaintiff's own testimony claims damages of the extent that would support **[\*19]** a $ 2 million verdict.

The evidence and circumstances of this case do not support an award of mental distress damages in the amount of $ 2,000,000. The Court will remit in accordance with the cap provided in _42 U.S.C. § 1981a(b)(3),_ as described below.

### 2. Punitive Damages

_HN9_[↑] By statute, a jury may award punitive damages in a discrimination case "if the complaining party demonstrates that the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to [her] federally protected rights." _42 U.S.C. § 1981a(b)(1)._ "The terms 'malice' and 'reckless indifference' pertain not to the employer's awareness that it is engaging in discrimination, but to its knowledge that it may be acting in violation of federal law." _Kolstad v. American Dental Assoc., 527 U.S. 526, 527, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999)._ "This standard requires a plaintiff to prove more than merely intentional discrimination." _White v. Burlington Northern & Santa Fe Railway Co., 364 F.3d 789, 808 (6th Cir. 2004)._ _HN10_[↑] In the Sixth Circuit, "the imposition of punitive damages in civil rights actions has generally been limited to cases **[\*20]** involving egregious conduct or a showing of willfulness and malice on the part of the defendant." _Beauford v. Sisters of Mercy-Province of Detroit, 816 F.2d 1104, 1109 (6th Cir. 1987)._

Plaintiff argues that there is sufficient evidence of malice where defendants retaliated against her for filing a complaint with the EEOC. Indeed, defendants fired plaintiff just days after the EEOC dismissed plaintiff's charge of discrimination because the evidence did not establish a violation of the statute. Because the defendants were essentially vindicated by the EEOC's closing of plaintiff's case without finding any violations of federal law, this is not strong evidence that defendants discriminated in the face of a perceived risk that their actions violated federal law. Still, the jury could have inferred malice from the timing of plaintiff's termination, and defendants have not challenged the jury's retaliation verdict. See, _EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 514 (6th Cir. 2001)._

It is fair to say that the defendants were tired of dealing with plaintiff's demands for accommodation and her absences from work. Maureen Lesourd testified she believed **[\*21]** plaintiff was lying about her claims of reexposure to Linda Bullard's perfume. It is not impossible, however, for a reasonable fact finder to conclude that defendants were motivated in part by retaliation for plaintiff filing an EEOC charge. However, even this evidence of animus is not strong enough to support the excessive punitive verdict awarded by the jury. Accordingly, the Court will remit the punitive damage award.

### 3. Statutory Cap on Compensatory and Punitive Damages

Plaintiff contends that the statutory cap set forth in _42 U.S.C. § 1981a(b)(3)_ is an affirmative defense which has been waived because it was not affirmatively pled. Defendant cites the court to cases from other jurisdictions which have held that the precise statutory cap at issue here is not an affirmative defense. See, _Oliver v. Cole Gift Centers, Inc., 85 F.Supp.2d 109, 112 (D. Conn. 2000); Peckinpaugh v. Post-Newsweek Stations, 1999 U.S. Dist. LEXIS_

*21289 (D. Conn. 1999)*; *Paris v. Dallas Airmotive, 2001 U.S. Dist. LEXIS 10772 (N.D. Tx. 2001)*. The <u>Oliver</u> court rejected the argument made by plaintiff:

> No plaintiff claiming **[*22]** damages under Title VII can complain of unfair surprise, prejudice, or lack of opportunity to respond when confronted with the CDA's [*Compensatory Damages Amendment*] limitation of damages, because the limitation is part of the same statutory scheme under which the plaintiff has brought his or her claim.

*Oliver, 85 F.Supp.2d at 112*. While the Court finds the reasoning of <u>Oliver</u> persuasive in holding that the statutory cap in *§ 1981* a is not an affirmative defense which is waived if not affirmatively pled, it is unnecessary to reach that conclusion in this case because the damages awarded so clearly exceed the amount supported by the evidence. **HN11**[⬆] The cap serves as a benchmark of appropriate damages for the Court in this case where plaintiff did not adequately mitigate her damages. Plaintiff admittedly failed to pursue testing to rule out acid reflux. She testified that she applied only to country music stations, and did not pursue any other type of work, including other formats in the radio industry. The court must also consider that defendants had legitimate, as well as illegitimate, reasons to act as it did. The Court views the cap, which is the legislature's **[*23]** opinion as to an appropriate upper figure for damages in a federal discrimination case, as a fair guideline for limiting damages awarded in this case for violations of both federal and state law.

Plaintiff argues that even if compensatory and punitive damages are capped at $ 300,000, she is entitled to $ 300,000 under the Title VII retaliation claim and an additional $ 300,000 under her ADA claim. The Sixth Circuit has conclusively decided this issue contrary to plaintiff's argument:

> **HN12**[⬆] Under the plain language of the statute, the cap on . . . damages applies to each complaining party in an "action". An "action" is simply a "lawsuit brought in court" . . . . Put simply, the *§ 1981* a caps apply to each party in an action, not to each claim, and there is nothing in the language of the statute to indicate otherwise.

*Hudson v. Reno, 130 F.3d 1193, 1200 (6th Cir. 1997)*.

**HN13**[⬆] The limitation in *§ 1981a(b)(3)* applies to "the sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive **[*24]** damages awarded under this section". The limitation does not apply to backpay. *§ 1981a(b)(2)*. The Court is guided by *§ 1981a(b)(3)* in this case and remits the sum of future economic damages [1], non-economic damages and punitive damages awarded to a total of $ 300,000. Defendants did not move to remit the jury's past economic damage award of $ 514,000, which the Court hereby affirms.

III. <u>New Trial</u>

Defendants alternatively move for a new trial for the reasons that the jury's verdict was inherently inconsistent and against the weight of evidence and erroneous, **[*25]** because of various procedural irregularities during deliberations, and because the award was excessive and beyond the range supported by the evidence.

A. <u>Legal Standard</u>

**HN14**[⬆] The Sixth Circuit has interpreted *Fed.R.Civ.P. 59(a)* as allowing for a new trial "when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings

---

[1] The Court seriously considered remitting future economic damages to zero, given that plaintiff was admittedly not under an employment contract and was an employee at will. Testimony from Maureen Lesourd also established that company practice provided no job security based on performance. The top paid, top performing artist, Chuck Edwards, himself had been let go when the company was unwilling to meet his pay demands at the time of contract renewal.

being influenced by prejudice or bias." *Meyers v. Wal-Mart Stores, East, Inc., 77 F. Supp. 2d 826, 828 (E.D. Mich. 1999)*, aff'd, *257 F.3d 625 (6th Cir. 2001)*.

*HN15*[↑] A motion under *Rule 59* is an appropriate means to challenge the size of the verdict. The Court always may grant relief if the verdict is excessive or inadequate as a matter of law, but this is not to limit the Court's power. It may also grant a new trial if the size of the verdict is against the weight of the evidence.

*Edwards v. Flagstar Bank, 109 F.Supp.2d 691, 695 (E.D. Mich. 2000)*, aff'd in part, rev'd in part on other [*26] grounds, *295 F.3d 565 (6th Cir. 2002)*. *HN16*[↑] Whether to grant or deny a motion for new trial is "committed to the sound discretion of the trial court." Id.

B. Analysis

1. Jury's Verdict Inherently Inconsistent

Defendants argue an inconsistency in the jury's verdict concerning the issue of gender discrimination. In response to Question 1 of the Special Verdict Form, the jury concluded that defendants did not discriminate against plaintiff on the basis of her gender. Defendants allege this is inconsistent with the response to Question 2, finding that defendants did discriminate against plaintiff in violation of the Equal Pay Act. *HN17*[↑] "When faced with a claim that a verdict is inconsistent," courts must "look for a reasonable way to read the answers to interrogatories as expressing a coherent and reasonable view of the case." *Morales v. American Honda Motor Co., 151 F.3d 500, 509 (6th Cir. 1998)*. This issue has become moot because the Court granted judgment as a matter of law on plaintiff's EPA claim.

2. Procedural Irregularities During Deliberations

Defendants object to the dismissal of Juror #4 for an alleged "medical emergency" after seven [*27] days of contentious deliberations and at least two notes from the jury expressing that it was deadlocked. *HN18*[↑] *Fed. R. Civ. P. 47* permits the court to dismiss a juror for "good cause." Defendants argue that the dismissal of Juror #4 had the *de facto* effect of eliminating a lone hold-out, and that the juror was dismissed prior to defendants placing an objection on the record. In addition, the juror was dismissed without any consultation with counsel, as was past practice in this case. Defendants seeks an order granting a new trial for these reasons.

*HN19*[↑] A court's decision to dismiss a juror "will not be grounds for reversal unless an abuse of discretion has been committed." *United States v. Brown, 571 F.2d 980, 985 (6th Cir. 1978)*. The record should be clear that Juror #4 was dismissed because of a medical problem, not because she was a hold-out. *HN20*[↑] Courts routinely uphold the dismissal of jurors for medical reasons. Defendants' motion to grant a new trial for procedural irregularities during deliberations is denied.

3. Excessive verdict

There are many reasons to seriously consider setting aside the verdict in this case, and after [*28] careful consideration, this Court came close to doing just that. The size of the verdict, especially for punitive damages, is telling evidence that the jury in this case was inflamed. It is unclear whether the jury's prejudice was a result of the passion with which plaintiff's counsel tried the case, the peculiar composition of the all female jury, the defendants' failure to pursue arguments which would have obliterated many of plaintiff's claims, or defendants' failure to focus sufficient attention to the damages issues in the case. However, there is sufficient evidence to support the jury's finding of retaliation, and any unfairness arising from the jury's emotion can be cured through remittitur. The Court, therefore, denies defendants' alternative motion for new trial.

IV. Plaintiff's Motion for Attorney Fees and Costs

Plaintiff's counsel seeks an award of attorney fees as the prevailing party in the amount of $ 411,987.50, through May 31, 2005. In addition, plaintiff's counsel seeks a 50% enhancement due to the quality of legal services provided, the results achieved, and the contingent nature of the work. Finally, plaintiff's counsel seeks $ 11,303.73 to be reimbursed as [*29] costs expended in the case.

Defendants oppose plaintiff's counsel's motion, and the Court finds many of defendants' challenges to be without merit. For example, defendants' argument that plaintiff's counsel's fees should be reduced because plaintiff failed to prevail on all of her claims is not meritorious. Likewise, plaintiff's counsel's claim for an enhancement of his attorney fees is not compelling.

Defendants attack the reasonableness of many of plaintiff's counsel's submissions of hourly records. The Court will need to hold a hearing to determine the reasonableness of hours expended. The same goes for defendants' objections to the recovery of certain costs. At this time, the Court grants plaintiff's motion for attorney fees and costs, with the exact amount to be determined at a later date.

V. Conclusion

Defendants' motion for judgment as a matter of law is granted as to plaintiff's Equal Pay Act claim. Defendants' motion for remittitur is granted as to compensatory and punitive damages, which are remitted to $ 300,000. Plaintiff is entitled to recover $ 514,000 for past economic damages and $ 300,000 for compensatory and punitive damages, for a total of $ 814,000. **[*30]** Defendants' motion for new trial is denied. Plaintiff's motion for attorney fees and costs is granted, with the exact amount of recovery to be determined by the Court at a later date.

s/George Caram Steeh

UNITED STATES DISTRICT JUDGE

Dated: December 14, 2005

---

**End of Document**